**No. 25-1550**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

NOVARTIS AG; NOVARTIS PHARMACEUTICALS CORPORATION,

*Plaintiffs-Appellees*,

v.

NOVADOZ PHARMACEUTICALS LLC; MSN PHARMACEUTICALS INC.;
MSN LABORATORIES PRIVATE LIMITED,

*Defendants-Appellants*.

Appeal from the United States District Court for the District of New Jersey,
No. 2:25-cv-00849, Hon. Evelyn Padin

## APPELLEES' EXPEDITED MOTION FOR STAY PENDING APPEAL
## TO RESTORE THE DISTRICT COURT'S PRELIMINARY INJUNCTION

MEGAN K. BANNIGAN
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001

ZACH ZHENHE TAN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.:  (202) 887-8740
DMaynard@mofo.com

*Counsel for Plaintiffs-Appellees Novartis AG and
Novartis Pharmaceuticals Corporation*

MAY 28, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... ii

INTRODUCTION ............................................................... 1

BACKGROUND ................................................................ 2

    A.    Novartis Invested Substantial Resources Developing ENTRESTO® and Establishing Trade Dresses the Public Trusts and Relies On ............................................................ 2

    B.    MSN Copied Novartis's Trade Dresses ................................ 6

    C.    The District Court Preliminarily Enjoined MSN's "Strikingly Similar" Products ....................................................... 7

    D.    Second Guessing Itself, the District Court Stayed Its Own Injunction, Potentially Allowing MSN to Destroy the Status Quo ................................................................... 9

ARGUMENT ................................................................. 11

I.    NOVARTIS WILL LIKELY SUCCEED IN DEFENDING THE DISTRICT COURT'S PRELIMINARY INJUNCTION .......................... 12

    A.    Novartis Established Likely Success on Trade Dress Infringement ........................................................ 12

        1.    Under a correct application of the law, the record amply supports the district court's finding of nonfunctionality .......... 12

        2.    The district court's stay decision second guessing nonfunctionality misapplied governing law ............................ 15

    B.    Novartis Established Irreparable Harm ............................... 22

II.    THE EQUITIES AND PUBLIC INTEREST FAVOR PROTECTING THE STATUS QUO ...................................................... 25

CONCLUSION ............................................................... 27

# TABLE OF AUTHORITIES

## Cases

*A. Phillip Randolph Inst. v. Husted*,
   907 F.3d 913 (6th Cir. 2018) ...............................................................11

*Am. Greetings Corp. v. Dan-Dee Imports, Inc.*,
   807 F.2d 1136 (3d Cir. 1986) ...............................................................17

*Boynes v. Limetree Bay Ventures LLC*,
   110 F.4th 604 (3d Cir. 2024) ...............................................................12

*Ciba-Geigy Corp. v. Bolar Pharm. Co.*,
   747 F.2d 844 (3d Cir. 1984) ..........................................................15, 19

*In re Citizens Bank, N.A.*,
   15 F.4th 607 (3d Cir. 2021) ...............................................................11

*Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*,
   986 F.3d 250 (3d Cir. 2021) ...............................................13, 17, 22

*Favia v. Ind. Univ. of Pa.*,
   7 F.3d 332 (3d Cir. 1993) ...................................................................25

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
   456 U.S. 844 (1982)............................................................................19

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ...............................................23, 26, 27

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................11

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
   920 F.2d 187 (3d Cir. 1990) ...............................................15, 23, 24

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
   602 F. App'x 669 (9th Cir. 2015).......................................................25

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
   143 F.3d 800 (3d Cir. 1998) ........................................................24, 26

*Publ'ns Int'l, Inc. v. Landoll, Inc.*,
  164 F.3d 337 (7th Cir. 1998) ...................................................................17

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159 (1995)........................................................13, 15, 18, 19

*Rose Art Indus., Inc. v. Swanson*,
  235 F.3d 165 (3d Cir. 2000) ...............................................................12

*S&R Corp. v. Jiffy Lube Int'l, Inc.*,
  968 F.2d 371 (3d Cir. 1992) ...............................................................23

*Shakeys Pizza Asia Ventures, Inc. v. PCJV USA, LLC*,
  2025 WL 1431270 (9th Cir. May 19, 2025).......................................23

*Shire US Inc. v. Barr Lab'ys, Inc.*,
  329 F.3d 348 (3d Cir. 2003) ...........................................8, 16, 17, 19

*Singer Mgmt. Consultants, Inc. v. Milgram*,
  650 F.3d 223 (3d Cir. 2011) ...............................................................12

*SK&F, Co. v. Premo Pharm. Lab'ys, Inc.*,
  625 F.2d 1055 (3d Cir. 1980) .............................................................15

*Taco-Cabana Int'l, Inc. v. Two Pesos, Inc.*,
  932 F.2d 1113 (5th Cir. 1991) ............................................................17

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23 (2001)...............................................................................13

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*,
  698 F.2d 862 (7th Cir. 1983) ..............................................................25

**Statutes**

15 U.S.C. § 1116(a) ...................................................................................23

15 U.S.C. § 1125(a) ....................................................................8, 12, 17

**Rules**

3d Cir. L.A.R. 27.7.................................................................................11

3d Cir. L.A.R. 8.2..................................................................................11

Fed. R. App. P. 8...............................................................................10, 11

**Other Authorities**

20 Moore's Fed. Prac. Civ. § 308.40 (3d ed. 2025) .................................11

3 McCarthy on Trademarks & Unfair Competition § 24:15 (5th ed. 2025)...........25

4 McCarthy on Trademarks & Unfair Competition § 30:10 (5th ed. 2025)...........25

4 McCarthy on Trademarks & Unfair Competition § 30:47 (5th ed. 2025)...........23

**INTRODUCTION**

This is a quintessential case for preserving the status quo pending appeal so that this Court will be able to issue a meaningful appellate decision. MSN has made clear that, absent court intervention, it will imminently launch generic competitors to Novartis's life-saving heart-failure treatment ENTRESTO® with nearly identical size, shape, and color tablets as Novartis's established trade dress:

| Image of ENTRESTO® Tablet | | | |
|---|---|---|---|
| Image of MSN's Tablet[52] | | | |
| Dosage | 24/26 mg | 49/51 mg | 97/103 mg |

Add13. If allowed to launch, MSN will flood the market with look-alike pills, infringing and significantly affecting the distinctiveness of Novartis's trade dress; confusing doctors, patients, and the public; and permanently destroying Novartis's ability to control the reputation and goodwill built over nearly a decade.

The district court recognized this impending irreparable harm to Novartis, granting a preliminary injunction until it could issue a final decision resolving the parties' dispute. Finding "no question that the two trade dresses are strikingly similar" and that "MSN intended for the pills to look similar," the district court

ordered MSN not to launch its copycat tablets, particularly because any harm to MSN from delaying its plans would be self-inflicted.  Add13-14, Add18.

Remarkably, the district court then paved the way for MSN to launch with an additional decision that stayed its preliminary injunction pending appeal.  To preserve the status quo—MSN's infringing generics are not and never have been on the market—this Court should intervene immediately (at least before the end of the day on July 15, 2025) by staying that stay pending appeal, thus restoring the preliminary injunction.

## BACKGROUND

### A. Novartis Invested Substantial Resources Developing ENTRESTO® and Establishing Trade Dresses the Public Trusts and Relies On

Novartis is a leading global pharmaceutical company that has spent decades earning a reputation for life-changing medical treatments.  Add43(¶¶4-5).  ENTRESTO® is a Novartis FDA-approved prescription drug for treating chronic heart failure.  Add50(¶18).  Since launching in 2015, ENTRESTO® has been the only chronic heart-failure treatment that combines the active ingredients valsartan and sacubitril.  Add50(¶19).  It is one of Novartis's top-selling pharmaceuticals and Novartis has sold more than 600 million tablets in the United States.  Add52(¶¶26-29).  Novartis estimates ENTRESTO® has helped over 2.5 million heart-failure patients in the United States.  Add52(¶25).

As the number one branded heart-failure treatment prescribed by cardiologists, ENTRESTO®'s effectiveness has made it a "key reputation driver" for Novartis.  Add51(¶¶20-21); Add67(¶9).  Novartis has spent significant time and effort linking itself to ENTRESTO®, ensuring ENTRESTO® is differentiated in the marketplace and consumers understand ENTRESTO® is Novartis's drug.  Add63-64(¶¶16-20).

Novartis selected the look and feel of the ENTRESTO® tablets to stand out from other heart-failure medications.  Each ENTRESTO® dose comes in a unique combination of size, shape, and color, with each combination individually comprising a protectable trade dress, and together making an additional protectable trio trade dress:



Add51-52(¶¶22, 28); Add62-63(¶¶14-15).

Since introducing ENTRESTO®, Novartis has exclusively used the same tablet designs, spent millions on marketing with the tablets' images, and distributed millions of samples.  Add49-59 (¶¶14, 23, 30-44).  For example, Novartis gives healthcare providers and patients materials highlighting the color, size, and shape of its ENTRESTO® tablets, individually and as a trio:



Add233-36; Add53(¶31).

No other marketed heart-failure products use the same design as the ENTRESTO® trade dresses, let alone the trio trade dress. Instead, there are a wide array of sizes, shapes, and colors for pills. Add86(¶12). Both branded and generic drugs reflect that wide array, and it is common for generic versions of drugs to look different from their branded counterparts. Add124-25(¶29), Add135(¶52); Add94-100(¶¶23-24). This is equally true in the chronic heart-failure space, where branded drugs use many size/shape/color combinations and the corresponding generics use different combinations:

4

| Drug | Image of Brand Name from Drugs.com | Image of Generic from Drugs.com |
|---|---|---|
| Brand: Kapspargo Sprinkle (top), Lopressor (bottom)  Generic: Metoprolol Succinate |  |  |
| Brand: Inspra Generic: Eplerenone |  |  |
| Brand: Vasotec Generic: Enalapril Maleate |  |  |
| Brand: Prinivil (top), Zestril (bottom) Generic: lisinopril |  |  |

Add151-52. In this way, the heart-failure-drug market is similar to markets for other drugs, where generics, including from defendant Novadoz (owned by MSN), look distinct from branded counterparts. Add98-100(¶24).

As MSN's executive conceded, unlike MSN, other companies seeking approval to market generic versions of ENTRESTO® made design choices for their products that differ from Novartis's. Add256(¶18). One company describes that its 24/26mg tablet will be round instead of the ENTRESTO® oval; another describes that it will use capsule-shaped tablets for all dosages; and multiple generic manufacturers describe different color schemes, such as light pink, off white, and white 24/26mg tablets instead of ENTRESTO®'s violet-white. Add260-61.

## B.    MSN Copied Novartis's Trade Dresses

In contrast, MSN deliberately copied Novartis's protected ENTRESTO® trade dresses. Relying on FDA's approval of ENTRESTO®, MSN applied to market generic valsartan/sacubitril tablets. Add342. Although FDA initially approved MSN's application in July 2024, MSN has never been permitted to launch because its generic products were held to infringe a valid Novartis patent with associated pediatric-marketing exclusivity. Add342-43. As a result, MSN's FDA approval can be effective no earlier than July 16, 2025. Add343-44.

After MSN's initial approval, Novartis learned that MSN's generic valsartan/sacubitril tablets are nearly identical to Novartis's ENTRESTO® tablets, mirroring all three tablets almost exactly in size, color, and shape:



| Image of ENTRESTO® Tablet | | | |
|---|---|---|---|
| Image of MSN's Tablet[52] | | | |
| Dosage | 24/26 mg | 49/51 mg | 97/103 mg |

Add13; Add74-77(¶¶10-16).

As the district court found, that was no accident: "MSN intended for the pills to look similar." Add14. MSN's executive admitted that "MSN chose colors that reference the colors used for Entresto pills so that patients taking MSN's generic equivalent will be able to rely on visual cues" learned through familiarity with ENTRESTO®. Add253(¶10).

## C. The District Court Preliminarily Enjoined MSN's "Strikingly Similar" Products

To prevent MSN from flooding the market with look-alike tablets that would irreparably harm Novartis, Novartis secured a preliminary injunction from the district court narrowly tailored to sales and similar acts involving MSN products "likely to infringe on Plaintiffs' trade dress." Add22.

The district court found Novartis was likely to succeed in proving all elements of trade-dress infringement under the Lanham Act and identical state-law claims: nonfunctionality, secondary meaning, and likely confusion.  Add5-15; 15 U.S.C. §1125(a).  The district court found "[t]here is no question that the two trade dresses are strikingly similar."  Add3, Add13.  On functionality, the district court credited Novartis's evidence that the ENTRESTO® designs are "purely based on a desire to differentiate the tablets from competitors' trade dress" and not "to improve cost, quality, or efficacy."  Add6.  The district court rejected MSN's reliance on an inapposite decision affirming, based on facts specific to ADHD patients, a determination that the ADHD-drug Adderall's color and shape was functional.  Add9 (distinguishing *Shire v. Barr Lab'ys*, 329 F.3d 348 (3d Cir. 2003)).  Among other things, the district court explained that ADHD patients often take different doses throughout a single day, but "ENTRESTO® patients need not distinguish between daily doses" because their doses do not vary during a day.  Add9.  The district court rejected MSN's attempt to carve out a special trade dress rule for generics:  "[t]he functionality doctrine cannot stand for the broader proposition that any distinctive look and feel of a pill means generic brands are free to wholesale copy them under the guise of" helping "patients":  "Simply put, MSN could have just picked different colors.  Or different shapes.  Or different sizes."  Add9.

The district court also found Novartis would be irreparably harmed were MSN permitted, for the first time, to market its look-alike products while the parties resolve this trade dress dispute.  Add15-18.  The district court rejected MSN's principal argument—that Novartis had unduly delayed in bringing suit—finding the at-most "five-month delay" reasonable "given the complexities of this case" and that MSN has not launched.  Add17.  The district court found Novartis had established the classic irreparable harm flowing from "lack of control" over one's reputation and goodwill:  "a misplaced affiliation with Novartis (and ENTRESTO®) 'puts at risk Novartis's reputation in the event of quality or safety issues with MSN's generic.'" Add17-18 (citation and brackets omitted); Add125-34(¶¶30-50).

In contrast with Novartis's irreparable harm, the district court found any hardship to MSN would be self-inflicted because "MSN could have distinguished its pills" but intentionally chose not to.  Add18.  "[O]n balance," the district court found a preliminary injunction warranted.  Add18.

### D. Second Guessing Itself, the District Court Stayed Its Own Injunction, Potentially Allowing MSN to Destroy the Status Quo

After MSN filed a notice of appeal and moved in the district court to stay the preliminary injunction pending appeal, the district court indicated it was "considering sua sponte reconsidering its decision" and requested additional briefing.  D.Ct.Dkt.43.  After briefing, the district court granted a stay pending

appeal but expressly declined to reconsider its preliminary-injunction grant. Add24, Add27.

The district court's stay decision did not discuss most of its preliminary-injunction analysis, including its conclusions on secondary meaning and the likelihood of confusion. Add27-28. Instead, the district court focused on nonfunctionality and irreparable harm, assessing whether MSN "is likely to succeed in the merits of its appeal" and whether "temporarily" staying the injunction was warranted given "the circumstances the parties face pending appeal." Add24, Add29, Add35-36. In contrast with its preliminary-injunction reasoning, the district court embraced MSN's reliance on *Shire*'s Adderall holding and MSN's arguments for a special trade dress rule for generics. Add29-35. That rationale carried over to the district court's view on the likely harm pending appeal. Add35-40. The district court also emphasized its belief that any harm to Novartis would be "temporally limited" because "MSN is barred from launching its generic drug product before at least July 16, 2025," and the appeal in this trade dress case would be of "limited" duration. Add39-40.

Having made clear in its stay and reconsideration briefing that Novartis sought to maintain the preliminary injunction pending appeal, Novartis now seeks that relief here. Fed. R. App. P. 8(a)(1). At the least, given the district court's grant of MSN's

stay-pending-appeal request, any further request in that court would be impracticable. *Id.* 8(a)(2)(A).

## ARGUMENT

This Court has authority to stay any district court order and/or restore an injunction pending appeal, and to do so on an expedited basis. Fed. R. App. P. 8(a); *Nken v. Holder*, 556 U.S. 418, 426-27 (2009); 3d Cir. L.A.R. 8.2, 27.7. Courts consider such interim relief "de novo, without deference to the district court's ruling on any request for a stay." 20 Moore's Fed. Prac. Civ. §308.40 (2025); *A. Phillip Randolph Inst. v. Husted*, 907 F.3d 913, 917 (6th Cir. 2018) (de novo review because "not reviewing" district court's decision on stay/injunction). Courts balance four factors, with the first two generally "the most critical": (1) likely success on appeal; (2) whether the movant will be irreparably harmed absent relief; (3) whether relief would substantially injure the non-movant; and (4) the public interest. *In re Citizens Bank*, 15 F.4th 607, 615 (3d Cir. 2021). The point is to decide whether "interim relief" is needed to avoid turning the appeal into "an 'idle ceremony.'" *Nken*, 556 U.S. 426-27.

Here, all four factors favor preserving the status quo pending appeal: MSN has never been permitted to launch its look-alike products.

# I.   NOVARTIS WILL LIKELY SUCCEED IN DEFENDING THE DISTRICT COURT'S PRELIMINARY INJUNCTION

A movant demonstrates likely success warranting interim relief by showing a "reasonable chance, or probability, of winning" on the merits, which need not be "more likely than not." *Singer Mgmt. Consultants v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). Here, the merits are MSN's appeal of the district court's grant of a preliminary injunction. This Court will review that grant for "abuse of discretion," assessing underlying factual findings "for clear error" and "legal conclusions de novo." *Boynes v. Limetree Bay Ventures*, 110 F.4th 604, 609 (3d Cir. 2024). Under that or any standard, Novartis has more than a reasonable chance of prevailing on appeal.

## A.   Novartis Established Likely Success on Trade Dress Infringement

### 1.   *Under a correct application of the law, the record amply supports the district court's finding of nonfunctionality*

Trademark law offers protection for a product's "trade dress," including its "overall appearance" based on "such features as size, shape, [and] color." *Rose Art Indus. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000); 15 U.S.C. §1125(a). When relying on product appearance, a plaintiff proves trade dress infringement by showing its trade dress (i) is "'nonfunctional'" and (ii) has "'acquired distinctiveness'" or secondary meaning, and (iii) the "'defendant's use of plaintiff's trade dress is likely to cause consumer confusion.'" *Rose*, 235 F.3d at 172.

The dispute here is nonfunctionality, which the district court found in granting a preliminary injunction but then second guessed in granting a stay pending appeal. The Supreme Court "recognizes several ways to show that a product feature is functional" or nonfunctional. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l*, 986 F.3d 250, 257 (3d Cir. 2021). A feature might be shown to be nonfunctional "for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 30 (2001). And "'in general terms'" a feature might be shown to be functional by showing it "'is essential to the use or purpose of the article'" or "'affects the cost or quality of the article.'" *Id.* at 32 (brackets and citation omitted).

The inquiry focuses on "the particular design chosen for feature(s)" comprising the plaintiff's trade dress. *Ezaki*, 986 F.3d at 257 (whether "'particular shape and form' chosen" are nonfunctional). For example, although "us[ing] *some* color" for ironing-board pads is useful "to avoid noticeable stains," the question is whether there is a functional reason to use the plaintiff's chosen color over other "'equally useable'" colors. *Qualitex v. Jacobson Prods.*, 514 U.S. 159, 166 (1995) (Supreme Court's emphasis; citation omitted); *Ezaki*, 986 F.3d at 257 (same). Even so, the nonfunctionality inquiry examines the trade dress as a whole, not whether each element in isolation is nonfunctional. *Ezaki*, 986 F.3d at 257.

As the district court's grant of the preliminary injunction makes clear, Novartis has more than a reasonable chance of establishing nonfunctionality of the ENTRESTO® trade dresses—each pill's appearance based on its combined size, color, and shape, as well as the trio's overall appearance. Add5-10. Novartis submitted unrebutted evidence that its design choices were rooted in setting its pills apart from other heart-failure drugs, not in functional concerns. Add63-64(¶¶16-20). Pharmaceutical companies know that "pill appearance can be an important element of pharmaceutical branding" and color especially is "an important means of creating brand value." Add89-93(¶¶12-16); Add61-62(¶¶9-12). Novartis achieved its goal—the oval-shaped pills, sizes, and violet-white, pale yellow, and light pink colors of ENTRESTO® are unique among marketed chronic heart-failure drugs:



Add63(¶¶16-18); Add177-78 (other examples).

This Court has long recognized that similar "arbitrarily chosen" pill designs are nonfunctional and hence eligible for protection. *Ciba-Geigy v. Bolar Pharm.*, 747 F.2d 844, 850-51 (3d Cir. 1984). *Ciba-Geigy* affirmed nonfunctionality where "no medical or business considerations compelled" the plaintiff's choice of "blue & white and pink & white capsules" in the "size and shape" chosen. *Id.* at 850. Anticipating the Supreme Court's later reasoning in *Qualitex*, this Court explained: "'that a manufacturer uses different colors to distinguish between its own products does not make those particular colors functional.'" *Id.* at 850-51 (quoting district court approvingly). *Ciba-Geigy* followed *SK&F v. Premo Pharmaceutical Laboratories*, 625 F.2d 1055 (3d Cir. 1980). There, this Court affirmed nonfunctionality of the "arbitrary" choice to use bi-colored capsules for a diuretic, given "ample evidence that neither the capsule form nor the color combination reflects any industry practice for the identification of diuretics." *Id.* at 1064-65.

### 2. The district court's stay decision second guessing nonfunctionality misapplied governing law

In its stay decision, the district court wrongly overlooked the clear parallels between this case and *Ciba-Geigy*, *SK&F*, and other decisions finding nonfunctionality and, with no new record evidence or change in law, questioned its nonfunctionality finding. Add30-35. Because both its new rationales rest on "obvious error[s] in applying the law" and "serious mistake[s] in considering the proof," neither undermines Novartis's likely appellate success. *Opticians Ass'n v.*

15

*Indep. Opticians*, 920 F.2d 187, 192 (3d Cir. 1990) (reversing preliminary-injunction denial in these circumstances).

*First*, Novartis will likely succeed in showing that the district court, in assessing whether ENTRESTO®'s trio of pill designs as a whole is nonfunctional, applied the law correctly in granting the preliminary injunction and incorrectly in its stay decision. *Compare* Add9 (distinguishing *Shire*, 329 F.3d 348), *with* Add30-31 (analogizing to *Shire*). According to unrebutted evidence, patients using ENTRESTO® have no need to distinguish dosages because they do not take different dosages throughout the day and thus generally do not even have different dosages on hand. Add310(¶¶29-32). Although the district court's stay decision pointed to initial dosage titration (where dosage levels may increase gradually over a period of weeks or more) and dosage adjustments, the district court ignored its prior finding that "ENTRESTO® patients need not distinguish between daily doses, because the patients remove previous ones from their medication cycle after they adjust to a different dosage." Add30-31; Add9 (citing Add310(¶¶31-32)).

These facts are nothing like those in *Shire*, which avoided adopting any bright-line rule about the functionality of pill appearance because such cases depend "on their facts." 329 F.3d at 355-59. Unlike here, *Shire* involved evidence that patients taking Adderall for ADHD "take multiple daily dosages"; those patients were known to "overuse visual cues"; and "therapeutically equivalent ADHD products have

similar visual recognition properties" to the color coding used for Adderall dosages. *Id.* at 354. The dearth of remotely similar evidence here means the district court applied the law correctly the first time, when it distinguished *Shire*. Add9.

*Second*, the district court also legally erred in its stay decision by focusing only on whether each element of "color, size, and shape" is individually functional. Add29, Add31-35. Congress was express that in a trade dress case like this, the question is whether "the *matter sought to be protected* is not functional." 15 U.S.C. §1125(a)(3) (emphasis added). When an asserted trade dress is a combination of elements, the matter sought to be protected is that combination, not individual elements: a "combination of non-protectible and distinctive elements may constitute protectible trade dress." *Am. Greetings v. Dan-Dee Imports*, 807 F.2d 1136, 1143 (3d Cir. 1986) (citation omitted); *Ezaki*, 986 F.3d at 258 (relying on same). Other courts consistently recognize the same: an "ensemble" of individually "functional features" may nevertheless be nonfunctional; any other rule would fail because "[a]ny product, any package, can be decomposed into elements that are not protectable." *Publ'ns Int'l v. Landoll*, 164 F.3d 337, 342 (7th Cir. 1998) (collecting other circuits' decisions); *Taco-Cabana Int'l v. Two Pesos*, 932 F.2d 1113, 1119 (5th Cir. 1991) ("a particular arbitrary combination of functional features" may "enjoy[] protection").

17

Neither the district court nor MSN ever suggested that the particular ensemble of color, size, and shape that Novartis chose for each individual ENTRESTO® pill —out of a staggering number of potential combinations—is functional.  Add29, Add31-35; D.Ct.Dkt.13 at 15-16 (MSN summarily addressing color, size, and shape individually without addressing ensemble as a whole).  Only the district court's preliminary-injunction decision applied the correct legal standard, concluding Novartis had established nonfunctionality.  Add9.  That alone shows Novartis's likely appellate success.

Yet even in considering elements of Novartis's trade dresses individually, the district court's stay decision reached legally and factually unsupported conclusions.  The district court rightly found that "the particular colors that Novartis chose were not innately functional."  Add31-32 ("no functional reason to have" made Novartis's color choices).  That should have ended the inquiry, because for color the question is whether the "particular" color a plaintiff chose is nonfunctional, not whether using "*some* color" might generally have a benefit.  *Qualitex*, 514 U.S. at 166.

Instead of stopping there, the district court concluded that Novartis's particular color choices are functional because they are useful for "associat[ing] MSN's Drug with Novartis's product."  Add31-32.  No law supports that reasoning, which wrongly turns a purpose of protecting trade dress—avoiding consumer confusion—into a reason to deny protection and allow copying.  The district court

thought otherwise by purporting to divine a special rule for generic "drug products," which supposedly "differ in nature" from other products.  Add32-33.  The source of this supposed special drug rule?  A discussion of the procedural history in *Inwood* (about an issue expressly not before the Supreme Court) and a passing statement in *Qualitex* (which was not about pill design) that "'drug color cases have more to do with public health policy.'"  Add32 (citing *Inwood Lab'ys v. Ives Lab'ys*, 456 U.S. 844, 853 (1982); quoting *Qualitex*, 514 U.S. at 169).  But contrary to the district court's rationale, *Ciba-Geigy* already considered the effect of *Inwood* on this Court's drug-color precedent and affirmed protection for nonfunctional pill designs like those here, including designs using distinctive colors.  *Ciba-Geigy*, 747 F.2d at 854-55; *supra* p.15.

Nor can the district court's stay rationale be supported by its suggestion that even if color choice is not initially functional, "colors, once chosen[,] can 'come to represent'" a pill's "'ingredients and their effects,'" particularly for medications "taken in seeming perpetuity."  Add32-33 (quoting *Shire*, 329 F.3d at 358 n.20; additional citation omitted).  The record refutes that conclusion for the ENTRESTO® trade dresses.  Rather than show patients understand ENTRESTO®'s particular colors to identify ENTRESTO® as heart-failure medication, the evidence shows heart-failure medications come in all sorts of colors.  *Supra* p.14; *accord Qualitex*, 514 U.S. at 170 (giving functional color example of "distinguish[ing] a heart pill

from a digestive medicine"). And the notion that patients may have learned to associate ENTRESTO®'s active ingredients (valsartan/sacubitril) with a specific color is refuted by the fact that ENTRESTO® itself comes in three different colors, all with the same active ingredients. Add52(¶28); Add62-63(¶15). Plus, instead of suggesting patients know the active ingredients in ENTRESTO®, the evidence and the district court's own undisturbed finding show that what patients know is that ENTRESTO® pills are from the same, single source. Add10-12; Add322(¶5).

The record also refutes the district court's notion of a "routine practice across the generic industry" of copying a branded drug's exact appearance to benefit patients. Add33. The FDA's "Generic Drugs: Questions & Answers" warns that "[t]rademark laws in the United States do not allow a generic drug to look exactly like other drugs already on the market," and so generic drug "characteristics, such as colors," that "do not affect the performance, safety, or effectiveness of the generic medicine, may be different." Add243-44. Consistent with that view, many generic drugs generally, and other proposed generic versions of ENTRESTO® specifically, differ in appearance from their branded counterparts. Add124-25(¶29), Add135(¶52); Add94-100(¶¶23-24). As Novartis's expert explained, "generics need not copy the color arrays" nor appearance "across all elements" of "their branded counterparts." Add329-35(¶¶20-21, 25-32); Add340-41 (showing numerous examples).

The district court's stay decision cited the Shimer declaration, which mostly addresses FDA guidance about ensuring generic pills are sized and shaped to be easy to swallow, not drug colors or appearance. Add278-81(¶¶37-43).[1] And in addressing color, the declaration largely offers conclusory, unsupported opinions, such as whether it "take[s] much imagination" or there is "sound reason" for generic manufacturers to want to copy a branded drug's color scheme. Add283-84(¶¶47-48). Regardless, nothing in that declaration shows patients associate violet-white, pale yellow, and/or light pink with valsartan and sacubitril, ENTRESTO®'s active ingredients, let alone that they associate the entire look and feel of the ENTRESTO® trade dresses with those ingredients. And as shown, other approved generics, including of ENTRESTO®, do not copy the branded drug's appearance. *Supra* pp.5-6.

Lacking any evidence about the ENTRESTO® trade dresses' functionality, the district court's stay decision wrongly embraced the unsound rule it had previously rightly rejected: that all generic competitors should be entitled to copy the corresponding branded drug's trade dress to benefit from associating their generic with the branded drug. *Compare* Add9 (rejecting this rule), *with* Add31-33. Such a rule would defeat the entire point of trade dress protection: to prevent consumer

---

[1] The latest version of the guidance is available at https://www.fda.gov/media/161902/download. Although it has been updated over the years, it continues to address only size and shape, not color.

confusion and protect the trade dress holder's control and exclusive use of its brand. *Ezaki*, 986 F.3d at 256. And given FDA's statements that generic drug characteristics like color may differ because they do not affect safety or effectiveness, and the numerous record examples reflecting that reality, such a per se rule is neither supported by law nor needed as a matter of health policy. Add94-100(¶¶23-24).

*****

In short, Novartis is likely to succeed on appeal in defending the grant of a preliminary injunction here. The district court's nonfunctionality finding in its preliminary-injunction decision is well supported and, indeed, compelled by this record. And its findings (which it never second guessed) that Novartis will likely succeed on secondary meaning and likelihood of confusion are equally well supported—including by Novartis's near-decade of exclusive marketing and sales that have established the ENTRESTO® trade dresses as designators of source, and MSN's own admissions that it deliberately copied those trade dresses. Add10-15; *infra* pp.23-24.

## B.    Novartis Established Irreparable Harm

Novartis will also likely succeed in defending the preliminary injunction based on the district court's original finding of irreparable harm, including loss of control over Novartis's reputation and goodwill. D.Ct.Dkt.4-1 at 37-38; Add17-18.

For starters, the Trademark Modernization Act entitles Novartis to a "rebuttable presumption" of irreparable harm given Novartis's showing of likely infringement under a correct application of functionality law. 15 U.S.C. §1116(a); Add35; *see Kos Pharms. v. Andrx*, 369 F.3d 700, 726 (3d Cir. 2004) (enforcing presumption). Among other things, such a rebuttable presumption protects against the immediate and irreversible loss of distinctiveness caused by even brief infringing uses of a protectible trade dress. *See* McCarthy, *McCarthy on Trademarks & Unfair Competition* §30:47 (2025) (elaborating on "fundamentally 'irreparable'" nature of harms in this context). The burden of overcoming that presumption "is a heavy one," which the district court never found MSN to have met. *Id.*; Add15-17 (rejecting MSN's irreparable harm arguments). Novartis's presumed irreparable harm thus alone suffices to support Novartis's request for interim relief. *Shakeys Pizza v. PCJV USA*, 2025 WL 1431270, at *2 (9th Cir. May 19, 2025) (affirming preliminary injunction partly because irreparable-harm presumption unrebutted).

Novartis showed irreparable harm even without the presumption, as the district court found in its preliminary-injunction decision. Add17-18. This Court has long recognized that the "loss of control" over one's "reputation" is a cognizable "irreparable injury." *S&R Corp. v. Jiffy Lube*, 968 F.2d 371, 378 (3d Cir. 1992); *Opticians*, 920 F.2d at 195-96. Here, the district court found (and never questioned) that ENTRESTO®'s trade dresses had acquired distinctiveness (i.e., secondary

meaning) because, "in the minds of the public," the primary significance of the ENTRESTO® trade dresses is "to identify the source of the product." Add10-12 (citation omitted). And the district court found (and never questioned) that sales of MSN's "strikingly similar" and "intended" look-alike pills would likely cause confusion, leading physicians, patients, and the public to mistakenly associate MSN's pills with Novartis. Add12-15; Add253(¶10). Those uncontroverted findings, and the ample evidence the district court relied on in making them, establish that allowing MSN to market its pills would place Novartis's brand reputation at MSN's mercy. Add12-15. That is classic irreparable harm. *Opticians*, 920 F.2d at 195-96; *Pappan Enters. v. Hardee's*, 143 F.3d 800, 805 (3d Cir. 1998).

Evidence of prescription practices shows additional irreparable harm. Novartis's declarants explained how some state laws permit, and even require, pharmacists to substitute ENTRESTO® with a generic *even if* healthcare providers initially represent to patients that they are being prescribed ENTRESTO®. Add69-70(¶¶24-29). In this context, where a patient may not even "detect a substitution" has occurred, Novartis would lose its ability to encourage patients to remain with the branded ENTRESTO® they have grown to trust. Add92-93(¶20), Add100(¶25); Add136-37(¶¶58-60).

The district court's stay decision had no basis for overlooking this evidence and dismissing Novartis's likely harms as "speculation." Add37-39. The district

court wrongly criticized Novartis for lacking evidence that MSN's as-yet unlaunched drug "actually is defective" and for having its declarants describe problems that "*could*" happen after launch.  Add37-39 (district court's emphasis). Preliminary injunctions exist to prevent harms before they occur—a "trademark owner does not have to await the impact of the threatened infringement to obtain preventive relief." *McCarthy* §30:10.  Regardless, loss of control alone is irreparable harm even without evidence that a likely infringer's product is inferior and/or defective.  *Id.* §24:15 (trademark owner need not prove inferiority of competing goods); *OTR Wheel Eng'g v. W. Worldwide Servs.*, 602 F. App'x 669, 672 (9th Cir. 2015); *Wesley-Jessen Div. of Schering v. Bausch & Lomb*, 698 F.2d 862, 867 (7th Cir. 1983).

## II.   THE EQUITIES AND PUBLIC INTEREST FAVOR PROTECTING THE STATUS QUO

The equities also favor staying the district court's stay decision and restoring the preliminary injunction pending appeal, independently or together with Novartis's strong showing of likely appellate success.  The point of preliminary relief is "to maintain things in their initial condition so far as possible until after a full hearing permits final relief." *Favia v. Ind. Univ.*, 7 F.3d 332, 342 (3d Cir. 1993). The undisputed initial condition here is that Novartis has exclusive use of its trade dresses.

Absent this Court's intervention before July 16, 2025, the district court's stay decision will allow alteration of the status quo, effectively granting victory to MSN by allowing MSN unilaterally to end Novartis's exclusive use of the ENTRESTO® trade dresses. In granting the preliminary injunction, the district court correctly rejected as self-inflicted MSN's alleged loss of any "first mover advantage" over other generic manufacturers. Add18; *Pappan*, 143 F.3d at 806 ("self-inflicted" harm "weighs in favor of granting" interim relief). Regardless, MSN never supported any such loss—the only other generic it identified as supposedly planning to launch is Noratech, which does not even have FDA approval. D.Ct.Dkt.13 at 36-37.

The public interest favors vindicating Congress's choice to protect against likely confusion from trade dress misappropriation: "The most basic public interest at stake in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos*, 369 F.3d at 730. Here, confusion caused by MSN's look-alike products threatens at-risk patients, who would want to take ENTRESTO® and will be deprived of autonomy in treatment choices, including about which drug manufacturer to trust given known instances of quality differences between generic and branded drugs. Add136-37(¶¶51-60); Add91-100(¶¶18-25); Add310-12(¶¶33-39); Add327-29(¶¶15-18).

The lack of choice is amplified because it is well known that, despite sharing the same active ingredients, generics and branded drugs have different compositions.

Add135(¶¶56-57); Add91-92(¶18).   Studies have shown some patients perform better with and thus prefer to continue using the branded drug.  Add135(¶¶56-57); Add91-92(¶18).   By selling nearly identical-appearing drugs, MSN will foment confusion and deprive the public of the option to make that choice and the better outcomes that at least some patients experience.

As this Court has recognized in similar circumstances, the district court's narrowly tailored injunction protects the public from those risks without blocking generic competition, because use of "the drug itself" is not enjoined.  *Kos*, 369 F.3d at 731-32.  That injunction should remain in force pending appeal.  MSN and others remain free to do what MSN (through Novadoz) has done with other products: distribute generic products without copying the branded drug's appearance.  Add98-100(¶24).

*****

The parties previously agreed to an expedited briefing schedule and Novartis is prepared to act as expeditiously as the Court deems appropriate.

## CONCLUSION

This Court should stay the district court's order staying the preliminary injunction and restore that injunction pending appeal, immediately or at least before the end of the day on July 15, 2025.

Dated:  May 28, 2025

Respectfully submitted,

/s/ Deanne E. Maynard

MEGAN K. BANNIGAN
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001

ZACH ZHENHE TAN
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

DEANNE E. MAYNARD
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.:  (202) 887-8740
DMaynard@mofo.com

*Counsel for Plaintiffs-Appellees Novartis AG and*
*Novartis Pharmaceuticals Corporation*

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

Preliminary Injunction Opinion (D.Ct.Dkt.32)
  (Mar. 17, 2025) ..............................................................................Add1

Preliminary Injunction Order (D.Ct.Dkt.33)
  (Mar. 17, 2025) ............................................................................Add22

Stay Opinion (D.Ct.Dkt.51)
  (May 23, 2025) .............................................................................Add24

Stay Order (D.Ct.Dkt.52)
  (May 23, 2025) .............................................................................Add41

Attachments to Plaintiffs' Motion for Preliminary Injunction (Jan. 31, 2025)

  Miller Declaration (D.Ct.Dkt.4-3)........................................Add42

  Valazza Declaration (D.Ct.Dkt.4-4).....................................Add60

  Ward Declaration (D.Ct.Dkt.4-5)..........................................Add65

  Lossignol Declaration (D.Ct.Dkt.4-6) ..................................Add72

  Robbins Declaration (D.Ct.Dkt.4-10) ...................................Add81

  Nayeri Declaration (D.Ct.Dkt.4-11)....................................Add113

  Bannigan Declaration (D.Ct.Dkt.4-12) ................................Add153

  Exhibit 1 (D.Ct.Dkt.4-13)...................................................Add176

  Exhibit 32 (D.Ct.Dkt.4-44).................................................Add232

  Exhibit 42 (D.Ct.Dkt.4-54).................................................Add235

  Exhibit 96 (D.Ct.Dkt.4-110)...............................................Add241

Attachments to Defendants' Opposition to Plaintiffs' Motion for Preliminary
    Injunction (Feb. 6, 2025)

    Nithiyanandam Declaration (D.Ct.Dkt.13-7) ........................................Add250

    Exhibit 1 (D.Ct.Dkt.13-8).......................................................................Add259

    Shimer Declaration (D.Ct.Dkt.13-46) ...................................................Add262

Attachments to Plaintiffs' Reply in Support of Motion for Preliminary Injunction
    (Feb. 10, 2025)

    Nayeri Declaration (D.Ct.Dkt.17-1) ......................................................Add296

    Robbins Declaration (D.Ct.Dkt.17-2) ....................................................Add319

Final Judgment, *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*,
    No.1:20-cv-2930 (D. Del. Apr. 1, 2025), ECF1824.............................Add342

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION, Plaintiffs, v. NOVADOZ PHARMACEUTICALS LLC, *et al.*, Defendants. | No. 25cv849 (EP) (JRA) **OPINION** |

**PADIN, District Judge.**

This matter comes before the Court by way of Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's (together, "Novartis") motion for a preliminary injunction against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") for alleged infringement of Novartis's trademark and trade dress rights. D.E. 4 ("Motion" or "Mot."). The Court decides the Motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **GRANT in part** and **DENY in part** the Motion.

## I. BACKGROUND

Novartis is a pharmaceutical company that manufactures ENTRESTO®, an FDA-approved heart failure prescription medication that was launched in 2015. D.E. 1 ¶¶ 3, 52-53 ("Compl."). It is the number one heart failure brand prescribed by physicians and has helped reduce the risk of

death and hospitalization for over 2.5 million patients.  *Id.* ¶ 3.  Novartis's generic partner is Sandoz, which used to be Novartis's wholly-owned generics division prior to its sale.  *Id.* ¶ 7.

ENTRESTO® is offered in three doses, each in a unique combination of size, shape, and color.  *Id.* ¶ 59.  The Low Starting Dose, a 24/26 mg dose, is a violet white oval tablet, measuring 13.1 mm x 5.2 mm; the Recommended Starting Dose, a 49/51 mg dose, is a pale yellow oval tablet, measuring and 13.1 mm x 5.2 mm; and the Target Dose, a 97/103 mg dose, is a light pink oval tablet, measuring 15.1 mm x 6.0 mm.  *Id.*  Images of the drug show that the face of each pill is marked "NVR."  D.E. 4-4 ¶ 15 ("Valazza Decl.").

Novartis alleges that MSN will imminently bring to market a generic version of ENTRESTO®, under the NOVADOZ name, intending to confuse healthcare providers and consumers into believing NOVADOZ is affiliated with Novartis (the "MSN Drug").  Compl. ¶¶ 6-7.

MSN submitted an Abbreviated New Drug Application ("ANDA") for its generic equivalent to ENTRESTO® on July 7, 2019.  D.E. 13-7 ¶ 3 ("Nithiyanandam Decl.").  To be eligible for FDA approval through an ANDA, a generic drug must contain the same active ingredient(s) of the branded drug, come in the same dosage form, and deliver the same dose.  *Id.* ¶ 4.  As a result, the MSN Drug also comes in three tablets: a 24/26 mg tablet, 49/51 mg tablet, and a 97/103 mg tablet.  *Id.* ¶ 5.  MSN's 2019 ANDA contained proposed dimensions of the drugs, respectively measuring 10 x 4 mm, 13 x 5.10 mm, and 15 x 5.9 mm.  *Id.* ¶ 6.  Images of the MSN

Add2

Drug show that the face of each pill is marked "M." *Id.* The pills are not identical, but strikingly similar.

| PARAMETERS | REFERENCE LISTED DRUG | PROPOSED DRUG PRODUCT |
|---|---|---|
| Strengths | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg |
| **Configuration** | | |
| 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | Bottle of 60's and 180's | Bottle of 60's and 180's |
| 24 mg/ 26 mg |  |  |
| 49 mg/ 51 mg |  |  |
| 97 mg/ 103 mg |  |  |
| **Dimensions** | | |
| 24 mg/ 26 mg | 13.35 x 5.33 | 10.00 X 4.00 mm |
| 49 mg/ 51 mg | 13.25 x 5.30 | 13.00 X 5.10 mm |
| 97 mg/ 103 mg | 15.34 x 6.12 | 15.00 X 5.90 mm |
| Active Ingredient | Sacubitril and Valsartan | Sacubitril and Valsartan |

*Id.*

Novartis avers that the physical similarities between NOVADOZ and ENTRESTO®, as well as NOVADOZ's name—purportedly intended to invoke a combination of Novartis and Sandoz—reflects an intentional effort to deceive the marketplace. Compl. ¶ 7. The launch of NOVADOZ hinges on the lift of an injunction in place in a separate patent appeal pending before the Federal Circuit. *Id.* ¶ 89. MSN's counsel has "expressly communicated to Novartis's counsel that MSN will seek to launch the MSN Drug in the window between the issuance of the Federal Circuit's mandate, and the Delaware District Court's further orders once the case is returned after appeal." *Id.*

Novartis brings claims for trademark infringement, false designation of origin, trade dress infringement, and unfair competition. *Id.* ¶¶ 128-205. It argues that patients will face imminent health risks as the MSN drugs do not have FDA-approved dosing instructions and will be confused

with ENTRESTO®. Mot. at 3. Specifically, the ENTRESTO® label and prescribing information directs certain patients to start with a low starting dose, while the MSN drug label and prescribing information does not. *Id.* at 14-15. Novartis argues it will face reputational damage and loss of trade in the form of lost sales. *Id.* at 37.

## II.    PROCEDURAL HISTORY

Novartis's Motion also sought a temporary restraining order. Mot. This Court denied Novartis's request for temporary restraints but ordered expedited briefing on the preliminary injunction motion. D.E. 7. MSN's opposition, D.E. 13 ("Opp'n"), and Novartis's reply, D.E. 17 ("Reply"), followed.

## III.   LEGAL STANDARD

"Preliminary injunctions and TROs are extraordinary remedies that are not routinely granted." *Gentile v. Secs. and Exch. Comm'n*, No. 19-5155, 2019 WL 1091068, at *2 (D.N.J. Mar. 8, 2019) (citing *Kos Pharm., Inc. v. Andrx. Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). The decision to grant such relief is within the discretion of the district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). In order to obtain a TRO or a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

4

Add4

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (internal marks and citations omitted); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

## IV. ANALYSIS

### A. Trade Dress

"A plaintiff must prove three elements to establish trade dress infringement under the Lanham Act: '(1) the allegedly infringing design is nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007)).

> #### 1. *Novartis has adequately shown the ENTRESTO® trade dress is nonfunctional*

"A nonfunctional feature is one that 'is unrelated to the consumer demand . . . and serves merely to identify the source of the product or business.'" *EBIN New York, Inc. v. Kiss Nail Prods., Inc.*, No. 23-2369, 2024 WL 1328029, at *6 (D.N.J. Mar. 28, 2024) (quoting *Fair Wind*, 764 F.3d at 311). "Conversely, a functional feature is 'one that is essential to the use or purpose of the article, affects the cost or quality of the article, or one that, if kept from competitors, would put

them at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Fair Wind*, 764 F.3d at 310). In the case of drugs, "the allegedly nonfunctional element must not enhance efficacy." *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1063 (3d Cir. 1980).

MSN argues that communication of functional information to patients—what drug each pill is and what dose it contains—is evidenced by the colors and sizes of the ENTRESTO® pills. Opp'n at 13. It further indicates that consistent color-coding systems can reduce therapeutic errors in other drug regimens. D.E. 13-40 ¶ 53 ("Clark Decl."). Novartis attests that it is unaware of "any functional reason why the Low Starting Dose and the Recommended Starting Dose need to be smaller than the Target Dose. These sizes could be made uniform without impacting the efficacy of the formulation." Valazza Decl. ¶ 20. The selection of size and shape of the pills, therefore, was purely based on a desire to differentiate the tablets from competitors' trade dresses. *Id.* ¶ 16. And while ENTRESTO® comes in three doses, patients can progress up from the lower doses to the target dose. D.E. 4-11 ¶ 17 ("Nayeri Decl."). Patients typically take their tablets twice daily, indefinitely, irrespective of the dose on which they begin their regimens. *Id.* ¶ 18. There is no need to distinguish between daily doses, because once adjusted to a different dosage, patients remove the others from their medication cycle. Reply at 4 n.4.

Novartis's position, in sum, is that the ENTRESTO® Trade Dresses were designed to differentiate the drug in the heart failure treatment market, rather than to improve cost, quality, or efficacy. Mot. at 17. MSN counters that under Third Circuit precedent, color-coding of drugs to convey dosage information is functional. Opp'n at 12 (citing *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348 (3d Cir. 2003)).

On appeal in *Shire* was the lower court's finding that the color and shape of Adderall is non-functional, accepting the position of the generic's manufacturer that the similar color-coding

6

Add6

and shape of products are meaningful for ADHD patients and enhance efficacy. 329 F.3d at 354. The Third Circuit noted other cases crediting testimony bearing on functionality. In *Ives Labs., Inc. v. Darby Drug Co.*, 488 F. Supp. 394 (E.D.N.Y. 1980),[1] for example, the court found that the capsule colors of the prescription drug cyclandelate were functional because "many elderly patients associate the appearance of their medication with its therapeutic effect," "some patients co-mingle their drugs in a single container and then rely on the appearance of the drug to follow their doctors' instructions," and "to some limited extent color is also useful to doctors and hospital emergency rooms in identifying overdoses of drugs." *Id.* at 398-99. The Supreme Court also "commented on the functional nature of the color of medical pills," *Shire*, 329 F.3d at 358, in *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159 (1995). The Court noted there that "competitors might be free to copy the color of a medical pill where that color serves to identify the kind of medication (*e.g.*, a type of blood medicine) in addition to its source." *Qualitex*, 514 U.S. at 169.

Novartis argues that *Shire* is distinguishable because it uniquely involved Adderall, a controlled substance; patients needed to distinguish between differing doses of Adderall throughout the day; and patients with ADHD rely on visual cues in making dosing adjustments. Reply at 4. As the lower court did in *Shire*, this Court will assess and credit testimony as it pertains to the facts of this case specifically. For the reasons below, it finds that *Shire* is distinguishable.

The parties' experts have competing but overlapping arguments for why a pill's distinctive (or similar) appearance is important for patients. Novartis's expert notes that drug shape and color can be helpful for patients to identify their prescriptions. D.E. 4-10 ¶ 13 ("Robbins Decl."). Drug

---

[1] The Supreme Court granted certiorari and reversed the judgment of the Second Circuit, which had reversed the district court.

appearance is particularly important for patients with chronic conditions such as chronic heart failure because they are more familiar with an appearance of a medication they take repeatedly, over a long period of time, and patients with chronic conditions are more likely to take multiple medications relative to others. *Id.* ¶ 14. Dr. Mark Robbins proffers that "pill appearance can be an important element of pharmaceutical branding," while also noting that images of a pill design can reinforce "that visual cues like shape and color" are intended to serve as reference points for patients to identify their prescribed medication. *Id.* ¶¶ 16-17. MSN's expert, Todd Clark, in a roundabout way, makes a similar point: that changes in physical attributes from the branded to generic drug can negatively affect therapeutic adherence. Clark Decl. ¶ 17. Patients used to identifying medication based on visual cues should have the option to switch to generic drugs with those same visual cues so as to not disrupt their drug regimen compliance. *Id.* ¶ 18. Dr. Robbins counters that a noticeable change in pill appearance is an important signal to patients that their medication is being switched. Robbins Decl. ¶ 18. Clark rebuts that the benefits offered by continuity of appearance outweigh the hypothetical downside of potential loss of patient autonomy. Clark Decl. ¶ 19.

An MSN executive also explains that in addition to following FDA guidance that generic tablets should have similar physical characteristics to their branded equivalents, MSN picked colors referencing those used for ENTRESTO® pills so that patients can rely on visual cues to identify what drug and dose they are taking. Nithiyanandam Decl. ¶¶ 8-10. The MSN Drug's shape similarity is justified by way of functionality; ovaloid-shaped pills are easier to swallow and more cost-effective to manufacture, and it is industry practice to use larger pills to designate higher doses. *Id.* ¶¶ 12-13. Nithiyanandam goes on to explain that MSN mirrored the functional features of ENTRESTO®, but distinguished them just enough based on the small-font letter markings,

8

Add8

marginal size differences, and color-shading distinctions. *Id.* ¶ 15. In sum and substance, MSN contends that it had to copy ENTRESTO® for functionality purposes, but stopped just short of copying it too much to infringe on the trade dress.

The Court credits the position that distinctive identifiers of medications can serve as useful visual cues for patients, particularly more vulnerable populations such as the elderly or others with comorbidities, and that familiarity with a medication to be taken in seeming perpetuity has an element of functionality. Simultaneously, the Court is wary of expanding this concern across every widely available drug. The functionality doctrine cannot stand for the broader proposition that any distinctive look and feel of a pill means generic brands are free to wholesale copy them under the guise of ensuring patients, whose medication is prescribed by doctors, know what they are taking. Simply put, MSN could have just picked different colors. Or different shapes. Or different sizes.

The Court understands MSN's reliance on *Shire* and takes note of Novartis's omission of it from its moving brief. But the Court's diversion from *Shire*'s holding has less to do with the fact that a controlled substance was uniquely at issue in that case, and more to do with the practical distinctions here. Adderall dosing is more involved. Many patients "may take multiple daily dosages of different strength." *Shire*, 329 F.3d at 354. Safety and compliance is also at greater issue in cases of children, whose doses may be dispensed through non-medical intermediaries. *Id.* at 355. ENTRESTO® patients need not distinguish between daily doses, because the patients remove previous ones from their medication cycle after they adjust to a different dosage. D.E. 17-1 ¶¶ 31-32 ("Nayeri Reb. Decl."). They are taking one type of pill in a day.

As to MSN's position that similarities in physical attributes between drugs helps reduce medication errors, increases therapeutic adherence, and maintains placebo effects, Clark Decl. ¶ 50, the Court notes that "regardless of whether the generic is identical in appearance to the brand

9

Add9

name, the patient ought to be-and usually is-told that a generic medication is now being dispensed."
*Boehringer Ingelheim G.m.b.H. v. Pharmadyne Labs.*, 532 F. Supp. 1040, 1047 (D.N.J. 1980).
The patient will be aware of the substitution, *id.*, and the Court is unpersuaded that mirroring—
entirely or substantially—the appearance of a pill so that patients associate their new medication
with the old one means that the initial distinctive appearance is functional. Having found that
Novartis has met its burden in demonstrating that the trade dress is likely not functional, the Court
turns to whether it has done so for secondary meaning.[2]

> 2.   *Novartis has sufficiently demonstrated secondary meaning*

Novartis must next show that "in the minds of the public," the primary significance of the
trade dress is "to identify the source of the product rather than the product itself." *Wal-Mart Stores,
Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs., Inc. v. Ives Labs.,
Inc.*, 456 U.S. 844, 851 n.11 (1982)) (internal marks omitted). Courts consider factors such as "the
extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the
fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the
size of the company, the number of sales, the number of customers, and actual confusion" in
determining whether secondary meaning exists. *Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277, 292 (3d Cir. 1991).

Novartis has adequately demonstrated the size of the company, the number of sales, and
the number of customers. *Id.* It is one of the most well-known global pharmaceutical companies

---

[2] The Court does not find that the trade dress is generic. Opp'n at 16. In trade dress law "the
inquiry into functionality resembles the genericness inquiry in trademark law." *Duraco Prods., v.
Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1442 (3d Cir. 1994). And the Court agrees with Novartis
that the relevant market is Novartis's competitors. Reply at 6 (citing *McNeil Nutritionals, LLC v.
Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 390 (E.D. Pa. 2008)). Obviously, there is a finite
amount of shapes and sizes that pills can come in. Opp'n at 17. But the Court is satisfied that
enough distinctions exist to determine that ENTRESTO® is not generic. Mot. at 18.

with net sales exceeding $45.4 billion in 2023.  D.E. 4-3 ¶¶ 6 ("Miller Decl.").  It is estimated to have helped over 284 million people worldwide in 2023.  *Id.*  As to ENTRESTO® specifically, it has generated more than $10.5 billion in cumulative net sales in this country between 2015 and 2023.  *Id.* ¶ 26.  Novartis estimates that over 2.5 million people have used ENTRESTO® to help with heart failure.  *Id.* ¶ 25.  MSN's opposition focuses primarily on exclusivity of use and buyer association, which the Court will address in turn.

*First*, although the shape, size, and colors of ENTRESTO® *alone* do not achieve secondary meaning, the Court finds that the length and exclusivity of use of the trade dress weighs in Novartis's favor.  ENTRESTO® has been the only drug of its kind available to treat patients with heart failure for the last nine years.  D.E. 4-5 ¶ 8.  MSN does not dispute this, but instead argues that because the trade dress consists of ubiquitous sizes, shapes, and colors, these features cannot be used to identify Novartis.  Opp'n at 19.  Of course, color alone is not inherently distinctive, *Wal-Mart*, 529 U.S. at 212, but MSN seems to just repackage its argument about genericness here.  And color, "in combination with other characteristics," can be protectable.  *See Smithkline Beckman Corp. v. Pennex Prods. Co., Inc.*, 605 F. Supp. 746, 750 (E.D. Pa. 1985).  Under MSN's theory, *no* drug could ever receive trade dress protection because there is a finite universe of size, shape, and color options.  ENTRESTO® is "the number one branded treatment for heart failure prescribed by cardiologists" and has been on the market since 2015.  Miller Decl. ¶¶ 19-20.  The Court is satisfied that Novartis's continuous marketing of this trade dress weighs in favor of the exclusivity and length elements.  *See Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 852 (3d Cir. 1983).

*Second*, MSN argues that, despite Novartis's expansive marketing campaign, it has not adequately shown buyer association with ENTRESTO®.  Opp'n at 19-20.  Courts do "place

particular weight in customer surveys and testimony because, though they 'are not dispositive, they are the only direct evidence of secondary meaning.'" *Richardson v. Cascade Skating Rink*, No. 19-8935, 2024 WL 3841942, at *8 (D.N.J. Aug. 16, 2024) (quoting *King of Prussia Dental Assocs., Ltd. v. King of Prussia Dental Care, LLC*, No. 19-1688, 2019 WL 2240492, at *12 (E.D. Pa. May 23, 2019)). Novartis does offer very little by way of direct consumer testimony. But it does offer testimony that a prescriber "recognize[d] Entresto just by seeing the pills." Nayeri Decl. ¶ 20.

The Court also disagrees with MSN's characterization of Novartis' marketing materials as highlights of the doses associated with each pill to the exclusion of the pills' source. Opp'n at 20. Although the marketing materials often provide instructions on how to take the trio of doses, *see, e.g.*, D.E.s 4-54, 4-55, 4-58, these materials have "routinely featured the [pills'] physical appearance in pictures as well as described them in words," *Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 547 F. Supp. 1095, 1101 (D.N.J. 1982), *aff'd*, 747 F.2d 844. The Court fails to see how instructions on initiating dosing washes away "promotional efforts . . . not only to familiarize" consumers with the name ENTRESTO® "but also with [ENTRESTO®'s] appearance." *Boehringer*, 532 F. Supp. at 1056. Accordingly, the Court finds that Novartis has met its burden and demonstrated the trade dress has likely achieved secondary meaning.

### 3.    Likelihood of confusion

To determine the final element of a trade dress infringement claim, courts in this district use the Third Circuit's ten-factor test, known as the *Lapp* factors:

> (1) the degree of similarity between the plaintiff's trade dress and the allegedly infringing trade dress;
>
> (2) the strength of the plaintiff's trade dress;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used its trade dress without evidence of actual confusion arising;

(5) the intent of the defendant in adopting its trade dress;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the plaintiff to manufacture a product in the defendant's market, or that the plaintiff is likely to expand into that market.

*McNeil*, 511 F.3d at 358 (citing *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471

(3d Cir. 2005), further citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)).

Factors 4 and 6 are neutral because MSN has not yet launched the MSN Drug.  Mot. at

27.  The Court addresses the remaining factors as follows.

### a.    Factor 1: degree of similarity

There is no question that the two trade dresses are strikingly similar.



| Image of ENTRESTO® Tablet | | | |
| --- | --- | --- | --- |
| Image of MSN's Tablet[52] | | | |
| Dosage | 24/26 mg | 49/51 mg | 97/103 mg |

Compl. ¶ 93.

This is true despite the different markings on the pills, because "[t]he proper test is 'not

side-by-side comparison' but 'whether the labels create the same overall impression when viewed

separately.'"  *Kos*, 369 F.3d at 713 (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30

F.3d 466, 477 (3d Cir. 1994)).  This factor weighs in favor of Novartis.

13

### b.    Factor 2: strength of trade dress

MSN makes the same arguments regarding functionality and secondary meaning with respect to the strength of the trade dress.  Opp'n at 23.  The Court adopts its reasoning regarding these arguments, *supra*, Sections IV.A.1-2, and finds this factor favors Novartis.

### c.    Factor 3: consumer care in purchase

The Court agrees with MSN that because the products at issue are prescription medications, the relevant market consists primarily of medical professionals, not consumers.  Opp'n at 24; *see Astrazeneca AB v. Dr. Reddy's Labs., Inc.*, 145 F. Supp. 3d 311, 317 (D. Del. 2015).  This factor weighs in favor of MSN.

### d.    Factor 5: intent to infringe

Although awareness of Novartis's trade dresses does not demonstrate bad faith, the Court still finds this factor weighs in Novartis's favor.  The Court already rejected MSN's functionality argument, *supra*, Section IV.A.1, so it declines to adopt MSN's position that the evidence unequivocally demonstrates that the similar appearances were driven by functional and regulatory considerations.  Opp'n at 25.  While the functionality arguments necessarily overlap with those demonstrating an interest in providing visual cues to patients shifting from a branded drug to a generic drug, it does also demonstrate that MSN intended for the pills to look similar.  The totality of the circumstances here results in this factor favoring Novartis.  *Astrazeneca*, 145 F. Supp. 3d at 317.

### e.    Factors 7-10: competition and overlap

The Court is persuaded by the District Court of Delaware's analysis in dealing with a branded product and generic, also finding that "[Novartis] and [MSN] are still competing in the same market for the same consumers in the first instance, even if [MSN] is ultimately competing against other generics once the decision to buy a generic has been made." *Id.* at 318.  These factors

14

weigh in favor of Novartis.  Accordingly, Novartis has demonstrated a likelihood of confusion and a likelihood to prevail on its trade dress infringement claim.

> ### 4.  Irreparable harm

"[A] party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted."  *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014).[3]  Novartis argues that it will suffer irreparable harm through loss of control over its reputation (if MSN's drug is defective) and loss of trade in the form of lost sales (if patients request refills of the MSN Drug, instead of ENTRESTO®).  Mot. at 37-38.  MSN counters that Novartis's multi-year delay in bringing this action militates against injunctive relief and that its reputational harm theory is too speculative.  Opp'n at 34-35.

> #### a.  The delay here does not vitiate irreparable harm

Third Circuit caselaw "may imply that inexcusable delay"—*i.e.,* not attributable to negotiations between the parties—"could defeat the presumption of irreparable harm in an appropriate case[.]"  *Kos*, 369 F.3d at 727.  Though the parties dispute the timeline of Novartis's knowledge of the MSN Drug's appearance, whether Novartis did in fact delay its request for injunctive relief is "most relevant for purposes of the Court's consideration of irreparable harm."  *Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*, 99 F. Supp. 3d 461, 504 (D.N.J. 2015).

MSN represents that in the course of the parties' patent claim litigation, MSN produced to Novartis a complete copy of its ANDA, including comparator images of the drugs, in 2020.  D.E. 13-2 ¶ 21.  It also states that it provided Novartis physical samples of MSN's pills for testing in

---

[3] Novartis misstates the law on this point, arguing it is entitled to a presumption of irreparable harm.  Mot. at 37.  The Third Circuit clarified the standard for irreparable harm in Lanham Act cases.  *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 203 (3d Cir. 2014).

January 2021.  *Id.* ¶ 22.  Nonetheless, MSN avers, Novartis never raised concerns with the appearance of MSN's pills.  *Id.* ¶ 23.  If this information is accurate, it would assuredly counsel against a finding of irreparable harm.

However, Novartis provides further context; the ANDA was produced in that MDL "confidential[ly] pursuant to Delaware Local Rule 26.2."  D.E. 17-3 ¶ 18 (citing D.E. 13-10 at 1).  Delaware Local Rule 26.2 states that if documents are deemed confidential by the producing parties who have not stipulated to a confidentiality agreement, disclosure is limited to trial counsel and where appropriate, those who have been admitted *pro hac vice*, and the individuals remain "under an obligation to keep such documents confidential and to use them **only for the purpose of litigating the case**." (emphasis added).  On September 18, 2020, Judge Stark entered a protective order in the MDL, designating "abbreviated new drug applications (ANDAs) and related FDA correspondence, Drug Master Files, test data relating to physical and/or chemical properties, and materials concerning research and development" as attorneys' eyes only and limiting disclosure to those designated as a qualified person, including specific people involved in or retained for the purpose of that litigation.  *Id.* ¶¶ 11-12.  The protective order further limited the use of protected information to the MDL actions.  *Id.* ¶ 16.

True, practically speaking, Novartis has known about the MSN Drug's purported similar appearance to ENTRESTO® for many years.  And the Court is not naïve to a multi-district strategy of litigation based on numerous legal theories to prevent the MSN Drug from hitting the market.  But for purposes of *this* case, at earliest, someone from Novartis could have learned about the MSN Drug's physical appearance through a written description of the drug in an exhibit filed in separate litigation on August 6, 2024.  *Id.* ¶ 28.  At earliest, images of the drug were seen on August

9, 2024, during oral argument in the MDL, though even that visual would presumably be covered by the protective order limiting its use to those actions.  *Id.* ¶ 29.

The exhibit describing the MSN Drug's physical appearance is fair game, as it was produced in *Novartis Pharm. Corp. v. Becerra*, No. 24-2234, 2024 WL 3823270 (D.D.C. Aug. 13, 2024), which was not constrained by the protective order in the Delaware MDL.  A persuasive argument can be made that a detailed written description of the dimensions, colors, and shapes of a drug is sufficient for purposes of determining whether a trade dress has been copied.  Nonetheless, given the complexities of this case and the fact that the MSN Drug has not yet gone to market, the Court does not find the five-month delay precludes a finding of irreparable harm.  Having so found, the Court turns to the actual theory of irreparable harm.

> b.    *Theory of reputational harm*

"Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill" and irreparable harm "can also be based on the possibility of confusion."  *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 378 (3d Cir. 1992).  The *Becerra* court conducted a well-reasoned rejection of such a speculative theory of harm "that a brand-name manufacturer will lose general customer goodwill due to the deficiencies of a generic competitor."  2024 WL 3823270, at *6.  However, that case involved FDA's approval of the MSN Drug.  Instead, the Court is bound by a recognized theory of irreparable harm of "lack of control which potentially might result in a damaged reputation."  *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990).  Relatedly, although the Court does not find that MSN necessarily intended to create a false impression that the MSN Drug is an authorized generic, rather than a bioequivalent, it finds the holding in *Astrazeneca* persuasive, that a misplaced affiliation with Novartis (and ENTRESTO®) "puts at risk [Novartis's] reputation in the event of quality or safety issues with [MSN's] generic."

17

2015 WL 7307101, at *5.  Accordingly, Novartis has demonstrated a likelihood of irreparable harm.

### 5.   Harm to defendants and public interest

Having found the "gateway factors" in Novartis's favor, the Court must turn to the remaining two factors and determine in its discretion if all four balance in favor of granting injunctive relief.  *Reilly*, 858 F.3d at 179.  There is no question that MSN would suffer significant hardship if enjoined.  Opp'n at 36.  It would lose its "first mover advantage" and face financial, research, and development setbacks.  *Id.*  The Court is also mindful of the societal benefits of affordable alternatives to brand-name drugs and laments obstacles to such access.  *See Otsuka*, 99 F. Supp. 3d at 507.  However, it is axiomatic that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).  As noted *supra*, MSN could have distinguished its pills. Accordingly, on balance, a preliminary injunction is warranted and the Court will **GRANT** a preliminary injunction.

### B.   Trademark Infringement[4]

#### 1.   There is no likelihood of confusion with the NOVADOZ mark

The elements for a trademark infringement claim under the Lanham Act are the same for those under New Jersey statutory and common law.  *J&J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002).  To establish such a claim, "a plaintiff must show that (1) it owns the mark; (2) its mark is valid and legally protectable; and (3) the Defendant's use of the

---

[4] Trademark infringement and unfair competition share the same elements and analysis. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001).

mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services." *Id.* MSN does not contest the first two elements, and instead argues that there is no likelihood of confusion between the parties' marks. Opp'n at 29. After analyzing the *Lapp* factors, the Court agrees. As a threshold matter, Novartis adopts its same position of neutrality on factors 4 and 6 as argued in its trade dress position. Mot. at 27, 33.

### a. *Factor 1: degree of similarity*

NOVADOZ is likely not confusingly similar to NOVARTIS. Novartis's arguments hinges on the fact that both words have three syllables, begin and end with similar sounds, and are coined words. Mot. at 31 (citing *Kos*, 369 F.3d at 712-15). In cases where the words contained the "same dominant syllable," they still gave the overall impression of similarity. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184 (3d Cir. 2010) (ForsLean and Forsthin gave overall similar impressions, and notably, the words "lean" and "thin" are interchangeable terms to consumers). The Court is not persuaded that there is a "similarity between the visual appearance" or aural similarity of the words NOVADOZ and NOVARTIS. *CPC Intern., Inc. v. Caribe Food Distribs.*, 731 F. Supp. 660, 665 (D.N.J. 1990) (Mazorca and Mazola look and sound alike). The marks are distinguishable in "'appearance, sound and meaning[].'" *Checkpoint Sys.*, 269 F.3d at 281 (quoting *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1096 (D.N.J. 1997)). The Court is also less persuaded that the "Doz" portion of NOVADOZ will be perceived to derive from Novartis's previous generics division, Sandoz. Mot. at 31. It is satisfied with MSN's attestation that the name is a combination of "Nova," meaning bright new star, and "doz," which invokes the word "dose." D.E. 13-2 ¶ 5. This factor weighs against Novartis.

### b. *Factor 2: strength of mark*

"To evaluate the strength of the mark, courts look at '(1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) [the mark's] commercial strength

(factual evidence of marketplace recognition).'" *What a Smoke, LLC v. Duracell U.S. Operations, Inc.*, No. 19-16657, 2024 WL 1327976, at *8 (D.N.J. Mar. 27, 2024) (quoting *Freedom Card*, 432 F.3d at 472). There is no dispute as to the ubiquity of the NOVARTIS trademark, given the company's massive profits and billions of dollars spent on marketing. Mot. at 32. However, as MSN points out, many marks begin with "Nov" or "Nova." Opp'n at 30 (citing D.E. 13-26). Novartis curiously dismisses third-party uses of the first three or four letters of the NOVARTIS mark and argues they do not undermine its strength, when it just made the argument that MSN has infringed because the first four letters of its mark are the same. Reply at 10. The Court is persuaded that there is enough evidence of third-party use of the prefix "Nov" or "Nova" so as to diminish the strength of the NOVARTIS mark. *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997); D.E. 13-26 (hundreds of trademarks with similar prefix). This factor weighs against Novartis.

### c.   Factor 3: consumer care in purchase

This factor weighs in favor of MSN for the same reasons explained *supra*, Section IV.A.3.c.

### d.   Factor 5: intent to infringe

Novartis also adopts its argument on this element as proffered in its trade dress claim. Mot. at 27, 33. Previously, Novartis argued that MSN's knowledge of the trade dress demonstrated its bad faith and intention to copy the design. *Id.* at 27. The Court is unconvinced by Novartis's argument that MSN "hid" its planned use of NOVADOZ in connection with the MSN Drug by initially producing a label with the MSN mark. Reply at 11. It is satisfied with MSN's explanation for the name for purposes of the preliminary injunction motion, D.E. 13-2 ¶ 5, and notes that the name has been used since 2018. Opp'n at 2. This factor favors MSN.

20

    *e. Factors 7-10: competition and overlap*

  The Court adopts its discussion *supra*, Section IV.A.3.e and finds these factors weigh in favor of Novartis, which evens the score.  However, given "[t]he single most important factor in determining likelihood of confusion is mark similarity," which the Court found against Novartis, on balance, Novartis has not demonstrated a likelihood of confusion.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000).  Accordingly, the Court finds that Novartis is not likely to succeed on its trademark infringement claim (and resultingly, its state law claims) and will **DENY** its Motion to this extent.[5]

## V. CONCLUSION

  For the reasons stated above, the Court will **GRANT in part** and **DENY in part** Novartis's Motion for Preliminary Injunction.  An appropriate Order accompanies this Opinion.


Dated:  March 17, 2025

                    Evelyn Padin, U.S.D.J.

---

[5] The Court recognizes that its holding above will enjoin MSN from putting the MSN Drug to market, functionally enjoining the use of the NOVADOZ name as well.

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>NOVADOZ PHARMACEUTICALS LLC, *et al.*,<br><br>Defendants. | No. 25cv849 (EP) (JRA)<br><br>**ORDER** |

Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation move for a preliminary injunction against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC for alleged infringement of Plaintiffs' trademark and trade dress rights. D.E. 4 ("Motion"). Having reviewed the parties' submissions and all other relevant items on the docket, and having determined that oral argument is not necessary,

**IT IS**, on this **17th** day of March 2025, for the reasons set forth in the accompanying Opinion,

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction, D.E. 4, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiffs have not demonstrated a likelihood to succeed on the merits of their trademark infringement and state law claims; and it is finally

**ORDERED** that Defendants are **PRELIMINARY ENJOINED** from manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying the MSN Drug, in a manner likely to infringe on Plaintiffs' trade dress.

Evelyn Padin, U.S.D.J.

2

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> NOVADOZ PHARMACEUTICALS LLC, *et al.*, <br><br> Defendants. | No. 25cv849 (EP) (JRA) <br><br> **OPINION** |

**PADIN, District Judge.**

This Court granted Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's (together, "Novartis") motion for a preliminary injunction, D.E. 4 ("PI Motion" or "PI Mot."), against Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") for alleged infringement of Novartis's trademark and trade dress rights. D.E. 32 ("Opinion"). Defendants have appealed that decision to the Third Circuit, D.E. 35, and move to stay the preliminary injunction pending that appeal. D.E. 37 ("Stay Motion" or "Stay Mot.").

The Court understands the imperative nature of the matter before it. After careful consideration of the arguments before it and the circumstances the parties face pending appeal before the Third Circuit, the Court will **GRANT** the Stay Motion.

## I. BACKGROUND

Novartis is a pharmaceutical company that manufactures ENTRESTO®, an FDA-approved heart failure prescription medication that was launched in 2015. D.E. 1 ("Compl.") ¶¶ 3, 52-53. It is the number one heart failure brand prescribed by physicians and has helped reduce the risk of

**NOT FOR PUBLICATION**

death and hospitalization for over 2.5 million patients. *Id.* ¶ 3. Novartis's generics partner is Sandoz, which used to be Novartis's wholly-owned generics division prior to its sale. *Id.* ¶ 7.

ENTRESTO® is offered in three doses, each in a unique combination of size, shape, and color. *Id.* ¶ 59. The Low Starting Dose, a 24/26 mg dose, is a violet white oval tablet, measuring 13.1 mm x 5.2 mm; the Recommended Starting Dose, a 49/51 mg dose, is a pale yellow oval tablet, measuring 13.1 mm x 5.2 mm; and the Target Dose, a 97/103 mg dose, is a light pink oval tablet, measuring 15.1 mm x 6.0 mm. *Id.* Images of the drug show that the face of each pill is marked "NVR." D.E. 4-4 ("Valazza Decl.") ¶ 15.

Novartis alleges that MSN will imminently bring to market a generic version of ENTRESTO®, under the NOVADOZ name, intending to confuse healthcare providers and consumers into believing NOVADOZ is affiliated with Novartis (the "MSN Drug"). Compl. ¶¶ 6-7. Novartis avers that the physical similarities between NOVADOZ and ENTRESTO®, as well as NOVADOZ's name—purportedly intended to invoke a combination of Novartis and Sandoz— reflect an intentional effort to deceive the marketplace. *Id.* ¶ 7. The launch of NOVADOZ, however, hinges on proceedings before the Federal Circuit. *Id.* ¶ 89. Patent barriers also currently prevent NOVADOZ and other generics from launching before July 16, 2025. D.E. 49.

MSN submitted an Abbreviated New Drug Application ("ANDA") for its generic equivalent to ENTRESTO® on July 7, 2019. D.E. 13-7 ("Nithiyanandam Decl.") ¶ 3. For an ANDA to receive FDA approval, the generic drug product must contain the same active ingredient(s) of the branded drug, come in the same dosage form, and deliver the same dose. *Id.* ¶ 4. As a result, the MSN Drug also comes in three tablets: a 24/26 mg tablet, 49/51 mg tablet, and a 97/103 mg tablet. *Id.* ¶ 5. MSN's 2019 ANDA contained proposed dimensions of the drug products, respectively measuring 10 x 4 mm, 13 x 5.10 mm, and 15 x 5.9 mm. *Id.* ¶ 6. Images of

**NOT FOR PUBLICATION**

the MSN Drug show that the face of each pill is marked "M." *Id.* The pills are not identical, but they are similar.



*Id.*

Novartis brings claims for trademark infringement, false designation of origin, trade dress infringement, and unfair competition. *Id.* ¶¶ 128-205. It argues that patients will face imminent health risks as the MSN Drug does not have identical FDA-approved dosing instructions and will be confused with ENTRESTO®. PI Mot. at 3. Specifically, the ENTRESTO® label and prescribing information directs certain patients to start with a low starting dose, while the MSN Drug label and prescribing information does not. *Id.* at 14-15. Novartis argues it will face reputational damage and loss of trade in the form of lost sales. *Id.* at 37.

## II.    PROCEDURAL HISTORY

Novartis's motion for a preliminary injunction also sought a temporary restraining order. PI Mot. This Court denied Novartis's request for temporary restraints but ordered expedited briefing on the preliminary injunction motion. D.E. 7. MSN's opposition, D.E. 13 ("PI Opp'n"),

3

and Novartis's reply, D.E. 17 ("PI Reply"), followed.  The Court then issued the Opinion.  Shortly

thereafter, MSN moved to stay.  Stay Mot.  Novartis opposed, D.E. 42 ("Stay Opp'n"), and MSN

replied, D.E. 44 ("Stay Reply").[1]

## III.  LEGAL STANDARD

As the standard for a stay or an injunction pending appeal "is essentially the same as that

for obtaining a preliminary injunction," the Court considers the preliminary injunction factors in

determining whether to grant the Stay Motion.  *Conestoga Wood Specialties Corp. v. Sec'y of U.S.*

*Dep't of Health and Human Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. 2013).

Novartis was required to demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if
> the injunction is denied; (3) that granting preliminary relief will not result in even
> greater harm to the nonmoving party; and (4) that the public interest favors such
> relief.

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708. (3d Cir. 2004). "[W]hen evaluating whether

interim equitable relief is appropriate, '[t]he first two factors of the traditional standard are the

most critical.'"  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (quoting *Nken v.*

*Holder*, 556 U.S. 418, 424 (2009)).  But "'[a] plaintiff's failure to establish any element in its favor

renders a preliminary injunction inappropriate.'"  *Conestoga*, 2013 WL 1277419, at *1 (quoting

*NutraSweet Co. v. Vit-Mar Enter., Inc.*, 176. F.3d 151, 153 (3d Cir. 1999)).

## IV.  ANALYSIS

The Court first addresses functionality before turning to MSN's primary argument that the

Court did not implement the proper burden-shifting framework to prove irreparable harm in

---

[1] The Court also indicated it was considering *sua sponte* reconsidering its Opinion and provided
the parties an opportunity to brief the issue.  D.E. 43.  The parties did so.  D.E.s 45-46.  The Court
addresses the Stay Motion and does not *sua sponte* reconsider its Opinion because "[a]s a general
rule, the timely filing of a notice of appeal . . .  divest[s] a district court of its control over those
aspects of the case involved in the appeal."  *Venen v. Sweet*, 758 F.2d 117, 120 (3d Cir. 1985).

4

**NOT FOR PUBLICATION**

trademark cases. Stay Mot. at 8. Novartis agrees that the Court applied the wrong framework for irreparable harm. Stay Opp'n at 11. The Court also agrees. The Court then addresses whether Novartis will suffer irreparable harm if the Court's preliminary injunction is not maintained for the time being. The Court finds that Novartis will not suffer irreparable harm if the Court stays its preliminary injunction for the pendency of MSN's appeal. As explained below, the parties' helpful reflection of the record in briefing the Stay Motion, the application of the appropriate legal framework, and attention to the parties' posture on appeal here in the Third Circuit and before the Federal Circuit merit staying this Court's preliminary injunction pending MSN's appeal. Therefore, the Court will grant the Stay Motion.

### A. Likelihood of Success on the Merits

"A plaintiff must prove three elements to establish trade dress infringement under the Lanham Act: '(1) the allegedly infringing design is nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners*, LLC, 511 F.3d 350, 357 (3d Cir. 2007)). This Court is also mindful of the Third Circuit's instruction that courts should "caution against the over-extension of trade dress protection." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 358 (2003). Trade dress protection should extend "only to incidental, arbitrary or ornamental product features which identify the product's source." *Shire*, 329 F.3d at 353. Upon close consideration of the parties' arguments, the Court finds that the allegedly infringed design is functional[2] and that Novartis is therefore

---

[2] The Court recognizes that its holding here is in conflict with its previous holding. Opinion at 6-10. The Court appreciates the parties' close attention to the issues in briefing the Stay Motion and notes that courts sometimes get things wrong. *See, e.g., Thompson Reuters Enter. Ctr. GmbH v.*

5

**NOT FOR PUBLICATION**

unlikely to succeed on the merits of its trade dress infringement claim on appeal. The Court also finds that in any event, Novartis is unlikely to suffer irreparable harm in the absence of injunctive relief during the pendency of the appeal.

### 1.     Non-functionality

MSN argues that it is likely to succeed on the merits of its appeal because the Court erred in finding non-functionality. Stay Mot. at 17-21. The Court agrees.

"Trade dress, a subset of trademark, protects distinctive choices (like size, shape, and color) that make up 'the overall look of a product.'" *PIM Brands Inc. v. Haribo of Am. Inc.*, 81 F.4th 317, 321 (3d Cir. 2023) (quoting *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 255 (3d Cir. 2021)). To be functional, the trade dress as a whole "need only be useful, not essential." *Ezaki Glico*, 986 F.3d at 258. And [t]he question is not whether the product or feature is useful, but whether 'the particular shape and form' chosen for that feature is." *Id.* at 257 (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:70 (5th ed. 2020)).

"A nonfunctional feature is one that 'is unrelated to the consumer demand . . . and serves merely to identify the source of the product or business.'" *EBIN New York, Inc. v. Kiss Nail Prods., Inc.*, No. 23-2369, 2024 WL 1328029, at *6 (D.N.J. Mar. 28, 2024) (quoting *Fair Wind*, 764 F.3d at 311). "Conversely, a functional feature is 'one that is essential to the use or purpose of the article, affects the cost or quality of the article, or one that, if kept from competitors, would put them at a significant non-reputation-related disadvantage.'" *Id.* (quoting *Fair Wind*, 764 F.3d at 310). The Court evaluates the color, size, and shape of ENTRESTO® and finds that all aspects are functional.

---

*Ross Intel. Inc.*, No. 20-cv-613-SB, 2025 WL 458520, at *1 (D. Del. Feb. 11, 2025) ("A smart man knows when he is right; a wise man knows when he is wrong. Wisdom does not always find me, so I try to embrace it when it does—even if it comes late, as it did here.").

**NOT FOR PUBLICATION**

a. Color-Coding and Size

MSN argues that communication of functional information to patients—what drug each pill is and what dose it contains—is evidenced by the colors and sizes of the ENTRESTO® pills. PI Opp'n at 13. It further indicates that consistent color-coding systems can reduce therapeutic errors in other drug regimens. D.E. 13-40 ("Clark Decl.") ¶ 53. On the other hand, Novartis attests that it is unaware of "any functional reason why the Low Starting Dose and the Recommended Starting Dose need to be smaller than the Target Dose. These sizes could be made uniform without impacting the efficacy of the formulation." Valazza Decl. ¶ 20. According to Novartis, the selection of size and shape of the pills, therefore, was purely based on a desire to differentiate the tablets from competitors' trade dresses. *Id.* ¶ 16. And while ENTRESTO® comes in three doses, patients can progress up from the lower doses to the target dose. D.E. 4-11 ("Nayeri Decl.") ¶ 17. Patients typically take their tablets twice daily, indefinitely, irrespective of the dose on which they begin their regimens. *Id.* ¶ 18. According to Novartis, there is no need to distinguish between daily doses, because once adjusted to a particular dosage, patients remove the others from their medication cycle. PI Reply at 4 n.4.

Novartis's position, in sum, is that the ENTRESTO® trade dresses were designed to differentiate the drug in the heart failure treatment market, rather than to improve cost, quality, or efficacy. PI Mot. at 17. MSN counters that under Third Circuit precedent, color-coding of drugs to convey dosage information is functional. PI Opp'n at 12 (citing *Shire*, 329 F.3d 348). Novartis does not dispute that the color-coding and size distinctions between dosages is functional but instead disputes that the particular colors chosen "do not confer an edge in usefulness." Stay Opp'n at 25. The Court agrees with MSN and addresses the particular colors next. *See infra* IV. A. 1. b.

7

**NOT FOR PUBLICATION**

The Court finds that the distinctions between doses—based on color-coding and size—are likely functional because patients, physicians, and pharmacists rely on these distinctions of ENTRESTO® strengths to distinguish between the three different doses. Stay Reply at 10. The Court agrees with MSN that the color-coding and size of ENTRESTO® provides some "degree of clinical functionality"—just as Adderall did in *Shire*—because the record shows that ENTRESTO® patients, like Adderall patients, require some initial dosage titration and intermittent dosage adjustment. *Shire*, 329 F.3d at 354 (crediting the record that "color coding of a particular preparation of mixed amphetamine salts tablets confers a substantial degree of clinical functionality for the patient in the titration/adjustment process"); *see also* PI Reply at 4 n.4; Nayeri Decl. ¶ 18; D.E. 17-1 ("Nayeri Rebuttal Decl.") ¶ 30.

### b. The Particular Colors

Novartis argues that even if using color to distinguish doses is functional, "there is no functional reason to use the colors of white-violet, light yellow, and light pink." Stay Opp'n at 25. MSN argues that the particular colors are functional because by "using colors similar to those Entresto patients had become accustomed to," MSN achieves "the functional benefit of helping existing Entresto patients identify MSN's Drug as the correct drug." Stay Reply at 10 n.8.

The Court recognizes that MSN's identified feature of "helping existing Entresto patients identify the correct drug only by using colors similar to those Entresto patients had become accustomed to" inures to MSN's benefit in part because it associates MSN's Drug with Novartis's product. The Court agrees that the particular colors that Novartis chose were not innately functional. As the Third Circuit explained, "[f]or instance, though ironing-board pads need to use some color . . . to avoid noticeable stains, there is no functional reason to use green-gold in particular. Though French press coffeemakers need some handle, there is no functional reason to

8

**NOT FOR PUBLICATION**

design the particular handle in the shape of a "C." And though armchairs need some armrest, there is no functional reason to design the particular armrest as a trapezoid." *Ezaki Glico*, 986 F.3d at 257-58.

But drug products can differ in nature compared to ironing board pads, coffeemakers, and armchairs. "[D]rug color cases have more to do with public health policy regarding generic drug substitution than with trademark law." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 169 (1995). Although there may have been no functional reason to have chosen violet white, pale yellow, and light pink in the first instance, those colors, once chosen can "come to represent to large numbers of those taking [the drugs] not its source but its ingredients and their effects." *Shire*, 329 F.3d at 358 n.20. Consequently, the colors can become

> functional to patients as well as doctors and hospitals; many elderly patients associate color with therapeutic effect; some patients comingle medications in a container and rely on color to differentiate one from another; colors are of some, if limited, help in identifying drugs in emergency situations; and use of the same color for brand name drugs and their generic equivalents helps avoid confusion on the part of those responsible for dispensing drugs.

*Inwood Laby's, Inc. v. Ives Laby's, Inc.*, 456 U.S. 844, 853 (1982). As a result, generic manufacturers that fail to mimic the RLD's color scheme can suffer "a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects [its] cost or quality.'" *Qualitex Co.*, 514 U.S. at 169 (quoting *Inwood Laby's, Inc.*, 456 U.S. at 850 n.10). This problem is of particular significance for patient populations who suffer from chronic illnesses, regularly comingle medications, and depend on a drug product's visual appearance to distinguish their medications from one another. *See Ives Laby's, Inc. v. Darby Drug Co., Inc.*, 488 F. Supp. 394, 399 (E.D.N.Y. 1980).[3]

---

[3] The Second Circuit reversed in *Ives Laby's, Inc. v. Darby Drug Co.*, 638 F.2d 538 (2d Cir. 1981) *sub nom.*, but the Supreme Court in turn reversed the Second Circuit in *Inwood Laby's, Inc. v. Ives*

**NOT FOR PUBLICATION**

The Court previously found that ENTRESTO®'s appearance "has an element of functionality" because it "can serve as useful visual cues for patients" and can provide "familiarity with a medication to be taken in seeming perpetuity." Opinion at *9. The Court appreciates the parties' thoughtful attention addressing the Declaration of Martin Shimer, the former Deputy Director of the FDA's Office of Generic Drugs. D.E. 13-46 ("Shimer Decl."). Shimer explains that mirroring the color scheme of the RLD helps to "ensure that patients are able to distinguish doses for similar products using the same functional cues as the color scheme of the branded RLD that a patient had been accustomed to receiving." Shimer Decl. ¶ 47. Shimer further explains that this is routine practice across the generic industry and helps avoid the uncertainty that would arise from generics using a different tablet size, shape, or color for their products. *Id.* ¶ 48 ("Patients rely upon visual cues and other distinguishing factors such as color and shape to both identify the kind of medication they are taking and how many times a day they take that medication.").

Considering the practical needs of patients with chronic illnesses and comorbidities who are often comingling multiple medications on a daily basis, the Court departs from the conclusion it reached in its prior Opinion. Analyzing functionality (or a lack thereof) of the particular colors of a drug product like ENTRESTO® differs in nature from the functionality of the particular colors chosen for products such as an ironing board pad. The Court therefore agrees with MSN and finds that the colors for ENTRESTO® are likely functional.

c.  Size and Shape

Relatedly, MSN also argues that the Court failed to address its evidence that it chose the shape and size of its pills for functional reasons. Stay Mot. at 20; Nithiyanandam Decl. ¶ 12

---

*Laby's, Inc.*, 456 U.S. 844 (1982). On remand from the Supreme Court, the Second Circuit affirmed the district court. *Ives Laby's, Inc. v. Darby Drug Co., Inc.*, 697 F.2d 291 (2d Cir. 1982).

10

NOT FOR PUBLICATION

("MSN's pills are ovaloid-shaped because that shape is very easy for patients to swallow. Ovaloid-shaped pills are also easier and more cost-effective for MSN to manufacture, including because they allow for a simpler mold design, more efficient use of the mold space, and more efficient coating and packaging processes. Indeed, hundreds if not thousands of other drug companies choose that ovaloid shape for their tablets for these functional reasons."). Although the Court agrees with Novartis that the functionality assessment turns on the plaintiff's trade dress, the Court nevertheless finds that the ovaloid shape and the size of Novartis's drug product are functional.

Shimer highlights the FDA's Physical Attribute Guidance[4] explaining the functionality of tablet size and shape. *Id.* (citing FDA Physical Attribute Guidance). For example, the FDA explains that survey data has shown "as many as 40 percent of Americans" have some difficulty swallowing tablets and capsules. FDA Physical Attribute Guidance at 2. "The size of the tablet or capsule influences esophageal transit, irrespective of patient factors and administration techniques." *Id.* Tablet shape affects esophageal transit time too. *Id.* at 3 ("Studies in humans have also suggested that oval tablets may be easier to swallow and have faster esophageal transit times than round tablets of the same weight.").

It is Novartis's burden to show that the ENTRESTO® trade dress is non-functional. *Shire*, 329 F.3d at 353. Yet, Novartis does not dispute that the size and shape of ENTRESTO® possess functionality. Stay Opp'n at 28-30; PI Brief at 17-20; PI Reply at 3-5. Instead, Novartis argues that it chose the ENTRESTO® trade dress "to distinguish ENTRESTO® from competitors' products." D.E. 17 at 3. But "product design almost invariably serves purposes other than source identification." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000). And here,

---

[4] U.S. Food & Drug Admin., Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules: Guidance for Industry (June 2015), https://www.fda.gov/media/87344/download (hereinafter "FDA Physical Attribute Guidance").

even if Novartis chose the shape and size of ENTRESTO® to distinguish it from other medications, the shape and size still seem to affect administrability of the medication and transit time after ingestion. The Court therefore credits Shimer's declaration and the FDA Physical Attribute Guidance here and finds that, like the colors of ENTRESO®, the size and shape of Novartis's drug products are likely also functional.

Because size, shape, and color all appear to be functional features of ENTRESTO®, the Court finds that MSN established that it is likely to succeed on appeal, with respect to the merits of its trade dress infringement claim under the Lanham Act. *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014). The Court now considers whether Novartis will face irreparable harm if the Court stays its preliminary injunction during the pendency of MSN's appeal.

### B. Irreparable Harm

The Trademark Modernization Act ("TMA") created a rebuttal presumption of irreparable harm, provided a likelihood of success on the merits is demonstrated. *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 184-85 (3d Cir. 2022); 15 U.S.C. § 1116(a). "Because the TMA does not explain how its rebuttable presumption applies, courts follow the Federal Rules of Evidence in this context." *Aljess LLC v. Tun Tavern Legacy Foundation Inc.*, No. 24-2388, 2024 WL 4988972, at *10 (E.D. Pa. Dec. 4, 2024). Federal Rule of Evidence 301 states that "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." The Court, therefore, must ask "whether the rebuttal evidence is enough to allow a reasonable factfinder to conclude that irreparable harm is unlikely." *Nichino*, 44 F.4th at 185.

The Court acknowledges it used the incorrect framework in its Opinion. The Court, however, also acknowledges that because the Court here finds that MSN has shown that it is likely

12

to succeed on the merits of its appeal, the statutory presumption does not apply to Novartis. Instead, Novartis must show that it "specifically and personally risks irreparable harm" during the pendency of the appeal. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009); *see also Del. State Sportsmens' Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204-05 (3d Cir. 2024) ("[Challengers] must show that, without a preliminary injunction, they will more likely than not suffer irreparable injury while proceedings are pending."). "Grounds for irreparable injury include loss of control over reputation, loss of trade, and loss of good will," but injuries "measured in solely monetary terms cannot constitute irreparable harm." *Buzz Bee Toys, Inc.*, 20 F. Supp. 3d 483, 510 (D.N.J. 2014) (quoting *Kos Pharms.*, 369 F.3d at 726). Novartis argues that it will suffer irreparable harm through loss of control over its reputation and loss of trade in the form of lost sales. PI Mot. at 37-38. For the reasons explained below, the Court here finds that for the pendency of MSN's appeal, MSN's evidence persuasively shows that irreparable harm to Novartis is unlikely.

The Court begins by addressing its prior finding that Third Circuit precedent dictated the outcome of Novartis's reputational harm theory. Opinion at *9 (quoting *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)). In *Opticians Association*, the Third Circuit held that "likelihood of confusion is inevitable, when . . . the identical mark is used concurrently by unrelated entities." *Id.* The Third Circuit agreed with the admonition that "[c]ases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement." *Id.* (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:7 (2d ed. 1984)). Here, however, the Court found it unlikely that trade dress protects the size, shape, and colors of ENTRESTO®. *See supra* IV. A.

13

Without a mark, this case is not an "open and shut" one and *Opticians Association of America* does not require holding that irreparable harm is a given.

      The Court must then address the merits of Novartis's theory of reputational harm. Novartis argues that "*if* the MSN Drug is defective, causes severe side effects . . . , or otherwise leads to safety concerns," Novartis's reputation will suffer the consequences. PI Mot. at 37-38 (emphasis added). In particular, Novartis points to MSN's proposed drug label, which omits dosing information that Novartis includes in its ENTRESTO® label. *Id.* Novartis's expert, Dr. Nayeri, also states that physicians may inadvertently refer to the drug label for MSN's Drug while prescribing ENTRESTO® and that reference to the label for MSN's Drug could result in dosing errors, thereby causing harm to patients and drawing disdain from HCPs. PI Reply at 13 (citing Nayeri Decl. ¶¶ 30-45). Finally, Novartis raises concerns that MSN's Drug has a higher risk of contamination by virtue of being manufactured in countries where some other drugs have had quality control problems. Nayeri Rebuttal Decl. ¶ 10. MSN calls this speculation. Stay Mot. at 11. The Court agrees with MSN.

      Safety has long fallen under the purview of the FDA. *See, e.g.*, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023). Here, the FDA has reviewed MSN's proposed drug label. *See Novartis Pharms. Corp. v. Becerra*, No. 24cv2234 (DLF), 2024 WL 3823270, at *6 (D.D.C. Aug. 13, 2024) (crediting "the FDA's judgment on [MSN's proposed drug label], which is set forth in 10-pages of highly technical analysis, [as] thorough and well-reasoned"). In the absence of evidence indicating that MSN's Drug actually is defective, will cause severe side effects, or will otherwise present safety concerns, the Court declines to assume that MSN's Drug—which can launch only if approved by the FDA and deemed bioequivalent to ENTRESTO®—is not as safe. The Court also agrees with MSN that Novartis's purported

14

**NOT FOR PUBLICATION**

scenario—where Novartis's reputation bears the blame when HCPs prescribe the wrong dose of ENTRESTO® after consulting the label for MSN's Drug after being led astray by images of MSN's Drug—is too speculative[5] for the Court to rely on and is credibly disputed by the opinion of MSN's expert Dr. Ardehali. PI Reply at 13; D.E.13-49 ("Ardehali Decl.") ¶¶ 35-39. Indeed, Novartis's expert opinions are hedged as scenarios that "could" occur. Ward Decl. ¶ 20 ("certain patients *could* receive a higher dose than is directed by the Entresto label"), ¶ 21 ("A patient . . . *could* believe the MSN Generic is Entresto . . . .") (emphasis added in both); Nayeri Decl. ¶ 29 ("An HCP *could* inadvertently mix up two drugs based on their appearance or confusingly similar manufacturer names. . . . Exposure to that information *could* lead HCPs to consult the generic's FDA-approved label and packaging insert . . . rather than through the branded drug's FDA-approved label and packaging insert. . . . "HCP confusion—and the inadvertent reference to the generic's prescribing information, rather than Entresto's prescribing information—*could* lead to patient harm. A confused HCP *might* fail to prescribe a reduced dosing regimen . . . .") (emphasis added in all). No particularized evidence indicates that these scenarios actually would occur.

And Novartis's concerns that contamination issues may affect MSN's Drug (and thereby Novartis's reputation) simply because some other drug manufacturers have faced similar issues in those countries of manufacture, is not enough to show that Novartis *specifically* and *personally* risks irreparable harm. PI Mot. at 38; *Liberty Lincoln-Mercury, Inc.*, 562 F.3d at 557. Thus, the

---

[5] Novartis also argues that this inadvertence will result in patients receiving MSN's Drug instead of ENTRESTO®. PI Reply at 13. Novartis does not explain how a patient will nevertheless receive MSN's Drug after a HCP erroneous reviews the label for MSN's Drug and erroneously prescribes the wrong dose of ENTRESTO®. *Id.*

**NOT FOR PUBLICATION**

Court agrees with MSN that Novartis has not shown that it is likely to face irreparable reputation-based harm.

The Court next addresses Novartis's economic-based theories of irreparable harm. Novartis argues that it will suffer loss of trade if "illegal substitution occurs or if confused patients request refills of the MSN Drug, rather than ENTRESTO®, through resources like Amazon Pharmacy or Medipod." PI Mot. at 38. Novartis also adds that it will lose sales to MSN. Robbins Decl. ¶¶ 18-27. Neither of Novartis's arguments are persuasive because Novartis provides no evidence that illegal substitution is likely to occur, nor does Novartis explain why its other injuries are not compensable by monetary damages. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015). Courts in this district and in others regularly find that lost sales are compensable injuries. *See, e.g.*, *Otsuka Pharm. Co., Ltd. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 501 (D.N.J. 2015) (collecting cases). This Court follows suit.

The parties have also clarified that irrespective of this Court's injunction, MSN is barred from launching its generic drug product before at least July 16, 2025. Stay Opp'n at 4-5 (citing *In re Entresto (Sacubitril/Valsartan) Patent Litig.*, No. 20-md-2930-RGA (D. Del.), D.E. 1823); *see also* D.E. 49 ("all patent barriers to MSN's entry will end by July 16, 2025"); D.E. 50 ("Novartis disagrees with MSN's representation that 'all patent barriers to MSN's entry will end by July 16, 2025 at the latest.'"). While this Court cannot predict the decisions of another, the Court is satisfied

16

**NOT FOR PUBLICATION**

that any harm to Novartis resulting from a stay of this Court's injunction will be temporally limited and not irreparable.[6]

Having determined that the two "gateway factors" appropriately favor MSN, the Court will stay its injunction for the pendency of MSN's appeal. *Reilly*, 858 F.3d at 179. Although the Court need not address the balance of equities and public interest prongs, the Court references its prior Opinion and finds that because trade dress does not apply, those factors now also favor staying the Court's injunction. Opinion at 18 ("There is no question that MSN would suffer significant hardship if enjoined. . . . The Court is also mindful of the societal benefits of affordable alternatives to brand-name drugs and laments obstacles to such access.").

## V.      CONCLUSION

For the reasons stated above, the Court will **GRANT** MSN's Motion for a Stay Pending Appeal. An appropriate Order accompanies this Opinion.


Dated: May 22, 2025

Evelyn Padin, U.S.D.J.

─────────────────────

[6] Novartis itself agrees that when "the time between the request for a preliminary injunction and the court's decision on the merits" is limited, that time serves as "an important limit on the harm." PI Reply at 12 n.13.

17

Add40

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG and NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>    Plaintiffs,<br><br>v.<br><br>NOVADOZ PHARMACEUTICALS LLC, *et al.*,<br><br>    Defendants. | No. 25cv849 (EP) (JRA)<br><br>**ORDER** |

Defendants MSN Laboratories Private Limited, MSN Pharmaceuticals Inc., and Novadoz Pharmaceuticals LLC (collectively, "MSN") move to stay the Court's order granting Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation's motion for a preliminary injunction. D.E. 37 ("Motion to Stay"). Having reviewed the parties' submissions and all other relevant items on the docket, and having determined that oral argument is not necessary,

**IT IS**, on this **22nd** day of May 2025, for the reasons set forth in the accompanying Opinion,

**ORDERED** that MSN's Motion to Stay, D.E. 37, is **GRANTED.**

Evelyn Padin, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-------------------------------------------------------------x
                                  :

NOVARTIS AG, NOVARTIS          :
PHARMACEUTICALS CORPORATION,    :
                                    :

            Plaintiffs,        :
                                    :      Civil Action No. 25-849

           v.               :
                                    :

NOVADOZ PHARMACEUTICALS LLC, MSN  :
PHARMACEUTICALS INC., and MSN     :
LABORATORIES PRIVATE LIMITED,     :
                                    :

           Defendants.      :
-------------------------------------------------------------x

**DECLARATION OF KRISTIN MILLER IN SUPPORT OF**
**PLAINTIFFS' ORDER TO SHOW CAUSE FOR A**
**TEMPORARY RESTRAINING ORDER**
**AND MOTION FOR A PRELIMINARY INJUNCTION**

I, Kristin Miller, hereby declare as follows:

    1.    I am over the age of 18.  I submit this declaration in support of Plaintiffs' Order to

Show Cause for a Temporary Restraining Order and Motion for a Preliminary Injunction.

Except as expressly indicated, the facts stated herein are based upon my personal knowledge,

including my experience in the pharmaceutical industry, my work at Novartis Pharmaceuticals

Corporation ("Novartis Pharmaceuticals"; together with Novartis AG, "Novartis"), and my

review of the business records of the company.

    2.    I am the Vice President and General Manager – MS/Neuroimmunology at

Novartis Pharmaceuticals, where I have been employed since 2018.  More generally, I have more

than 25 years of experience in the pharmaceutical industry, including, but not limited to, sales

and sales management, marketing, global services and general management.  During my time at

Novartis Pharmaceuticals, I have held various roles in marketing and general management and have worked in numerous therapeutic areas including ophthalmology, neuroscience and cardiovascular, including with ENTRESTO® (sacubitril/valsartan).

3.      In my current position, I am responsible for leading the General Management team for Multiple Sclerosis and Neuroimmunology, as well as the cross functional team.  From May 2021 through November 2024, I worked directly with Novartis's blockbuster drug product, ENTRESTO®.  From 2021 to 2022, I led the marketing team and was responsible for commercial strategy development and promotional activities for ENTRESTO®.  From 2022 through November of 2024, I led the development and oversight of the broader, cross-functional strategy, including P&L management, resource allocation, and overall performance for ENTRESTO®.

## Novartis Background

4.      Novartis AG is an innovative medicines company based in Switzerland.  It was founded in 1996 through the merger of two chemicals companies, Ciba-Geigy AG and Sandoz AG.

5.      Novartis AG, and its subsidiaries, including Novartis Pharmaceuticals, seek to improve and extend people's lives through the development of new medicines in four core therapeutic areas—cardiovascular, renal and metabolic; immunology; neuroscience; and oncology.

6.      Novartis is one of the most well-known pharmaceutical companies in the world, and it has been operating under the Novartis name for almost three decades.  Novartis's products are sold in approximately 130 countries.  In 2023, its net sales exceeded $45.4 billion, and Novartis estimates it helped over 284 million people across the world in 2023.  *See* Declaration of Megan K. Bannigan ("Bannigan Decl.") Ex. 38.

2

7.      The United States is an important market for Novartis, and its most recent net sales figures reflect its sustained growth in the United States:

| 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|
| $ 13,788,602,008 | $ 14,341,884,333 | $ 14,999,403,427 | $ 15,899,367,710 | $ 18,096,469,184 |

8.      It is important to Novartis's marketing strategy to use the NOVARTIS trademark, and the goodwill that it represents, on the packaging and inserts for each of its medications.  For example:



¹

---

3

Add44



9.      Novartis has spent billions of dollars marketing its drugs in the United States under the NOVARTIS trademark.  Novartis anticipates that it spent close to $1.3 billion dollars in marketing in the United States in 2024.

10.      Novartis advertises its pharmaceuticals to the general public using the NOVARTIS trademark via digital and traditional media channels, including the internet, television, newspapers, and magazines in the United States.  In each of these forums, the NOVARTIS trademark is prominently featured, ensuring that the public recognizes Novartis as the source of the advertised treatments.

11.      Some of our well-known advertisements feature celebrities, such as Grammy-award-winning singer Cyndi Lauper and actress Jamie-Lynn Sigler, who have benefited from Novartis treatments.  These promotions further raise the profile of the NOVARTIS trademark:

---





12.     Other advertisements use storytelling to encourage patients to improve their lives through Novartis treatments.  For example, it used the theme "Real Men: Challenge What You've Been Told" in a commercial encouraging men to get tested for prostate cancer:

---

3    *See* COSENTYX TV Spot, 'Years' Featuring Cyndi Lauper, iSpot.tv,, https://www.ispot.tv/ad/o9Um/cosentyx-years-featuring-cyndi-lauper (aired Oct. 29, 2019).

4    KESIMPTA TV Spot, 'My Time' Featuring Jamie-Lynn Sigler, iSpot.tv, https://www.ispot.tv/ad/5C85/kesimpta-my-time-featuring-jamie-lynn-sigler (aired Nov. 13, 2023).



[5]

13.     Novartis further maintains an active presence on social media websites, where it uses the NOVARTIS trademark on posts and content designed to inform investors, patients, and healthcare professionals ("HCPs")  about the company's mission and developments in its research.  For example, Novartis maintains the following social media accounts—all operating under handles incorporating the Novartis name:

| Social Media Site | Profile |
|---|---|
| YouTube (www.youtube.com/user/Novartis)[6] |  |

---

[5]     PSMA TV Spot, 'Real Men: Challenge What You've Been Told', iSpot.tv, https://www.ispot.tv/ad/6JDm/novartis-real-men-challenge-what-youve-been-told (aired June 2, 2024).

[6]     Bannigan Decl. Ex. 70.

6



---

[7]   Bannigan Decl. Ex. 67.

[8]   Bannigan Decl. Ex. 68.

[9]   Bannigan Decl. Ex. 69.

7

14.    Novartis also works to ensure that HCPs are familiar with the Novartis name brand.  Its trained sales representatives have met with tens of thousands of physicians, pharmacists, hospitals, insurance groups, managed care organizations, and other healthcare professionals in the United States to educate them on the therapeutic benefits and risks of Novartis's products.

15.    In the United States in the last year, Novartis has attended several top medical conferences, including the American College of Cardiology Conference and the American Heart Association Conference.

16.    Its booths at these events make prominent use of the Novartis name.  For example:



[10]

---

[10]    Bannigan Decl. Ex. 51.



17.    Because of these marketing efforts, consumers and physicians also know they can trust Novartis to provide high quality treatments.  In particular, Novartis was the top-ranking pharmaceutical company developing heart-disease focused drugs, according to a 2024 consumer perception survey released by ZoomRx.  According to an article in *Fierce Pharma*, the study surveyed clinicians and asked them to rank pharmaceutical companies based on metrics including promotional efforts, patient centricity, healthcare provider centricity, innovation, and reputation.  Doctors surveyed noted Novartis's "patient commitment and engagement."  *See* Bannigan Decl. Ex. 41.

**Entresto Background**

18.    ENTRESTO® is a Novartis prescription medicine that is approved by the U.S. Food and Drug Administration ("FDA") to treat adult and certain pediatric patients with chronic heart failure.  *See* Bannigan Decl. Ex. 39.

19.    Since launching in 2015, ENTRESTO® has been the only tablet available to patients that combines the active ingredients sacubitril and valsartan.

9

20.     ENTRESTO® has been recognized as a clinically superior treatment for patients suffering from chronic heart failure.  ENTRESTO® is the number one branded treatment for heart failure prescribed by cardiologists, and the 2022 guidelines adopted by the American Heart Association, American College of Cardiology, and Heart Failure Society of America recommend ENTRESTO® as a first line treatment for chronic heart failure.  *See* Bannigan Decl. Ex. 28.

21.     Doctors surveyed in the ZoomRx study noted above specifically called out Entresto as a "*key reputation driver*" for Novartis—serving to cultivate consumer trust and goodwill in Novartis.

### ENTRESTO®'s Distinctive Appearance

22.     ENTRESTO® is offered in three doses.  Each dose is offered in a different oval-shaped tablet with a unique color and size:



23.     Novartis has consistently offered the ENTRESTO® doses in these shapes, colors, and sizes since the drug was first sold in 2015.  *See* Bannigan Decl. Ex. 7.

24.     Patients who take ENTRESTO® quickly become familiar with the design of these pills because they take the appropriate dose of the medication twice a day indefinitely to treat their chronic heart failure.

10

## Marketing and Recognition of ENTRESTO®

25.     Novartis estimates that ENTRESTO® has helped over 2.5 million people with heart failure in the United States, making it Novartis's top-selling pharmaceutical in 2023.

26.     The drug has generated more than $10.5 billion in cumulative net sales in the United States between 2015 and 2023.  In 2021, ENTRESTO® generated $1.7 billion in sales in the United States.  In 2022, that figure grew to approximately $2.4 billion.  In 2023, it totaled over $3 billion, accounting for a substantial share of Novartis's revenue.

27.     Sales of ENTRESTO® were expected to exceed $3.5 billion in 2024 due to market dynamics in the Unites States, such as the displacement of other therapies for chronic heart failure, an aging population, and the rising incidence rate of health conditions that contribute to heart failure.

28.     ENTRESTO® is offered in three doses.[11]  The 24/26 mg dose is a violet white oval tablet, measuring 13.1 mm x 5.2 mm (the "Low Starting Dose"); the 49/51 mg dose is a pale yellow oval tablet, measuring 13.1 mm x 5.2 mm (the "Recommended Starting Dose"); and the 97/103 mg dose is a light pink oval tablet, measuring 15.1 mm x 6.0 mm (the "Target Dose") (together "the Trio of ENTRESTO® Tablets").  *See* Bannigan Decl. Ex. 5.

29.     The Low Starting Dose tablets and the Recommended Starting Dose tablets are the most sold doses of ENTRESTO®.  As of October 2024 YTD, Novartis has sold 314 million Low Starting Dose tablets, 172.6 million Recommended Starting Dose tablets, and 128.8 million Target Dose tablets in the United States.

---

[11]     Novartis also offers the ENTRESTO® SPRINKLE, which is not part of this proceeding.  The ENTRESTO® SPRINKLE consists of sacubitril and valsartan oral tablets within a capsule that can be mixed with food for ease of administration in, for example, pediatric patients.  *See* ENTRESTO® SPRINKLE prescribing information, https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/entresto.pdf#page=25 (last visited Jan. 29, 2025).

30.    ENTRESTO®'s success is driven by its efforts over the last nine years to educate patients and healthcare providers about the drug's lifechanging capabilities, and to ensure consumers know ENTRESTO® comes from Novartis, a brand they can trust.  In 2023 alone, Novartis's trained sales representatives met with tens of thousands of physicians, pharmacists, and other HCPs to educate them on the benefits of ENTRESTO®.

31.    Novartis highlights the Trio of ENTRESTO® Tablets in its marketing and promotional materials to ensure that patients and HCPs recognize the medication.  The appearance of the Trio of ENTRESTO® Tablets is portrayed with a consistent image:  the oval pills on their side, lined up next to each other, in the same color combination order: violet white, pale yellow, and light pink.

32.    The materials that Novartis distributes to HCPs consistently highlight the appearance of the Trio of ENTRESTO® Tablets when introducing HCPs to the drug's three doses and explaining how to add the drug to a patient's care plan.

33.    For example, Novartis has a website for HCPs that is dedicated to information about ENTRESTO®.  The "Provider Resources" page of the website allows HCPs to "[d]iscover more about ENTRESTO®," and includes an educational video about the patient journey that shows the appearance of the Trio of ENTRESTO® tablets.

34.    The "Provider Resources" webpage also includes resources that HCPs can download, such as a "Dosing Flash Card" that features the appearance of the Trio of ENTRESTO® Tablets.  *See* Bannigan Decl. Ex. 32.



35.     The same image of the Trio of ENTRESTO® Tablets is included in

ENTRESTO®'s "Initiation Guide for Providers" also available on the "Provider Resources"

webpage.  *See* Bannigan Decl. Ex. 64.



36.     The "Dosing" page of the HCP-focused website also features the appearance of

the Trio of ENTRESTO® Tablets.  *See* Bannigan Decl. Ex. 46.

13



37.    Novartis has included images of the Trio of ENTRESTO® Tablets in materials it distributes to HCPs since the drug's launch in 2015.  For example, images of the ENTRESTO® tablets appear on a 2015 "Dosing and Titration Guide" Novartis distributed to physicians and depicted on the next page.  *See* Lossignol Decl. Ex. 1.

[CONTINUED ON NEXT PAGE]

14



38.     In addition, Novartis has distributed $29.8 million in samples of ENTRESTO® to physicians to give to their patients, ensuring that physicians see the Trio of ENTRESTO® Tablets and are familiar with the appearance of those tablets.

39.     As of October 2024, Novartis had given away as samples 13.6 million violet white Low Starting Dose tablets and 13.7 million pale yellow Recommended Starting Dose tablets in the United States.

40.     Novartis further recognizes that physicians are a key source of educational materials for their patients.  To facilitate this, Novartis provides materials to physicians to distribute to their patients that include the appearance of the Trio of ENTRESTO® Tablets.

41.     For example, a page in an in-office brochure available on the "Patient Resources" webpage uses the appearance of the Trio of ENTRESTO® Tablets.  *See* Bannigan Decl. Ex. 47.



42.     As does the Heading Home Digital Kit, which offers a "quick guide for patients

that are heading home with ENTRESTO®" and can be downloaded from the "Patient

Resources" webpage.  *See* Bannigan Decl. Ex. 42.

16

Add57



43.    Novartis also markets directly to patients in the United States about the potential benefits of ENTRESTO®.  Showing patients images of the Trio of ENTRESTO® Tablets is central to these efforts.  For example, Novartis has a patient-focused website where it provides information to consumers hoping to learn more about ENTRESTO®, as well as existing patients looking for additional information about the medication.  This website includes images of the

17

Trio of ENTRESTO® Tablets, much like the physician-facing webpage. *See* Bannigan Decl. Ex. 43.



44.     Novartis has spent approximately $2.1 million developing and designing the webpages and resources cited in this declaration. It has further spent over $200,000 printing resources that feature the ENTRESTO® trade dress to be distributed to HCPs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of January, 2025, in Ringoes, NJ.

Kristin Miller

18

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------x
                                                    :
NOVARTIS AG, NOVARTIS                                :
PHARMACEUTICALS CORPORATION,                         :
                                                    :
                        Plaintiffs,                 :
                                                    :        Civil Action No. 25-849
            v.                                      :
                                                    :
NOVADOZ PHARMACEUTICALS LLC, MSN                     :
PHARMACEUTICALS INC., and MSN                        :
LABORATORIES PRIVATE LIMITED,                        :
                                                    :
                        Defendants.                 :
------------------------------------------------------------x

<u>DECLARATION OF STEPHEN VALAZZA IN SUPPORT OF</u>
<u>PLAINTIFFS' ORDER TO SHOW CAUSE FOR A</u>
<u>TEMPORARY RESTRAINING ORDER</u>
<u>AND MOTION FOR A PRELIMINARY INJUNCTION</u>

I, Stephen Valazza, hereby declare as follows:

1.      I am Technical Project Leader at Novartis Pharmaceuticals Corporation (together

with Novartis AG, "Novartis"). I am over the age of 18 and am competent to testify. I submit

this declaration in support of Plaintiffs' Order to Show Cause for a Temporary Restraining Order

and Motion for a Preliminary Injunction. The facts stated herein are based on my personal

knowledge and on my review of Novartis's records and information in the public domain.

<u>Professional Background</u>

2.      I have worked at Novartis Pharmaceuticals Corporation since its founding in

1996. Before that, I worked at Ciba-Geigy, a predecessor to Novartis, for five years.

3.      I have a Bachelor of Science in Pharmacy from the University of the Sciences in

Philadelphia. I am a registered pharmacist by the New Jersey Board of Pharmacy.

Add60

4.      I have worked as a Technical Project Leader in the Technical Research and Development ("TRD") group at Novartis for more than 10 years.  TRD is responsible for developing new drugs and preparing them for commercial production, including developing the final form of the drug that will be offered to consumers.

5.      As a Technical Project Leader, I lead a development team that is focused on the formulation development, process development, technical transfer and scale-up for Novartis Pharmaceuticals Corporation.  I have worked on the formulation of numerous Novartis products, including Entresto.  In recent years, I have specialized in leading the formulation and technical development of malaria drugs and other global health products.

6.      Prior to my transition into the role as Technical Project Leader, I worked as a Drug Product Project Leader and Formulation Expert where I gained significant knowledge and experience in formulation and process development of solid dosage forms.

### Novartis Tablet Design

7.      Each Novartis tablet goes through a multi-phase product design process that involves stakeholders from several Novartis groups, including Legal, Marketing, Clinical Development, Regulatory Affairs, TRD, and Technical Operations.  This process covers every step of drug development leading to the commercial sale of the pharmaceutical.

8.      During the design process, TRD will run tests to determine the ways it can formulate a pharmaceutical without affecting its stability.  For example, a drug may be formulated as a film-coated tablet, a capsule, a powder or a liquid, among other options.

9.      Once appropriate formulations are identified, members of Novartis's product design team, including Marketing, will choose the form for the medication based on both regulatory factors as well as marketability and consumer preference.  For example, a liquid form may be chosen if the target consumer is a child.

2

Add61

10.     The product design process also includes choosing a color for the product.  For film-coated tablets like Entresto, Novartis has developed a proprietary color palette of 23 options.  If TRD determines that coloring does not impact the stability of the drug, the product design team can choose from these 23 options when designing the appearance of the drug.  This choice is typically driven by commercial factors, including the desire to differentiate Novartis's products from those of competitors.

11.     Aside from color, the process design team will also choose the shape of a film-coated tablet.  At Novartis, we typically use one of six different shapes for tablets: round flat, round curved, elongated flat, elongated curved, ovaloid flat, and ovaloid curved.  As with color, once TRD determines that a tablet format is viable for a certain pharmaceutical, the decision of what shape to use is largely driven by commercial factors (such as product differentiation).

12.     The size of a tablet is also part of the product design process.  A pharmaceutical tablet typically has a minimum size based on its formulation and compressibility.  However, that minimum size can be increased to meet certain aesthetic goals.  For example, a tablet size may be increased to make it uniform with other tablets in the same family of drugs.

### Entresto's Distinctive Appearance

13.     Entresto is a Novartis prescription medicine.

14.     Entresto is offered in three doses in the United States.  Each dose is offered as a film coated tablet.

15.     As shown below, the 24/26 mg dose is an ovaloid, violet white tablet measuring 13.1 mm x 5.2 mm (the "Low Starting Dose"); the 49/51 mg dose is an ovaloid, pale yellow tablet measuring 13.1 mm x 5.2 mm (the "Recommended Starting Dose"); and the 97/103 mg dose is an ovaloid, light pink tablet measuring 15.1 mm x 6.0 mm (the "Target Dose").

3



16.     The appearance of the Entresto tablets was chosen to differentiate the tablets from competitors' trade dress.

17.     The violet white, pale yellow, and light pink colors of the tablets were chosen from the Novartis color palette described above.  With respect to Entresto, the colors of the pills did not impact the stability of the drug.  Instead, when designing Entresto, the product design team had the option of any of the 23 colors from the Novartis color palette.  The selection of violet white, pale yellow, and light pink was unrelated to function or efficacy.

18.     The product design team also chose an "ovaloid" shape for the Entresto tablets to differentiate them from competitors' tablets.

19.     Entresto could have been offered in other shapes.  In fact, I was personally involved in the activities to change the shape of the lowest dose of the Entresto pill during the development phase from a round shape to an ovaloid shape.  This change was requested by Marketing to match the higher doses of Entresto, which were already in an ovaloid shape.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4

Add63

20.     Finally, I am not aware of any functional reason why the Low Starting Dose and the Recommended Starting Dose need to be smaller than the Target Dose.  These sizes could be made uniform without impacting the efficacy of the formulation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of January, 2025, in *East Hanover, NJ.*

_____
Stephen Valazza

5

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
------------------------------------------------------------x
                                              :
NOVARTIS AG, NOVARTIS                         :
PHARMACEUTICALS CORPORATION,                  :
                    Plaintiffs,               :
                                              :
                                              :
        v.                                    :        Civil Action No. 25-849
                                              :
NOVADOZ PHARMACEUTICALS LLC, MSN              :
PHARMACEUTICALS INC., and MSN                 :
LABORATORIES PRIVATE LIMITED,                 :
                    Defendants.               :
                                              :
                                              :
------------------------------------------------------------x
```

## DECLARATION OF JONATHAN WARD IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

I, Jonathan Ward, hereby declare as follows:

1.      I am a Senior Medical Director, working in cardiovascular clinical research, education, and medical affairs at Novartis Pharmaceuticals Corporation ("Novartis Pharmaceuticals," together with Novartis AG, "Novartis"). I am over the age of 18 and am competent to testify. I submit this declaration in support of Plaintiffs' Order to Show Cause for a Temporary Restraining Order and Motion for a Preliminary Injunction. Except as expressly indicated, the facts stated herein are based on my personal knowledge and on my review of Novartis's records and information in the public domain.

## Professional Background

2.      I have worked at Novartis for over eleven years.

3.      I have a Bachelor of Science in Biology from the University of Oregon and a Doctor of Pharmacy from the University of Washington.

4.      I have over two decades of experience working in cardiovascular clinical practice (ICU) and cardiovascular research, with eleven years of experience focusing specifically on treatments like Entresto. As a Senior Medical Director at Novartis Pharmaceuticals, I have been responsible for leading strategic and operational planning for Medical Affairs for Entresto, as well as leading US clinical trials and evidence generation projects related to Heart Failure research and treatments, including Entresto. I have been involved with five Entresto clinical trials and served on multiple Novartis US and global committees regarding this compound.

**History of ENTRESTO®**

5.      Entresto is a twice-daily oral pill that is commonly used to treat patients with chronic heart failure.

6.      Entresto has two active ingredients that can reduce strain on the heart and improve its ability to pump blood to the body—(i) valsartan, which reduces blood vessel tightening and the buildup of sodium and fluid, and (ii) sacubitril, which helps relax blood vessels and decrease sodium and fluid in the body.

7.      There are three doses of Entresto, each with increasing amounts of sacubitril and valsartan.  The 24/26 mg dose is an oval-shaped, violet white tablet, measuring 13.1 mm x 5.2 mm (the "Low Starting Dose"). The 49/51 mg dose is an oval-shaped, pale yellow tablet, measuring 13.1 mm x 5.2 mm (the "Recommended Starting Dose"). And, the 97/103 mg dose is an oval-shaped, light pink tablet, measuring 15.1 mm x 6.0 mm (the "Target Dose").

2

8. For the last nine years, Entresto has been the only sacubitril/valsartan combination drug available to treat patients with heart failure.

9. Entresto is the number one heart failure brand prescribed by cardiologists, and it serves as a vital treatment option for many patients with heart failure. *See* Declaration of Megan K. Bannigan ("Bannigan Decl.") Ex. 28.

### Comparison to MSN's Sacubitril/Valsartan Combination Drug

10. On July 24, 2024, MSN Laboratories Private Limited and MSN Pharmaceuticals Inc., (collectively, "MSN"), received US Food and Drug Administration ("FDA") approval for a generic sacubitril/valsartan combination drug (the "MSN Generic").

11. I understand that MSN is set to imminently launch its generic sacubitril/valsartan combination.

12. I understand that the MSN Generic will be offered in the same doses as Entresto and the tablets for each dose will be nearly identical in appearance to the Entresto Low Starting Dose, Recommended Starting Dose, and Target Dose.

13. I also understand that Novadoz Pharmaceuticals LLC, which identifies itself as MSN's "marketing partner" and which markets pharmaceuticals under the NOVADOZ brand, will be involved in the distribution of the MSN Generic based on the most recent publicly available version of the product label and package insert.

14. While the FDA has determined that the MSN Generic is therapeutically equivalent to Entresto, the products have different dosing directions. As a result, confusion between Entresto and the MSN Generic could cause harm to patients, the Entresto brand, and to Novartis.

3

**The Dosing Regimen Carveout for the MSN Generic
Could Lead to Serious Side Effects for Certain Patients**

15.     The label for the MSN Generic omits important dosing information that is included on the label for Entresto.

16.     Entresto's label includes a modified dosing regimen for adult patients who are not currently taking angiotensin-converting enzyme inhibitors or angiotensin II receptor blockers or previously were taking low doses of these drugs.

17.     For these patients, Entresto's label (Section 2.6) includes a direction to prescribe the Low Starting Dose, rather than the typical Recommended Starting Dose.

18.     This modification improves the safety and tolerability of Entresto for these patient groups and helps to avoid certain side effects like hypotension (low blood pressure), electrolyte disturbances, and renal injury/failure.

19.     The modified dosing directions in Section 2.6 of Entresto's label are wholly omitted from the MSN Drug's label.  *See* Bannigan Decl. Exs. 92–94.

20.     Because of this dosing regimen carveout, if a health care professional ("HCP") referred only to the dosing directions for the MSN Generic, either intentionally or because they believed that the MSN Generic was Entresto or would be interchangeable for Entresto based on a mistaken impression that Novartis is the source of or somehow affiliated with the MSN Generic, certain patients could receive a higher dose than is directed by the Entresto label.

21.     A patient who experiences side effects from taking a higher starting dose that is not tailored to their status could believe the MSN Generic is Entresto based on the

4

Add68

nearly identical appearance of the drugs or the generic's ties to the NOVADOZ name and attribute any negative side effects to Entresto and/or Novartis.

### Substitution of the MSN Generic for ENTRESTO® Will Lead Patients and Physicians to Attribute Harm to Entresto and/or Novartis

22.     An HCP can write a prescription for Entresto by writing its generic name ("sacubitril/valsartan") or its brand name ("Entresto") on the prescription form that is delivered to the pharmacy.

23.     Because Entresto is the only available sacubitril/valsartan combination product, pharmacists currently will fill any prescriptions written for either "ENTRESTO" or "sacubitril/valsartan" with ENTRESTO®. This will change if the MSN Generic is able to enter the market.

24.     State law typically governs the substitution of generic drugs for their brand name equivalents. These laws may permit, and in some states require, a pharmacist to substitute a generic drug that has been "AB" rated, meaning the FDA has found it to be therapeutically equivalent to the brand name drug.

25.     The MSN Generic is "AB" rated to Entresto.  As a result, if the MSN Generic is made available, pharmacists typically will have either the option or the obligation (depending on state law) to fill prescriptions written for either "Entresto" or "sacubitril/valsartan" with the MSN Generic—unless the HCP writes "Dispense As Written" or "Brand Medically Necessary" on the prescription or in states where the patient is required to consent to the substitution and refuses.

5

26.     Pharmacists also have an incentive to fill prescriptions with generic drugs because they historically have been able to take advantage of a higher reimbursement spread on lower-cost generic drugs than they do when dispensing branded drugs. This pattern can be expected to unfold with respect to Entresto and the MSN Generic.

27.     Because of this substitution practice, HCPs may tell patients they are prescribing Entresto, but the patients will be given the MSN Generic by pharmacies.

28.     Upon receiving the MSN Generic, the nearly identical appearance of the MSN Generic tablets and the Entresto tablets could confuse patients who are already taking Entresto (or received a sample of Entresto from their HCP) and are familiar with the shape, size, and color of their pill, as well as patients who have seen direct-to-consumer advertisements for Entresto featuring images of the pills.

29.     If a patient does not understand that they are taking a generic version of Entresto manufactured by a third party due to the way it is presented, the patient could associate any negative experience stemming from the MSN Generic with Entresto.

30.     For example, if MSN has a manufacturing issue that affects the efficacy or safety of the MSN Generic or a patient has an adverse reaction to the MSN Generic, the patient would attribute that issue to Entresto.

31.     This would have a practical impact on patients' ability to accurately report unexpected side effects or adverse events caused by the MSN Generic to the FDA, which tracks such issues for patient safety. It could also lead them to report any issues with the drug to the wrong manufacturer, delaying resolution of what could be a larger issue with the MSN Generic.

32.     Any negative associations would also harm Novartis's reputation for producing high quality, lifechanging treatments, in the eyes of our consumers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of January, 2025, in *Portland, Oregon*

JONATHAN WARD

7

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

```
-------------------------------------------------------------x
                                    :
NOVARTIS AG, NOVARTIS               :
PHARMACEUTICALS CORPORATION,        :
                    Plaintiffs,     :
                                    :
                                    :
        v.                          :        Civil Action No. 25-849
                                    :
NOVADOZ PHARMACEUTICALS LLC, MSN    :
PHARMACEUTICALS INC., and MSN       :
LABORATORIES PRIVATE LIMITED;       :
                    Defendants.     :
                                    :
                                    :
-------------------------------------------------------------x
```

## DECLARATION OF DAVID LOSSIGNOL IN SUPPORT OF
## PLAINTIFFS' ORDER TO SHOW CAUSE FOR
## A TEMPORARY RESTRAINING ORDER
## AND MOTION FOR PRELIMINARY INJUNCTION

I, David Lossignol, hereby declare as follows:

1.      I am Global Head Legal Brand Protection at Novartis AG (together with

Novartis Pharmaceuticals Corporation, "Novartis").  I am over the age of 18 and am

competent to testify.  I submit this declaration in support of Plaintiffs' Order to Show

Cause for a Temporary Restraining Order and Motion for a Preliminary Injunction.

Except as expressly indicated, the facts stated herein are based on my personal

knowledge and on my review of Novartis's records and information in the public domain.

## Professional Background

2.      I have worked at Novartis for 15 years.  From January 2010 through

November 2015, I worked as a trademark attorney and senior trademark attorney at

Novartis Pharma AG, responsible for worldwide trademark, design and domain name

Add72

portfolios, and various related pan-European litigation matters. From November 2015 through December 2018, I was Head of Trademarks for Sandoz International ("Sandoz"), a division of Novartis AG, and oversaw management of Sandoz's global trademark portfolio. From January 2019 through October 2021, I served as Global Head of Trademarks, Domain Names and Copyright for Novartis Pharma AG, and led a team of trademark professionals handling all trademark, domain name, and copyright matters for Novartis Pharma worldwide. In this role, I worked with outside counsel to coordinate enforcement strategies to protect the intellectual property of Novartis Pharma for the Pharmaceutical Unit of the Innovative Medicines Division.

3.      Since 2021, I have been Global Head Legal Brand Protection at Novartis AG. When I started this role, I oversaw the global brand protection strategy for all Novartis divisions worldwide, which consisted of Sandoz and Novartis's Innovative Medicines Division, comprising the Oncology and Pharmaceutical units. Following a restructuring and spin-off of Sandoz in 2023, I now manage the legal brand protection strategy for all Novartis therapeutic units, including the corporate portfolio.

4.      I obtained law degrees at Nice Sophia-Antipolis University in France and have diplomas from Oxford Brookes University in the United Kingdom and from the Center for International Intellectual Property Studies in Strasbourg, France.

**<u>Novartis's Awareness of Increasingly Confusing Uses of NOVADOZ</u>**

5.      In June of 2019, Novartis became aware that Novadoz Pharmaceuticals LLC ("Novadoz Pharma") had submitted to the United States Patent and Trademark Office ("USPTO"), an application to register a stylized NOVADOZ mark for use in connection with goods in International Class 005, covering pharmaceutical treatments.

2

6.      In September of 2019, Novartis, through its then outside counsel, sent
Novadoz Pharma an email communicating that Novartis was concerned that uses of
NOVADOZ—a combination of Novartis and Sandoz—would confuse consumers as to
the source of Novadoz Pharma's generic drugs.

7.      Novadoz Pharma responded to this email communication stating its
disagreement with Novartis's concerns and its refusal to cease its use of the NOVADOZ
mark.  Novadoz further refused to engage in any further discussions regarding its use of
the mark with Novartis's counsel.

8.      At the time of Novadoz Pharma's refusal to cease and desist, Novartis was
not aware of Novadoz Pharma marketing or selling a generic version of any Novartis
drugs in connection with the NOVADOZ name.  Nor was Novartis aware of Novadoz
Pharma marketing or selling any generic drugs that copied any Novartis protected trade
dress.

9.      In 2021, Novartis became aware of Novadoz Pharma's distribution of a
generic version of a Novartis brand drug called Jadenu Sprinkle.  However, Jadenu
Sprinkle—which is offered in white granules—does not have a distinctive product design
trade dress.

**Trade Dress of MSN's Generic**

10.      On August 6, 2024, Novartis become aware that the appearance of the
generic version of ENTRESTO® (the "MSN Drug") developed by MSN Laboratories
Private Limited ("MSN Labs"), the parent company of MSN Pharmaceuticals Inc.
("MSN Pharma," together with MSN Labs, "MSN"), could resemble that of
ENTRESTO® when MSN filed an exhibit in another litigation that included a written

3

description of the appearance of the MSN Drug tablets. Attached as **Exhibit 2** is a true and correct copy of the exhibit filed by MSN in *Novartis Pharms. Corp. v. Becerra et al.*, No. 24-02234 (D.D.C. 2024), which includes the written description of the appearance of the MSN Drug. It describes the doses of the MSN Drug as follows:

    a.    24 mg/ 26 mg: "Purple colored, oval shaped, biconvex, film coated tablets"

    b.    49 mg / 51 mg: "Light yellow to yellow colored, oval shaped, biconvex, film coated tablets"; and

    c.    97 mg / 103 mg: "Light pink to pink colored, oval shaped, biconvex, film coated tablets."

11.    Novartis first saw images of the MSN Drug on August 9, 2024, when MSN relied upon a demonstrative slide depicting the MSN Drug in connection with an oral argument in *Novartis Pharms. Corp. v. MSN Pharms. Inc.*, No. 1:22-cv-01395 (D. Del. 2024). Attached as **Exhibit 3** is a true and correct copy of that demonstrative slide, which was lodged publicly by MSN on August 20, 2024. In the same case, MSN also filed a copy of MSN Lab's abbreviated new drug application ("MSN's ANDA") on August 20, 2024. *See* Declaration of Megan K. Bannigan Ex. 48.

12.    MSN's ANDA stated that the generic would be offered in three doses, all oval shaped: (1) the 24 mg/26 mg tablet would be purple colored and 10.00 x 4.00 mm; (2) the 49 mg/51 mg tablet would be light yellow to yellow colored and 13.00 x 5.10 mm; and (3) the 97 mg/103 mg tablet would be light pink to pink colored and 15.00 x 5.90 mm. *See* Exhibit 1, p. 2, 8. The ANDA further provided the below image of the tablets (right) in comparison to Entresto (left):

4

| PARAMETERS | REFERENCE LISTED DRUG | PROPOSED DRUG PRODUCT |
|---|---|---|
| Strengths | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg / 103 mg | 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg |
| Configuration | | |
| 24 mg/ 26 mg, 49 mg / 51 mg and 97 mg/ 103 mg | Bottle of 60's and 180's | Bottle of 60's and 180's |
| 24 mg/ 26 mg |  |  |
| 49 mg/ 51 mg |  |  |
| 97 mg/ 103 mg |  |  |

13.     The appearance of MSN's generic, as described and pictured in the ANDA, is nearly identical to that of the ENTRESTO® tablets, which have remained the same since the drug was launched in 2015.  Attached as **Exhibit 1** is a true and correct copy of the June 2015 Entresto Dosing and Titration Guide, which displays the ENTRESTO® tablets in the year they were first launched.

14.     Despite the ANDA, Novartis had no concrete proof in August 2024  that the MSN drug would actually launch in this format.  ANDA images can be altered and are not always representative of the look and feel of a product in real life.  For example, as shown on the next page, the alleged images of Entresto tablets included in the ANDA appear distorted, so it is unclear exactly how the MSN pills will appear.


[CONTINUED ON NEXT PAGE]

| Images of Entresto from the ANDA | Images of Entresto from Novartis Press Release[1] |
|---|---|
|  | |

### Use of NOVADOZ Name with MSN's Generic

15.     Novartis first became aware that Novadoz Pharma may use the NOVADOZ mark in some capacity in connection with a generic version of a ***Novartis*** product ***that copies the protectable trade dress of a Novartis pharmaceutical*** in early October 2024, based on a letter filed in *In re Entresto (Sacubitril/Valsartan) Patent Litigation*, No. 1:20-02930 (D. Del. Oct. 17, 2024), indicating that MSN had imported its drug into the United States, to be held by Novadoz Pharma.  Dkt. No. 1588.  However, at that time, Novartis was not aware that Novadoz would be used on consumer-facing materials in connection with the generic.  In particular, the FDA-approved package insert and label for MSN's generic to which Novartis had access at that time, did not use NOVADOZ and listed "MSN" as the distributor (as depicted below).

---

[1]     Press Release, Novartis, New analyses show Novartis' Entresto™ reduced cardiovascular death or hospitalization for heart failure, consistently benefitting patients with reduced ejection fraction regardless of prior heart failure hospital admissions or background therapy (April 2, 2016), https://novartis.gcs-web.com/novartis-analyses-show-improved-outcomes-in-heart-failure-patients.

6



16.    On January 20, 2025, Novartis discovered a new package insert and label

on the National Library of Medicine's DailyMed database for MSN's Drug showing that

the NOVADOZ mark would be used on the insert and label.  The NOVADOZ mark is

prominently visible on these materials (as depicted on the next page).



17.    Novadoz Pharma's consumer-facing use of NOVADOZ in connection

with MSN's generic version of ENTRESTO® is a dramatic expansion of its uses of the

mark, representing a progressive encroachment upon Novartis's trademark rights.  This

expansion has greatly heightened Novartis's concerns that consumers are likely to be

confused as to the source of MSN's generic sacubitril/valsartan product and believe that

7

Novartis has released its own, authorized generic either directly or in collaboration with Sandoz.

### Awareness of MSN's Intent to Imminently Launch

18.     On January 28, 2025, at 5:08 pm EST, counsel for MSN informed Novartis's counsel that it intends to launch its generic after the Federal Circuit issues a mandate in an appeal involving one of Novartis's patents covering ENTRESTO®, in *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, Appeal No. 23-2218 (Fed. Cir.).

19.     My understanding from counsel is that there is currently an injunction in place from the Federal Circuit preventing MSN from launching, but that the injunction will be lifted when the Federal Circuit issues its mandate.

20.     I further understand from counsel that the Federal Circuit's mandate could issue any time, including next week.

21.     Given the recent knowledge that MSN intends to use NOVADOZ on consumer-facing materials, Novartis is concerned that MSN will launch after the Federal Circuit's mandate issues, absent another order or injunction that prevents it from doing so, using the ENTRESTO® Trade Dresses alongside NOVADOZ, and that irreparable harm will be inevitable.

8

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30ᵀᴴ day of January, 2025, in *BASEL, SWITZERLAND*.

_____
David Lossignol

9

Add80

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Novartis AG, Novartis Pharmaceuticals Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> Novadoz Pharmaceuticals LLC, MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, <br><br> Defendants, | Civil Action No. 2:25-cv-00849 |

**EXPERT DECLARATION OF MARK ROBBINS, PH.D., J.D.**

**January 30, 2025**

# TABLE OF CONTENTS

I.      INTRODUCTION AND RETENTION ........................................................ 1

    A.   Qualifications and Experience ......................................................1

    B.   Assignment.....................................................................................2


II.     PHARMACEUTICAL COMPANIES CAN USE PILL APPEARANCE TO
        DISTINGUISH THEIR DRUGS IN THE MARKETPLACE AND HELP
        PATIENTS IDENTIFY THEIR MEDICATION ...................................... 4


III.    A GENERIC DRUG WITH A SIMILAR APPEARANCE TO ITS BRAND
        COUNTERPART MAY DERIVE SALES FROM PATIENTS WITH
        CHRONIC CONDITIONS WHO DO NOT REALIZE THAT THE
        SOURCE OF THEIR MEDICATION HAS CHANGED .......................... 9

## I.    INTRODUCTION AND RETENTION

### A.    Qualifications and Experience

1.    My name is Mark Robbins.  I am the President and Chief Executive Officer of Kodiak Strategic Consultants, LLC.  My business address is 3140 Harbor Lane North, Suite 202, Plymouth, Minnesota 55447.  A copy of my Curriculum Vitae, which includes lists of my testimony over the past four years and my publications over the last ten years, is attached as **Appendix A**.

2.    I received my Bachelor of Science in Biochemistry from the University of California, Los Angeles, in 1974, and a Ph.D. in Pharmacology from the University of Minnesota Medical School in 1980.  In 1991, I received my J.D. from the St. Louis University School of Law.

3.    I have over forty years of experience in the pharmaceutical and biotechnology industries, including the regulatory affairs, clinical and preclinical research, and FDA compliance matters relevant to a company's incentives and challenges in bringing innovator and generic drug and biologic products to consumers.  I have worked as a pharmaceutical regulatory affairs professional since the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act").

4.    Since 2011, I have been the President and Chief Executive Officer of Kodiak Strategic Consultants, and I have provided strategic, clinical, regulatory, quality, and business development consultation to numerous pharmaceutical and biotechnology companies. Additionally, I am an adjunct professor at the University of Minnesota Medical School in the Department of Pharmacology and at the University of Minnesota College of Pharmacy in the Department of Experimental and Clinical Pharmacology.

5.    From 2006 to 2011, I served as Chief Scientific Officer and Executive Vice President of Legal, Scientific, and Technical Operations at Upsher-Smith Laboratories ("Upsher-Smith"), a pharmaceutical company.  From 1998 to 2006, I served as General Counsel and Vice President of Legal and Regulatory Affairs at Upsher-Smith, and provided strategic and direct oversight of the regulatory, clinical, quality, and legal groups.  During my tenure at Upsher-Smith, I led Upsher-Smith's U.S. Food and Drug Administration ("FDA")

1

clinical and regulatory strategy, including product development priorities and strategies, and I handled negotiations with the FDA, resulting in NDA and ANDA approvals for several therapeutics, including drug-device combination products. Many of these approved NDAs and ANDAs were successfully commercialized and launched.

6. From 1996 to 1998, I served as the President and COO of Certus International, a Contract Research Organization ("CRO"). Since retiring from Upsher-Smith Laboratories, I have continued to work as a principal regulatory and strategic consultant for Certus International.

7. As described above, I have had direct involvement with submitting ANDA, NDA and BLA filings, obtaining FDA regulatory approvals, and commercially launching various pharmaceutical and biotechnology drug products. I have overseen the development of dozens of generic drugs, as well as innovator new drugs and biologic drug products throughout my tenure in the industry. With respect to commercial products, I have overseen marketing and promotional activities from a regulatory perspective. In conjunction with marketing professionals, I have also overseen tablet design and packaging as part of my research and development responsibilities.

**B.    Assignment**

8. I have been retained by counsel for Novartis AG and Novartis Pharmaceuticals Corporation (together, "Novartis" or "Plaintiffs") to: (i) explain the ways in which pharmaceutical companies use pill appearance to differentiate their products in the marketplace and enhance the ability of patients who have been prescribed the company's pills to identify that the pill is in fact the medication they have been prescribed, which would be Entresto® in the present case; and (ii) discuss the potential for patients to believe that a generic pill that is similar in appearance to its brand counterpart is associated with or sponsored by the manufacturer of the brand product.

9. I understand from Counsel that:

- Novartis has filed claims of trade dress infringement, trademark infringement, and unfair competition against Novadoz Pharmaceuticals

2

LLC, MSN Pharmaceuticals Inc., and MSN Laboratories Private Limited (collectively, "Novadoz" or "Defendants").[1]

- Novartis' claims stem from Defendants' manufacture and imminent distribution, promotion, and sale of a generic drug that Novartis alleges is nearly identical in appearance to Entresto®, Novartis's treatment for chronic heart failure, and that will be distributed in connection with the "Novadoz" name (the "Novadoz generic").[2]

- Entresto® has two active ingredients, sacubitril and valsartan, and it comes in three doses: (1) a 24/26 mg dose that is an oval pill, in a violet white color, measuring 13.1 mm x 5.2 mm; (2) a 49/51 mg dose that is an oval pill, in a pale yellow color, measuring and 13.1 mm x 5.2 mm; and (3) a 97/103 mg dose that is an oval pill, in a light pink color, measuring 15.1 mm x 6.0 mm.[3]

- Defendants received FDA approval for the Novadoz/MSN generic on July 24, 2024,[4] and are set to imminently launch the drug in the U.S.[5]

10. I have been retained at my customary rate of $1,000 per hour, and I am being reimbursed for my reasonable travel and out-of-pocket expenses that I incur in connection with my work on this matter. Staff at Analysis Group, Inc. working under my direction and supervision, have assisted me, and I receive compensation based on Analysis Group, Inc.'s professional fees. My compensation in connection with this matter has not affected my conclusions and does not depend on my opinions or the outcome of this matter.

11. I am independent from the parties and their legal advisors. I affirm that this declaration and the opinions expressed in it are my own genuine opinions, and not those of any organization or group with which I am or have been affiliated. This declaration and the opinions herein are based on my experience and analysis of the information available to

---

[1]  *Novartis v. Novadoz Pharmaceuticals, LLC, et al.,* Complaint ("Complaint").
[2]  Complaint, pp. 2-3.
[3]  Complaint, p. 23.
[4]  ANDA No. 213748 Approval Notice dated July 24, 2014, U.S. Food & Drug Administration, available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/213748Orig1s000ltr.pdf.
[5]  Complaint, p. 3.

3

me as of the date of this declaration, which includes publicly available information. The materials I relied upon in forming my opinions reflected herein are identified throughout the declaration. I reserve the right to supplement this declaration should I become aware of additional facts or additional documents relevant to the opinions I provide herein.

## II. PHARMACEUTICAL COMPANIES CAN USE PILL APPEARANCE TO DISTINGUISH THEIR DRUGS IN THE MARKETPLACE AND HELP PATIENTS IDENTIFY THEIR MEDICATION

12. Pharmaceutical companies can use the appearance of their drug products, particularly the color and shape, to distinguish their drugs in the marketplace.[6] There is a wide variety of pill shapes and colors that pharmaceutical companies can select. For example, **Figure 1** identifies 12 common tablet shapes that drug manufacturers use, and pill color options are generally available across the color spectrum.[7]

**Figure 1**
**Common Tablet Shapes[8]**



---

[6] Fritch, David M., "Should 'The Purple Pill' by Any Other Drug Company Still Be as Purple? The Changing Face of Trade Dress Protection for Pharmaceutical Manufacturers," *IDEA: The Intellectual Property Law Review*, 2006, Vol. 47.

[7] For example, Colorcon, a company that designs and develops specialty excipients and packaging for oral doses in the pharmaceutical and nutritional industries, offers Tablet Design Services, which allows companies to select their pill color from a range of the color spectrum, with distinct Pantone color references for different pill color options. *See* "Tablet Selector," Colorcon, available at https://www.colorcon.com/color-selector/#/selector; "About," Colorcon, available at: https://www.colorcon.com/about.

[8] "Tablet Design," Natoli, available at https://natoli.com/services/tablet-design. Natoli is a tablet compression tooling manufacturer. *See* "About Natoli Engineering Company," Natoli, available at https://natoli.com/about.

4

13. Drug appearance features, such as shape and/or color, can be used by patients to identify the specific medication they were prescribed.[9]  For example, the Institute for Safe Medication Practices, which provides a website dedicated to helping consumers avoid mistakes when taking medications,[10] explains that some patients tend to ignore the label on their medication and rely on pill appearance to help identify which medication to take.[11] Academic studies note that "physicians, pharmacists, and patients use color to distinguish between different medicines"[12] and that visual cues can be "paramount to identification of pills."[13]

14. Drug appearance may be especially important for patients with chronic conditions, such as patients with chronic heart failure that may be prescribed Entresto®,[14] because (i)

---

[9]  My use of "identify the specific medication they were prescribed" refers to pill appearance identifying a particular drug from a particular manufacturer (rather than a class of drugs).

[10]  "About ConsumerMedSafety.org," Consumer MedSafety.org, available at https://www.consumermedsafety.org/about-us.

[11]  "Using Color to Identify Your Medicine Can Result in an Error," Consumer MedSafety.org, March 2022, available at https://www.consumermedsafety.org/safety-articles/using-color-to-identify-your-medicine-can-result-in-an-error.

[12]  Hetrick, Evan M. et al., "Integrating Tristimulus Colorimetry into Pharmaceutical Development for Color Selection and Physical Appearance Control: A Quality-by-Design Approach," *Journal of Pharmaceutical Sciences*, 2013, Vol. 102 ("Hetrick et al. (2013)"), p. 2608.

[13]  Kesselheim, Aaron S. et al., "Variations in Pill Appearance of Antiepileptic Drugs and the Risk of Nonadherence," *JAMA Internal Medicine*, 2013, Vol. 173 ("Kesselheim et al. (2013)"), p. 205.  Kesselheim et al. (2013) includes a policy recommendation to make brand and generic pills identical in appearance in the interest of medication adherence outcomes.  This policy recommendation, however, has several shortcomings.  First, it is not clear that nonadherence is rooted solely in changes in pill appearance.  As members of the U.S. FDA's Office of Generic Drugs noted in an *Annals of Internal Medicine* Comment and Response, there are many reasons for nonadherence beyond pill appearance.  *See* "Burden of Change in Generic Pill Appearance," *Annals of Internal Medicine, Comments and Responses,* December 2014, Vol. 161, No. 11, p. 839.  Dr. Kesselheim and his co-authors note that poor adherence contributors include "patient factors, providers, and routine aspects of health care delivery, such as medication burden."  *See* Kesselheim, Aaron S., et al., "Burden of Changes in Pill Appearance for Patients Receiving Generic Cardiovascular Medications After Myocardial Infarction," *Annals of Internal Medicine*, 2014, Vol. 161 ("Kesselheim et al. (2014)"), p. 96.  Second, a policy recommendation for the brand and the generic to be identical has the potential to preclude patients from exercising agency over their own treatments.  As I discuss in this declaration, differences in pill appearance may help patients understand when they should have a discussion with their physicians and/or pharmacists about any changes in the medication they are receiving.  Also, differences in pill appearance facilitate patients' agency and ability to make their own informed choices.  *See also*, Fritch, David M., "Should 'The Purple Pill' by Any Other Drug Company Still Be as Purple?  The Changing Face of Trade Dress Protection for Pharmaceutical Manufacturers," *IDEA: The Intellectual Property Law Review*, 2006, Vol. 47.  One way to protect both patient agency and patient adherence to medications is to ensure patients are informed as to what pharmacists are dispensing.  In its *Annals of Internal Medicine* Comment and Response, FDA staff noted that "[t]he dispensing pharmacist currently is responsible for explaining these differences [in appearance] to concerned patients."  *See* "Burden of Change in Generic Pill Appearance," *Annals of Internal Medicine, Comments and Responses,* December 2014, Vol. 161, No. 11, p. 839.

[14]  "Why Suddenly Stopping Entresto Isn't a Good Idea (Plus, 4 Other Things to Know about Taking It)," GoodRx, August 21, 2024, available at: https://www.goodrx.com/entresto/suddenly-stop-taking-entresto.

5

intuitively, a patient taking the same prescribed medication (e.g., Entresto®) repeatedly over a longer period will have a greater familiarity with the appearance of that medication than with a pill they take for a short period, all else equal; and (ii) patients with chronic conditions are more likely to take multiple medications relative to other patients. As the U.S. National Institute of Health ("NIH") points out, the phenomenon of taking multiple drugs to treat diseases and other health conditions, known as polypharmacy, is more common "among older adults, many of whom have multiple chronic conditions."[15] A 2023 study found that among studied patients with certain forms of heart failure, 90 percent were taking five or more medications.[16] A patient who is taking multiple drugs but has accumulated familiarity with the appearance of their prescribed drugs may therefore rely, at least in part, on pill appearance to ensure that they are taking the particular medication they have been prescribed (e.g., Entresto®).

15. The importance of pill appearance may be further enhanced if a patient's pills are placed in a container where the bottle and packaging are no longer visible. For example, a patient or their caregiver may organize their pills into daily allotments using a pill box, or a pharmacy may provide a service that organizes a patient's pills into daily packages (e.g., Amazon's Pill Pack).[17] Indeed, academic studies of pill appearance support that "drugs are commonly removed from their bottles to assist in organization, such as when patients or caregivers sort their medications into pill planners or pharmacists provide blister packs to patients," making "[v]isual clues … paramount to identification of pills."[18] Mediquation, a medication management tool provider, stated that the risks of using pill organizers include (1) "taking the wrong medication at the wrong time" ("[i]f medications are incorrectly sorted or if pills look similar") and (2) "[o]nce medications are removed from

---

[15] "The Dangers of Polypharmacy and the Case for Deprescribing in Older Adults," National Institute on Aging, August 24, 2021, available at https://www.nia.nih.gov/news/dangers-polypharmacy-and-case-deprescribing-older-adults.

[16] Park, Jin Joo and Barry Greenberg, "Topping Off the Pill Box: Dapagliflozin, Heart Failure, and Polypharmacy," *Journal of the American College of Cardiology: Heart Failure*, 2023, Vol. 11, pp. 1394-1396.

[17] "How PillPack Works," *Amazon Pharmacy,* available at https://pharmacy.amazon.com/pillpack.

[18] Kesselheim et al. (2013), p. 205, citing Petersen, Maya L. et al., "Pillbox Organizers are Associated with Improved Adherence to HIV Antiretroviral Therapy and Viral Suppression: A Marginal Structural Model Analysis," *Clinical Infectious Diseases*, 2007, Vol. 45, pp. 908-915 and Huang, HY et al., "Impact of Pill Organizers and Blister Packs on Adherence to Pill Taking in Two Vitamin Supplementation Trials," *American Journal of Epidemiology*, 2000, Vol. 152, pp. 780-787.

their original packaging, it can be challenging to identify them, especially if they are not distinct in size, shape, or color. This can lead to confusion and potential dosing errors."[19]

16.   Because of the potential for pill appearance to aid patients in distinguishing among the particular prescription drugs that have been prescribed to them, pill appearance can be an important element of pharmaceutical branding.[20] Academic articles have found that brand pharmaceutical companies rely on color as an important means of creating brand value.[21] In an article about pill color titled "Red pill or blue? It could be a billion-dollar decision," Eli Lilly is quoted as writing that "[t]he right combination of brand elements can evoke emotion from customers while helping to differentiate from other brands in the disease state and drug class."[22] The article also quotes a creative director at a healthcare advertising agency who explains that "[i]f you have a big competitor in your category that is the orange brand, you're not going to go out and have orange be your primary color... [s]o you do want to be mindful of what else has already been taken in that therapeutic category."[23] Branded pharmaceutical companies have both cited branding and consumer insights as a key driver of product color and the brand's color palette and logo, with manufacturers making investments into these choices years before launch.[24]

17.   I understand that Novartis features images of its Entresto® pills in patient-facing materials, including brochures intended to be distributed to patients by healthcare practitioners and the Entresto® patient website, as shown in **Figure 2** and **Figure 3** below, respectively. Images of pill design can reinforce that visual cues like shape and color are intended by the manufacturer to serve as a reference point for patients to identify the particular medication they are prescribed, e.g., Entresto®.

---

[19]   "The Benefits and Risks of Pill Organizers," Mediqation, July 15, 2024, available at https://mediqation.com/blog/benefits-risks-pill-organizer/.

[20]   Lim, Sean, "Drug Tablet Design: Why Pills Come in So Many Shapes and Sizes," For the Love of Science, November 23, 2022, available at https://ftloscience.com/drug-tablet-design ("[P]atients are more likely to form a connection with the drug and the company that manufactured it, if they can easily distinguish it from its competitors").

[21]   Hetrick et al. (2013), pp. 2608-2621.

[22]   Bell, Jacob, "Red pill or blue? It could be a billion-dollar decision," BioPharma Dive, October 29, 2018, available at https://www.biopharmadive.com/news/red-pill-or-blue-it-could-be-a-billion-dollar-decision/539283.

[23]   Bell, Jacob, "Red pill or blue? It could be a billion-dollar decision," BioPharma Dive, October 29, 2018, available at https://www.biopharmadive.com/news/red-pill-or-blue-it-could-be-a-billion-dollar-decision/539283.

[24]   Bell, Jacob, "Red pill or blue? It could be a billion-dollar decision," BioPharma Dive, October 29, 2018, available at https://www.biopharmadive.com/news/red-pill-or-blue-it-could-be-a-billion-dollar-decision/539283.

7

**Figure 2**
**Excerpt of Entresto® Patient Brochure[25]**



**Figure 3**
**Screenshot from Entresto® Patient Website[26]**

## HOW TO TAKE ENTRESTO

ENTRESTO is a tablet that comes in the following doses:



---

[25]  Entresto Patient Brochure, available at https://www.entrestohcp.com/assets/english-patient-brochure_1.pdf.

[26]  "Starting ENTRESTO | ENTRESTO® (sacubitril/valsartan)," Entresto website, available at https://www.entresto.com/starting-entresto.

8

### III. A GENERIC DRUG WITH A SIMILAR APPEARANCE TO ITS BRAND COUNTERPART MAY DERIVE SALES FROM PATIENTS WITH CHRONIC CONDITIONS WHO DO NOT REALIZE THAT THE SOURCE OF THEIR MEDICATION HAS CHANGED

18. As I explain in **Section II**, brand pharmaceutical companies can develop appearance features of their pills such that patients can more easily identify the particular medication they were prescribed. Generic drugs, which are required by the FDA to have the same active ingredients as the brand drug, often have different characteristics including pill shape and color, among others.[27] A noticeable change in pill appearance can signal to patients that their dispensed medication is being switched from a brand drug to a generic drug. This switching, called "generic substitution," occurs at the pharmacy,[28] and in some U.S. states, does not require consent of, or notification to patients.[29] Patients, however, have agency to resist generic substitution and choose to stay with the brand drug,[30] a phenomenon that has been well-studied.[31] Patients and their prescribers may make this choice for a variety of reasons, including familiarity with and trust in the brand drug, preference to maintain

---

[27] Kefalas, Costas H., and Arthur A. Ciociola, "The FDA's Generic-Drug Approval Process: Similarities to and Differences from Brand-Name Drugs," *The American Journal of Gastroenterology,* 2011, Vol. 106, pp. 1018-1021; "Generic vs Brand Drugs: Your FAQs Answered," Drugs.com, May 14, 2024, available at https://www.drugs.com/article/generic_drugs.html.

[28] Generic substitution is encouraged by state laws that require or allow pharmacies to dispense available generic drugs when a brand drug is prescribed, unless the prescriber explicitly indicates not to allow substitution. *See,* for example: Grabowski, Henry G., and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, 1992, Vol. 35, pp. 333-334; Rome, Benjamin N., et al, "State Laws and Generic Substitution in the Year After New Generic Competition," *Health Policy Analysis*, 2022, Vol. 25 ("Rome et al. (2022)"), pp. 1736-1742.

[29] Sacks, Chana A., et al., "Assessment of Variation in State Regulation of Generic Drug and Interchangeable Biologic Substitutions," *JAMA Internal Medicine*, 2021, Vol. 181 ("Sacks et al. (2021)"), pp. 16, 18 ("Seven states and Washington, DC, required that patients consent to substitution"). *See also,* Rome et al (2022), p. 1739 ("A total of 12 (23.5%) states… did not require patient notification or consent beyond the generic label.")

[30] All U.S. states mandate the dispensing of the brand drug if the physician has indicated as such, and all but three U.S. states allow for the brand drug to be dispensed if requested by the patient. *See* "Expanding the Use of Generic Drugs," U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation ("ASPE") Issue Brief, December 1, 2010, pp. 7, 11, Appendix A, available at https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//43501/ib.pdf.

[31] *See*, for example, Regan, Tracy L., "Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug market," *International Journal of Industrial Organization*, 2008, Vol. 26, pp. 930-948; "Expanding the Use of Generic Drugs," U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation ("ASPE") Issue Brief, December 1, 2010, pp. 7, 11, Appendix A, available at https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//43501/ib.pdf.

the status quo, perceptions about generic quality, and differences in inactive ingredients between the brand and generic drugs.[32]

19.     Difference in pill appearance between the brand drug and the generic drug therefore provides an opportunity for patients to question whether they wish to proceed with the generic medication or, alternatively, to stay with the brand drug, which in this matter is a treatment for a serious chronic disease.[33]  Consumer sources often suggest that patients talk to their doctor or pharmacist if their pill appearance changes.  For example, warfarin tablet identification materials from UC San Diego tells patient to "[a]sk your pharmacist if the color or shape of your pill changes or if you have questions."[34]  Literature has shown that changes in pill appearance can cause patients to question whether to proceed with a new, different-looking pill.[35]  Patients then have the opportunity to gather additional information to inform their decision of whether to stay with the brand drug, for example, by speaking to their doctor and/or pharmacist.[36]

20.     Hence, when the generic drug is similar in appearance to the brand drug, this creates the potential for a patient to miss the opportunity to interact with their doctor and pharmacist about whether to stay with the brand drug.  This missed opportunity can occur, for example, if the patient does not give close attention to the changes that may be associated with

---

[32]  Costa-Font, Joan et al., "Brand Loyalty, Patients and Limited Generic Medicines Uptake," *Health Policy*, 2014, Vol. 116, pp. 2-3; "Expanding the Use of Generic Drugs," U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation ("ASPE") Issue Brief, December 1, 2010, pp. 7-8, 11-12, available at https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//43501/ib.pdf; Dunne, Suzanne S. and Colum P. Dunne, "What do people really think of generic medicines? A systematic review and critical appraisal of literature on stakeholder perceptions of generic drugs," *BMC Medicine*, 2015, Vol. 13 ("Dunne and Dunne (2015)"), pp. 1-27.

[33]  Literature discusses the notion that generics are less readily accepted by patients who have been using a brand medication for some time and/or who are experiencing serious illness.  *See*, for example: O'Malley, James A. et al., "Impact of Alternative Interventions on Changes in Generic Dispensing Rates," *Health Services Research,* 2006, Vol. 41, p. 1892; Dunne and Dunne (2015), pp. 15, 20; Rome et al. (2022), p. 1737.

[34]  "Warfarin Tablet Identification," UC San Diego Health, available at https://health.ucsd.edu/for-health-care-professionals/anticoagulation-guidelines/warfarin/tablet-identification/.  *See also*, "Burden of Change in Generic Pill Appearance," *Annals of Internal Medicine, Comments and Responses,* December 2014, Vol. 161, No. 11, p. 839 where the FDA notes that "[t]he dispensing pharmacist currently is responsible for explaining" differences in appearance between brand and generic drugs.  Similarly, Kesselheim et al. (2013) suggest that educating consumers about the safety and efficacy of drugs "no matter what physical attributes the drug possesses" may mitigate the adherence challenges they observe, and, "[i]n the near term, as more widely used brand-name drugs face generic competition, physicians should warn patients about the possibility that pill color might change, and pharmacists might take greater care to alert patients when changes in suppliers lead to new pill characteristics." *See* Kesselheim et al. (2013), p. 206.

[35]  Kesselheim et al. (2013), p. 205; Kesselheim et al. (2014), p. 96.

[36]  Kesselheim et al. (2013), p. 205.

generic substitution, such as changes in the manufacturer name on the label of the pill bottle, or if the patient does not internalize a notification from the pharmacy that generic substitution has occurred, which literature shows is common.[37]

21.   Even where generic and branded drug pill appearance is similar but not identical, those similarities may signal to consumers that the generic drug is not independent from the brand drug and, instead, is an "authorized generic." It is common for brand pharmaceutical companies to launch an "authorized generic," which is "an approved brand name drug that is marketed without the brand name on its label."[38] Since 1999, approximately 1,136 authorized generic products have entered the U.S. drug market.[39] Authorized generics are manufactured by the manufacturer of the brand drug and then sold by the manufacturer of the brand name drug or by a licensee who obtains the brand company's permission.[40]

22.   Authorized generics typically have identical appearance features as the brand drug apart from markings on the pill,[41] and evidence indicates that patients may favor authorized generics over non-authorized generics.[42] For example, a 2018 study on switchback rates, or rates at which patients who were switched from a brand drug to a generic subsequently switched back to the brand drug, demonstrated that "[s]witching from branded to authorized generic drug products was associated with lower switchback rates compared with switching from branded to generic drug products."[43] The authors of the study

---

[37]   Sacks et al. (2021), p. 18 ("31 states and Washington, DC, mandate[] that patients be notified of the action independent of the drug's packaging."); Kesselheim et al. (2014), p. 101 ("Some [pharmacies] affix labels that describe the pills and alert patients to changes. Unfortunately, warning stickers on pill bottles are often numerous and are often ignored.")

[38]   "FDA List of Authorized Generic Drugs," FDA, October 8, 2024, available at https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs.

[39]   "FDA Listing of Authorized Generics as of October 8, 2024," FDA, October 8, 2024, available at https://www.fda.gov/media/77725/download.

[40]   "FDA List of Authorized Generic Drugs," FDA, October 8, 2024, available at https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs; "Authorized Generics: What Pharmacists Should Know," U.S. Pharmacist, June 18, 2020, available at https://www.uspharmacist.com/article/authorized-generics-what-pharmacists-should-know.

[41]   "Authorized Generics: What Pharmacists Should Know," U.S. Pharmacist, June 18, 2020, available at https://www.uspharmacist.com/article/authorized-generics-what-pharmacists-should-know.

[42]   Evans, Alex, "How to Discuss Brand vs. Generic Drugs with Your Patients," GoodRx, June 16, 2021, available at https://www.goodrx.com/hcp-articles/providers/discussing-brand-vs-generics-with-patients ("If insurance will not pay for a branded product or it is too expensive, but the patient will not take or is very concerned about taking a generic product, consider discussing the authorized generic with them. Because the formula is exactly the same, it might allow them to feel at ease while also saving money.").

[43]   Desai, Rishi J. et al., "Differences in Rates of Switchbacks After Switching from Branded to Authorized Generic and Branded to Generic Drug Products: Cohort Study," *BMJ*, 2018, Vol. 361 ("Desai et al. (2018)"), p. 1.

hypothesized that "[o]ne potential reason for lower switchbacks among branded to authorized generic switchers may be the similarity in product appearance between authorized generics and brand drug products."[44]  Patients may learn about authorized generics via multiple channels, including their pharmacist and patient-facing educational resources.[45]  Therefore, a generic drug that has similar appearance to the brand drug may benefit if patients mistakenly perceive the generic as the authorized  generic drug manufactured by the brand drug company.

23.    Patient ability to distinguish a generic drug from a brand drug is enhanced where the generic manufacturer selects pill appearance features to set their pills apart.  The below provides six examples in which shape and/or color vary between a generic drug and its brand counterpart:

- As shown in **Figure 4**, the brand drug Viagra has a diamond/four-sided shape for its 50mg tablet,[46] while the generic sildenafil citrate 50mg tablet manufactured by Rubicon[47] has an oval shape.[48]

---

[44]  Desai et al. (2018), pp. 5-6.

[45]  Evans, Alex, "What are Authorized Generics?" GoodRx, April 28, 2023, available at https://www.goodrx.com/drugs/medication-basics/what-are-authorized-generics; "FDA List of Authorized Generic Drugs," U.S. Food and Drug Administration, October 8, 2024, available at https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs; "Authorized Generics: What Pharmacists Should Know," U.S. Pharmacist, June 18, 2020, available at https://www.uspharmacist.com/article/authorized-generics-what-pharmacists-should-know.

[46]  "Pfizer VGR 50 Pill Blue Four-Sided 11mm," Drugs.com, available at https://www.drugs.com/imprints/pfizer-vgr-50-1183.html.

[47]  FDA-Approved Drugs on ANDA 204882, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process&ApplNo=204882.

[48]  "R 50 Pill Blue Oval 13mm," Drugs.com, available at https://www.drugs.com/imprints/r-50-27591.html.

12

**Figure 4**
**Brand Viagra and Rubicon's Generic Sildenafil Citrate (50mg)[49]**

                    

Viagra (50mg)                    Sildenafil Citrate (50mg)

- As shown in **Figure 5**, the brand drug Sutent, a Pfizer drug for the treatment of gastrointestinal stromal tumor ("GIST"), has an orange/red color for its 12.5mg capsule,[50] while Teva's generic sunitinib malate has a maroon color.[51]

**Figure 5**
**Brand Sutent and Teva's Generic Sunitinib Malate (12.5mg)[52]**






Sutent (12.5mg)                    Sunitinib Malate (12.5mg)

---

49  "Pfizer VGR 50 Pill Blue Four-Sided 11mm," Drugs.com, available at https://www.drugs.com/imprints/pfizer-vgr-50-1183.html; "R 50 Pill Blue Oval 13mm," Drugs.com, available at https://www.drugs.com/imprints/r-50-27591.html.

50  "Pfizer STN 12.5 mg Pill Orange Capsule / Oblong," Drugs.com, available at https://www.drugs.com/imprints/pfizer-stn-12-5-mg-9628.html.

51  FDA-Approved Drugs on ANDA 021938, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=021938; "TEVA 8199 Pill Maroon Capsule / Oblong," Drugs.com, available at https://www.drugs.com/imprints/teva-8199-teva-8199-32290.html.

52  "Pfizer STN 12.5 mg Pill Orange Capsule / Oblong," Drugs.com, available at https://www.drugs.com/imprints/pfizer-stn-12-5-mg-9628.html; "TEVA 8199 Pill Maroon Capsule / Oblong," Drugs.com, available at https://www.drugs.com/imprints/teva-8199-teva-8199-32290.html.

13

- As shown in **Figure 6**, the brand drug Valium has a "V" shaped hole in the center of its 10mg tablet,[53] while Teva's generic diazepam 10mg tablet has no hole in the center.[54]

**Figure 6**
**Brand Valium and Teva's Generic Diazepam (10mg)[55]**

  

Valium (10mg)                    Diazepam (10mg)

- As shown in **Figure 7**, the brand drug Lopressor has a grey color and oval shape for its 100mg tablet,[56] while Rubicon's generic metoprolol tartrate 100mg tablet has a pink color and round shape.[57]

---

[53] "Roche Roche Valium 10 Pill – blue round, 9mm," Drugs.com, available at https://www.drugs.com/imprints/roche-roche-valium-10-840.html.

[54] "TEVA 3927 Pill – blue round, 8mm," Drugs.com, available at https://www.drugs.com/imprints/teva-3927-16980.html; FDA-Approved Drugs on ANDA 070362, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=070362.

[55] "Roche Roche Valium 10 Pill – blue round, 9mm," Drugs.com, available at https://www.drugs.com/imprints/roche-roche-valium-10-840.html; "TEVA 3927 Pill – blue round, 8mm," Drugs.com, available at https://www.drugs.com/imprints/teva-3927-16980.html.

[56] "71 71 GEIGY Pill," Drugs.com, available at https://www.drugs.com/imprints/71-71-geigy-7334.html.

[57] "R 100 Pill – pink round, 12mm," Drugs.com, available at https://www.drugs.com/imprints/r-100-22525.html; FDA-Approved Drugs on ANDA 200981, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=200981.

14

**Figure 7**
**Brand Lopressor and Rubicon's Generic Metoprolol (100mg)[58]**





Lopressor (100mg)                    Metoprolol Tartrate (100mg)

- As shown in **Figure 8**, the brand drug Coumadin had a round shape for its 5mg tablet,[59] while Amneal Pharmaceutical's generic warfarin 5mg tablet, which was on the market at the same time, had an oval shape.[60]

**Figure 8**
**Brand Coumadin and Amneal's Generic Warfarin (5mg)[61]**





Coumadin (5mg)                    Warfarin Sodium (5mg)

---

[58] "R 100 Pill – pink round, 12mm," Drugs.com, available at https://www.drugs.com/imprints/r-100-22525.html; "71 71 GEIGY Pill," Drugs.com, available at https://www.drugs.com/imprints/71-71-geigy-7334.html.

[59] "Coumadin 5 Pill – orange round, 9mm," Drugs.com, available at https://www.drugs.com/imprints/coumadin-5-2650.html.

[60] "AN 766 5 Pill – peach oval, 11mm," Drugs.com, available at https://www.drugs.com/imprints/an-766-5-20712.html; FDA-Approved Drugs on ANDA 202202 (archived June 29, 2017), Wayback Machine, available at https://web.archive.org/web/20170629134208/https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event =overview.process&ApplNo=202202. I understand Bristol Myers Squibb discontinued the sales and distribution of all strengths of Coumadin tablets in the U.S. on April 24, 2020.  *See* "Coumadin Discontinuation Letter," abcardio.org, available at https://abcardio.org/wp-content/uploads/2020/05/Document_20200424_0001_Coumadin-Discontinuation-Letter.pdf.

[61] "Coumadin 5 Pill – orange round, 9mm," Drugs.com, available at https://www.drugs.com/imprints/coumadin-5-2650.html; "AN 766 5 Pill – peach oval, 11mm," Drugs.com, available at https://www.drugs.com/imprints/an-766-5-20712.html.

15

- As shown in **Figure 9**, the brand drug Synthroid has a vivid green color and round shape for its 88mcg (0.088mg) tablet,[62] while Mylan's generic levothyroxine 88mcg tablet has a light green color and an oval shape.[63]

**Figure 9**
**Brand Synthroid and Mylan's Generic Levothyroxine (88mcg)[64]**




Synthroid (88mcg)                    Levothyroxine Sodium (88mcg)

24.   Evidence indicates that Novadoz Pharmaceuticals LLC, one of the Defendants in the present litigation, has distributed generic drugs that look different from their brand counterparts. For example,[65]

- Novadoz distributes a darunavir product, which is a generic version of brand drug Prezista.[66] The colors for the equivalent doses of Novadoz' darunavir product and Prezista differ, as laid out below in **Table 1**:

---

[62] "SYNTHROID 88 Pill – green round, 7mm," Drugs.com, available at https://www.drugs.com/imprints/synthroid-88-7433.html.

[63] "M L 7 Pill – green capsule/oblong, 9mm," Drugs.com, available at https://www.drugs.com/imprints/m-l-7-7224.html; FDA-Approved Drugs on ANDA 076187, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=076187.

[64] "SYNTHROID 88 Pill – green round, 7mm," Drugs.com, available at https://www.drugs.com/imprints/synthroid-88-7433.html; "M L 7 Pill – green capsule/oblong, 9mm," Drugs.com, available at https://www.drugs.com/imprints/m-l-7-7224.html.

[65] Images of Novadoz generics cited in the following examples are not publicly available, therefore, I rely on written descriptions of the generic pills from the National Library of Medicine and compare those to the descriptions of the branded-equivalent pills.

[66] "LABEL: Darunavir tablet, fil coated," National Library of Medicine, updated November 29, 2023, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=ea6e0136-75b2-4793-9500-04e6658a0a73; FDA-Approved Drugs on ANDA 021976, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=021976.

16

**Table 1**
**Pill Color by Strength**
**Branded Presista and Novadoz Generic Darunavir[67]**

| Strength | Pill Color | |
|---|---|---|
| | **Prezista** | **Novadoz Darunavir** |
| **600mg** | Orange | Beige |
| **800mg** | Dark Red | Brown |

- Novadoz distributes a doxepin hydrochloride product, which is a generic version of brand drug Silenor.[68] The colors for the equivalent doses of Novadoz' doxepin hydrochloride product and Silenor differ, as laid out below in **Table 2**:

**Table 2**
**Pill Color by Strength**
**Branded Silenor and Novadoz Generic Doxepin Hydrochloride[69]**

| Strength | Pill Color | |
|---|---|---|
| | **Silenor** | **Novadoz Doxepin Hydrochloride** |
| **3mg** | Blue | White |
| **6mg** | Green | Light Yellow |

- Novadoz distributes a dabigatran etexilate product, which is a generic version of brand drug Pradaxa.[70] The colors for the equivalent doses of

---

[67] "LABEL: Prezista – darunavir tablet, film coated, Prezista – darunavir suspension," National Library of Medicine, updated July 23, 2024, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=814301f9-c990-46a5-b481-2879a521a16f; "LABEL: Darunavir tablet, fil coated," National Library of Medicine, updated November 29, 2023, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=ea6e0136-75b2-4793-9500-04e6658a0a73.

[68] "LABEL: Doxepin Hydrochloride tablet," National Library of Medicine, updated October 14, 2022, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=96086fd8-8fa3-4a2b-ac12-fe1a3ad4f384; FDA-Approved Drugs on ANDA 022036, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=022036.

[69] "LABEL: Silenor – doxepin hydrochloride tablet," National Library of Medicine, updated May 8, 2024, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1bec1223-5239-4eb6-a9e8-62444106d2c0; "LABEL: Doxepin Hydrochloride tablet," National Library of Medicine, updated October 14, 2022, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=96086fd8-8fa3-4a2b-ac12-fe1a3ad4f384.

[70] "LABEL: Dabigatran – dabigatran etexilate capsule," National Library of Medicine, updated October 7, 2024, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=6f79088b-b353-485a-9df4-6f5088f5bd0f; FDA-Approved Drugs on ANDA 022512, FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=022512.

Novadoz' dabigatran etexilate and Pradaxa differ, as laid out below in **Table 3**:

**Table 3**
**Pill Color by Strength**
**Branded Pradaxa and Novadoz Generic Dabigatran Etexilate[71]**

| Strength | Pill Color | |
|---|---|---|
| | Pradaxa | Novadoz Dabigatran Etexilate |
| **75mg** | White | White to Light Yellow |
| **110mg** | Light Blue | White to Light Yellow |
| **150mg** | Light Blue | White to Light Yellow |

25. Applying the above findings to this matter, to the degree that the Novadoz/MSN generic is similar in appearance to Entresto®, and patients perceive it as such, this creates the potential for Defendants to unfairly benefit from patients' inability to distinguish the two drugs. For example, a patient that has been using Entresto® may not realize that they have been switched to a generic product if that generic has a similar appearance, and if the manufacturer name on the bottle ("Novadoz") is perceived as similar to "Novartis" (or if they do not pay attention to the manufacturer name on the bottle). In a world where the generic pill appearance was not similar, the patient has a greater opportunity to realize the difference, speak to their physician and/or pharmacist, and exercise their agency to remain with the brand drug Entresto® if desired.

[SIGNATURE ON NEXT PAGE]

---

[71] "Label: PRADAXA- dabigatran etexilate mesylate capsule," National Library of Medicine, updated April 3, 2024, available at https://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=1a214cf1-b41e-46f6-8f24-e3637e6d2612; "LABEL: Dabigatran – dabigatran etexilate capsule," National Library of Medicine, updated October 7, 2024, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=6f79088b-b353-485a-9df4-6f5088f5bd0f.

18

26. I declare under penalty of perjury that the foregoing is comprised of true and correct statements of my expert opinions.

27. Signed this 30th day of January, 2025

_____

Mark Robbins, Ph.D., J.D.

# Curriculum Vitae and Prior Testimony

# Mark S. Robbins Ph.D., J.D.

● MSROBBINS@KODIAKSTRATEGIES.COM  ■ 3130 HARBOR LANE N., SUITE 202, PLYMOUTH, MN 55447  ■ (952) 215-5146

## SUMMARY

Pharmaceutical/Biotech Executive with 35+ years of broad based pharmaceutical and biotechnology experience and strong entrepreneurial drive. Therapeutic experience includes oncology, neurology, pain management, cardiology, endocrine/metabolic, women's health, dermatology, nuclear medicine, and radiology. Serial entrepreneur with several start up biotech ventures. Developed and successfully implemented drug development programs leading to numerous successful NDA/BLA approvals and successful commercialization. Provide Expert Witness assistance in pharmaceutical/biotechnology antitrust and patent litigation. Trained mediator and former American Arbitration Association arbitrator (2012-2022).

## WORK EXPERIENCE

**KODIAK STRATEGIC CONSULTANTS, LLC, Minneapolis, MN**

**President and CEO**
**November 2011-Present**
Provide strategic clinical, regulatory and business development consultation to a diverse group of pharmaceutical and biotech companies. Serve as Expert on antitrust and patent litigation. Speaker at numerous regulatory scientific meetings including the Food and Drug Law Institute Annual meeting CBER Update 2013-2014.

**Major Accomplishments:**
- Developed a broad client base of pharmaceutical and biotech companies.
- Serving as Acting CEO, GigaMune, a research stage T cell receptor therapy and gene editing company. April 2021 – December 2021. Strategic business/regulatory advisor – 2019 – present.
- Executive Regulatory and Strategic Business advisor, GigaGen, a clinical stage immunotherapy company – 2014 – present.
- Co-Founder, Board member and Chief Scientific Officer, Diastol Therapeutics, Inc. a cardiovascular research and development stage company.
- President, CEO and Board Member for Tansna Therapeutics, a research stage CNS pharmaceutical company. 2015-2018
- Clinical/Regulatory advisor and Chief Operating Officer, Corporate Secretary for Bullet Biotechnology a research stage cancer immunotherapy company. 2012-2017.
- Co-Founder, Tychon Bioscience, an oncology immunotherapy company.

- Head of Regulatory and Strategic Business Consultant for Hennepin Life Sciences, a clinical stage anti-infective development company.
- VP, Quality Regulatory Affairs and Legal Counsel for Tapemark, a leading transdermal and oral thin film drug delivery company. 2017-2019.
- Executive Vice President, DiaMedica Inc, a clinical stage biotech company 2012-2015.
- Provide due diligence and expert support to VC funds and law firms.
- Provided strategic direction and assistance in private equity and venture capital financing activities of various development stage companies.
- VP, Regulatory Affairs for QOL Medical, specializing in Orphan Drugs. 2016 - 2017.
- Principal Regulatory and Strategic consultant for Certus International, a CRO.
- Expert Witness on pharmaceutical/biotechnology patent, contract, and antitrust litigation.

**UPSHER-SMITH LABORATORIES, INC., Minneapolis, MN**
**1998-November 2011**

**Executive Vice President, Legal, Scientific and Technical Operations**
**Chief Scientific Officer and Corporate Secretary**
2006 – Nov. 2011
Promotion and new oversight responsibilities for Research and Development, Manufacturing Operations and the Supply Chain.

**Major accomplishments**:
- Negotiated with the FDA the regulatory strategy leading to the NDA approval of Fortical based on surrogate endpoints including the successful resolution of FDA legal concerns resulting from a Citizens Petition challenge to our approval.
- Provided strategic oversight in the clinical regulatory program resulting in the NDA approval for Divigel based on one US Phase 3 trial.
- Led the resolution of the legal challenge to the FDA approval of the ANDA Oxandrin based upon a Section 8 carve-out and successful resolution of patent litigation by Savient.
- Successfully negotiated with the FDA clinical and regulatory strategy for three neurological drugs in Phase 1-3 development.

**Vice President, Legal and Regulatory Affairs**
**General Counsel**
**1998-2006**
Responsible for strategic leadership and direct oversight of the Regulatory, Clinical, Quality and Legal groups.

**Major Accomplishments:** Directed the legal team in defeating the FTC challenge of our Paragraph IV settlement with Schering-Plough.  This case went up to the US Supreme Court (cert, denied) and is a landmark case in Paragraph IV settlements.

- Led the regulatory development plan and reviewed all submission for a novel antiviral agent that ultimately failed in Phase 2 clinical trials.
- Provided strategic oversight, reviewed all regulatory submissions and directly participated in FDA meetings leading to the approval of Fortical for the treatment of osteoporosis in post-menopausal women.
- Provided strategic oversight, reviewed all regulatory submissions and directly participated in FDA meetings leading to the approval of Divigel for the treatment of vasomotor symptoms in post-menopausal women.
- Developed and negotiated the regulatory strategy with the FDA culminating in the orphan drug NDA approval of intranasal midazolam for acute repetitive seizures.

## CERTUS INTERNATIONAL, INC., St. Louis, MO

### President & Chief Operating Officer
### 1996-1998
Certus was a start-up Contract Research Organization providing a full range of Regulatory and Clinical services to the pharmaceutical and medical device industry. I held overall responsibility for strategic planning, business development, staffing, marketing, sales and profit/loss. In addition, I served as the primary regulatory agent for several biotech and medical device companies.

**Major accomplishments:**
- Achieved an 80% increase in revenues and tripled the client base in fiscal 1997.
- Personally developed clinical regulatory strategies for 5 critical clients, serving as the FDA regulatory agent and directly negotiation with the FDA on clinical/regulatory development plans.
- Drafted clinical portions of regulatory submissions resulting in BLA approval of two radiolabeled monoclonal antibodies for diagnosis of venous thrombosis and acute appendicitis.
- Led regulatory development program and drafted clinical portions of regulatory submissions for two brachytherapy devices – MammoSite and GliaSite.
- Led clinical regulatory strategy and negotiations with the FDA enabling the initial clinical evaluation of a magnetically driven stereotaxis brain biopsy device.

## UPSHER-SMITH LABORATORIES, INC., Minneapolis, MN

### Vice President, Scientific and Regulatory Affairs
### 1994-1996
Joined Upsher-Smith as a career development opportunity to lead the Regulatory, Clinical, Research and Development and Quality groups with two Phase 3 clinical development programs ongoing.

**Major accomplishments:**
- Worked directly with the FDA to define guidance for demonstrating in vitro bioequivalency for a nonabsorbable resin leading to the successful approval of

Prevalite, the only generic product to obtain an AB rating to two reference listed drugs.
- Implemented quality programs driving FDA compliance throughout our operations and establish an ongoing history of outstanding compliance and relationships with the Agency at both the headquarters and district level.
- Developed and negotiated the regulatory strategy with the FDA culminating in the orphan drug NDA approval of Diastat for acute repetitive seizures.
- Successfully negotiated the regulatory strategy for Niacor SR, although this program was subsequently discontinued following my departure.

**MALLINCKRODT GROUP, INC. St. Louis, MO**
**1981 - 1994**

**Director, Medical Affairs Department**
**1993 -1994**

**Associate Director/Director of Clinical Research**
**1989– 1993**

**Executive Administrative Assistant, Office of the President**
**1988–1989**

**Research Manager, Pharmacology and Toxicology**
**1984–1988**

**Research Pharmacologist/Senior Research Pharmacologist**
**1981–1984**

**Major Accomplishments:**
- Developed and implemented regulatory strategy resulting in the first NDA approval for morphine sulfate injection for patient controlled analgesia**.**
- Developed compelling regulatory rational and obtained the only approval of an ultrasound contrast agent as a PMA medical device.
- Led Phase 2 and 3 clinical trials for cancer therapeutic drug treating bone metastases secondary to prostate and breast cancer.
- Provided the strategic oversight and implemented the regulatory strategies and drafted regulatory submissions leading to the worldwide approvals for Optiray, TechneScan MAG3, Ultratag PYP, and OctreoScan.
- Led successful response from DDMAC challenging off label promotion of Hexabrix by supplying compelling data supporting product promotional claims.
- Drove the regulatory strategies demonstrating substantial equivalence supporting 510 (k) approvals of Cardiology, Anesthesiology and Critical Care devices.
- Represented the Office of the President as part of the team charged with the decentralization of Mallinckrodt into three independent operating companies: Medical, Specialty Chemicals and Veterinary Medicine.

- Successfully negotiated the worldwide preclinical development strategy leading to the ultimate worldwide approval of Optiray, Optimark, Octreoscan, TechneScan MAG3 and Ultratag PYP.
- Successfully negotiated the preclinical regulatory strategy leading to ultimate approval of pre-filled power injector syringes containing various X-ray contrast agents.

### EDUCATION

J.D., magna cum laude, St. Louis University School of Law, 1991.

Ph.D., Pharmacology, University of Minnesota Medical School, 1980.

B.S., Biochemistry, University of California at Los Angeles, 1974.

### FELLOWSHIPS

NIH USPHS Postdoctoral Fellow, Department of Anatomy, University of Minnesota Medical School, 1979-1981

NIH USPHS Predoctoral Fellow, Department of Pharmacology, University of Minnesota Medical School, 1974-1979

### PROFESSIONAL AFFILIATIONS

Minnesota State Bar Association
- Chair, Food and Drug Law Section, 2001
- Secretary, Food and Drug Law Section, 2002-2006
- Antitrust Council, 2019-present

### LICENSURE AND CERTIFICATIONS

- Minnesota Bar, 2000 - present
- Missouri Bar, 1991 - present
- Regulatory Affairs Certification, 1994-2015
- Diplomate, American Board of Toxicology, 1984-2015

### ACADEMIC APPOINTMENTS

- Adjunct Professor, University of Minnesota Medical School, Department of Pharmacology, 2020 - present
- Adjunct Associate Professor, University of Minnesota College of Pharmacy, Department of Experimental and Clinical Pharmacology,1995 - present
- Adjunct Professor (Food and Drug Law), William Mitchell College of Law 2001-2006

COMMUNITY SERVICE

- Volunteer Lawyers Network, 2019 - present
- Community Mediation and Restorative Services, Volunteer Mediator, 2012-present, Finance Committee 2016- present, Board Member 2018-present
- Wishes and More, Board Member, 2003-present
- Jewish Family and Children's Services of Minneapolis, Board Member 2008 – 2016

BIBLIOGRAPHY

1. Meyer, D. R.; el–Azhary, R.; Bierer, D. W.; Hanson, S. K.; Robbins, M. S. and Sparber, S. B. Behavioral tolerance and dependence after chronic administration of clonidine to the rat.  Pharmacol, Biochem. Behav. 7:227–231, 1977.

2. Robbins, M. S.; Hughes, J. A.; Sparber, S. B. and Mannering, G. J.  Delayed teratogenic effect of methylmercury on hepatic cytochrome P–450 dependent monooxygenase systems of rats.  Life Science 22:287–293, 1978.

3. Robbins, M. S.; Grouse, L. H.; Sorenson, R. L.; and Elde, R. P.  Effect of muscimol on glucose stimulated somatostatin and insulin release from the isolated perfused rat pancreas.  Diabetes 30:168–171, 1981.

4. Robbins, M.S. and Mannering, G. J.  Effect of the interferon inducing agents, tilorone and polyriboinosinic acid–poly–ribocytidylic acid (PolyIC), on the hepatic monooxygenase systems of pregnant and fetal rats. Biochem. Pharmacol. 33:1213–1222, 1984.

5. Robbins, M. S. and Mannering, G. J.  Effect of the interferon inducing agents, tilorone and polyriboinosinic acid–poly–ribocytidylic acid (IC), on the hepatic monooxygenase systems of the developing neonatal rat.  Biochem. Pharmacol. 33:1223–1227, 1984.

6. Robbins, M. S.; Sorenson, R. L.; Elde, R. P.; Schmechel, D. E. and Oertel, W. H. Gamma– aminobutyric acid (GABA) inhibition of somatostatin secretion from the isolated perfused rate pancreas and immunohistochemical localization of L–glutamate decarboxylase in the islet beta cell.  In:  Second International Symposium on Somatostatin, pp. 165–172, Raptis, S.; Rosenthal, J. and Gerich, J. E., eds., Attemtpo Verlag Tuebingen GmbH, Germany, 1984.

7.  Dean, R. T.; Wester, D. W.; Nosco, D. L.; Adams, M. D.; Coveney, J. R.; Robbins, M. S.; McElvany, K. D. and DeJong, R.  Progress in the design, evaluation and development of Tc– 99m radiopharmaceuticals.  In:  Technetium in Chemistry and Nuclear Medicine Vol. 2, pp. 147–154, Deutsch, E.; Nicolini, M. and Wagner, H. N., eds., Verona:  Cortina Int'l Verona, 1986.

8.  Coveney, J. R. and Robbins, M. S.  Comparison of Tc–99m MAG3 kit with HPLC– purified Tc– 99m MAG3 and OIH in rats.  J. Nucl. Med. 28:1881–1887, 1987.

9.  Ralston, W. H.; Robbins, M. S.; Mosier, L. D.; Barco, S. J.; Adams, M. D.; and Hopkins, R. M.  The effect of sodium on the fibrillatory potential of ioversol.  Invest. Radiol. 23:S140–S143, 1988.

10.  Ralston, W. H.; Robbins, M. S. and Coveney, J. R.  Hemodynamic effects of ioversol in the dog and the rat.  Invest. Radiology 24:S10–S15, 1989.

11.  Coveney, J. R. and Robbins, M. S.  Biodistribution and excretion of [I–125] ioversol in conscious dogs.  Invest. Radiology 24:S23–S27, 1989.

12.  Ralston, W. H.; Robbins, M. S.; Coveney, J. R.; and Blair, M.  Acute and subacute toxicity of ioversol in experimental animals.  Invest. Radiology 24:S2–S9, 1989.

13.  Ralston, W. H.; Robbins, M. S.; and James, P.  Reproductive, developmental and genetic toxicology of ioversol.  Invest. Radiology 24:S16–S22, 1989.

14.  Patrick, S. T.; Glowniak, J. V.; Turner, F. E.; Robbins, M. S. and Wolfangel, R. G.  Comparison of in vitro RBC labeling with the Ultratag RBC kit versus in vivo labeling.  J. Nucl. Med. 32:242– 244, 1991.

15.  Wester, D. W.; Coveney, J. R.; Nosco, D. L.; Robbins, M. S. and Dean, R. T.  Synthesis, characterization and myocardial uptake of cationic bis(arene)technetium (I) complexes.  J. Med. Chem. 34:3284–3290, 1991.

16.  Coleman, R. E.; Robbins, M. S.; and Siegel, B. A.  The future of PET in clinical medicine and the impact of drug regulation.  Sem. Nucl. Med., XXII:193–201, 1992.

17.  Preclinical Characterization of Recombinant Human Tissue Kallikrein-1 as a Novel Treatment for Type 2 Diabetes Mellitus  Kolodka, T.A, Charles, M.L., Raghavan , A,  Radichev, I.A., Amatya, C., Ellefson, J., Savinov,  A.Y., Nag,  A.. Williams, M.S., Robbins, M.S. PLOS ONE; DOI: 10.1371/journal.pone.0103981, August 6, 2014.

18.  Autoimmune Diabetes Is Suppressed by Treatment with Recombinant Human Tissue Kallikrein-1 Maneva-Radicheva, L., Amatya, C.,  Parker, C., Ellefson, J.,

Radichev, I., Raghavan, A., Charles, M.L. Williams, M.S., Robbins, M.S, Savinov, A.Y. <u>PLOS ONE</u>; DOI: 10.1371/journal.pone.0107213. September 26, 2014.

19.   Pharmacological effects of recombinant human tissue kallikrein on bradykinin B 2 receptors Charest-Morin, X, Raghavan, A., Charles, M.L., Kolodka, T., Bouthillier, J., Jean, M. Robbins, M.S., Marceau, F. <u>Pharma Res Per</u>, 3(2), e00119, doi: 10.1002/prp2.119, 2015.

20.   The isolated human umbilical vein as a bioassay for kinin-generating proteases: an *in vitro* model for therapeutic angioedema agents. Jean, M., Raghavan, A., Charles, M.L., Robbins, M.S., Wagner, E. Rivard, G-E, Charest-Morin, X., Marceau, F.: <u>Life Sciences</u>, 155, 180-188, 2016.

## ABSTRACTS

1.   Robbins, M. S.; Hughes, J. A.; Sparber, S. B. and Mannering G. J. Delayed teratogenic effect of methylmercury on the hepatic cytochrome P–450 dependent monooxygenase system of rats. <u>Fed. Proc.</u> <u>36</u>:404, 1977.

2:   Robbins, M. S. and Mannering, G. J. Temporal aspects of the depressant effect of poly ri–rC on the hepatic mixed function oxidase systems during maturation in the rat. <u>Pharmacologist</u> <u>20</u>:200, 1978.

3.   Robbins, M. S. and Mannering, G. J. Effects of the interferon inducing agent, tilorone, on hepatic mixed function oxidase systems in pregnant and fetal rats. <u>Fed. Proc.</u> <u>38</u>:437, 1979.

4.   Robbins, M. S. and Mannering, G. J. Effects of phenobarbital, 3–methylcholanthrene, poly rl– rC and tilorone on hepatic P–450 hemoproteins of weanling and adult rats. <u>Pharmacologist</u> <u>21</u>:223, 1979.

5.   Robbins, M. S.; Sorenson, R. L.; Elde, R. P.; Schmechel, D. E. and Oertel, W. H. Gamma– aminobutyric acid (GABA) inhibition of somatostatin secretion from the isolated perfused rat pancreas and immunohistochemical localization of L–glutamate decarboxylase in the islet beta cell. <u>Second International Symposium on Somatostatin</u>, Athens, Greece, 145, 1981.

6.   Robbins, M. S.; Harris, J. A.; Hopkins, R. M.; and Adams, M. D. Urinary excretion of lactate dehydrogenase and alkaline phosphatase in the rat following sodium fluoride administration. <u>Pharmacologist</u> <u>24</u>:146, 1982.

7.   Robbins, M. S.; Adams, M. D.; Hopkins, R. M.; and Hoey, G. B. Comparative biodistribution and excretion of MnCl2 and MnEDTA in the rat. <u>Pharmacologist</u> <u>25</u>:233, 1983.

8.  Adams, M. D.; Robbins, M. S.; Hopkins, R. M.; and Hoey, G. B.  Renal effects of ioxaglic acid – preclinical studies.  Invest. Radiol. 19:S123,   1984.

9.  Adams, M. D.; Dean, R. T.; Godat, J. F.; Hoey, G. B.; Hopkins, R. M.; Lin, Y.; Rizzolo, R. R.; Robbins, M. S.; and Valenti, A.  Preclinical studies with      MP–328: A potential nonionic myelographic and anglourographic contrast agent.  Invest. Radiol. 19:S135, 1984.

10.  Hoey, G. B.; Adams, M. D.; Robbins, M. S.; Dean, R. T.; White, D. W.; Rizzolo, R. R.; Monzyk, M. A.; Bosworth, M. E.; and Wolf, G. L.  Factors in the design of NMR imaging agents.  Invest. Radiol. 19:S150, 1984.

11.  Robbins, M. S. and Adams, M. D.  Myocardial Kinetics of hexakis (trimethyphosphite) technetium–99m(l) chloride (Tc–TMP) in rats, rabbits, dogs, cats and pigs.  J. Nucl. Med. 25:P15, 1984.

12.  Dean, R. T.; Adams, M. D.; Miller, F. W.; Robbins, M. S.; Wester, D. W.; and White, D. H.  Synthesis, characterization and identification of the hexakis (trimethylphosphite) [Tc–99m] technetium(l) cation as a myocardial imaging agent.  J. Nucl. Med. 25:P15, 1984.

13.  Robbins, M. S.; Adams, M. D.; Anderson, H. A.; Dean, R. T,; and White, D. H.  Myocardial uptake of radioiodine–labeled 15–(4–iodophenyl)–9–methylpentadecanoic acid in laboratory animals.  J. Nucl. Med. 26:P124, 1985.

14.  Coveney, J. R. and Robbins, M. S.  Biodistribution of radiomercury in rabbits and efficacy of dimercaptopropanesulfonic acid (DMPS) and dimercaprol (BAL) to reduce tracer–level kidney burden of radiomercury in rats.  Fed. Proc. 45:440, 1986.

15.  Ralston, W. H.; Robbins, M. S.; Mosier, L. D.; Valenti, A.; Barco, S. J.; and Adams, M. D.  Comparative arrhythmogenicity of MP–328 and diatrizoate during coronary angiography in the dog.  Pharmacologist 28:217, 1986.

16.  Coveney, J. R. and Robbins, M. S.  Biological characterization of Tc–99m mercaptoacetylglycylglycylglycine (MAG3) kit for renal function.  J. Nucl. Med. 28:732, 1987.

17.  Mosier, L. D.; Joist, J. H.; Chance, D.; Adams, M. D.; Ralston, W. H.; and Robbins, M. S.  In Vitro effects of ionic and nonionic contrast media on coagulation, platelet function and fibrinolysis.  Radiology 165 (P.) Supplement:62, 1987.

18.  Pilcher, G. D.; Coveney, J. R.; Nosco, D. L.; and Robbins, M. S.  Probenecid inhibition of Tc– 99m MAG3 and o–iodohippurate (OIH) uptake by rat kidney slices.  J. Nucl. Med. 29:908, 1988.

19.  Coveney, J. R. and Robbins, M. S.  Effects of urinary pH upon Tc–99m MAG3 renograms in the rat.  J. Nucl. Med. 29:906, 1988.

20.  Nosco, D. L.; Coveney, J. R.; Pipes, D. W.; and Robbins, M. S.  Chemistry of Tc–MAG3 and derivatives; synthesis, characterization, reactivity and biodistribution of these complexes.  J. Nucl. Med. 29:801, 1988.

---

### PRIOR TESTIMONY

In the last five years, I have testified as an expert in deposition and/or trial in the following matters:

- United States of America v. Nadar Pourhassan and Kazem Kazempour, No. 8:22-cr-00440-PX, United States District Court for the District of Maryland

- Alnylam Pharmaceuticals, Inc. v. Pfizer, Inc., Pharmacia & Upjohn Co. LLC, BioNtech SE, and BioNtech Manufacturing GMBH, No. 22-cv-336-CFC, United States District Court for the District of Delaware

- In re: Lantus Direct Purchaser Antitrust Litigation, No. 16-12652-LTS-JGD, United States District Court for the District of Massachusetts

- Madison Joint Venture LLC v. Chemo Research S.L. Exeltis USA, Inc., and Sergio Sosa-Estani, No. 2:19-cv-8012-JEP-JBC, United States District Court for the District of New Jersey

- In re: Zetia (Ezetimibe) Antitrust Litigation, MDL No. 2:18-md-2836, United States District Court for the Eastern District of Virginia

- Juno Therapeutics, Inc., Memorial Sloan Kettering Cancer Center and Sloan Kettering Institute for Cancer Research v Kite Pharma, Inc., No. 2:17-cv-07639-SJO, United States District Court for the Central District of California

- In re Losterin 24 Fe Antitrust Litigation, MDL No. 1:13-md-02472-SPAS, United States District Court for the District of Rhode Island

- Allergan, Inc. v. Imprimis Pharmaceuticals, Inc., No. 8:17-cv-01551-JVS-DFMx, United States District Court for the Central District of California Southern Division

- Allergan, Inc. v. Prescriber's Choice, Inc. and Sincerus Florida, LLC, No. 8:17-cv-01550, United States District Court for the Central District of California Southern Division

- Abeona Therapeutics Inc. v. REGENXBIO Inc., No. 01-20-0005-3750, American Arbitration Association

- Sorrento Therapeutics, Inc. v. NantPharma, LLC, No. 01-19-0001-0303, American Arbitration Association

- In re: Ranbaxy Generic Drug Application Antitrust Litigation, No. 19-md-02878-NMG, United States District Court for the District of Massachusetts

- In re Valsartan, Losartan and Irbesartan Products Liability Litigation, 1:19-md-02875, United States District Court for the District of New Jersey

- Glenn Alto; Edward Connolly, and Lewis William Waters v. Sun Pharmaceutical Industries, Inc., No. 1:19- cv-09758-GHW, United States District Court for the Southern District of New York

- In re: Novartis and Par Antitrust Litigation, 1:18-cv-04361-AKH, United States District Court for the Southern District of New York

- BLS Pharma, Inc. v. Inovio Pharmaceuticals, Inc., and Genetronics, Inc., No. 30-2019-01119045-CUCO-CJC, Superior Court of the State of California for the County of Orange

- Syneos Health, LLC, and Syneos Health UK Limited v. FSD Pharma, Inc., No. 01-22-0000-3166, American Arbitration Association

- In re Arizona Theranos, Inc., Litigation, No. 2:16-cv-2138-DGC, United States District Court for the District of Arizona

- Shareholder Representative Services LLC v. Alexion Pharmaceuticals, Inc., No. 2020-1069-MTZ, Court of Chancery of the State of Delaware

- AMAG Pharmaceuticals, Inc. v. American Guarantee and Liability Insurance Company, No. 1:21-cv-10618, United States District Court for the District of Massachusetts (Boston)

- In re: Actos Antitrust Litigation, 1:13-cv-09244-RA-SDA, United States District Court for the Southern District of New York

- Sandoz Inc. v. Cediprof, Inc., No. 01-20-0010-0588, American Arbitration Association

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

NOVARTIS AG,
NOVARTIS PHARMACEUTICALS
CORPORATION,

                    Plaintiffs,

    v.

NOVADOZ PHARMACEUTICALS LLC,
MSN PHARMACEUTICALS INC., and
MSN LABORATORIES PRIVATE
LIMITED,

                    Defendants.

Civil Action No. 25-849

 

**Expert Declaration of Dr. Arash Nayeri, MD
In Support of Plaintiffs' Order to Show Cause for a
Temporary Restraining Order
And Motion for Preliminary Injunction**

January 30, 2025

Add113

I.     **INTRODUCTION** ................................................................................................ **2**

   A.  Professional Qualifications and Experience ................................................ 2

   B.  Retention and Assignment ........................................................................ 3

   C.  Parties and Allegations ............................................................................. 5

   D.  Information Considered ............................................................................ 10

   E.  Summary of Opinions .............................................................................. 11

II.    **HCP PRESCRIBING DECISIONS** ............................................................... **12**

III.   **POTENTIAL FOR HCP CONFUSION** ......................................................... **17**

IV.   **PATIENT HARM STEMMING FROM CONFUSION** ............................... **19**

V.    **GENERIC MEDICATIONS DO NOT NEED TO LOOK LIKE THE BRANDED EQUIVALENT** ............................................................................. **22**

1

## I.  Introduction

### A.  Professional Qualifications and Experience

1. I am a licensed and practicing physician in the state of California. I specialize in treating cardiovascular diseases, with a focus on chronic heart failure or "cardiomyopathy." I am Board Certified in General Cardiology, Echocardiography (which is integral to the diagnosis and surveillance of heart failure), and Nuclear Cardiology (which encompasses a variety of tests used to delineate possible etiologies of heart failure). I am also a Fellow of the American College of Cardiology, a non-profit organization dedicated to transforming cardiovascular care and improving heart health for all.

2. I received my B.A. in Molecular and Cell Biology with a Departmental Citation and the Chancellor's Outstanding Scholar Award from the University of California Berkeley— which I attended on a UC Regent Scholarship, a full, merit-based scholarship. I received my M.D. from Vanderbilt University School of Medicine—which I attended on a Cornelius Vanderbilt Scholarship, a full, merit-based scholarship. I completed my two-year residency training in Internal Medicine and my four-year fellowship in Cardiology at the David Geffen School of Medicine at the University of California, Los Angeles.

3. I have been practicing medicine for over eight years. During that time, I have been deeply engaged in the Cardiology community, not only through my daily treatment of patients but also through my extensive research on cardiomyopathy.

4. I have built an innovative practice, informed by currently available treatments and technologies. For example, I have done cutting edge work on the use of artificial intelligence ("AI") in Cardiology. Specifically, I have provided physician education on the use of AI to detect and risk stratify coronary artery disease on coronary computerized tomography angiography, and I have started an active effort to validate AI algorithms in echocardiography with an emphasis on detection and characterization of cardiomyopathy/heart failure.[1] In addition (and separate from my work on AI), I started,

---

[1]  "Cardiomyopathy" is the broader, umbrella category for diseases that make it difficult for the heart to pump blood. "Heart failure" is used to described symptoms attributable to cardiomyopathy or cardiomyopathy when it is severe enough to cause symptoms. Often, these two terms are used interchangeably.

2

and am the principal investigator for, a research initiative investigating physician and patient misconceptions on the efficacy and safety of certain newer cardiovascular drugs, and the impact of any misconceptions on appropriate utilization.

5. I currently work at Cedars-Sinai Medical Center, a teaching hospital in Los Angeles, California, renowned for its cardiovascular care and consistently ranked among the best institutions in the world in the different subspecialities within Cardiology, including heart failure and transplant medicine. I have supervised and taught physicians focusing on Cardiology, as well as physicians training in Internal Medicine, in both inpatient and outpatient settings.

6. I am actively engaged in outcomes research in the field of Cardiology. I am the author of eleven peer-reviewed publications in this area. In addition, throughout my training at the University of California, Los Angeles, I participated in the Specialty Training and Advanced Research ("STAR") Pathway, a professional track that offers trainees both comprehensive clinical and intensive research training. Through that track, I conducted substantial, grant-funded research focusing on cardiomyopathy, and I obtained a Master of Science in Clinical Research.

7. I have presented my original research numerous times at prominent medical conferences including the Annual Scientific Meeting of the Heart Failure Society of America, the America College of Cardiology's Annual Scientific Sessions, and the American Heart Association's Scientific Sessions. My presentations have covered topics ranging from cardiomyopathy and heart failure to cardio-oncology. These conferences are widely attended by Cardiologists from around the country.

### B.    Retention and Assignment

8. I understand that Plaintiffs Novartis AG and Novartis Pharmaceuticals Corporation ("Plaintiffs" or "Novartis") are filing a lawsuit against Defendants Novadoz Pharmaceuticals LLC, MSN Pharmaceuticals Inc., and MSN Laboratories Private Limited ("Defendants" or "MSN") alleging, among other things, that MSN has engaged in trade dress infringement by preparing to release a generic version of Entresto, with

3

pill tablets nearly identical in appearance to that of the appearance of the 24/26 mg, 49/51 mg, and 97/103 mg Entresto pill tablets, and has engaged in trademark infringement by preparing to use the "Novadoz" name to distribute its generic drug.[2]

9. I have been retained by Debevoise and Plimpton LLP, counsel for Novartis, to provide an independent opinion to assist the Court regarding matters on which expert assistance may be required in this litigation. Specifically, I have been asked by counsel to:

   a)    offer background on Entresto, its use, and my decision-making process for prescribing Entresto;

   b)    assess the potential for confusion of health care practitioners ("HCPs") treating chronic heart failure, regarding the source of MSN's generic drug, given that the drug will be nearly identical in appearance to Entresto and distributed under the Novadoz name; and

   c)    offer insight into whether a generic drug must be identical to its branded equivalent to be effective.

10. I reserve the right to address additional issues as requested by counsel in future declarations or reports, including potentially in rebuttal to opinions offered by Defendants' experts. I am being compensated at the rate of $1,300 per hour for my time in preparing this declaration. No part of my compensation is dependent upon the outcome of this action or the nature of the opinions that I express.

11. This is the first time I have offered expert testimony, and a list of my publications from the last ten years is included in **Appendix A**.

---

[2] Complaint, *Novartis v. Novadoz Pharmaceuticals, LLC, et al.*, Case No. 25-849 (D.N.J. filed Jan. 30, 2025) ("Complaint") ¶¶ 88–105.

4

**C.    Parties and Allegations**

**1.    Novartis and Its Entresto Drug**

12. Novartis is an innovative pharmaceutical company that was formed in 1996.[3] Novartis focuses its research and development of breakthrough medications on four key therapeutic areas: (1) Oncology; (2) Neuroscience; (3) Immunology; and (4) Cardiovascular, Renal, and Metabolic.[4] Specifically, within its Cardiovascular, Renal, and Metabolic therapeutic focus, Novartis has developed Entresto, a prescription medication to treat adults with long-lasting, chronic heart failure, that was released in 2015.[5]

13. Chronic heart failure is a "condition where the heart muscle responsible for the pumping action weakens or stiffens over time, leaving people feeling fatigued, short of breath and at risk of sudden cardiac death."[6] Because the heart is not able to efficiently pump and supply the organs with the vital oxygen and nutrients needed to function, chronic heart failure can lead to serious complications such as liver damage, kidney failure, and increased risk of sudden cardiac death.[7] In the United States, chronic heart failure remains a leading cause of morbidity, including complications leading to hospitalization, and carries a significant risk of mortality.[8]  Chronic heart failure is seen in a variety of different populations but is most common in adults 65 years of age or older.

---

[3]    Novartis in the US, Novartis, https://www.novartis.com/us-en/about/novartis-us (accessed Jan. 28, 2025); 25 years of Novartis – more than 250 years of innovation, Novartis, https://www.novartis.com/about/25-years-novartis-more-250-years-innovation (accessed Jan. 28, 2025).

[4]    Therapeutic Areas, Novartis, https://www.novartis.com/about/therapeutic-areas (accessed Jan. 28, 2025).

[5]    Cardiovascular, renal, and metabolic, Novartis, https://www.novartis.com/about/therapeutic-areas/cardiovascular-renal-and-metabolic#tabheart-failure-210841 (accessed Jan. 28, 2025); Entresto, Entresto, https://www.entresto.com/ (accessed Jan. 28, 2025); Drugs@FDA:FDA-Approved Drugs (Entresto), FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=207620 (accessed Jan. 28, 2025) (noting the FDA approved Entresto on July 7, 2015).

[6]    Cardiovascular, renal, and metabolic, Novartis, https://www.novartis.com/about/therapeutic-areas/cardiovascular-renal-and-metabolic#tabheart-failure-210841 (accessed Jan. 28, 2025).

[7]    Heart Failure, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-failure/symptoms-causes/syc-20373142 (accessed Jan. 28, 2025).

[8]    Braunwald E. The war against heart failure: the Lancet lecture. The Lancet. 2015 Feb 28. doi: 10.1016/S0140-6736(14)61889-4.

14. There are a variety of heart failure treatments available that have been shown to improve patient outcomes, particularly with respect to heart failure with reduced ejection fraction (a measure of the efficiency with which the heart pumps blood), also often referred to as systolic cardiomyopathy. There are "four pillars" of heart failure therapy that have become the standard of care for most patients and are incorporated into all relevant guidelines for the treatment of heart failure given their best evidence for improving outcomes:[9]

- Beta blockers (e.g., carvedilol, bisoprolol, and metoprolol succinate), which help block the effects of adrenaline on the heart;

- Mineralocorticoid receptor antagonists (e.g., spironolactone and eplerenone), which block the action of the hormone aldosterone, which can lead to harmful fluid retention and damage the heart muscle;

- Sodium-glucose co-transporter-2 inhibitors ("SGLT2i") (e.g., empagliflozin and dapagliflozin), which reduce the amount of renally reabsorbed glucose and sodium in the blood by blocking the sodium-glucose co-transporter-2 protein; and

- Angiotensin converting enzyme inhibitors ("ACEis") (e.g., enalapril and lisinopril), angiotensin II receptor blockers ("ARBs") (e.g., losartan and valsartan), and angiotensin-receptor neprilysin inhibitors ("ARNIs"). ACEis and ARBs both block the production of angiotensin II, a hormone that constricts the blood vessels. Of note, following a landmark trial published in the New England Journal of Medicine in 2014 ("PARADIGM-HF"), a new class of agent (an ARNI) was introduced to this pillar of heart failure treatment: sacubitril/valsartan (branded as Entresto). In that study, which was stopped early due to clear evidence of benefit in the trial arm, the combination of valsartan with sacubitril

---

[9]   Lewis EF. A fourth pillar for all in the treatment of heart failure. Eur Heart J. 2021 Nov 14;42(43):4452-4454; Heidenreich PA, Bozkurt B, Aguilar D, Allen LA, Byun JJ, Colvin MM, Deswal A, Drazner MH, Dunlay SM, Evers LR, Fang JC. 2022 AHA/ACC/HFSA guideline for the management of heart failure: a report of the American College of Cardiology/American Heart Association Joint Committee on Clinical Practice Guidelines. J Am Coll Cardiol. 2022 May 3;79(17): e263-421.

was compared to enalapril (an ACEi). In PARADIGM-HF, Entresto was shown to be superior to enalapril in reducing the risk of cardiovascular death and heart failure hospitalization.[10]

As these pillars show, there are a number of different therapies used to treat chronic heart failure. Many of these products are offered in multiple generic forms, often different in appearance from that of the branded equivalent. **Appendix C** includes examples of generic treatments for heart failure that look different from their branded equivalents.

15. Novartis's Entresto is the only chronic heart failure drug currently on the market that is made up of the active ingredients sacubitril and valsartan. The addition of Entresto to treatment options for patients with chronic heart failure was monumental. While they have different mechanisms of action,[11] sacubitril and valsartan help to relax the blood vessels and decrease sodium and fluid in the body, making it easier for the heart to pump blood throughout the body and, as a result, lessening the burden on the heart.[12]

16. Entresto comes in three doses—(1) a 24/26 mg "Low Starting Dose," (2) a 49/51 mg "Recommended Starting Dose," and (3) a 97/103 mg "Target Dose," each depicted on the next page, in an image from Entresto's website for HCPs.[13]

---

[10]   McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR; PARADIGM-HF Investigators and Committees. Angiotensin-neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

[11]   Entresto belongs to a class of drugs called ARNIs. Sacubitril works by blocking the enzyme neprilysin, which breaks down certain peptides that might otherwise help to relax blood vessels and promote sodium and water excretion. Valsartan works by blocking the hormone angiotensin II, which can cause blood vessels to narrow and increase blood pressure. The combined effect of these active ingredients is to increase the ease with which the heart can pump blood throughout the body. Entresto, Drugs.com, https://www.drugs.com/entresto.html (accessed Jan. 28, 2025).

[12]   How Entresto Works, Entresto, https://www.entresto.com/how-entresto-works (accessed Jan. 28, 2025).

[13]   Safety & Dosing, Entresto, https://www.entrestohcp.com/safety-and-dosing/dosing (accessed Jan. 28, 2025).





Low Starting Dose
24/26 mg BID

Recommended Starting Dose
49/51 mg BID

Target Dose
97/103 mg BID

17. Patients can progress from the lower doses to the Target Dose. However, not all patients start at the Recommended Starting Dose. Entresto's FDA-approved label and packaging insert include a modified dosing regimen for patients who are not currently taking or taking low doses of ACEis or ARBs. Specifically, Entresto's label and packaging insert recommend that HCPs prescribe the Low Starting Dose of Entresto, rather than the typical Recommended Starting Dose for this particular patient population. Starting with the Low Starting Dose can help these patients avoid complications like hypotension (low blood pressure), electrolyte disturbances, and renal (kidney) injury or failure.[14] This impacts a substantial patient population: as illustration, in a study of over 7,000 patients, "over one-third of patients initiating sacubitril-valsartan had not filled a prescription for an ACE or ARB in the last 6 months."[15] Moreover, in a recent study of over 100,000 patients hospitalized with heart failure, the rates of patients being discharged on Entresto over ACEi or ARB had increased from 1% in 2015 to 55% in 2022.[16] This is strong evidence that more patients are being started directly on Entresto without prior exposure to ACEi or ARB and that the patient population in whom inappropriately high initial dosing of Entresto can lead to adverse events is increasing in size.

18. No matter the dose on which they begin, patients generally take their Entresto tablets twice daily, indefinitely, to help manage chronic heart failure over time.

---

[14] Entresto Prescribing Information, Entresto, https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/entresto.pdf#page=25 (accessed Jan. 28, 2025).

[15] Tan NY, Sangaralingham LR, Sangaralingham SJ, Yao X, Shah ND, Dunlay SM. Comparative effectiveness of sacubitril-valsartan versus ACE/ARB therapy in heart failure with reduced ejection fraction. JACC: Heart Fail. 2020 Jan;8(1):43-54.

[16] Srivastava PK, Klomhaus AM, Greene SJ, et al. Angiotensin Receptor-Neprilysin Inhibitor Prescribing Patterns in Patients Hospitalized for Heart Failure. JAMA Cardiol. 2024 Dec 11. doi:10.1001/jamacardio.2024.3815.

19. As a Cardiologist at Cedars Sinai Medical Center, I regularly treat chronic heart failure patients and prescribe Entresto. Over the past few years, I have cared for over a thousand patients on Entresto, which is a staple of our treatment for patients with heart failure due to its potential life-saving benefits. While I appreciate the significant therapeutic benefit of this drug, through experience I am also very aware and watchful of possible side effects, which are more likely if not dosed properly. As mentioned above, complications including hypotension (low blood pressure), electrolyte disturbances (particularly higher potassium), and renal (kidney) injury or failure are concerns with the use of Entresto.

20. Through my regular engagement with this medication, including through pill samples, patients bringing their medication supply to the office visit, HCP-directed resources from Novartis depicting the drug, and online resources like Medscape and Drugs.com that include images of the drug, I was intimately familiar with the appearance of the Entresto tablets before this litigation and am able to recognize Entresto just by seeing the pills.

## 2. MSN and Its Generic Sacubitril/Valsartan Drug

21. I understand that MSN is set to launch a generic sacubitril/valsartan chronic heart failure treatment that looks almost identical to the Entresto tablets.[17] I understand that MSN's drug will be offered in the same doses—24/26 mg, 49/51 mg, and 97/103 mg—which will be offered in purple, light yellow, and light pink colors respectively, and which all are similar oval shapes and sizes to those of the Entresto tablets.[18]

22. I also understand that the MSN generic drug's label and packaging insert omit instructions on the reduced dosing regimen for patients who are not taking or are taking low doses of ACEis or ARBs.[19]

---

[17]   Complaint ¶ 89.

[18]   Complaint ¶¶ 90–93.

[19]   Complaint ¶¶ 119–123.

23. In addition, I understand that MSN plans to distribute its generic drug under the "Novadoz" name.[20]

### 3. Allegations

24. I understand that Novartis has filed a lawsuit alleging that MSN's sale of a generic drug that replicates the sizes, shapes, and colors of the Entresto tablets infringes Novartis's trade dress rights in the look and feel of the Entresto tablets.[21] I also understand that Novartis alleges that MSN's use of the Novadoz name—which combines the first half of Novartis with the second half of Sandoz—in connection with its generic drug infringes on Novartis's rights in the "Novartis" trademark.[22]

25. As part of its claims, Novartis alleges that MSN's sale of pills that look just like Entresto and are offered under the Novadoz name, could confuse HCPs as to the source of MSN's generic and could lead to patient harm. Specifically, Novartis alleges that confused HCPs may mistakenly consult the MSN label when making prescribing decisions and fail to treat patients who are not currently taking or are taking low doses of ACEis or ARBs, according to the reduced dosing regimen included in the Entresto labeling and packaging insert.[23] Novartis alleges that this confusion could lead to negative side effects harming patients.[24]

### D. Information Considered

26. In preparing this declaration, I have reviewed information from a variety of sources. These include, for example: (a) information obtained directly from Novartis; (b) information in my personal possession; and (c) information from publicly available sources. In addition, I have relied on my experience as a practicing Cardiologist and researcher.

---

[20] Complaint ¶¶ 95–98.

[21] Complaint ¶¶ 88–94.

[22] Complaint ¶¶ 95–105.

[23] Complaint ¶¶ 119–126.

[24] *Id.*

10

27. All of the materials relied on are listed in **Appendix B**. The specific information on which I have relied is also cited in the footnotes of the text. I expressly reserve the right to supplement my opinions, including with any relevant charts, tables, and exhibits, in response to any experts Defendants put forward, should any additional information become available to me or the correction of inadvertent errors lead me to change my opinions.

28. I may use the materials that I have identified, as well as other information that has been or may be produced during the course of this case, to support my testimony at deposition and at trial. In addition, I may use demonstrative materials based on this information and my analyses to support that testimony.

**E.    Summary of Opinions**

29. A high-level overview of my opinions—which are described in more detail throughout the body of this declaration—is included below.

a)    HCPs refer to FDA-approved labels and packaging inserts when making prescribing decisions.

b)    HCPs consult online resources such as Medscape, UpToDate, and Drugs.com when making prescribing decisions, and will often use online search engines like Google to search for drug prescribing information.

c)    HCPs are not immune to confusion regarding drugs or to medical error. An HCP could inadvertently mix up two drugs based on their appearance or confusingly similar manufacturer names. HCPs are exposed to drug appearances and the names of associated manufacturers through informational resources direct from the manufacturer, as well as online resources incorporating images of products, such as Medscape, Drugs.com, or even a Google search.  Exposure to that information could confuse HCPs as to the identity and source of various treatments based on the similar appearance of two drugs or confusingly similar manufacturer names. This confusion could lead HCPs to consult the generic's FDA-approved label and packaging insert (either directly or through an online

11

Add124

resource incorporating that data), rather than the branded drug's FDA-approved label and packaging insert.

d)      HCP confusion—and the inadvertent reference to the generic's prescribing information, rather than Entresto's prescribing information—could lead to patient harm. A confused HCP might fail to prescribe a reduced dosing regimen for patients not currently taking or taking low doses of ACEis and ARBs (because the MSN generic's label omits the modified dosing regimen).

e)      Generic medications do not need to look just like the branded equivalent to be effective. Generic medications often look different from their branded equivalents (examples included in **Appendix C**). After years of chronic heart failure medications looking different in appearance, patients are accustomed to changes in appearance in their medications as new medications, including new generic options, become available. To the extent a difference in appearance causes patient anxiety or any risks of nonadherence, those issues can be resolved with a simple conversation with patients, informing them that they are receiving a generic version of the brand drug to which they are accustomed.

f)      It is always vital that patients have a say in the medication they are given. Where generics and their branded equivalents look nearly identical, patients often do not even realize when a generic drug has been substituted. This substitution— without patient awareness—can deprive patients of the right to have a say in the medications they receive and to maintain control over their own treatment. This is particularly important given that it has been shown that for many drugs, patients report better performance and/or fewer adverse events on the brand name drug. The patient's right to make a decision is eroded if the brand name and generic drugs are identical in appearance, such that the patient does not detect a substitution.

## II.      HCP Prescribing Decisions

30. HCPs consult a variety of resources in making prescribing decisions.

31. HCPs consult FDA-approved labels and packaging inserts (both of which are available online) in making prescribing decisions. An FDA-approved label includes "a summary of the essential scientific information needed for the safe and effective use of the drug," and "includes the Prescribing Information, FDA-approved patient labeling (Medication Guides, Patient Package Inserts, and/or Instructions for Use), and/or carton and container labeling."[25] "Labeling for prescription medicines is FDA's primary tool for communicating drug information to healthcare professionals, and patients and their caregivers."[26]

32. HCPs also frequently consult online resources to locate information on drugs, including MedScape, UpToDate, Drugs.com, and WebMD, many of which include FDA-approved prescribing information.[27] HCPs' use of these references is very commonplace. For example, UpToDate is used roughly 1.6 million times per day to aid in clinical decision making and is shown to change management roughly a third of the time.[28] In my experience, nearly every practicing HCP relies on these resources daily to review drug-drug interactions, side effects, and appropriate dosing (as provided in the drugs' respective product inserts). I too reference one or multiple of these resources on an approximately near-daily basis to provide my patients with appropriate pharmaceutical treatment.

33. For most HCPs, reliance on these resources is even more common for drugs with more complicated names and dosing options, such as Entresto. Of the four-pillars for heart

---

[25] FDA's Labeling Resources for Human Prescription Drugs: For Industry, FDA, https://www.fda.gov/drugs/laws-acts-and-rules/fdas-labeling-resources-human-prescription-drugs (accessed Jan. 28, 2025).

[26] Frequently Asked Questions about Labeling for Prescription Medicines: For Healthcare Professionals, FDA, https://www.fda.gov/drugs/fdas-labeling-resources-human-prescription-drugs/frequently-asked-questions-about-labeling-prescription-medicines (accessed Jan. 28, 2025).

[27] Sullivan HW, Squire C, Aikin KJ, Tzeng J, Ferriola-Bruckenstein K, Brodsky E, Trentacosti AM, Johnson M. Physicians' use of and preferences for FDA-approved prescribing information. Res Social Adm Pharm. 2022 Jun;18(6):3027-3037. doi: 10.1016/j.sapharm.2021.07.028.

[28] 30 years of UpToDate: The evolution of clinical decision support and the future of evidence-based medicine, Wolters Kluwer, https://www.wolterskluwer.com/en/expert-insights/30-years-of-uptodate-evolution-of-clinical-decision-support-future-of-evidence-based-medicine (accessed Jan. 28, 2025); see also Dorfman S, Woodland J, Tarantino T, Kuper C. Media Vitals 2016 What Physicians Want and Need from Pharma A Look Across Six Specialties. CMI/Compas Study. 2016 Oct. (In one study, more than 70% of HCPs reported using search engines at least once daily for professional purposes, with 48% of cardiologists using search engines 1–3 times per day).

13

failure treatment, Entresto is the only drug with a two-part dosing structure[29] and with non-rounded dosing numbers (i.e., 24/26 mg, 49/51 mg, and 97/103 mg). For comparison to SGLT2 inhibitors, dapagliflozin (branded as Farxiga) comes in 5mg or 10mg doses, meanwhile empagliflozin (branded as Jardiance) comes in 10mg and 25mg doses. In my experience, including from teaching other HCPs and collaborating with my colleagues in the treatment of heart failure, the complicated dosing structure of Entresto in particular leads many HCPs to consult online resources (which often incorporate FDA-approved prescribing information and information from drugs' labels) in guiding their use of this medication.

34. The online resources referenced by HCPs may contain images of drugs, and some even comingle the information for branded and generic drugs on one informational page. For example, searching for the brand drug "Farxiga" on Medscape.com, leads to a single page for drugs incorporating the active ingredient "dapagliflozin."[30] That webpage includes images of dapagliflozin tablets at the bottom of the page, as shown below:



35. Drugs.com incorporates a "Pill Identifier," including images of drugs. A search for a compound name on Drugs.com—such as "dapagliflozin"—leads to a series of results,

---

[29]    When I refer to Entresto's "two-part dosing structure," I mean that each Entresto dose has two numbers (e.g., 24/26 mg). The numbers in the Entresto doses correspond to the two medicines that make up Entresto—sacubitril and valsartan. Tips For Taking Entresto®, Novartis, https://www.entresto.com/starting-entresto (accessed Jan. 28, 2025) ("Entresto is a film-coated tablet that comes in the following doses: 24/26 mg, 49/51 mg, and 97/103 mg.  It comes in these doses because it contains 2 medicines, which enable it to work in 2 ways.").

[30]    Farxiga, Medscape, https://reference.medscape.com/drug/farxiga-dapagliflozin-999899 (accessed Jan. 28, 2025).

including results from the "Pill Identifier," showing images of both generic and branded medications (sample image included below).[31]



36. These online resources often incorporate the information that appears on FDA-approved labels and prescribing information. For example, MedScape and Drugs.com both include detailed information on potential side effects and dosing instructions.[32]

---

[31]  Dapaglifozin, Drugs.com, https://www.drugs.com/search.php?searchterm=dapagliflozin (accessed Jan. 28, 2025).

[32]  1428 10 Pill – yellow four-sided, Drugs.com, https://www.drugs.com/imprints/1428-10-35511.html (accessed Jan. 28, 2025); dapagliflozin (Rx), MedScape, https://reference.medscape.com/drug/farxiga-dapagliflozin-999899 (accessed Jan. 28, 2025).

37. Both MedScape and Drugs.com include pages for Entresto. For example, a search for "Entresto" on MedScape leads to a page on "sacubitril/valsartan,"[33] that includes the below image of the Entresto tablets.

## Images



| BRAND | FORM. | PILL IMAGE |
|---|---|---|
| Entresto (sacubitril/valsartan) | 24-26 mg tablet | |
| Entresto (sacubitril/valsartan) | 49-51 mg tablet | |
| Entresto (sacubitril/valsartan) | 97-103 mg tablet | |

[34]

38. Drugs.com also includes results for Entresto, as depicted on the next page.

---

[33] "Entresto" Search, Medscape, https://search.medscape.com/search?q=entresto&plr=ref (accessed Jan. 28, 2025).

[34] Sacubitril/Valsartan, Medscape, https://reference.medscape.com/drug/entresto-sacubitril-valsartan-1000010#90 (accessed Jan. 28, 2025).

16

**Entresto Prescribing Information**

Prescribing Information (FDA)

**ENTRESTO** is indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure. Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal. LVEF is a variable measure, so use clinical judgment...

**Entresto results from the Pill Identifier**

  

**Entresto Dosage Guide**

Dosage Information (Advanced)

**Entresto** Dosage 2.1 General Considerations **ENTRESTO** is contraindicated with concomitant use of an angiotensin-converting enzyme (ACE) inhibitor. If switching from an ACE inhibitor to **ENTRESTO** allow a washout period of 36 hours between administration of the two drugs. 2.2 Adult Heart Failure The... [35]

39. HCPs also make prescribing decisions based on Google searches, which could lead to a mix of results for the brand name and generic drugs. In my experience, these search results often do not differentiate between brand and generic options. Moreover, one of the most utilized clinical resources in the United States by HCPs is UpToDate, which makes no distinction between brand or generic medications in the drug information articles. In fact, searches for "Entresto" and "Sacubitril Valsartan" yield the same search result with the generic name as the header and a single, comingled drug facts page. [36]

## III.   Potential for HCP Confusion

40. HCPs are not immune to confusion and medical error. Medical error is often rooted in confusing packaging, labeling, or copycat drugs. According to the Institute for Safe

---

[35]   "Entresto" Search, Drugs.com, https://www.drugs.com/search.php?searchterm=Entresto (accessed Jan. 28, 2025).

[36]   Sacubitril and valsartan: Drug information, UpToDate, https://www.uptodate.com/contents/sacubitril-and-valsartan-drug-information (accessed Jan. 28, 2025).

Medication Practices ("ISMP"), approximately 25% of medical error reports received by ISMP are related to look-alike products and misleading container labeling.[37]

41. HCPs exposed to the appearance of products through manufacturer-distributed resources, pill samples, or an online resource, could confuse drugs based on similarities in appearances of pill tablets.[38]

42. This is particularly true where online resources include images of the generic and branded drugs—including links to information about those respective drugs—side-by-side. For example, on Drugs.com, where the generic and branded medications appear identical, a prescriber could easily click on an image of the generic medication believing it was the branded equivalent, and make prescribing decisions based on the information provided in connection with the generic drug.

43. Particularly in the context of this case, HCPs could easily click on the image of MSN's generic product, believing it was Entresto, and make prescribing decisions based on the FDA-approved prescribing information for the generic (which notably omits the modified dosing regimen for patients who are not currently taking or taking low doses of ACEis and ARBs).

44. Further, where information for brand and generic drugs is comingled on a single webpage (as is the case on MedScape and UpToDate), it is not clear that dosing instructions for the respective drugs (from their respective product inserts) will be clearly distinguished, and HCPs may be confused into believing that the FDA-approved prescribing information for the respective products is identical. This is particularly true on MedScape because MedScape's combined informational pages include images of

---

[37] <u>Importance of Premarket Labeling and Packaging Safety Evaluations in Minimizing Postmarket Medication Errors</u>, ECRI, https://home.ecri.org/blogs/ismp-on-demand-events/importance-of-premarket-labeling-and-packaging-safety-evaluations-in-minimizing-postmarket-medication-errors?_pos=4&_sid=307280481&_ss=r (accessed Jan. 28, 2025); <u>ISMP National Vaccine Errors Reporting Program 2022-2023 Analysis: New Vaccines, New Errors</u>, ECRI, https://home.ecri.org/blogs/ismp-alerts-and-articles-library/ismp-national-vaccine-errors-reporting-program-2022-2023-analysis-new-vaccines-new-errors (accessed Jan. 28, 2025) (reporting similar figures).

[38] Cristina Milesi, <u>Preserving Patient Safety: Understanding the Risks of Look-Alike and Sound-Alike Drug Names</u>, Brand Institute, https://www.brandinstitute.com/preserving-patient-safety-understanding-the-risks-of-look-alike-and-sound-alike-drug-names/ (accessed Jan. 28, 2025).

pills; where brand and generic pills are identical, HCPs may assume the associated information is also identical.

45. HCPs could also be confused as to the source of a generic pill based on the use of a confusingly similar manufacturer name. For example, in this case, the use of "Novadoz" (in combination with the similar appearance of the Entresto and generic pills) could lead HCPs to believe that Novartis has released an "authorized generic"[39] version of Entresto and deceive HCPs into believing there is no material difference between the FDA-approved uses of Entresto and MSN's generic product. Before this case, I was aware that Sandoz was the generics division of Novartis. The combination of those two names—particularly used in connection with pills identical to a Novartis brand drug—could confuse HCPs into believing that Novartis has released its own authorized generic version of Entresto and that the generic and Entresto are equivalent.

## IV.    Patient Harm Stemming from Confusion

46. A physician's goal is always to do no harm—a key component of our Hippocratic oath. Here, confusion between the two drugs could lead an HCP to mistakenly click on an image of the generic product believing it was Entresto or falsely assuming its label and prescribing information was identical to that of Entresto (on a resource like Medscape or Drugs.com), and make a decision without the benefit of key dosing information in Entresto's label that would allow the HCP to maximize the benefit of the drug while minimizing the potential harm.

47. The MSN generic's label omits key dosing information for patients who are not currently taking or taking low doses of ACEis or ARBs. Unlike Entresto's label—which indicates these patients start on the 24/26 mg Low Starting Dose, rather than the 49/51

---

[39]    "The term 'authorized generic' drug is most commonly used to describe an approved brand name drug that is marketed without the brand name on its label. Other than the fact that it does not have the brand name on its label, it is the exact same drug product as the branded product. An authorized generic may be marketed by the brand name drug company, or another company with the brand company's permission." FDA List of Authorized Generic Drugs, FDA, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs (accessed Jan. 28, 2025).

19

mg Recommended Starting Dose—the MSN generic's label includes no unique information regarding the dosing of these particular patients.

48. Even though the FDA approved the MSN generic's label, the omission of this information could lead to negative side effects—some quite severe—that could be avoided if the HCP had referred to Entresto's label in making prescribing (and relatedly, dosing) decisions. For example, prescribing Entresto or the MSN generic at a dose higher than the 24/26 mg Low Starting Dose in patients naïve to ACEi or ARB could lead to low blood pressure, electrolyte disturbances, or even kidney failure. As stated above, this issue impacts a substantial patient population.[40]  Here, HCP confusion as to the appropriate dosing of Entresto can lead to higher risk of adverse events, elevated concerns about the safety profile of Entresto, and possible underutilization of this drug for the treatment of chronic heart failure. In other words, patients who are not dosed according to the directed dosing in Entresto's label due to confusion between the drugs, are more likely to have initial adverse reactions, and thereby be deemed "intolerant" of Entresto moving forward. This can lead to the underutilization of this pillar of chronic heart failure treatment.

49. In my experience, prescribing Entresto at higher than recommended doses can lead to very serious side effects for patients. As a clinician experienced in the treatment of heart failure, I am very much aware that any medication we use in this disease state can lead to adverse events. In heart failure the heightened risk of adverse events is largely attributable to 3 factors:

    a)    Medications for heart failure with reduced ejection fraction, particularly medications that fall within the "four pillars" of heart failure, are often co-administered. Low blood pressure, which can lead to a number of adverse events including loss of consciousness and even death, is a potential side effect of the "four pillars" of heart failure treatment. Three of the "four pillars" are also known

---

[40]    Tan NY, Sangaralingham LR, Sangaralingham SJ, Yao X, Shah ND, Dunlay SM. Comparative effectiveness of sacubitril-valsartan versus ACE/ARB therapy in heart failure with reduced ejection fraction. JACC: Heart Fail. 2020 Jan;8(1):43-54.

20

to contribute to acute kidney injuries, which can lead to hospitalization and in
severe cases, need for hemodialysis.

    b)    Patients with significant heart failure are more likely to have a lower blood
pressure and worse renal function at baseline, heightening the risk of such adverse
events with polypharmacy.[41]

    c)    Guideline-directed medical therapy ("GDMT") of heart failure encourages
the combination of the "four pillars," often with as high of a dose as can be
tolerated, further heightening the risks of hypotension and kidney injury.[42]

50. While Entresto is a drug with many benefits, the heightened risk of adverse events with
Entresto is well known, particularly with regard to hypotension and acute kidney injury
(particularly if not dosed properly).[43] I am familiar with this heightened risk not only
through my review of the literature, but also via my personal experience with this drug.
Following the publication of its landmark trial in heart failure with reduced ejection
fraction ("PARADIGM-HF"), my colleagues and I were, and continue to be, eager to
use this drug in our patients with heart failure.[44] However, we balance our enthusiasm
for its potential benefit (which is substantial) with its risks of adverse events.
Appropriate and careful dosing, consistent with Entresto's label's instructions,
particularly in patients previously not on ACEis or ARBs, is essential to minimize risks
and the omission of the modified dosing regimen for these patients in the MSN generic's
label can lead to provider confusion with possibly catastrophic consequences.

---

[41]  Arundel C, Lam PH, Gill GS, Patel S, Panjrath G, Faselis C, White M, Morgan CJ, Allman RM, Aronow WS, Singh SN. Systolic blood pressure and outcomes in patients with heart failure with reduced ejection fraction. J Am Coll Cardiol. 2019 Jun 25;73(24):3054-63; Löffler AI, Cappola TP, Fang J, Hetzel SJ, Kadlec A, Astor B, Sweitzer NK. Effect of renal function on prognosis in chronic heart failure. Am J Cardiol. 2015 Jan 1;115(1):62-8.

[42]  Heidenreich PA, Bozkurt B, Aguilar D, Allen LA, Byun JJ, Colvin MM, Deswal A, Drazner MH, Dunlay SM, Evers LR, Fang JC. 2022 AHA/ACC/HFSA guideline for the management of heart failure: a report of the American College of Cardiology/American Heart Association Joint Committee on Clinical Practice Guidelines. J Am Coll Cardiol. 2022 May 3;79(17):e924, e937-39.

[43]  Kimm YS, Brar S, D'Albo N, Dey A, Shah S, Ganatra S, Dani SS. Five years of sacubitril/valsartan—a safety analysis of randomized clinical trials and real-world pharmacovigilance. Cardiovasc Drugs Ther. 2022 Oct;36(5):915-24; McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR. Angiotensin–neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

[44]  McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR. Angiotensin–neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

21

## V.    Generic Medications Do Not Need to Look Like the Branded Equivalent

51. After years of chronic heart failure medications looking different in appearance—including branded medications looking different from each other, as well as from their own generic equivalents (examples included in **Appendix C**)—patients are accustomed to changes in appearance in their medications as new medications, including new generic options, become available.

52. Generic medications do not need to look like their branded equivalents to be effective. To the extent a difference in appearance causes patient anxiety or any risks of nonadherence, those issues can be addressed by a conversation with the HCP.

53. In my experience, patient concerns about the differing appearance of their tablets can be effectively addressed in a few sentences discussing the presence of different manufacturers in the pharmaceutical industry.

54. If anything, having a generic medication look different from a branded equivalent is to a patient's advantage because it helps to ensure that patients understand when they are receiving a generic substitute and make an informed decision about their medical care.

55. Pharmacies will often substitute generic drugs for brand name drugs, due to cost considerations.

56. However, not all patients perform equally as well on generic drugs. In fact, for many drugs, patients may report better performance and/or less adverse events on the brand name drug.[45]

57. As a result, some patients are willing to pay a premium for brand name drugs to ensure optimal, consistent performance. They can exercise this choice by instructing their HCP to note on the prescription that only the brand name drug should be dispensed by the pharmacist. I encounter this request on almost a daily basis and often with medications

---

[45] Wang L, Chen YJ, Grabner M, Nepal B, Bodhani A, Espaillat R, Hennessey JV. Comparative Effectiveness of Persistent Use of a Name-Brand Levothyroxine (Synthroid®) vs. Persistent Use of Generic Levothyroxine on TSH Goal Achievement: A Retrospective Study Among Patients with Hypothyroidism in a Managed Care Setting. Adv Ther. 2022 Jan;39(1):779-95; Brown JP, Davison KS, Olszynski WP, Beattie KA, Adachi JD. A critical review of brand and generic alendronate for the treatment of osteoporosis. Springerplus. 2013 Dec;2:1-2.

that patients have relied on for significant diagnoses. With a medication such as Entresto, that patients rely on to treat a life-threatening condition and that can result in adverse events, patients may be particularly concerned about possible complications from a switch to a generic option.

58. If a patient does not realize the generic product on the market is distinct from the brand name drug, they may not know to request that they receive the brand name drug only. In addition, if a patient receives a generic substitution that looks nearly identical to the brand name drug, they may not even realize the substitution has occurred.

59. Where a patient does not detect a substitution, their right to make an informed decision about their medical care is eroded. Patient confusion and the resulting deprivation of a choice between the generic and brand name drug is contrary to patient autonomy—a core tenet of bioethics.[46] This is particularly concerning for a medication like Entresto, which patients have been educated to consider as potentially lifesaving.

60. In my experience, this could easily happen, as patients have a varied understanding of the details of their pharmaceutical regimen. Some patients keep personalized lists of their regimen with the names/doses, some organize their regimens with pill boxes, and many simply recognize the color and the shape of their drugs. It is not uncommon for patients to not be able to pronounce the full name of some of their drugs but recognize them by their appearance and still be compliant with their prescription use. I often have found that some patients are not aware of whether the drug they are taking is brand or generic and it is not an infrequent occurrence that an auto-substitution has taken place by the pharmacy from a brand to a generic alternative without the provider's or patient's consent or knowledge. This commonplace automated substitution by pharmacies takes away patient and provider autonomy over individualized decisions for patients, particularly for those with a history of drug intolerances and preference for some brand names. Here, the very similar appearance of MSN's generic to Entresto would heighten

---

[46] The Four Principles of Medical Ethics, Medical Protection, https://www.medicalprotection.org/uk/articles/essential-learning-law-and-ethics (accessed Jan. 28, 2025).

the risk of this confusion and compromise patients' autonomy over their pharmaceutical regimen.

I declare under penalty of perjury that the foregoing is comprised of true and correct statements of my expert opinions.

Signed this 30th day of January, 2025, in _Los Angeles, CA_ :

Arash Nayeri, MD

24

## Appendix A

Arash Nayeri, MD, MS, FACC

Diplomate, American Board of Internal Medicine: Cardiovascular Diseases

Diplomate, National Board of Echocardiography

Board Certified, Nuclear Cardiology

Fellow, American College of Cardiology

Attending Cardiologist, Cedars-Sinai Smidt Heart Institute

(310) 383-5085 • Nayeri2008@gmail.com

---

EDUCATION

---

2018-2022   **University of California, Los Angeles**- Los Angeles, CA
Fellowship, Cardiology
STAR Research Pathway
Board certified in echocardiography and nuclear medicine
Board certified in general cardiology

2016-2018   **University of California, Los Angeles**- Los Angeles, CA
Residency, Internal Medicine
Pro-STAR Research Pathway

2012-2016   **Vanderbilt University School of Medicine**- Nashville, TN
Doctor of Medicine Degree
Cornelius Vanderbilt Scholarship- Full, merit-based scholarship

2008-2012   **University of California, Berkeley**- Berkeley, CA
BA, Molecular and Cell Biology
Departmental Citation and Outstanding Scholar Award
UC Regent Scholarship- Full, merit-based four-year scholarship

---

WORK EXPERIENCE

---

2022-   Cardiologist
Non-invasive, lipidology, and metabolic health
Cedars-Sinai Smidt Heart Institute
COR Medical Group

2024-   Clinical Advisor & Site Principal Investigator
iCARDIO.ai

2023-   Clinical Advisor & Speaker

25

Heartflow

| | |
|---|---|
| 2023- | Clinical Advisor & Speaker<br>Eli Lilly and Company |
| 2022- | Clinical Advisor & Speaker<br>Esperion Therapeutics |
| 2022- | Lead Clinical Advisor<br>Petros Pharmaceuticals |
| 2019-2022 | Cardiology Inpatient Weekend Coverage<br>Private Cardiology Practice Groups, Cedar Sinai Medical Center |
| 2016-2020 | Mobile Concierge Physician<br>Heal, a Mobile Health Company, Los Angeles |

## HONORS/AWARDS

| | |
|---|---|
| 2020 | Fellow Teaching Award, University of California, Los Angeles |
| 2018 | Best Clinical Poster, 63rd Academy of Psychosomatics Annual Meeting |
| 2015 | Poster Presentation Award, 14th Annual MVT Cancer Retreat |
| 2014 | Best Clinical Poster, Vanderbilt-Ingram Cancer Center Annual Retreat |
| 2014 | Clara Barton Volunteer Leadership Award, Santa Monica Red Cross |
| 2013 | Microbes and Defense Academic Society Inductee |
| 2012-2016 | Cornelius Vanderbilt Scholarship |
| 2012 | Alpha Sigma Phi Graduate Award & Scholarship |
| 2012 | Departmental Citation & Outstanding Scholar Award, Dep. of MCB |
| 2012 | Paola S. Timiras Memorial Prize, Dep. of MCB, UC Berkeley |
| 2012 | Outstanding Graduate Student Instructor Award, UC Berkeley |
| 2011 | Bioinformatics Research Award, Dep. of MCB, UC Berkeley |
| 2009 | Brandon Huseman Legacy Award, NSCS |

26

2008-2012     Merit Scholar, Iranian Scholarship Foundation

2008-2012     UC Berkeley Regent Scholarship

## LEADERSHIP/SERVICE

2017-2018     Cardiovascular Quality Improvement Initiative, UCLA
              Lead of quality improvement initiative in cardiology clinics

2016-2018     Chiefs' Summer Fellowship, David Geffen School of Medicine at UCLA
              Resident research mentor

2016-2017     Providers for Responsible Ordering (PRO), UCLA
              Project leader for resource utilization after organ transplant

2015-2016     Vanderbilt University School of Medicine, Office of Admissions
              Executive member of the admissions committee

2014-Present  Recovered Medical Equipment for the Developing World (REMEDY)
              Group leader and volunteer at Vanderbilt's chapter of REMEDY

2012-Present  Shade Tree Clinic (Nashville, TN)
              Volunteer at student-run, free clinic.

2008-2012     National Society of Collegiate Scholars, UC Berkeley
              Founding member, president, alumni director
              Brandon Huseman Legacy Award (2009)

2006-2014     Santa Monica Red Cross (Santa Monica, CA)
              Program coordinator, recruitment officer, fundraising support
              Clara Barton Volunteer Leadership Award (2014)

## RESEARCH EXPERIENCE

2015-2020     Patient and Provider Misconceptions in the use of new Cardiovascular
              Pharmaceuticals

2015-2020     Disparities in Evidence Based Pharmaceutical use, Insights from the
              National Health Interview Survey
                Mentor: James Macinko, PhD

2015-2019     Atypical Cardiomyopathy Diagnostics, Management, and Outcomes
              Mentors: Quinn Wells, M.D. John McPherson, M.D.

2015-2017     Stress Cardiomyopathy Diagnostics, Management, and Outcomes

27

Relevant manuscripts, abstracts, and presentations are listed below
Mentor: Quinn Wells, M.D.

2015-2017     Therapeutic Hypothermia Following Cardiac Arrest
Relevant manuscripts, abstracts, and presentations are listed below
Mentor: Quinn Wells, M.D. John McPherson, M.D. Gregg Fonarow M.D.

2015-2017     Aortic Stenosis: Echocardiographic Predictors of Progression
Manuscripts in preparation
Mentor: Quinn Wells, M.D. John McPherson, M.D. Gregg Fonarow M.D.

2012-2016     Meningioma Treatment, Outcomes, and Postoperative Surveillance   Relevant
manuscripts, abstracts, and presentations are listed below
Mentor: Lola Chambless, M.D.

2012-2016     Pituitary Adenoma Postoperative Surveillance & Follow-Up
Relevant manuscripts, abstracts, and presentations are listed below
Mentors: Heather Kistka, M.D. Lola Chambless, M.D.

2012-2014     Publication Misrepresentation amongst Residency Applicants
Relevant manuscript, abstract, and presentation are listed below
Mentors: Reid Thompson, M.D. Lola Chambless, M.D.

2010-2014     Actin Cytoskeleton and Signaling in *Giardia Lamblia*
Relevant manuscripts, abstracts, and presentations are listed below
Mentors: Zac Cande, Ph.D. Alexander Paredez Ph.D.

## PEER-REVIEWED PUBLICATIONS

Krishnan, S., Srivastava, P.K., Attaluri, J., Nayeri, R., Chatterjee, D., Patel, J., Nsair, A., Budoff, M. and Nayeri, A., 2025. Physician Perceptions of the Safety and Efficacy of GLP-1 Receptor Agonists: Underestimation of Cardiovascular Risk Reduction and Discrepancies with Clinical Evidence. Journal of Cardiovascular Development and Disease, 12(1), p.19.

Krishnan S, Phan J, Kinninger A, Hubbard L, **Nayeri A**, Kianoush S, Benzing T, Ichikawa K, Aldana-Bitar J, Budoff M. Automated Quantitative Analysis Of Coronary Plaque Progression Using Serial Ccta In Los Angeles County Firefighters. Journal of Cardiovascular Computed Tomography. 2024 Jul 1;18(4):S71-2.

Krishnan S, Khalil SO, Hsu JJ, **Nayeri A**, Middlekauff HR, Cho D, Nsair A. Estimation of echocardiographic parameters of systolic function from analysis of photoplethysmography based arterial pulse wave using automated feature selection. Journal of the American College of Cardiology. 2023 Mar 7;81(8_Supplement):2207.

Vuong JT, Stein-Merlob AF, **Nayeri A**, Sallam T, Neilan TG, Yang EH. Immune checkpoint therapies and atherosclerosis: mechanisms and clinical implications: JACC state-of-the-art review. Journal of the American College of Cardiology. 2022 Feb 15;79(6):577-93.

**Nayeri A**, Middlekauff H. Vaping instead of cigarette smoking: a panacea or just another form of cardiovascular risk?. Canadian Journal of Cardiology. 2021 May 1;37(5):690-8.

**Nayeri A**, Xu M, Farber-Eger E, Blair M. Saini I, Shamsa K, Fonarow G, Horwich T, Wells Q. Initial changes in peak aortic jet velocity and mean gradient predict progression to severe aortic stenosis. IJC Heart & Vasculature. 2020; 1(30)16-21.

**Nayeri A**, Yuen A, Huang C, Cardoza K, Shamsa K, Ziaeian B, Wells Q, Fonarow G Horwich T. , Blair M. Saini I, Shamsa K, Fonarow G, Horwich T, Wells Q. Prognostic implications of pre-existing medical comorbidity in Takotsubo cardiomyopathy. Heart & Vasculature. 2020; 1(30) 1-7.

**Nayeri A**, Rafla-Yuan E, Krishnan S, Ziaeian B, Cadeiras M, McPherson J, Wells Q. Psychiatric Illness in Takotsubo (Stress) Cardiomyopathy: A Review. Psychosomatics. 2018; 59(3):220-226.

**Nayeri A**, Rafla-Yuan E, Farber-Eger E, Blair M, Ziaeian B, Cadeiras M, McPherson JA, Wells QS. Response to Letter to the Editor: Psychiatric Disease Among Patients with Takotsubo Syndrome. Psychosomatics. 2018;59(1):102.

**Nayeri A**, Gluck H, Farber-Eger E, Krishnan S, Shamsa K, Lee M, Wells Q, McPherson J. Temporal Pattern and Prognostic Significance of Hypokalemia in Patients Undergoing Targeted Temperature Management Following Cardiac Arrest. Am J Cardiol. 2017;120(7):1110-1113.

**Nayeri A**, Bhatia N, Holmes B, Borges N, Young M, Wells QS, McPherson JA. Pre-existing Medical Comorbidity is not Associated with Neurological Outcomes in Patients Undergoing Targeted Temperature Management following Cardiac Arrest. Heart and Vessels. 2017;32(11):1358-1363.

Lee M, Shlofmitz E, **Nayeri A**, Hollowed J, Shlofmitz R. Outcomes of Patients with a History of Coronary Artery Bypass Grafting Who Underwent Orbital Atherectomy for Severe Coronary Artery Calcification. The Journal of Invasive Cardiology. 2017;29(10):359-362.

Lee M, Shlofmitz E, **Nayeri A**, Hollowed J, Shlofmitz R. Comparison of Heparin and Bivalirudin in Patients Undergoing Orbital Atherectomy. The Journal of Invasive Cardiology. 2017;29(11):397-400

**Nayeri A**, Rafla-Yuan E, Farber-Eger E, Blair M, Ziaeian B, Cadeiras M, McPherson JA, Wells QS. Pre-Existing Psychiatric Illness is Associated with Increased Risk of Recurrent Takotsubo Cardiomyopathy. Psychosomatics. 2017;58(5):527-532

**Nayeri A**, Bhatia N, Holmes B, Borges N, Armstrong W, Xu M, Farber-Eger E, Wells QS, McPherson JA. Temperature variability during targeted temperature management is not associated with neurological outcomes following cardiac arrest. The American Journal of Emergency Medicine. 2017;35(6):889-892.

29

**Nayeri A**, Bhatia N, Xu M, Farber-Eger E, Blair M, McPherson J, Wang T, Wells Q. Prognostic Significance of Early Rehospitalization After Takotsubo Cardiomyopathy. Am J Cardiol. 2017;119(10):1572-1575.

**Nayeri A**, Wu S, Adams E, et al. Acute Calcineurin Inhibitor Nephrotoxicity Secondary to Turmeric Intake: A Case Report. Transplant Proc. 2017;49(1):198-200.

**Nayeri A**, Chotai S, Douleh DG, Brinson PR, Prablek MA. Type 2 Diabetes Mellitus is an Independent Risk Factor for Postoperative Complications in Patients Surgically Treated for Meningioma. J Neurol Neurophysiol. 2016;7(368):2.

**Nayeri A**, Chotai S, Prablek MA, et al. Type 2 diabetes is an independent negative prognostic factor in patients undergoing surgical resection of a WHO grade I meningioma. Clin Neurol Neurosurg. 2016;149:6-10.

**Nayeri A**, Brinson P, Weaver K, Thompson R, Chambless L. Factors Associated with Low Socioeconomic Status Predict Poor Postoperative Follow-up after Meningioma Resection. J Neurol Surg B Skull Base. 2016;77(3):226-30.

**Nayeri A**, Douleh DG, Brinson PR, Weaver KD, Thompson RC, Chambless LB. Early postoperative emergency department presentation predicts poor long-term outcomes in patients surgically treated for meningioma. J Clin Neurosci. 2016;25:79-83.

**Nayeri A**, Prablek MA, Brinson PR, Weaver KD, Thompson RC, Chambless LB. Short-term postoperative surveillance imaging may be unnecessary in elderly patients with resected WHO Grade I meningiomas. J Clin Neurosci. 2016;26:101-4.

Kistka HM, **Nayeri A**, Wang L, Dow J, Chandrasekhar R, Chambless LB. Publication misrepresentation among neurosurgery residency applicants: an increasing problem. J Neurosurg. 2016;124(1):193-8.

Kistka HM, Kasl RA, **Nayeri A**, Utz AL, Weaver KD, Chambless LB. Imaging of Resected Nonfunctioning Pituitary Adenomas: The Cost of Surveillance. J Neurol Surg B Skull Base. 2015;76(5):344-50.

Paredez AR, **Nayeri A**, Xu JW, Krtková J, Cande WZ. Identification of obscure yet conserved actin-associated proteins in Giardia lamblia. Eukaryotic Cell. 2014;13(6):776-84.

PRESENTATIONS

**Poster Presentations**

**Nayeri A**, Farber-Eger E, Blair M, Fonarow G, Shamsa K, McPherson J, Wells Q. Sex-based Similarities In Left Ventricular Hypertrophy Regression And Progression. American Heart Association Scientific Sessions, Philadelphia, PA. November 16-18, 2019.

Bhatia N, Agrawal S, **Nayeri A**, Mohananey D, Villablanca P, Agarwal M, Garg L, Haddad E. Trends and In-Hospital Outcomes of Patients Admitted with ST Elevation Myocardial Infarction

30

Add143

and Chronic Total Occlusions: Insights from a National Database. American College of Cardiology, 66th Annual Scientific Session, Washington, DC. March 17-19, 2017.

**Nayeri A**, Bhatia N, Holmes B, Borges N, Young M, Wells Q, McPherson J. Pre-existing Medical Comorbidity is not Associated with Neurological Outcomes in Comatose Survivors of Cardiac Arrest Undergoing Targeted Temperature Management. American Heart Association Scientific Sessions, New Orleans, LA. November 12-16, 2016.

**Nayeri A**, Bhatia N, Holmes B, Borges N, Armstrong W, Xu M, Farber-Eger E, Wells Q, McPherson J. Temperature variability during targeted temperature management is not associated with neurological outcomes following cardiac arrest. American Heart Association Scientific Sessions, New Orleans, LA. November 12-16, 2016.

**Nayeri A**, Bhatia N, Farber-Eger E, Blair M, Wells Q. Atypical Stress Cardiomyopathy is Associated with Lower Risk of Severe Shock at Diagnosis. American Heart Association Scientific Sessions, New Orleans, LA. November 12-16, 2016.

Bhatia N, **Nayeri A**, Holmes B, Armstrong W, Borges N, Young M, Huang S, McPherson J. Outcomes of Concomitant Use of Mechanical Circulatory Support in Patients Undergoing Therapeutic Hypothermia: A Propensity Score Weighted Regression Analysis. American Heart Association Scientific Sessions, New Orleans, LA. November 12-16, 2016.

**Nayeri A**, Bhatia N, Rafla-Yuan E, Farber-Eger E, Blair M, Wells Q. Pre-Existing Psychiatric Illness is Associated with Increased Risk of Recurrence in Stress Cardiomyopathy. 20th Annual Scientific meeting of the Heart Failure Society of America, Orlando, FL. September 17-20, 2016.

**Nayeri A**, Bhatia N, Xu M, Farber-Eger E, Blair M, McPherson J, Wang T, Wells Q. Clinical Predictors of Hospital Readmission after Diagnosis of Takotsubo Cardiomyopathy. 20th Annual Scientific meeting of the Heart Failure Society of America, Orlando, FL. September 17-20, 2016.

**Nayeri A**, Bhatia N, Rafla-Yuan E, Farber-Eger E, Blair M, Wells Q. Loss of Patient Follow-Up after Diagnosis of Takotsubo Cardiomyopathy. 20th Annual Scientific meeting of the Heart Failure Society of America, Orlando, FL. September 17-20, 2016.

**Nayeri A**, Brinson P, Prablek M, Douleh D, Chambless L. Increased Perioperative Risk and Complications in Type 2 Diabetics Undergoing Surgical Treatment for Meningioma. 84th AANS Annual Scientific Meeting, Chicago, IL. April 30-May 4 2015.

**Nayeri A**, Brinson P, Chambless L. Factors Associated with low Socioeconomic Status Predict Poor Postoperative Follow-up after Meningioma Resection. 20th Annual Meeting of the Society for Neuro-Oncology, San Antonio, TX. November 19-22 2015.

**Nayeri A**, Brinson P, Douleh D, Chambless L. Early Postoperative Emergency Department Presentation Predicts Poor Long-term Outcomes in Patients Surgically Treated for Meningioma. 20th Annual Meeting of the Society for Neuro-Oncology, San Antonio, TX. November 19-22 2015.

31

Add144

**Nayeri A**, Brinson P, Prablek M, Chambless L. Increased Risk of Permanent Neurologic Deficits Following Meningioma Resection in the Elderly. 20th Annual Meeting of the Society for Neuro-Oncology, San Antonio, TX. November 19-22 2015.

**Nayeri A**, Prablek M, Brinson P, Chambless L. Increased Perioperative Morbidity and Poor Surgical Outcomes in Patients with Asymptomatic Meningiomas. 20th Annual Meeting of the Society for Neuro-Oncology, San Antonio, TX. November 19-22 2015.

**Nayeri A**, Brinson P, Prablek M, Douleh D, Chambless L. Type 2 Diabetes Mellitus is an Independent Risk Factor for Perioperative Complications in Patients Surgically Treated for Meningioma. 20th Annual Meeting of the Society for Neuro-Oncology, San Antonio, TX. November 19-22 2015.

**Nayeri A**, Prablek M, Brinson P, Chambless L. Performance Status Changes Following Meningioma Resection are Strongly Correlated with age. Congress of Neurological Surgeons Annual Meeting, New Orleans, LA. September 26-30 2015.

**Nayeri A**, Brinson P, Chambless L. Clarifying the Need for Surveillance Imaging in Elderly Patients with Resected WHO Grade I Meningiomas: Less is More. Congress of Neurological Surgeons Annual Meeting, New Orleans, LA. September 26-30 2015.

**Nayeri A**, Brinson P, Chambless L. Postoperative Imaging Surveillance in Asymptomatic Elderly Patients with Resected WHO Grade I Meningiomas. MVT Cancer Partnership, 14th Annual Retreat, Nashville, TN. April 11 2015. **Poster Presentation Award.**

Paredez A, **Nayeri A**, Krtkova J, Xu J, Hardin W. Rac Regulation of Membrane Trafficking in *Giardia Intestinalis*. 25th Annual Molecular Parasitology Meeting, Falmouth, MA. September 14-19 2014.

**Nayeri A**, Chambless L. Updated Demographics for Patient with Operative Intracranial Meningiomas. Vanderbilt-Ingram Cancer Center Annual Retreat, Nashville, TN. May 15 2014. **Best Clinical Poster Award Winner.**

Kistka H, **Nayeri A**, Kasl R Utz A, Weaver K, Chambless L. Trends in Follow-up of Patients Surgically Treated for Nonfunctioning Pituitary Adenomas, Vanderbilt 32nd Annual Research Forum, Nashville, TN. April 30 2014.

Hardin W, **Nayeri A**, Xu J, Cande Z, Paredez A. Characterization of a Novel Player in Myosin Independent Cytokinesis. 24th Annual Molecular Parasitology Meeting, Woods Hole, MA. September 8-12 2013.

**Nayeri A**, Paredez A, Cande W.Z. A Novel Bioinformatics Approach to Survey the *Giardia* Genome for Actin Binding Domains. MCB Fall Research Poster Session, University of California, Berkeley. October 17 2011. **Best Bioinformatics Research Award.**

32

**Oral Presentations**

**Nayeri A**, Desai P. Reed T, Yuen A, Huang C, Cardoza K, Shamsa K, Wells Q, Yang E, Fonarow G. Right Ventricular Function In Takotsubo Cardiomyopathy. American Heart Association Scientific Sessions, Philadelphia, PA. November 16-18, 2019.

**Nayeri A**, Cardoza K, Yuen A, MacDonald A, Huang C, Fonarow C, Wells, Q, Shamsa K. Prognostic Significance Of Physical Trigger Type In Takotsubo Cardiomyopathy. American Heart Association Scientific Sessions, Philadelphia, PA. November 16-18, 2019.

**Nayeri A**, Kallos J, Brinson R, Chambless L. Early Surveillance Imaging after Complete Resection of Skull Base Meningiomas may be Unnecessary. 12th Annual Congress of the European Skull Base Society Meeting, Berlin, Germany. May 26-28 2016.

**Nayeri A**, Kallos J, Brinson R, Chambless L. Patient Age does not Effect Rates of Perioperative Morbidity in Patients with Completely Resected Skull Base Meningiomas. 12th Annual Congress of the European Skull Base Society Meeting, Berlin, Germany. May 26-28 2016.

**Nayeri A**, Chotai S, Prablek M, Douleh D, Brinson P, Chambless L. Increased Long-term Mortality in Type 2 Diabetics Undergoing Surgical Resection of a WHO Grade I Meningioma. 26th Annual North American Skull Base Society Meeting, Scottsdale, AZ. February 12-14 2016.

Kistka H, **Nayeri A**, Dow J, Chambless L. Increasing Publication Misrepresentation Among Neurosurgery Residency Applicants. **Plenary presentation** at American Association of Neurological Surgeons Annual Meeting, San Francisco, CA. April 4-9, 2014.

Kistka H, Kasl R, **Nayeri A**, Utz A., Weaver K, Chambless L. Imaging of Nonfunctioning Pituitary Adenomas: The Cost of Surveillance. North American Skull Base Society Meeting, San Diego, CA. February 14-16, 2014.

Kistka H, Kasl R, **Nayeri A**, Chambless L. Cost-effective Imaging Follow-up of Non-functioning Pituitary Adenomas. Tennessee Neurosurgical Society Annual Meeting. Nashville, TN. August 9-11, 2013. **Best Resident Presentation Award Winner**

Paredez A, **Nayeri A,** Xu J.W., Krtkova J, Cande W.Z. Evolutionarily Conserved Actin Binding Domains in *Giardia Lamblia*. The International Society of Protistologists North American Section, North Carolina Central University, Durham, NC. September 22-23, 2012.

**Nayeri A**, Paredez A, Cande W.Z. The Identification of Novel Actin-binding Proteins in *Giardia Intestinalis*. Annual MCB Research Symposium, University of California, Berkeley, CA. April 27, 2012. **Best symposium presentation winner**.

33

Add146

**Appendix B – Materials Considered**

**Legal Documents**

Complaint, *Novartis v. Novadoz Pharmaceuticals, LLC, et al.*


**Academic Papers**

Arundel C, Lam PH, Gill GS, Patel S, Panjrath G, Faselis C, White M, Morgan CJ, Allman RM, Aronow WS, Singh SN. Systolic blood pressure and outcomes in patients with heart failure with reduced ejection fraction. J Am Coll Cardiol. 2019 Jun 25;73(24):3054-63.

Brown JP, Davison KS, Olszynski WP, Beattie KA, Adachi JD. A critical review of brand and generic alendronate for the treatment of osteoporosis. Springerplus. 2013 Dec;2:1-2.

Braunwald E. The war against heart failure: the Lancet lecture. The Lancet. 2015 Feb 28. doi: 10.1016/S0140-6736(14)61889-4.

Heidenreich PA, Bozkurt B, Aguilar D, Allen LA, Byun JJ, Colvin MM, Deswal A, Drazner MH, Dunlay SM, Evers LR, Fang JC. 2022 AHA/ACC/HFSA guideline for the management of heart failure: a report of the American College of Cardiology/American Heart Association Joint Committee on Clinical Practice Guidelines. J Am Coll Cardiol. 2022 May 3;79(17):e263-421.

Kimm YS, Brar S, D'Albo N, Dey A, Shah S, Ganatra S, Dani SS. Five years of sacubitril/valsartan—a safety analysis of randomized clinical trials and real-world pharmacovigilance. Cardiovasc Drugs Ther. 2022 Oct;36(5):915-24.

Lewis EF. A fourth pillar for all in the treatment of heart failure. Eur Heart J. 2021 Nov 14;42(43):4452-4454.

Löffler AI, Cappola TP, Fang J, Hetzel SJ, Kadlec A, Astor B, Sweitzer NK. Effect of renal function on prognosis in chronic heart failure. Am J Cardiol. 2015 Jan 1;115(1):62-8.

McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR. Angiotensin–neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR; PARADIGM-HF Investigators and Committees. Angiotensin-neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

34

Srivastava PK, Klomhaus AM, Greene SJ, et al. Angiotensin Receptor-Neprilysin Inhibitor Prescribing Patterns in Patients Hospitalized for Heart Failure. JAMA Cardiol. 2024 Dec 11. doi:10.1001/jamacardio.2024.3815.

Sullivan HW, Squire C, Aikin KJ, Tzeng J, Ferriola-Bruckenstein K, Brodsky E, Trentacosti AM, Johnson M. Physicians' use of and preferences for FDA-approved prescribing information. Res Social Adm Pharm. 2022 Jun;18(6):3027-3037. doi: 10.1016/j.sapharm.2021.07.028.

Supapaan TS, Songmuang A, Napaporn J, Sangsukwow P, Boonrod P, Intarapongsakul P, Jaturapattarawong A, Pitchayajittipong C. Look-alike/sound-alike medication errors: An in-depth examination through a hospital case study. Pharm Pract. 2024 May 31;22(2):1-3.

Tan NY, Sangaralingham LR, Sangaralingham SJ, Yao X, Shah ND, Dunlay SM. Comparative effectiveness of sacubitril-valsartan versus ACE/ARB therapy in heart failure with reduced ejection fraction. JACC: Heart Fail. 2020 Jan;8(1):43-54.

Wang L, Chen YJ, Grabner M, Nepal B, Bodhani A, Espaillat R, Hennessey JV. Comparative Effectiveness of Persistent Use of a Name-Brand Levothyroxine (Synthroid®) vs. Persistent Use of Generic Levothyroxine on TSH Goal Achievement: A Retrospective Study Among Patients with Hypothyroidism in a Managed Care Setting. Adv Ther. 2022 Jan;39(1):779-95.

**Public Documents**

1428 10 Pill – yellow four-sided, Drugs.com, https://www.drugs.com/imprints/1428-10-35511.html.

30 years of UpToDate: The evolution of clinical decision support and the future of evidence-based medicine, Wolters Kluwer, https://www.wolterskluwer.com/en/expert-insights/30-years-of-uptodate-evolution-of-clinical-decision-support-future-of-evidence-based-medicine.

Cardiovascular, renal, and metabolic, Novartis, https://www.novartis.com/about/therapeutic-areas/cardiovascular-renal-and-metabolic#tabheart-failure-210841.

Company History, Novartis, https://www.novartis.com/us-en/about/company-history.

Cristina Milesi, Preserving Patient Safety: Understanding the Risks of Look-Alike and Sound-Alike Drug Names, Brand Institute, https://www.brandinstitute.com/preserving-patient-safety-understanding-the-risks-of-look-alike-and-sound-alike-drug-names/.

Dapaglifozin, Drugs.com, https://www.drugs.com/search.php?searchterm=dapagliflozin.

dapagliflozin (Rx), MedScape, https://reference.medscape.com/drug/farxiga-dapagliflozin-999899.

Dorfman S, Woodland J, Tarantino T, Kuper C. Media Vitals 2016 What Physicians Want and Need from Pharma A Look Across Six Specialties. CMI/Compas Study. 2016 Oct.

Drugs@FDA:FDA-Approved Drugs (Entresto), FDA, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=207620.

Entresto, Drugs.com, https://www.drugs.com/entresto.html.

Entresto, Entresto, https://www.entresto.com/.

Entresto Prescribing Information, Entresto, https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/entresto.pdf#page=.

"Entresto" Search, Medscape, https://search.medscape.com/search?q=entresto&plr=ref.

Farxiga, Medscape, https://reference.medscape.com/drug/farxiga-dapagliflozin-999899.

FDA List of Authorized Generic Drugs, FDA, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs.

FDA's Labeling Resources for Human Prescription Drugs: For Industry, FDA, https://www.fda.gov/drugs/laws-acts-and-rules/fdas-labeling-resources-human-prescription-drugs.

Frequently Asked Questions about Labeling for Prescription Medicines: For Healthcare Professionals, FDA, https://www.fda.gov/drugs/fdas-labeling-resources-human-prescription-drugs/frequently-asked-questions-about-labeling-prescription-medicines.

Heart Failure, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/heart-failure/symptoms-causes/syc-20373142.

How Entresto Works, Entresto, https://www.entresto.com/how-entresto-works.

Importance of Premarket Labeling and Packaging Safety Evaluations in Minimizing Postmarket Medication Errors, ECRI, https://home.ecri.org/blogs/ismp-on-demand-

36

events/importance-of-premarket-labeling-and-packaging-safety-evaluations-in-minimizing-postmarket-medication-errors.

ISMP National Vaccine Errors Reporting Program 2022-2023 Analysis: New Vaccines, New Errors, ECRI, https://home.ecri.org/blogs/ismp-alerts-and-articles-library/ismp-national-vaccine-errors-reporting-program-2022-2023-analysis-new-vaccines-new-errors.Sacubitril and valsartan: Drug information, UpToDate, https://www.uptodate.com/contents/sacubitril-and-valsartan-drug-information.

Sacubitril/Valsartan, Medscape, https://reference.medscape.com/drug/entresto-sacubitril-valsartan-1000010#90.

Safety & Dosing, Entresto, https://www.entrestohcp.com/safety-and-dosing/dosing.

The Four Principles of Medical Ethics, Medical Protection, https://www.medicalprotection.org/uk/articles/essential-learning-law-and-ethics.

Therapeutic Areas, Novartis, https://www.novartis.com/about/therapeutic-areas.

**Appendix C**

| Drug | Image of Brand Name from Drugs.com | Image of Generic from Drugs.com |
|---|---|---|
| <u>Brand:</u> Coreg<br><u>Generic:</u> Carvedilol |  |  |
| <u>Brand:</u> Zebeta<br><u>Generic:</u> Bisoprolol Fumarate |  |  |
| <u>Brand:</u> Kapspargo Sprinkle (top), Lopressor (bottom)<br><br><u>Generic:</u> Metoprolol Succinate |  |  |

38



| Brand: Inspra Generic: Eplerenone | | |
|---|---|---|
| Brand: Vasotec Generic: Enalapril Maleate | | |
| Brand: Prinivil (top), Zestril (bottom) Generic: lisinopril | | |

39

Megan K. Bannigan (mkbannigan@debevoise.com)
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------x
                                    :

NOVARTIS AG, NOVARTIS            :
PHARMACEUTICALS CORPORATION,   :
                                    :

                Plaintiffs,      :

                                    :      Civil Action No. 25-849
                 v.                    :

                                    :

NOVADOZ PHARMACEUTICALS LLC, MSN   :
PHARMACEUTICALS INC., and MSN       :
LABORATORIES PRIVATE LIMITED,     :
                                    :

               Defendants.     :
------------------------------------------------------------x

**DECLARATION OF MEGAN K. BANNIGAN IN SUPPORT OF PLAINTIFFS'**
**ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER**
**& MOTION FOR PRELIMINARY INJUNCTION**

I, Megan K. Bannigan, an attorney duly admitted in the State of New Jersey and New

York, and not a party to the above-captioned case, declare the following to be true under penalty

of perjury:

1.     I am counsel for Novartis AG and Novartis Pharmaceuticals Corporation ("Novartis") in

the above-captioned case, and as such I am familiar with the facts and circumstances set forth

herein.

2.     I submit this declaration in support of Novartis's application for a temporary restraining

order and motion for preliminary injunction.

3.      Attached as **Exhibit 1** are true and correct copies of:

    a.   **Exhibit 1.A**, the "Farxiga" webpage from Drugs.com, last updated September 2, 2024, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/farxiga.html.

    b.   **Exhibit 1.B,** the "Lasix" webpage from Drugs.com, last updated April 4, 2023, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/lasix.html.

    c.   **Exhibit 1.C,** the "Vasotec" webpage from Drugs.com, last updated March 1, 2024, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/vasotec.html.

    d.   **Exhibit 1.D,** the "Verquvo, 5 MG Tablet" webpage from Amazon Pharmacy, which was obtained at my direction on January 24, 2025, from https://pharmacy.amazon.com/dp/B09KWJ3X15?.

    e.   **Exhibit 1.E,** the "Coreg" webpage, which was obtained at my direction on January 24, 2025, from https://coreg.com/.

    f.   **Exhibit 1.F,** the "Jardiance Imprints" webpage from Drugs.com, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/imprints/s-10-logo-22340.html.

    g.   **Exhibit 1.G,** the "Valsartan Imprints" webpage from Drugs.com, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/imprints/hh-342-23594.html.

h. **Exhibit 1.H,** the "Prinivil Imprints" webpage from Dugs.com, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/imprints/msd-106-prinivil-193.html.

i. **Exhibit 1.I,** the "Losartan Imprints" webpage from Drugs.com, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/imprints/e-46-16422.html.

4.      Attached as **Exhibit 2** is a true and correct copy of the April 4, 2000 Trademark Registration, US Registration No. 2,336,960, a registration of NOVARTIS for use in connection with International Classes 01, 05, 09, 10, 29, 30, 31, 32, 42, which was obtained at my direction on January 24, 2025, from https://tsdr.uspto.gov/documentviewer?caseId=sn75131409&docId=ORC20060213184925&linkId=14#docIndex=13&page=1.

5.      Attached as **Exhibit 3** is a true and correct copy of the November 20, 2003 article, *Novartis to Give Consumer Ads a Big Role in Selling Drugs*, by Gardiner Harris, from *The New York Times*, which was obtained at my direction on January 24, 2025, from https://www.nytimes.com/2003/11/20/business/novartis-to-give-consumer-ads-a-big-role-in-selling-drugs.html.

6.      Attached as **Exhibit 4** is a true and correct copy of the September 20, 2005 Trademark Registration, US Registration No. 2,997,235, a registration of NOVARTIS for use in connection with International Class 05, which was obtained at my direction on January 24, 2025, from

3

https://tsdr.uspto.gov/documentviewer?caseId=sn78365657&docId=ORC20050920061730&linkId=10#docIndex=9&page=1.

7. Attached as **Exhibit 5** is a true and correct copy of the Center for Drug Evaluation and Research Application Number 207620Orig1s000, Chemistry Review(s) for Entresto, dated June 30, 2015, which was obtained at my direction on January 24, 2025, from https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/207620Orig1s000ChemR.pdf.

8. Attached as **Exhibit 6** is a true and correct copy of the "About Medscape" webpage from Medscape.com, which was obtained at my direction on January 29, 2025, from https://www.medscape.com/public/about.

9. Attached as **Exhibit 7** is a true and correct copy of the Full Prescribing Information for Entresto as of July 2015, which was obtained at my direction on January 24, 2025, from https://www.accessdata.fda.gov/drugsatfda_docs/label/2015/207620Orig1s000lbl.pdf.

10. Attached as **Exhibit 8** is a true and correct copy of the September 24, 2015 article, *Novartis CEO talks about drug costs, paying doctors, and 'doing the right thing'*, by Lillian Cunningham, from *The Washington Post*, which was obtained at my direction on January 26, 2025, from https://www.washingtonpost.com/news/on-leadership/wp/2015/09/24/one-of-pharmas-biggest-ceos-talks-about-drug-costs-paying-doctors-and-what-doing-whats-right-looks-like/.

11. Attached as **Exhibit 9** is a true and correct copy of the February 9, 2016 article, *Novartis signs Aetna, Cigna for pay-for-performance drug deal, but no remote monitoring yet*, by Jonah Comstock, from *Mobi Health News*, which was obtained at my direction on January

4

25, 2025, from https://www.mobihealthnews.com/content/novartis-signs-aetna-cigna-pay-performance-drug-deal-no-remote-monitoring-yet.

12.    Attached as **Exhibit 10** is a true and correct copy of the February 22, 2016 article, *Insurers, drugmakers wrestle with how to build value-based contracts*, by Bob Herman, from *Modern Healthcare*, which was obtained at my direction on January 24, 2025, from https://www.modernhealthcare.com/article/20160220/MAGAZINE/302209963/insurers-drugmakers-wrestle-with-how-to-build-value-based-contracts.

13.    Attached as **Exhibit 11** is a true and correct copy of the June 23, 2016 article, *How to save 28,000 heart patients a year? Use Novartis' Entresto, JAMA says*, by Tracy Staton, from *Fierce Pharma*, which was obtained at my direction on January 24, 2025, from https://www.fiercepharma.com/pharma/how-to-save-28-000-heart-patients-a-year-use-novartis-entresto-jama-says.

14.    Attached as **Exhibit 12** is a true and correct copy of the June 28, 2016 Trademark Registration, US Registration No. 4,986,124, a registration of NOVARTIS for use in connection with International Classes 05, 09, 10, 41, 42, 44, which was obtained at my direction on January 24, 2025, from https://tsdr.uspto.gov/documentviewer?caseId=sn86063136#docIndex=6&page=1.

15.    Attached as **Exhibit 13** is a true and correct copy of the March 13, 2018 Trademark Registration, US Registration No. 5,420,583, a registration of NOVARTIS for use in connection with International Classes 09, 10, 41, 42, 44, 45, which was obtained at my direction on January 24, 2025 from, https://tsdr.uspto.gov/documentviewer?caseId=sn79209927&docId=#docIndex=8&page=1.

5

Add157

16.     Attached as **Exhibit 14** is a true and correct copy of the April 5, 2018 article, *Novartis reports positive new heart failure data for Entresto*, from *The Financial*, which was obtained at my direction on January 24, 2025, from https://finchannel.com/novartis-reports-positive-new-heart-failure-data-for-entresto/72712/business-2/pharmacy/2018/04/.

17.     Attached as **Exhibit 15** is a true and correct copy of the Sandoz Global Facebook post on June 18, 2019, which was obtained at my direction on January 25, 2025, from https://www.facebook.com/100066861194065/posts/2479571942087987/.

18.     Attached as **Exhibit 16** is a true and correct copy of the Sandoz Global Instagram post on June 14, 2019, which was obtained at my direction on January 25, 2025, from https://www.instagram.com/sandozglobal/reel/Byrmy4mAdYp/.

19.     Attached as **Exhibit 17** is a true and correct copy of the September 5, 2019 "Access to Healthcare" webpage from the Sandoz — A Novartis Division website, which was obtained at my direction on January 25, 2025, from https://web.archive.org/web/20190905211016/https://www.sandoz.com/making-access-happen/access-healthcare.

20.     Attached as **Exhibit 18** is a true and correct copy of the November 19, 2019 article, *Merck, Bayer's trial win for heart failure rival could actually boost Novartis' Entresto*, by Kyle Blakenship, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/pharma/merck-bayer-drug-s-trial-win-for-entresto-competitor-could-actually-be-a-boon-for-novartis.

6

21.     Attached as **Exhibit 19** is a true and correct copy of the November 24, 2019 article, *Novartis to Buy the Medicines Company for $ 9.7 Billion*, by the Associated Press, from *The New York Times*, which was obtained at my direction on January 24, 2025, from https://www.nytimes.com/2019/11/24/business/novartis-medicines-company-cholesterol.html.

22.     Attached as **Exhibit 20** is a true and correct copy of the March 4, 2019 article, *Third of consumers have used visual search*, from *Smart Insights*, which was obtained at my direction on January 26, 2025, from https://www.smartinsights.com/ecommerce/third-consumers-use-visual-search/.

23.     Attached as **Exhibit 21** is a true and correct copy of the Sandoz Global Instagram post on October 12, 2020, which was obtained at my direction on January 25, 2025, from https://www.instagram.com/sandozglobal/reel/CGPNhuEg0EB/.

24.     Attached as **Exhibit 22** is a true and correct copy of the December 11, 2020 article, *FDA reviewers argue for Novartis ahead of Entresto advisory panel confab*, by Angus Liu, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/marketing/where-do-you-stand-fda-reviewers-argue-for-novartis-entresto-committee-meeting-file.

25.     Attached as **Exhibit 23** is a true and correct copy of the December 16, 2020 article, *Novartis' Sandoz spotlights importance of generic drugs in new social campaign,* by Beth Snyder Bulik, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/marketing/novartis-sandoz-spotlights-importance-generic-drug-new-u-s-awareness-campaign.

7

26.     Attached as **Exhibit 24** is a true and correct copy of the February 16, 2021 article, *Entresto Granted Expanded Indication in Chronic Heart Failure by FDA*, by Andrew Humphreys, from *PharmaLive.com*, which was obtained at my direction on January 25, 2025, from https://www.pharmalive.com/entresto-granted-expanded-indication-in-chronic-heart-failure-by-fda/.

27.     Attached as **Exhibit 25** is a true and correct copy of the April 8, 2021 "Our Purpose and Ambition" webpage from the Sandoz — A Novartis Division website, which was obtained at my direction on January 24, 2025, from https://web.archive.org/web/20210408112156/https://www.sandoz.com/.

28.     Attached as **Exhibit 26** is a true and correct copy of the April 12, 2022 article, *The top 20 pharma companies by 2021 revenue*, by Kevin Dunleavy, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/special-reports/top-20-pharma-companies-2021-revenue.

29.     Attached as **Exhibit 27** is a true and correct copy of the April 22, 2022 "COVID-19 Information Center" webpage from the Sandoz — A Novartis Division website, which was obtained at my direction on January 25, 2025, from https://web.archive.org/web/20220422231136/https://www.sandoz.com/.

30.     Attached as **Exhibit 28** is a true and correct copy of the May 3, 2022 article, *2022 American Heart Association / American College of Cardiology / Heart Failure Society of America Guideline for the Management of Heart Failure*, 145 Circulation e895 (2022), by Paul A. Heidenreich et al., which was obtained at my direction on January 26, 2025, from https://www.ahajournals.org/doi/epub/10.1161/CIR.0000000000001063.

8

31.    Attached as **Exhibit 29** is a true and correct copy of the July 18, 2022 article, *The top 10 generic drug makers by 2021 revenue*, by Kevin Dunleavy, Zoey Becker, Fraiser Kansteiner, Angus Liu, and Eric Sagonowsky, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/pharma/top-10-generic-drugmakers-2021-revenue.

32.    Attached as **Exhibit 30** is a true and correct copy of the July 31, 2022 article, *How Novartis Is Finding The Path To Be A Digital Winner*, by Steve Denning, from *Forbes*, which was obtained at my direction on January 25, 2025, from https://www.forbes.com/sites/stevedenning/2022/07/31/how-novartis-is-finding-the-path-to-be-a-digital-winner/.

33.    Attached as **Exhibit 31** is a true and correct copy of the September 13, 2022 Trademark Registration, US Registration No. 6,841,619, a registration of NOVARTIS for use in connection with International Class 35, which was obtained at my direction on January 25, 2025, from https://tsdr.uspto.gov/documentviewer?caseId=sn79330127&docId=ORC20220828021449&linkId=3#docIndex=2&page=1.

34.    Attached as **Exhibit 32** is a true and correct copy of the September 2022 "Starting with Entresto®" Dosing Flash Card webpage from the Entresto website, which was obtained at my direction on January 24, 2025, from https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/hcp-dosing-flashcard.pdf.

35.     Attached as **Exhibit 33** is a true and correct copy of the 2022 Novartis Annual Report, which was obtained at my direction on January 24, 2025, from https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2022.pdf.

36.     Attached as **Exhibit 34** is a true and correct copy of the Sandoz Global Instagram post on January 21, 2023, which was obtained at my direction on January 25, 2025, from https://www.instagram.com/sandozglobal/p/CnrMF5kNxuP/.

37.     Attached as **Exhibit 35** is a true and correct copy of the Sandoz Global Facebook post on March 8, 2023, which was obtained at my direction on January 25, 2025, from https://www.facebook.com/photo.php?fbid=533441622227873&set=pb.100066861194065.-2207520000&type=3.

38.     Attached as **Exhibit 36** is a true and correct copy of the April 18, 2023 article, *The top 20 pharma companies by 2022 revenue*, by Kevin Dunleavy, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/pharma/top-20-pharma-companies-2022-revenue.

39.     Attached as **Exhibit 37** is a true and correct copy of the September 3, 2023 article, *How Novartis's CEO Learned From His Mistakes and Got Help From an Unlikely Quarter*, by Jared S. Hopkins, from *The Wall Street Journal*, which was obtained at my direction on January 24, 2025, from https://www.wsj.com/health/pharma/how-novartiss-ceo-learned-from-his-mistakes-and-got-help-from-an-unlikely-quarter-b087ebbb.

10

40.    Attached as **Exhibit 38** is a true and correct copy of the 2023 Novartis Annual Report, which was obtained at my direction on January 24, 2025, from https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2023.pdf.

41.    Attached as **Exhibit 39** is a true and correct copy of the Full Prescribing Information for Entresto as of April 2024, which was obtained at my direction on January 24, 2025, from https://www.novartis.com/us-en/sites/novartis_us/files/entresto.pdf.

42.    Attached as **Exhibit 40** is a true and correct copy of the April 15, 2024 article, *The top 20 pharma companies by 2023 revenue*, by Kevin Dunleavy, from *Fierce Pharma*, which was obtained at my direction on January 24, 2025, from https://www.fiercepharma.com/pharma/top-20-pharma-companies-2023-revenue.

43.    Attached as **Exhibit 41** is a true and correct copy of the May 7, 2024 article, *Entresto puts Novartis at top of docs' ranking of heart disease drug makers, with Pfizer close behind*, by Andrea Park, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025, from https://www.fiercepharma.com/marketing/entresto-puts-novartis-top-docs-ranking-heart-disease-drugmakers-pfizer-close-behind.

44.    Attached as **Exhibit 42** is a true and correct copy of the June 2024 "Heading Home with Entresto®" webpage from the Entresto website, which was obtained at my direction on January 24, 2025, from https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/heading-home-digital-kit_1.pdf.

45.    Attached as **Exhibit 43** is a true and correct copy of the June 2024 "Before Starting Entresto" webpage from the Entresto website, which was obtained at my direction on January 24, 2025, from https://www.entresto.com/starting-entresto.

46.    Attached as **Exhibit 44** is a true and correct copy of the July 18, 2024 article, *Novartis Raises Profit Guidance as Key Drugs Boost Sales*, by Helena Smolak, from *The Wall Street Journal*, which was obtained at my direction on January 24, 2025, from https://www.wsj.com/business/earnings/novartis-raises-profit-guidance-as-key-drugs-boost-sales-d6a79f0e.

47.    Attached as **Exhibit 45** is a true and correct copy of the U.S. Food & Drug Administration approval letter for ANDA 213748 sent to MSN Pharmaceuticals Inc. on July 24, 2024, which was obtained at my direction on January 25, 2025, from https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/213748Orig1s000ltr.pdf.

48.    Attached as **Exhibit 46** is a true and correct copy of the July 2024 "Dosing" webpage from the Entresto website, which was obtained at my direction on January 25, 2025, from https://www.entrestohcp.com/safety-and-dosing/dosing.

49.    Attached as **Exhibit 47** is a true and correct copy of the July 2024 Entresto In-Office Patient Brochure, which was obtained at my direction on January 24, 2025, from https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/english-patient-brochure_1.pdf.

50.    Attached as **Exhibit 48** is a true and correct copy of the August 20, 2024 Exhibit 2045 filed by MSN Laboratories Private Limited, MSN Life Sciences Private Limited, MSN

12

Pharmaceuticals Inc. in *Novartis Pharms. Corp. v. MSN Pharms. Inc.*, No. 1:22-cv-01395 (D.
Del. 2024), Dkt. No. 263-3, which was obtained at my direction on January 24, 2025, from
https://ecf.ded.uscourts.gov/doc1/04316521228.

51.    Attached as **Exhibit 49** is a true and correct copy of the August 28, 2024 article, *The
world's top pharmaceutical companies — by reputation*, by James Clasper, from *Group
Caliber*, which was obtained at my direction on January 25, 2025, from
https://www.groupcaliber.com/the-worlds-top-pharmaceutical-companies-by-reputation/.

52.    Attached as **Exhibit 50** is a true and correct copy of the August 28, 2024 article, *With
phase 3 win, Novartis pads case for broader use of heart med Leqvio*, by Zoey Becker, from
*Fierce Pharma*, which was obtained at my direction on January 25, 2025, from
https://www.fiercepharma.com/pharma/novartis-pads-case-heart-med-leqvios-full-spectrum-
usage-phase-3-monotherapy-win.

53.    Attached as **Exhibit 51** is a true and correct copy of the September 4, 2024 article,
*Radiotherapy leader Novartis brings US isotope production in house, builds West Coast plant*,
by Angus Liu, from *Fierce Pharma*, which was obtained at my direction on January 25, 2025,
from https://www.fiercepharma.com/manufacturing/novartis-erects-3rd-radiotherapy-facility-
us-brings-isotope-production-house-amid.

54.    Attached as **Exhibit 52** is a true and correct copy of the November 12, 2024 article,
*Novartis shines a light on skin disease using testimonials and digital touchpoints*, by Asa
Hiken, from *AdAge*, which was obtained at my direction on January 24, 2025, from
https://adage.com/article/special-report-healthcare-marketing-impact-awards/novartis-
healthcare-marketing-impact-awards-2024/2585176.

13

55.    Attached as **Exhibit 53** is a true and correct copy of the "25 years of Novartis – more than 250 years of innovation" webpage from the Novartis website, which was obtained at my direction on January 25, 2025, at https://www.novartis.com/about/25-years-novartis-more-250-years-innovation.

56.    Attached as **Exhibit 54** is a true and correct copy of the 44th Edition of Approved Drug Products with Therapeutic Equivalence Evaluations (2024), from the U.S. Food & Drug Administration, which was obtained at my direction on January 25, 2025, from https://www.fda.gov/media/71474/download?attachment.

57.    Attached as **Exhibit 55** is a true and correct copy of the "About Novadoz" webpage from the Novadoz Pharmaceuticals website, which was obtained at my direction on January 25, 2025, from https://novadozpharma.com/about-us/.

58.    Attached as **Exhibit 56** is a true and correct copy of the "Neomycin Sulfate / Polymyxin B Sulfate / Hydrocortisone 3.5 – 10,000 – 1 Otic Drops 10 mL" webpage from the McKesson website, which was obtained at my direction on January 25, 2025, from https://mms.mckesson.com/product/653097/Sandoz-61314064511.

59.    Attached as **Exhibit 57** is a true and correct copy of the "Ampicillin Sodium 500 mg / 8 mL Injection 8 mL" webpage from the McKesson website, which was obtained at my direction on January 25, 2025, from https://mms.mckesson.com/product/547773/Sandoz-00781340795.

60.    Attached as **Exhibit 58A** is a true and correct copy of the "Awards and recognition: People and society" webpage from the Novartis website, which was obtained at my direction on January 25, 2025, from https://www.novartis.com/about/awards-and-recognition#.

61.     Attached as **Exhibit 58B** is a true and correct copy of the "Awards and recognition: Innovation and digital" webpage from the Novartis website, which was obtained at my direction on January 25, 2025, from https://www.novartis.com/about/awards-and-recognition#tabinnovation-and-digital-98096.

62.     Attached as **Exhibit 59** is a true and correct copy of the "Azithromycin Tablets 500 mg (3-Pack) by Sandoz (Rx)" webpage from the Mountainside Medical Equipment website, which was obtained at my direction on January 25, 2025, from https://www.mountainside-medical.com/products/azithromycin-tablets-film-coated-500-mg-3-pack-sandoz.

63.     Attached as **Exhibit 60** is a true and correct copy of the "Ciprofloxacin Drops 0.3%, 5mL – Sandoz" webpage from the Keeler website, which was obtained at my direction on January 25, 2025, from https://www.accutome.com/ciprofloxacin-drops-0-3-5ml-sandoz.

64.     Attached as **Exhibit 61** is a true and correct copy of the "Desloratadine Sandoz 5 mg – 30 film-coated tablets" webpage from the My Dr. XM website, which was obtained at my direction on January 25, 2025, from https://mydrxm.com/products/desloratadine-sandoz-5-mg-30-film-coated-tablets.

65.     Attached as **Exhibit 62** is a true and correct copy of the Drugs@FDA: FDA-Approved Drugs webpage for ANDA 213748, which was obtained at my direction on January 25, 2025, from https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=213748.

66.     Attached as **Exhibit 63** is a true and correct copy of the "Ampicillin Sodium 1 Gram / 15 mL Injection 15 mL" webpage from the McKesson website, which was obtained at my direction on January 25, 2025, from https://mms.mckesson.com/product/577182/Sandoz-00781340495.

67.     Attached as **Exhibit 64** is a true and correct copy of the July 2023 "Initiation Guide for Providers" from the Entresto website, which was obtained at my direction on January 24, 2025, from https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/entresto-initiation-guide-for-providers.pdf.

68.     Attached as **Exhibit 65** is a true and correct copy of the "Kisqali" webpage from the Medical Professionals Reference website, which was obtained at my direction on January 24, 2025, from https://www.empr.com/drug/kisqali/.

69.     Attached as **Exhibit 66** is a true and correct copy of the "Cyclophosphamide 1 Gram Injection 50 mL" webpage from the McKesson website, which was obtained at my direction on January 25, 2025, from https://mms.mckesson.com/product/952048/Sandoz-00781324494.

70.     Attached as **Exhibit 67** is a true and correct copy of the Novartis Instagram account, which was obtained at my direction on January 23, 2025, from https://www.instagram.com/novartis/.

71.     Attached as **Exhibit 68** is a true and correct copy of the Novartis Facebook account, which was obtained at my direction on January 23, 2025, from https://www.facebook.com/novartis/.

16

72.     Attached as **Exhibit 69** is a true and correct copy of the Novartis X (formerly Twitter) account, which was obtained at my direction on January 23, 2025, from https://x.com/novartis.

73.     Attached as **Exhibit 70** is a true and correct copy of the Novartis YouTube account, which was obtained at my direction on January 23, 2025, from https://www.youtube.com/novartis.

74.     Attached as **Exhibit 71** is a true and correct copy of the "Sandoz Brimonidine Tartrate Ophthalmic Solution 0.2% - 5mL" webpage from the Amcon website, which was obtained at my direction on January 24, 2025, from https://amconlabs.com/product.asp?pid=7810.

75.     Attached as **Exhibit 72** is a true and correct copy of "The Novartis Commitment to Patients and Caregivers" from the Novartis website, which was obtained at my direction on January 24, 2025, from https://www.novartis.com/it-it/sites/novartis_it/files/NVSCommitment%202024.pdf.

76.     Attached as **Exhibit 73** is a true and correct copy of the February 16, 2021 press release, *Novartis Entresto® granted expanded indication in chronic heart failure by FDA*, from the Novartis website, which was obtained at my direction on January 25, 2025, from https://www.novartis.com/news/media-releases/novartis-entresto-granted-expanded-indication-chronic-heart-failure-fda.

77.     Attached as **Exhibit 74** is a true and correct copy of the "Amazon Pharmacy: How it Works" webpage from the Amazon Pharmacy website, which was obtained at my direction on January 24, 2025, from https://pharmacy.amazon.com/how-it-works.

17

78.     Attached as **Exhibit 75** is a true and correct copy of the "Entresto, 24 MG – 26 MG Tablet" webpage from the Amazon Pharmacy website, which was obtained at my direction on January 24, 2025, from https://pharmacy.amazon.com/Novartis-ENTRESTO-24-MG-TABLET/dp/B084BPW9XK?ref_=sr_1_1&s=amazon-pharmacy&keywords=entresto&dib_tag=se&dib=eyJ2IjoiMSJ9.khwo4XN5dsyn039G5LCCFS zgAWN8HEh1YqSnLQK4ydM.c4OTJRHnPGWJS6plwLG44AMDPH_4zHh0VzqyujcSKxc& qid=1733521429&sr=1-1.

79.     Attached as **Exhibit 76** is a true and correct copy of the "Entresto, 49 MG – 51 MG Tablet" webpage from the Amazon Pharmacy website, which was obtained at my direction on January 25, 2025, from https://pharmacy.amazon.com/Novartis-ENTRESTO-49-MG-51-MG-TABLET/dp/B084BYD8TB?ref_=sr_1_1&s=amazon-pharmacy&keywords=entresto&dib_tag=se&dib=eyJ2IjoiMSJ9.khwo4XN5dsyn039G5LCCFS zgAWN8HEh1YqSnLQK4ydM.c4OTJRHnPGWJS6plwLG44AMDPH_4zHh0VzqyujcSKxc& qid=1733521429&sr=1-1.

80.     Attached as **Exhibit 77** is a true and correct copy of the "Entresto, 97 MG – 103 MG Tablet" webpage from the Amazon Pharmacy website, which was obtained at my direction on January 25, 2025, from https://pharmacy.amazon.com/Novartis-ENTRESTO-97-MG-TABLET/dp/B084BVQYD6?ref_=sr_1_1&s=amazon-pharmacy&keywords=entresto&dib_tag=se&dib=eyJ2IjoiMSJ9.khwo4XN5dsyn039G5LCCFS zgAWN8HEh1YqSnLQK4ydM.c4OTJRHnPGWJS6plwLG44AMDPH_4zHh0VzqyujcSKxc& qid=1733521429&sr=1-1.

81.     Attached as **Exhibit 78** is a true and correct copy of the Search results for "Entresto"

webpage from the Amazon Pharmacy website, which was obtained at my direction on January

24, 2025, from https://www.amazon.com/s?k=entresto&i=amazon-pharmacy&ref=nb_sb_noss.

82.     Attached as **Exhibit 79** is a true and correct copy of the Search results for "Coreg"

webpage from the Amazon Pharmacy website, which was obtained at my direction on January

24, 2025, from https://www.amazon.com/s?k=coreg&i=amazon-

pharmacy&crid=SQ7W07KCOUY2&sprefix=coreg%2Camazon-

pharmacy%2C62&ref=nb_sb_noss_1.

83.     Attached as **Exhibit 80** is a true and correct copy of the "Carvedilol, 25 MG Tablet"

webpage from the Amazon Pharmacy website, which was obtained at my direction on January

24, 2025, from https://pharmacy.amazon.com/Carvedilol-Generic-Coreg-Oral-

Tablet/dp/B084BQJ36S?ref_=sr_1_1&s=amazon-

pharmacy&keywords=coreg&crid=SQ7W07KCOUY2&sprefix=coreg%2Camazon-

pharmacy%2C62&dib_tag=se&dib=eyJ2IjoiMSJ9.79AdMXYxxTcADTVV_FpF31BX8u-

M70H2Wi7IPcZLgKfdh-sBjxx0BriUoYnudYsdP1aDakdVA6kv-

rNFEQQDZQ.SEi6GleGltqOXnPRY6CyeL76Rk9koxAP7mYb6lmcKHw&qid=1733521728&

sr=1-1.

84.     Attached as **Exhibit 81** is a true and correct copy of the June 2022 article,

*Democratizing data at Novartis through clinical trial data access*, by Gabriel S. Eichler,

Georges Imbert, Janice Branson, Rene Balibey, and Jason M. Laramie, which was obtained at

my direction on January 24, 2025, from

https://www.sciencedirect.com/science/article/abs/pii/S1359644622000770.

85.     Attached as **Exhibit 82** is a true and correct copy of the April 2019 article, *Novartis*

*Access: a small step towards increased access for non-communicable disease care*, by Imran

Manji and Sonak D. Pastakia, from The Lancet Global Health, which was obtained at my

direction on January 24, 2025, from

https://www.thelancet.com/journals/langlo/article/PIIS2214-109X(19)30049-X/fulltext.

86.     Attached as **Exhibit 83** is a true and correct copy of the November 11, 2022 article,

*Novartis: Pursuing tomorrow's therapies for cancer*, from *Science.org*, which was obtained at

my direction on January 24, 2025, from https://www.science.org/content/article/novartis-

pursuing-tomorrow-s-therapies-cancer.

87.     Attached as **Exhibit 84** is a true and correct copy of the Search results for "Carvedilol"

webpage from the MediPond website, which was obtained at my direction on January 24, 2025,

from https://medipond.com/catalogsearch/result/?q=carvedilol.

88.     Attached as **Exhibit 85** is a true and correct copy of the Search results for "Coreg"

webpage from the MediPond website, which was obtained at my direction on January 24, 2025,

from https://medipond.com/catalogsearch/result/?q=coreg.

89.     Attached as **Exhibit 86** is a true and correct copy of the "Top Selling" webpage from

the MediPond website, which was obtained at my direction on January 24, 2025, from

https://medipond.com/.

90.     Attached as **Exhibit 87** is a true and correct copy of the Search results for

"Dapagliflozin" webpage from the Drugs.com website, which was obtained at my direction on

January 24, 2025, from https://www.drugs.com/search.php?searchterm=dapagliflozin.

91.     Attached as **Exhibit 88** is a true and correct copy of the "Find Drugs & Conditions" webpage from the Drugs.com website, which was obtained at my direction on January 24, 2025, from https://www.drugs.com/.

92.     Attached as **Exhibit 89** is a true and correct copy of the "Today on Medscape" webpage from the Medscape website, which was obtained at my direction on January 24, 2025, from https://www.medscape.com/?ecd=ppc_google_acq-brand_mscp_englang-top8-int&gad_source=1&gclid=EAIaIQobChMI-IbR6MKligMVrTUIBR18RxMTEAAYASAAEgK5aPD_BwE.

93.     Attached as **Exhibit 90** is a true and correct copy of the Search results for "Farxiga" webpage from the Medscape website, which was obtained at my direction on January 24, 2025, from https://search.medscape.com/search?q=farxiga&plr=ref.

94.     Attached as **Exhibit 91** is a true and correct copy of the "dapagliflozin (RX")" webpage from the Medscape website, which was obtained at my direction on January 26, 2025, from https://reference.medscape.com/drug/farxiga-dapagliflozin-999899#91.

95.     Attached as **Exhibit 92** is a true and correct copy of the Full Prescribing Information for Novadoz Pharmaceuticals LLC's Sacubitril and Valsartan as of July 2024, which was obtained at my direction on January 21, 2025, from https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=44db8114-622e-41f6-96a1-447d47b0267c&type=display.

96.     Attached as **Exhibit 93** is a true and correct copy of the Drug Label Information for Novadoz Pharmaceuticals LLC's Sacubitril and Valsartan as of July 31 2024, which was

obtained at my direction on January 21, 2025, from

https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=44db8114-622e-41f6-96a1-

447d47b0267c.

97.     Attached as **Exhibit 94** is a true and correct copy of the Full Prescribing Information for

Novadoz Pharmaceuticals LLC's Sacubitril and Valsartan as of July 2024 downloaded from

Sacubitril and Valsartan Drug Label Information, which was obtained at my direction on

January 21, 2025, from https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=44db8114-

622e-41f6-96a1-447d47b0267c.

98.     Attached as **Exhibit 95** is a true and correct copy of the October 17, 2024 Public Letter

to the Honorable Richard G. Andrews from Daniel M. Silver, Esq. on behalf of Novartis

regarding Discovery Dispute filed by Novartis Pharmaceuticals Corporation in *Novartis*

*Pharmaceuticals Corporation v. MSN Pharmaceuticals Inc. et al. Patent Litigation,* No. 1:20-

md-02930 (D. Del. 2024), Dkt. No. 1580, which was obtained at my direction on January 23,

2025, from https://ecf.ded.uscourts.gov/doc1/04316580993.

99.     Attached as **Exhibit 96** is a true and correct copy of the March 16, 2021 "Generic

Drugs: Questions & Answers" webpage from the U.S. Food & Drug Administration website,

which was obtained at my direction on January 29, 2025, from

https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-

answers.

100.     On January 30, 2025, at 6:37 p.m. EST, counsel for Plaintiffs provided notice to

Defendants of Plaintiffs' application for an order to show cause for a temporary restraining

order and preliminary injunction by emailing Defendants' counsel of record in the other

pending litigations pertaining to MSN's launch of a generic version of ENTRESTO®.

101.    Defendants' counsel responded at 10:30 p.m. EST, indicating that they are not available

to appear before the Court on Friday, January 31, 2025, but that they would respond "later

tomorrow afternoon with [] availability to appear in court."

102.    Given that MSN could launch as early as next week, Counsel for Plaintiffs is available

Friday, January 31 through Wednesday, February 5, for a conference at the Court's

convenience to discuss Plaintiffs' application.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 30th day of January, 2025, in New York, New York.

By:    /s/ *Megan K. Bannigan*
Megan K. Bannigan

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(mkbannigan@debevoise.com)
(212) 909-6000

*Attorney for Plaintiffs Novartis AG and
Novartis Pharmaceuticals Corporation*

# EXHIBIT 1

| Exhibit | Name | Image |
|---------|------|-------|
| 1.A | FARXIGA® |  |
| 1.B | LASIX® |  |
| 1.C | VASOTEC® |  |
| 1.D | VERQUVO® |  |

| 1.E | COREG® |  |
| 1.F | JARDIANCE® |  |
| 1.G | Valsartan |  |
| 1.H | PRINIVIL® |  |
| 1.I | LOSARTAN® |  |

2

# EXHIBIT 1A



Sign In

Drugs A-Z    Pill Identifier    Interaction Checker    Compare Drugs    News    Pro Edition    More...

Help & Support

Home / Farxiga

Print    Save

# Farxiga 

**Pronunciation:** *FAR-SEE-GUH*
**Generic name:** dapagliflozin
**Dosage form:** oral tablets
**Drug class:** SGLT-2 inhibitors

Medically reviewed by Carmen Pope, BPharm. Last updated on Sep 2, 2024.

Uses | Side effects | Before taking | Dosage | What to avoid | Interactions | FAQ

## What is Farxiga?

Farxiga (dapagliflozin) is an oral medication that may be given to certain people with diabetes, heart disease, or kidney disease to improve their outcomes. Specifically, Farxiga is used to:

- Improve blood sugar control in adults and children aged 10 years and older with type 2 diabetes mellitus alongside diet and exercise
- Lower the risk of going to hospital for heart failure in adults with type 2 diabetes who also have cardiovascular disease or multiple risk factors for cardiovascular disease
- Reduce the risk of cardiovascular death, hospitalization for heart failure, and urgent heart failure visits in adults with heart failure
- Lower the risk of further worsening of kidney disease, end-stage kidney disease (ESKD), death due to cardiovascular disease, and hospitalization for heart failure in adults with chronic kidney disease at risk of progression.

Farxiga mechanism of action involves preventing glucose reabsorption in the kidneys, and increasing how much is excreted in the urine. Farxiga works by inhibiting sodium-glucose cotransporter 2 (SGLT2), which is present in the proximal renal tubules and reabsorbs filtered glucose. By inhibiting this, Farxiga promotes the excretion of glucose in the urine.

Farxiga also works by reducing the amount of sodium reabsorbed by the kidneys and increasing how much reaches the distal tubule. This is thought to influence several physiological functions including lowering the preload and afterload of the heart, downregulating sympathetic activity, and decreasing pressure inside the kidneys.

Farxiga first gained FDA approval on January 8, 2014. There is no Farxiga generic.

## Farxiga side effects

The **most common side effects of Farxiga** are:

- Female genital yeast infections (vaginal thrush)

### DRUG STATUS

Rx — **Availability**
Prescription only

 **Pregnancy & Lactation**
Risk data available

N/A — **CSA Schedule\***
Not a controlled drug

10+ years — **Approval History**
FDA approved 2014

**User Reviews & Ratings**
4.7 / 10    160 Reviews

### Related News



Weight Loss Meds Help Stroke Survivors Prevent Stroke Recurrence, Death

### Images



Farxiga 10 mg (1428 10)

    View larger images

Add180

## Farxiga side effects

The **most common side effects of Farxiga** are:

- Female genital yeast infections (vaginal thrush)
- Urinary tract infections
- Nasopharyngitis (a runny or stuffy nose).

### Serious side effects

Farxiga can cause the following serious side effects.

**Diabetic ketoacidosis (increased ketones in your blood or urine)** in people with type 1 diabetes and other ketoacidosis. Farxiga can cause ketoacidosis that can be life-threatening and may lead to death. Ketoacidosis is a serious condition that needs to be treated in a hospital. People with type 1 diabetes have a high risk of getting ketoacidosis. People with type 2 diabetes or pancreas problems also have an increased risk of getting ketoacidosis. Ketoacidosis can also happen in people who are sick, cannot eat or drink as usual, skip meals, are on a diet high in fat and low in carbohydrates (ketogenic diet), take less than the usual amount of insulin, or miss insulin doses, drink too much alcohol, have a loss of too much fluid from the body (volume depletion), or who have surgery. Ketoacidosis can happen even if your blood sugar is less than 250 mg/dL. Your healthcare provider may ask you to periodically check ketones in your urine or blood. Stop taking FARXIGA and call your healthcare provider or get medical help right away if you get any of the following:

- nausea
- tiredness
- vomiting
- trouble breathing
- stomach area (abdominal) pain
- ketones in your urine or blood.

If possible, check for ketones in your urine or blood, even if your blood sugar is less than 250 mg/dL.

**Dehydration**. Farxiga can cause some people to become dehydrated (the loss of body water and salt). Dehydration may cause you to feel dizzy, faint, lightheaded, or weak, especially when you stand up (orthostatic hypotension). There have been reports of sudden kidney injury in people with Type 2 diabetes who are taking Farxiga. You may be at a higher risk of dehydration if you:

- take medicines to lower your blood pressure, including water pills (diuretics)
- are on a low-salt diet
- have kidney problems
- are 65 years of age or older.

Talk to your healthcare provider about what you can do to prevent dehydration including how much fluid you should drink daily. Call your healthcare provider right away if you reduce the amount of food or liquid you drink, for example, if you cannot eat or you start to lose liquid from your body, for example from vomiting, diarrhea, or being in the sun too long.

**Vaginal yeast infections**. Women who take Farxiga may get vaginal yeast infections. Symptoms of a vaginal yeast infection include:

- vaginal odor
- white or yellowish vaginal discharge (discharge may be lumpy or look like cottage cheese)

Vaginal yeast infections. Women who take Farxiga may experience a yeast infection. Symptoms of a vaginal yeast infection include:

- vaginal odor

- white or yellowish vaginal discharge (discharge may be lumpy or look like cottage cheese)

- vaginal itching.

**Yeast infection of the penis (balanitis).** Swelling of an uncircumcised penis may develop in men who take Farxiga which makes it difficult to pull back the skin around the tip of the penis. Other symptoms of yeast infection of the penis include:

- redness, itching, or swelling of the penis

- foul-smelling discharge from the penis

- rash of the penis

- pain in the skin around the penis.

Allergic reactions. Farxiga may cause an allergic reaction. Do not take Farxiga if you have a **history of serious hypersensitivity reactions** to dapagliflozin, Farxiga, or any of the inactive ingredients in the tablets. Serious reactions, including anaphylaxis and angioedema, have been reported.

Farxiga **should not be used in patients with type 1 diabetes** to improve blood sugar control because it may increase their risk of diabetic ketoacidosis.

Not recommended to improve blood sugar control in people with type 2 diabetes with **moderate to severe kidney disease** (an eGFR of less than 45 mL/min/1.73 m$^2$) (likely to be ineffective in this setting).

**Dosages of insulin** or other medications that increase insulin release may need reducing to avoid the risk of hypoglycemia. Farxiga may increase the risk of hypoglycemia developing when combined with these medications.

Serious, **life-threatening cases of necrotizing fasciitis** of the perineum (Fournier's Gangrene) have been reported in patients with diabetes prescribed Farxiga. If you develop pain or tenderness, redness, or swelling in your genital or perineal area, along with fever or malaise, see your doctor immediately.

Some side effects may be more likely to occur in older adults.

This is not a complete list of side effects and others may occur. Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088.

 Farxiga side effects (more detail)

## Related/similar drugs



**Ozempic**
Learn about Ozempic (semaglutide) for type 2 diabetes treatment, weight management, and ...
**Reviews & ratings**
6.6 / 10          1,413 Reviews
View more

**Rybelsus**
Rybelsus tablets are used to improve blood sugar control in adults with type 2 diabetes, and may ...
**Reviews & ratings**
6.4 / 10          266 Reviews
View more

**Jardiance**
Jardiance (empaglifloz... treat type 2 diabetes... disease and reduce th...
**Reviews & rati...**
5.3 / 10
View m...

Document title: Farxiga: Uses, Dosage, Side Effects &amp; Warnings - Drugs.com
Capture URL: https://www.drugs.com/farxiga.html
Capture timestamp (UTC): Fri, 24 Jan 2025 21:52:30 GMT

Add182

## Before taking this medicine

You should not use Farxiga if you are allergic to dapagliflozin, or if you have:

- severe kidney disease (or if you are on dialysis)
- diabetic ketoacidosis (call your doctor for treatment).

To make sure Farxiga is safe for you, tell your doctor if you:

- have type 1 diabetes or have had diabetic ketoacidosis
- have polycystic kidney disease
- have a decrease in your insulin dose
- have a serious infection
- have a history of infection of the vagina or penis
- have liver problems
- have a history of urinary tract infections or problems with urination
- are on a low sodium (salt) diet. Your healthcare provider may ask you to change your diet
- are going to have surgery. Your healthcare provider may stop your Farxiga before you have surgery. Talk to your healthcare provider if you are having surgery about when to stop taking Farxiga and when to start it again
- are eating less or there is a change in your diet
- are dehydrated
- have or have had problems with your pancreas, including pancreatitis or surgery on your pancreas
- drink alcohol very often or drink a lot of alcohol in the short term ("binge") drinking)
- are pregnant or plan to become pregnant
- are breastfeeding or plan to breastfeed.

## Pregnancy

Farxiga may cause harm to an unborn baby, especially the developing kidneys of an unborn baby. If you become pregnant while taking Farxiga, your healthcare provider may switch you to a different medicine to control your blood sugar. Talk to your healthcare provider about the best way to control your blood sugar if you plan to become pregnant or while you are pregnant.

## Breastfeeding

It is not known if Farxiga passes into your breast milk. You should not breastfeed if you take Farxiga.

ⓘ Farxiga pregnancy and breastfeeding warnings (more detail)

## How should I take Farxiga?

Take Farxiga exactly as your doctor prescribed. Follow all directions on your prescription label and read all medication guides or instruction sheets. Your doctor may occasionally change your dose.

## How should I take Farxiga?

Take Farxiga exactly as your doctor prescribed. Follow all directions on your prescription label and read all medication guides or instruction sheets. Your doctor may occasionally change your dose.

- **Farxiga is taken 1 time per day.**
- You may take Farxiga with or without food.
- Your treatment may include dietary changes, exercise, weight control, and special medical care.

Your blood sugar will need to be checked often, and you may also need to test the level of ketones in your urine. Farxiga can cause life-threatening ketoacidosis. Even if your blood sugar is normal, contact your doctor if a urine test shows that you have high ketones in the urine.

During prolonged illness, you may become dehydrated. Call your doctor if you are sick with vomiting or diarrhea or if you eat or drink less than usual.

## Farxiga dosing information

Patients should be well hydrated before starting treatment with Farxiga.

**Recommended Farxiga dose for adults and children aged 10 and older for Type 2 diabetes to improve blood sugar control**

- Initial dose: Farxiga 5 mg once daily
- May increase to 10 mg orally once a day for additional glycemic control if a lower dose has been tolerated
- Maximum dose: Farxiga 10 mg/day

**Usual adult dose of Farxiga for heart failure and kidney disease**

- Initial and maintenance dose: Farxiga 10 mg orally once a day
- Maximum dose: Farxiga 10 mg/day.

ⓘ Detailed Farxiga dosage information

## Should Farxiga be stopped for surgery?

The Farxiga Package Insert recommends withholding Farxiga for at least 3 days, if possible, before major surgery or procedures associated with prolonged fasting. Farxiga should be restarted once the person is clinically stable and has started eating or receiving nutrition again.

## What happens if I miss a dose?

Take the medicine as soon as you can, but skip the missed dose if it is almost time for your next dose. Do not take two doses at one time.

## What happens if I overdose?

Seek emergency medical attention or call the Poison Help line at 1-800-222-1222.

## What should I avoid while taking Farxiga?

# What happens if I overdose?

Seek emergency medical attention or call the Poison Help line at 1-800-222-1222.

## What should I avoid while taking Farxiga?

Avoid drinking alcohol.

Avoid getting up too fast from a sitting or lying position, or you may feel dizzy.

## What other drugs will affect Farxiga?

Other drugs may increase or decrease the effects of Farxiga on lowering your blood sugar. Tell your doctor about all your current medicines and any you start or stop using, especially:

- Insulin or other oral diabetes medicines

- A diuretic or "water pill", such as furosemide or HCTZ

- Lithium.

Farxiga will increase urinary glucose excretion and will lead to positive urine glucose tests. Use alternative ways to monitor glycemic control. It also interferes with some other laboratory assays.

This list is not complete. Other drugs may interact with dapagliflozin, including prescription and over-the-counter medicines, vitamins, and herbal products. Not all possible drug interactions are listed here.

ⓘ Farxiga drug interactions (more detail)



### Does Farxiga interact with my other drugs?

Enter medications to view a detailed interaction report using our Drug Interaction Checker.

| Farxiga | + | Enter a drug name | Add |

## Farxiga and Medicare

Because of the prescription drug law, known as the Inflation Reduction Act, Medicare can negotiate directly with drug companies to improve access to some of the costliest single-source brand-name Medicare Part B and Part D drugs.

Farxiga is one of 10 drugs covered under Medicare Part D that were selected in 2024 for the first cycle of negotiation based on Total Expenditures under Part D and other criteria as required by the law. Negotiations with participating drug companies are ongoing, and any negotiated prices for the first cycle of negotiation is effective from 2026.

## Storage

Store at room temperature 20°C to 25°C (68°F to 77°F) away from moisture and heat. Excursions are permitted between 15°C and 30°C (59°F and 86°F).

## Farxiga ingredients

- **Active**: dapagliflozin.

Store at room temperature 20°C to 25°C (68°F to 77°F) away from moisture and heat. Excursions are permitted between 15°C to 30°C (59°F to 86°F).

## Farxiga ingredients

- **Active**: dapagliflozin.

- **Inactive**: microcrystalline cellulose, anhydrous lactose, crospovidone, silicon dioxide, and magnesium stearate. Film coating: polyvinyl alcohol, titanium dioxide, polyethylene glycol, talc, and yellow iron oxide.

Available as Farxiga 5 mg and Farxiga 10 mg tablets.

## Who makes Farxiga?

AstraZeneca Pharmaceuticals LP. makes Farxiga.

## Popular FAQ



Does Farxiga cause weight loss?

How long does it take for Farxiga to work?

Can Farxiga cause kidney damage?

What is Farxiga used for and how does it work?

Can Farxiga cause constipation?

### More FAQ

- Why does Farxiga cause yeast infections?
- What are the ingredient drugs contained in Qternmet XR?

View more FAQ...

**References**

1. Farxiga Package Insert
2. Farxiga Prescribing Information

Was this page helpful? 

## More about Farxiga (dapagliflozin)

- Check interactions
- Compare alternatives
- Pricing & coupons
- Reviews (160)

Document title: Farxiga: Uses, Dosage, Side Effects &amp; Warnings - Drugs.com
Capture URL: https://www.drugs.com/farxiga.html
Capture timestamp (UTC): Fri, 24 Jan 2025 21:52:30 GMT

Add186

## More about Farxiga (dapagliflozin)

- Check interactions
- Compare alternatives
- Pricing & coupons
- Reviews (160)
- Drug images
- Side effects
- Dosage information
- Patient tips
- During pregnancy
- Support group
- FDA approval history
- Drug class: SGLT-2 inhibitors
- Breastfeeding
- En español

## Professional resources

- Farxiga prescribing information
- Dapagliflozin (AHFS Monograph)

## Related treatment guides

- Heart Failure
- Chronic Kidney Disease
- Type 2 Diabetes

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.

About    Terms & privacy    Support

Add187

- During pregnancy
- Support group
- FDA approval history
- Drug class: SGLT-2 inhibitors
- Breastfeeding
- En español

## Professional resources

- Farxiga prescribing information
- Dapagliflozin (AHFS Monograph)

## Related treatment guides

- Heart Failure
- Chronic Kidney Disease
- Type 2 Diabetes

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



## Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.



**About**
About Drugs.com
Advertising policy
Attribution & citations

**Terms & privacy**
Terms of use
Editorial policy
Privacy policy

**Support**
Help center
Sitemap
Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.

   

Copyright © 2000-2025 Drugs.com. All rights reserved.

Document title: Farxiga: Uses, Dosage, Side Effects &amp; Warnings - Drugs.com
Capture URL: https://www.drugs.com/farxiga.html
Capture timestamp (UTC): Fri, 24 Jan 2025 21:52:30 GMT

Add188

# EXHIBIT 1B



# Lasix 

**Generic name:** furosemide [ *fur-OH-se-mide* ]
**Drug class:** Loop diuretics

Medically reviewed by Sophia Entringer, PharmD. Last updated on Apr 4, 2023.

Uses · Warnings · Before taking · Dosage · Side effects · Interactions · FAQ

## What is Lasix?

Lasix is a loop diuretic (water pill) that prevents your body from absorbing too much salt, causing it to be passed in your urine. Lasix treats fluid retention (edema) in people with congestive heart failure, liver disease, or kidney disorders such as nephrotic syndrome.

Lasix is also used to treat high blood pressure (hypertension).

## Warnings

You should not use Lasix if you are unable to urinate.

Using more than your recommended dose will not make this medicine more effective. High doses of furosemide may cause irreversible hearing loss.

Before using Lasix, tell your doctor if you have kidney disease, enlarged prostate, urination problems, cirrhosis or other liver disease, an electrolyte imbalance, high cholesterol, gout, lupus, diabetes, or an allergy to sulfa drugs.

Tell your doctor if you have recently had an MRI (magnetic resonance imaging) or any type of scan using a radioactive dye that is injected into your veins. Do not take more of this medication than is recommended.

If you are being treated for high blood pressure, keep using Lasix even if you feel fine. High blood pressure often has no symptoms.

Tell your doctor about all your other medicines. Some drugs should not be used with Lasix.

## Before taking this medicine

You should not use Lasix if you are allergic to furosemide, if you are unable to urinate or have hepatic cirrhosis.

To make sure Lasix is safe for you, tell your doctor if you have ever had:

- an electrolyte imbalance (such as low levels of potassium or magnesium in your blood);

### DRUG STATUS

**Availability**
Prescription only

**Pregnancy & Lactation**
Risk data available

**CSA Schedule\***
Not a controlled drug

**Approval History**
FDA approved 1966

**WADA Class**
Anti-Doping Classification

### User Reviews & Ratings

6.4 / 10      56 Reviews

### Images



Lasix 40 mg (LASIX® 40)

       View larger images

You should not use Lasix if you are allergic to furosemide, if you are unable to urinate or have hepatic cirrhosis.

To make sure Lasix is safe for you, tell your doctor if you have ever had:

- an electrolyte imbalance (such as low levels of potassium or magnesium in your blood);
- enlarged prostate, bladder obstruction, or other urination problems;
- gout;
- lupus;
- diabetes;
- an allergy to sulfa drugs;
- kidney disease; or
- cirrhosis or other liver disease.

Tell your doctor if you have an MRI (magnetic resonance imaging) or any type of scan using a radioactive dye that is injected into a vein. Contrast dyes and furosemide can harm your kidneys.

It is not known if furosemide will harm an unborn baby. Tell your doctor if you are pregnant or plan to become pregnant.

It may not be safe to breastfeed while using Lasix. Ask your doctor about any risk. Lasix may slow breast milk production.

ⓘ Lasix pregnancy and breastfeeding warnings (more detail)

## How should I use Lasix?

Take Lasix exactly as prescribed by your doctor. Follow all directions on your prescription label and read all medication guides or instruction sheets.

Do not use more than your recommended dose. **High doses of furosemide may cause irreversible hearing loss.**

Doses are based on weight in children and teenagers. Your child's dose may change if the child gains or loses weight.

Lasix will make you urinate more often and you may get dehydrated easily. Follow your doctor's instructions about using potassium supplements or getting enough salt and potassium in your diet.

Your blood pressure will need to be checked often and you may need other medical tests.

If you have high blood pressure, **keep using Lasix even if you feel well.** High blood pressure often has no symptoms.

If you need surgery, tell the surgeon ahead of time that you are using Lasix.

Store at room temperature away from moisture, heat, and light.

## Dosing Information

**Usual Adult Dose of Lasix for Ascites:**

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

Document title: Lasix Uses, Dosage &amp; Side Effects - Drugs.com
Capture URL: https://www.drugs.com/lasix.html
Capture timestamp (UTC): Fri, 24 Jan 2025 21:54:32 GMT

Add191

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

### Usual Adult Dose of Lasix for Congestive Heart Failure:

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

### Usual Adult Dose of Lasix for Edema:

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

### Usual Adult Dose of Lasix for Nephrotic Syndrome:

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

### Usual Adult Dose of Lasix for Renal Failure:

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

### Usual Adult Dose of Lasix for Liver Cirrhosis:

Oral: Initial dose: 20 to 80 mg orally once; may repeat with the same dose or increase by 20 or 40 mg no sooner than 6 to 8 hours after the previous dose until the desired diuretic effect has been obtained. Maintenance dose: Administer the dose that provided the desired diuretic effect once or twice a day (e.g., at 8 am and 2 pm).

Comments:
-Edema may be most efficiently and safely mobilized by giving this drug on 2 to 4 consecutive days each week.
-When doses greater than 80 mg/day are given for prolonged periods of time, careful clinical observation and laboratory monitoring are particularly advisable.

### Usual Adult Dose of Lasix for Pulmonary Edema:

Oral: Initial dose: 80 mg/day, usually divided into 40 mg orally twice a day

Use: Treatment of hypertension alone or in combination with other antihypertensive agents.

**Maximum Adult dose: 600 mg/day in patients with clinically severe edematous states.**

### Usual Pediatric Dose for Edema:

Oral: Initial dose: 2 mg/kg orally once; if the diuretic response to the initial dose is not satisfactory, may increase by 1 or 2 mg/kg and administer no sooner than 6 to 8 hours after the previous dose.

**Maximum Adult dose:** 600 mg/day in patients with clinically severe edematous states.

**Usual Pediatric Dose for Edema:**

Oral: Initial dose: 2 mg/kg orally once; if the diuretic response to the initial dose is not satisfactory, may increase by 1 or 2 mg/kg and administer no sooner than 6 to 8 hours after the previous dose. Maintenance dose: Adjust to minimum effective dose.

Maximum dose: 6 mg/kg

Use: Treatment of edema associated with congestive heart failure, cirrhosis of the liver and renal disease, including the nephrotic syndrome, especially when an agent with greater diuretic potential is desired.

ⓘ Detailed Lasix dosage information

## What happens if I miss a dose?

Lasix is sometimes used only once, so you may not be on a dosing schedule. If you are using the medication regularly, use the medicine as soon as you can, but skip the missed dose if it is almost time for your next dose. Do not use two doses at one time.

## What happens if I overdose?

Seek emergency medical attention or call the Poison Help line at 1-800-222-1222.

Overdose symptoms may include feeling very thirsty or hot, heavy sweating, hot and dry skin, extreme weakness, or fainting.

## What should I avoid while using Lasix?

Avoid getting up too fast from a sitting or lying position, or you may feel dizzy.

Avoid becoming dehydrated. Follow your doctor's instructions about the type and amount of liquids you should drink while you are using Lasix.

Drinking alcohol with this medicine can cause side effects.

Lasix could make you sunburn more easily. Avoid sunlight or tanning beds. Wear protective clothing and use sunscreen (SPF 30 or higher) when you are outdoors.

If you have high blood pressure, ask a doctor or pharmacist before taking any medicines that can raise your blood pressure, such as diet pills or cough-and-cold medicine.

## Lasix side effects

Get emergency medical help if you have **signs of an allergic reaction to Lasix** (hives, difficult breathing, swelling in your face or throat) **or a severe skin reaction** (fever, sore throat, burning eyes, skin pain, red or purple skin rash with blistering and peeling).

**Lasix may cause serious side effects. Call your doctor at once if you have:**

- a light-headed feeling, like you might pass out;
- ringing in your ears, hearing loss;
- muscle spasms or contractions;
- pale skin, easy bruising, unusual bleeding;

Lasix may cause serious side effects. Call your doctor at once if you have:

- a light-headed feeling, like you might pass out;

- ringing in your ears, hearing loss;

- muscle spasms or contractions;

- pale skin, easy bruising, unusual bleeding;

- **high blood sugar** - increased thirst, increased urination, dry mouth, fruity breath odor;

- **kidney problems** - swelling, urinating less, feeling tired or short of breath

- **signs of liver or pancreas problems** - loss of appetite, upper stomach pain (that may spread to your back), nausea or vomiting, dark urine, jaundice (yellowing of the skin or eyes); or

- **signs of an electrolyte imbalance** - increased thirst or urination, constipation, muscle weakness, leg cramps, numbness or tingling, feeling jittery, fluttering in your chest.

**Common Lasix side effects may include:**

- diarrhea, constipation, loss of appetite;

- numbness or tingling;

- headache, dizziness; or

- blurred vision.

This is not a complete list of side effects and others may occur. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

ⓘ Lasix side effects (more detail)

## What other drugs will affect Lasix?

Sometimes it is not safe to use certain medicines at the same time. Some drugs can affect your blood levels of other drugs you use, which may increase side effects or make the medicines less effective

If you also take sucralfate, take your Lasix dose 2 hours before or 2 hours after you take sucralfate.

Tell your doctor about all your other medicines, especially:

- another diuretic, especially ethacrynic acid;

- methotrexate;

- chloral hydrate;

- lithium;

- phenytoin;

- an antibiotic;

- cancer medicine, such as cisplatin;

- heart or blood pressure medicine; or

- **NSAIDs (nonsteroidal anti-inflammatory drugs)** - aspirin, ibuprofen (Advil, Motrin), naproxen (Aleve), celecoxib, diclofenac, indomethacin, meloxicam, and others.

This list is not complete. Other drugs may interact with furosemide, including prescription and over-the-counter medicines, vitamins, and herbal products. Not all possible drug interactions are listed here.

ⓘ Lasix drug interactions (more detail)



This list is not complete. Other drugs may interact with furosemide, including prescription and over-the-counter medicines, vitamins, and herbal products. Not all possible drug interactions are listed here.

ℹ️ Lasix drug interactions (more detail)

### Does Lasix interact with my other drugs?

Enter medications to view a detailed interaction report using our Drug Interaction Checker.

| Lasix | + | Enter a drug name | Add |

## Popular FAQ

Should you drink a lot of water when taking Lasix?                                        ⌄

### More FAQ

- Are losartan and losartan potassium the same or different drugs?
- How long after taking Lasix would you expect to urinate?
- Can you take Lasix for weight loss?
- What are the equivalent dosages of bumetanide, furosemide & torsemide?

View more FAQ...

### References

1. Lasix Prescribing Information

Was this page helpful?   👍   👎

## More about Lasix (furosemide)

- Check interactions
- Compare alternatives
- Reviews (56)
- Drug images
- Side effects
- Dosage information
- Patient tips
- During pregnancy

**Discover a Treatment Option**

If you are affected by **Ulcerative Colitis**, help may be at hand.

Learn more

- During pregnancy
- Generic availability
- Support group
- Drug class: loop diuretics
- Breastfeeding
- En español

## Patient resources

- Lasix (Furosemide Injection) advanced reading

### Other brands

Furoscix

## Professional resources

- Lasix prescribing information
- Furosemide (AHFS Monograph)

### Other brands

Furoscix

## Related treatment guides

- Heart Failure
- Edema
- Ascites
- High Blood Pressure

# Further information

Remember, keep this and all other medicines out of the reach of children, never share your medicines with others, and use Lasix only for the for the indication prescribed.

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer

Copyright 1996-2025 Cerner Multum, Inc. Version: 18.01.



Discover a Treatment Option

If you are affected by **Ulcerative Colitis**, help may be at hand.

Learn more

Document title: Lasix Uses, Dosage &amp; Side Effects - Drugs.com
Capture URL: https://www.drugs.com/lasix.html
Capture timestamp (UTC): Fri, 24 Jan 2025 21:54:32 GMT

Add196

**Professional resources**

- Lasix prescribing information
- Furosemide (AHFS Monograph)

**Other brands**

Furoscix

## Related treatment guides

- Heart Failure
- Edema
- Ascites
- High Blood Pressure

## Further information

Remember, keep this and all other medicines out of the reach of children, never share your medicines with others, and use Lasix only for the for the indication prescribed.

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer

Copyright 1996-2025 Cerner Multum, Inc. Version: 18.01.



# Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.

Download on the App Store

GET IT ON Google Play



**About**

About Drugs.com
Advertising policy
Attribution & citations

**Terms & privacy**

Terms of use
Editorial policy
Privacy policy

**Support**

Help center
Sitemap
Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.

**Discover a Treatment Option**

If you are affected by **Ulcerative Colitis**, help may be at hand.

Learn more

Document title: Lasix Uses, Dosage &amp; Side Effects - Drugs.com
Capture URL: https://www.drugs.com/lasix.html
Capture timestamp (UTC): Fri, 24 Jan 2025 21:54:32 GMT

Add197

# EXHIBIT 1C

Drugs.com
Know more. Be sure.

Browse all medications: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9

Advanced Search

Sign In

Drugs A-Z   Pill Identifier   Interaction Checker   Compare Drugs   News   Pro Edition   More...

Help & Support

Home / Vasotec

Print   Save

# Vasotec 

**Generic name:** enalapril [ e-NAL-a-pril ]
**Dosage form:** oral tablet (10 mg; 2.5 mg; 20 mg; 5 mg).
**Drug class:** Angiotensin Converting Enzyme Inhibitors

Medically reviewed by Melisa Puckey, BPharm. Last updated on Mar 1, 2024.

Uses | Warnings | Before taking | Dosage | Side effects | Interactions | FAQ

## DRUG STATUS

Rx — **Availability**
Prescription only

**Pregnancy & Lactation**
Risk data available

N/A — **CSA Schedule\***
Not a controlled drug

10+ — **Approval History**
years   FDA approved 1985

### User Reviews & Ratings

4 Reviews

### Images



Vasotec 10 mg (VASO 10)

View larger images

## What is Vasotec?

Vasotec (enalapril) is used alone or in combination with other medications to treat high blood pressure in adults and children at least 1 month old.

Vasotec can also be used to prevent and treat congestive congestive heart failure in adults.

Vasotec belongs to a class of medications called angiotensin-converting enzyme (ACE) inhibitors. Enalapril works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently.

## Warnings

**Do not use Vasotec if you are pregnant. If you become pregnant, stop taking this medicine and tell your doctor right away.**

Tell your doctor about all your other medicines. **Some drugs should not be used with Vasotec.**

If you have diabetes, do not use enalapril together with any medication that contains aliskiren (such as Tekturna or Tekamlo).

You should not use Vasotec if you have ever had angioedema. Do not take Vasotec within 36 hours before or after taking any medicine that contains sacubatril (such as Entresto).

Enalapril can affect your heart or your electrolyte levels. Call your doctor if you have chest pain, pounding heartbeats or fluttering in your chest, a slow heart rate or weak pulse, a tingly feeling, muscle weakness, or muscle tightness or contraction.

## Before taking this medicine

You should not use Vasotec if you are allergic to enalapril or to any other ACE (angiotensin converting enzyme) inhibitor such as benazepril, captopril, fosinopril, trandolapril, lisinopril, moexipril, perindopril, quinapril, or ramipril.

Do not use Vasotec within 36 hours before or after taking medicine that contains sacubitril (such

# Before taking this medicine

You should not use Vasotec if you are allergic to enalapril or to any other ACE (angiotensin converting enzyme) inhibitor such as benazepril, captopril, fosinopril, trandolapril, lisinopril, moexipril, perindopril, quinapril, or ramipril.

Do not use Vasotec within 36 hours before or after taking medicine that contains sacubitril (such as Entresto).

Do not use Vasotec if you have a history of angioedema (severe allergic reaction).

To make sure Vasotec is safe for you, tell your doctor if you have ever had:

- heart disease, heart problems such as a recent heart attack;
- low blood pressure;
- stomach pain;
- low white blood cell count;
- if you are on a low-salt diet;
- diabetes;
- kidney disease (or if you are on dialysis); or
- liver disease.

You may also need to avoid taking Vasotec with aliskiren **if you have kidney disease.**

**Stop using this medicine and tell your doctor right away if you become pregnant.** Enalapril can cause injury or death to the unborn baby if you use the medicine during your second or third trimester.

Do not breastfeed.

ⓘ Vasotec pregnancy and breastfeeding warnings (more detail)

# How should I use Vasotec?

Take Vasotec exactly as prescribed by your doctor. Follow all directions on your prescription label and read all medication guides or instruction sheets. Your doctor may occasionally change your dose.

Vasotec tablets are taken by mouth.

You may take Vasotec tablets with or without food.

Call your doctor if you have ongoing vomiting or diarrhea, or if you are sweating more than usual. You can easily become dehydrated while taking Vasotec. This can lead to very low blood pressure, an electrolyte imbalance, or kidney failure.

Your blood pressure will need to be checked often and you may need frequent blood tests.

Tell your doctor if you have a planned surgery.

If you have high blood pressure, keep using Vasotec even if you feel well. High blood pressure often has no symptoms.

Store Vasotec tablets tightly closed at room temperature, away from moisture and heat.

# Dosing information

**Usual Adult Dose for Hypertension:**

Add200

## Dosing information

### Usual Adult Dose for Hypertension:

Initial dose: 5 mg orally once a day
Maintenance dose: 10 to 40 mg orally per day as a single dose or in 2 divided doses
Maximum dose: 40 mg orally daily as a single dose or in 2 divided doses

In combination with diuretics:
Initial dose: 2.5 mg orally once a day
If feasible, the diuretic should be discontinued 2 to 3 days prior to initiation of therapy with enalapril. If required, diuretic therapy may be gradually resumed.

### Usual Adult Dose for Congestive Heart Failure:

Initial dose: 2.5 mg orally once a day
Maintenance dose: 2.5 to 20 mg daily in 2 divided doses
Maximum dose: 40 mg orally per day in 2 divided doses

Comments:
-Treatment is usually combined with diuretics and digitalis.
-Doses should be titrated upward, as tolerated, over a period of a few days or weeks.

### Usual Adult Dose for Left Ventricular Dysfunction:

Initial dose: 2.5 mg orally twice a day
Maintenance dose: 20 mg orally per day in 2 divided doses

Comments:
-After the initial dose, the patient should be observed for at least 2 hours and until blood pressure has stabilized for at least an additional hour.
-If possible, the dose of any concomitant diuretic should be reduced which may diminish the likelihood of hypotension.

### Usual Pediatric Dose for Hypertension:

Children 1 month to 17 years:
Initial dose: 0.08 mg/kg/day (up to 5 mg) in 1 to 2 divided doses. Adjust dosage based on patient response.
Maximum dose: Doses greater than 0.58 mg/kg (40 mg) have not been evaluated in pediatric patients.

Comment:
-Not recommended in neonates and in pediatric patients with glomerular filtration rate less than 30 mL/min, as no data are available.

ⓘ Detailed Vasotec dosage information

## What happens if I miss a dose?

Take the medicine as soon as you can, but skip the missed dose if it is almost time for your next dose. Do not take two doses at one time.

## What happens if I overdose?

Seek emergency medical attention or call the Poison Help line at 1-800-222-1222.

Document title: Vasotec: Uses, Dosage &amp; Side Effects - Drugs.com
Capture URL: https://www.drugs.com/vasotec.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:01:23 GMT

Add201

Take the medicine as soon as you can, but skip the missed dose if it is almost time for your next dose. Do not take two doses at one time.

## What happens if I overdose?

Seek emergency medical attention or call the Poison Help line at 1-800-222-1222.

## What should I avoid while using Vasotec?

Avoid getting up too fast from a sitting or lying position, or you may feel dizzy.

Do not use potassium supplements or salt substitutes, unless your doctor has told you to.

Avoid becoming overheated or dehydrated during exercise, in hot weather, or by not drinking enough fluids. Follow your doctor's instructions about the type and amount of liquids you should drink. In some cases, drinking too much liquid can be as unsafe as not drinking enough.

## Vasotec side effects

Get emergency medical help if you have **signs of an allergic reaction to Vasotec:** hives, severe stomach pain, difficulty breathing, swelling of your face, lips, tongue, or throat.

**Enalapril may cause serious side effects. Call your doctor at once if you have:**

- a light-headed feeling, like you might pass out;

- **high blood potassium** - nausea, weakness, tingly feeling, chest pain, irregular heartbeats, loss of movement;

- **low white blood cell counts** - fever, mouth sores, skin sores, sore throat, cough;

- **kidney problems** - swelling, urinating less, feeling tired or short of breath; or

- **liver problems** - loss of appetite, stomach pain (upper right side), tiredness, itching, dark urine, clay-colored stools, jaundice (yellowing of the skin or eyes).

**Common Vasotec side effects may include:**

- cough, diarrhea;

- chest pain, dizziness, tiredness;

- headache, nausea; or

- low blood pressure.

This is not a complete list of side effects and others may occur. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

ⓘ Vasotec side effects (more detail)

## What other drugs will affect Vasotec?

Enalapril can harm your kidneys, especially if you also use certain medicines for infections, cancer, osteoporosis.

Tell your doctor about all your other medicines, especially:

- a diuretic or "water pill" that may increase blood potassium such as spironolactone, triamterene, amiloride;

osteoporosis.

Tell your doctor about all your other medicines, especially:

- a diuretic or "water pill" that may increase blood potassium such as spironolactone, triamterene, amiloride;

- **NSAIDs (nonsteroidal anti-inflammatory drugs)** - aspirin, ibuprofen (Advil, Motrin), naproxen (Aleve), celecoxib, diclofenac, indomethacin, meloxicam, and others;

- medicine to prevent organ transplant rejection such as temsirolimus, sirolimus, or everolimus; or

- heart or blood pressure medication.

This list is not complete. Other drugs may interact with enalapril, including prescription and over-the-counter medicines, vitamins, and herbal products. Not all possible drug interactions are listed here.

ⓘ Vasotec drug interactions (more detail)



## Ingredients

**Active ingredient:** enalapril maleate.
**Inactive ingredients:** lactose, magnesium stearate, sodium bicarbonate, and starch. The 10 mg and 20 mg tablets also contain iron oxides.

## Manufacturer

**Valeant Pharmaceuticals North America LLC**, Bridgewater, NJ 08807, USA.

## Frequently asked questions

- Do ACE inhibitors make COVID-19 worse?

**References**

1. Vasotec Product Label

## More about Vasotec (enalapril)

- Check interactions
- Compare alternatives
- Pricing & coupons
- Reviews (4)
- Drug images
- Side effects
- Dosage information

### More about Vasotec (enalapril)

- Check interactions
- Compare alternatives
- Pricing & coupons
- Reviews (4)
- Drug images
- Side effects
- Dosage information
- During pregnancy
- Generic availability
- Drug class: Angiotensin Converting Enzyme Inhibitors
- Breastfeeding
- En español

### Patient resources

#### Other brands

Epaned

### Professional resources

- Vasotec prescribing information
- Enalapril (AHFS Monograph)

#### Other brands

Epaned

### Related treatment guides

- High Blood Pressure
- Hypertensive Emergency
- Diabetic Kidney Disease
- Heart Failure
- Left Ventricular Dysfunction

## Further information

Remember, keep this and all other medicines out of the reach of children, never share your medicines with others, and use Vasotec only for the indication prescribed.

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer

Copyright 1996-2025 Cerner Multum, Inc. Version: 15.01.

**Discover a Treatment Option**

If you are affected by **Granulomatosis with Polyangiitis**, help may be at hand.

Document title: Vasotec: Uses, Dosage &amp; Side Effects - Drugs.com
Capture URL: https://www.drugs.com/vasotec.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:01:23 GMT

Add204

- Vasotec (AHFS Monograph)
- Enalapril (AHFS Monograph)

**Other brands**

Epaned

## Related treatment guides

- High Blood Pressure
- Hypertensive Emergency
- Diabetic Kidney Disease
- Heart Failure
- Left Ventricular Dysfunction

## Further information

Remember, keep this and all other medicines out of the reach of children, never share your medicines with others, and use Vasotec only for the indication prescribed.

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer

Copyright 1996-2025 Cerner Multum, Inc. Version: 15.01.



## Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.



| About | Terms & privacy | Support |
|-------|-----------------|---------|
| About Drugs.com | Terms of use | Help center |
| Advertising policy | Editorial policy | Sitemap |
| Attribution & citations | Privacy policy | Contact us |

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

**Drugs.com** provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.

**Discover a Treatment Option**

If you are affected by **Granulomatosis with Polyangiitis**, help may be at hand.

Learn more

Document title: Vasotec: Uses, Dosage &amp; Side Effects - Drugs.com
Capture URL: https://www.drugs.com/vasotec.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:01:23 GMT

Add205

# EXHIBIT 1D





## amazon pharmacy

Home | How it works | Ways to save | ⓘ Help

Sign up | Sign in



Sample image.

# Verquvo, 5 MG Tablet

Rx **Prescription required** | FSA or HSA eligible

**Form** Oral Tablet

**Strength** ⓘ
5 MG ⌄

**Frequency**
1 tablet per day ⌄

**Supply** ⓘ
30 days (30 tablets) ⌄

## How Amazon Pharmacy works

▶ Discover Amazon Pharmacy (0:47)



**1. Sign up for Amazon Pharmacy**
It's simple. And free, always. Sign in or sign up to get started.

**2. We'll get your prescription**
We can work with your insurance and current pharmacy to get your prescription.

**3. Get your meds delivered**
Have a question? Our pharmacists are available 24/7.

Learn more about how it works

## About this medication

VERICIGUAT (VER e SIG ue at) lowers the risk of death and reduces the need for hospitalization caused by heart failure. It works by relaxing your blood vessels and lowering the blood pressure in your lungs, which makes it easier for your heart to pump blood to the rest of your body.



**How should you use this medication?**

Take this medication by mouth with water. Take it as directed on the prescription label at the same time every day. Take it with food. Swallow the tablet whole. You may crush the tablet and put the contents in water. Swallow the medication and water right away. Keep taking this medication unless your care team tells you to stop. Talk to your care team about the use of this medication in children. Special care may be needed.



**What are the possible side effects of this medicine?**

### Average insurance price

$11⁰⁰

To get your exact price, transfer your prescription or call your insurance provider. Details

OR

### Buy without insurance

-13% $707⁶⁷ ($707.67/month)
Retail price: $814.20
Save $106.53 with Prime. Details

📍 Enter your ZIP Code to see your delivery eligibility

Fast, free delivery

**Get started**

Already a pharmacy customer? Sign in

Sold by          Amazon Pharmacy
Ships from       Amazon Pharmacy
FSA or HSA eligible



one medical    **Get care and request prescriptions online or in person**
Get started ›

Document title: Amazon Pharmacy: Merck Sharp &amp; Dohme VERQUVO 5 MG TABLET (1 Tablet)
Capture URL: https://pharmacy.amazon.com/dp/B09KWJ3X15?
Capture timestamp (UTC): Fri, 24 Jan 2025 22:02:14 GMT

Page 1 of 2

Add207

Learn more about how it works

---

## About this medication

VERICIGUAT (VER e SIG ue at) lowers the risk of death and reduces the need for hospitalization caused by heart failure. It works by relaxing your blood vessels and lowering the blood pressure in your lungs, which makes it easier for your heart to pump blood to the rest of your body.



### How should you use this medication?

Take this medication by mouth with water. Take it as directed on the prescription label at the same time every day. Take it with food. Swallow the tablet whole. You may crush the tablet and put the contents in water. Swallow the medication and water right away. Keep taking this medication unless your care team tells you to stop. Talk to your care team about the use of this medication in children. Special care may be needed.



### What are the possible side effects of this medicine?

Side effects that you should report to your care team as soon as possible:

- Allergic reactions--skin rash, itching, hives, swelling of the face, lips, tongue, or throat
- Low blood pressure--dizziness, feeling faint or lightheaded, blurry vision
- Low red blood cell level--unusual weakness or fatigue, dizziness, headache, trouble breathing



### What may interact with this medicine?

Our pharmacists will check to see if this medication will cause any interactions with the information in your profile.
Do not take this medication with any of the following:

- Riociguat This medication may also interact with the following:
- Avanafil
- Sildenafil
- Tadalafil
- Vardenafil

Copyright Elsevier Inc.

This is a summary of information about this product. It is not medical advice. Ask your health care professional for complete information about this product and your individual health needs.

---

Back to top

Your Account        Your Orders        Help        Already a customer? Sign in

**amazon**

Amazon Pharmacy Terms of Use    Notice of Privacy Practices    Nondiscrimination Notice
© 1996-2024, Amazon.com, Inc. or its affiliates

Add208

# EXHIBIT 1E

Full Prescribing Information    For Healthcare Professionals

**COREG®**
(carvedilol) Tablets

ABOUT COREG®    COREG® FAQs    CHOOSE BRAND COREG®    **COPAY SAVINGS CARD**



## You've Got This.

If you've been diagnosed with hypertension, heart failure or have suffered a recent heart attack, COREG can help you get back to your life.

[ Get Your Savings Card ]

## 3 Steps to Getting Brand-Name COREG®



### Ask Your Doctor

Ask your doctor to prescribe brand name COREG®, no substitutions and indicate 'DAW' on your prescription.



### Get Your Copay Card

Get your Copay Savings Card, you may pay as little as $5.00 for your prescription.

[ Copay Savings Card ]

 3.125 mg    6.25 mg    12.5 mg    25 mg

### Make Sure You Have Brand Name COREG®

To ensure you get this brand name medication, look for the distinctive shape and marking of COREG®. 3.125 mg tablets are white, oval-shaped with "3B" embossed. Larger doses appear elongated, white, with a smaller oval inside.

---

## What is COREG?

If you've been diagnosed with hypertension, heart failure or have suffered a recent heart attack, COREG can help you get back to your life. COREG can help lower high

**Select Safety Information for COREG®**

**Do not abruptly stop taking COREG®**, as it may lead to acute exacerbation of coronary artery disease upon cessation of therapy. Bradycardia, hypotension, worsening heart failure/fluid retention may occur. Discuss these symptoms with your doctor. **Tell your doctor about all the medications you take.** Certain other medications may affect how COREG® works.

**COREG for Hypertension**     **COREG for Heart Attack that Reduced**     **COREG for Heart Failure**

Document title: COREG® Home - Coreg® (carvedilol) Tablets
Capture URL: https://coreg.com/
Capture timestamp (UTC): Fri, 24 Jan 2025 22:03:19 GMT

Add210

If you've been diagnosed with hypertension, heart failure or have suffered a recent heart attack, COREG can help you get back to your life. COREG can help lower high blood pressure to combat hypertension and can improve survival for patients with post-heart attack LVD or heart failure.

See what COREG can do for you.

### COREG for Hypertension

Hypertension is another name for high blood pressure — a disease that causes the heart to work harder than normal and puts a strain on the heart and arteries. Left untreated, hypertension can eventually lead to serious conditions, such as heart attack, stroke, heart failure or kidney failure.

COREG can effectively lower blood pressure without worsening blood sugar or cholesterol levels.

[Learn More]

### COREG for Heart Attack that Reduced How Well Your Heart Pumps

If you've had a heart attack that reduced how well your heart pumps, you are probably worried about your health. But many people who have had a heart attack that reduced how well your heart pumps recover and are able to enjoy life as they did before.

COREG can help improve your heart health. Adding COREG to your current therapy could help prevent another heart attack.

[Learn More]

### COREG for Heart Failure

If you have heart failure, COREG can help. COREG is in the class of drugs called beta-blockers, and is approved by the FDA for the treatment of mild, moderate, or severe heart failure. It helps to lower the heart rate and make the heart pump better. COREG can help people with heart failure live longer and stay out of the hospital.

[Learn More]

## Taking Control of Your Heart Health Plan



Talking with Your Doctor ›



Taking COREG ›

## IMPORTANT SAFETY INFORMATION AND INDICATIONS

**Do not abruptly stop taking COREG®**, as it may lead to acute exacerbation of coronary artery disease upon cessation of therapy.
**Bradycardia, hypotension, worsening heart failure/fluid retention may occur.** Discuss these symptoms with your doctor.
**Tell your doctor about all the medications you take.** Certain other medications may affect how COREG® works.

**Do not** take COREG® if you have any of the following:

- Bronchial asthma or related bronchospastic conditions
- Second- or third-degree AV block.
- Sick sinus syndrome.
- Severe bradycardia (unless permanent pacemaker in place).
- Patients in cardiogenic shock or decompensated heart failure requiring the use of IV inotropic therapy
- Severe hepatic (liver) impairment.
- History of serious hypersensitivity reaction (e.g., Stevens-Johnson syndrome, anaphylactic reaction, angioedema) to carvedilol or any of the components of COREG®.

## SIDE EFFECTS

Select Safety Information for COREG®



Talking with Your Doctor ›    Taking COREG ›

## IMPORTANT SAFETY INFORMATION AND INDICATIONS

**Do not abruptly stop taking COREG**®, as it may lead to acute exacerbation of coronary artery disease upon cessation of therapy.

**Bradycardia, hypotension, worsening heart failure/fluid retention may occur.** Discuss these symptoms with your doctor.

**Tell your doctor about all the medications you take.** Certain other medications may affect how COREG® works.

**Do not** take COREG® if you have any of the following:

- Bronchial asthma or related bronchospastic conditions
- Second- or third-degree AV block.
- Sick sinus syndrome.
- Severe bradycardia (unless permanent pacemaker in place).
- Patients in cardiogenic shock or decompensated heart failure requiring the use of IV inotropic therapy
- Severe hepatic (liver) impairment.
- History of serious hypersensitivity reaction (e.g., Stevens-Johnson syndrome, anaphylactic reaction, angioedema) to carvedilol or any of the components of COREG®.

## SIDE EFFECTS

The most commonly reported side effects were:

- Allergy
- chest pain, discomfort, tightness, or heaviness
- dizziness, lightheadedness, or fainting
- generalized swelling or swelling of the feet, ankles, or lower legs
- pain
- shortness of breath
- slow heartbeat
- weight gain

You are encouraged to report negative side effects of prescription drugs to the FDA.

Visit www.fda.gov/medwatch or call 1-800-FDA-1088.

**These highlights do not include all the information needed to use COREG® safely and effectively. See full prescribing information for COREG®.**

**Please read the accompanying** Medication Guide **for COREG®, including the information about birth defects if taken during pregnancy, and discuss it with your doctor.**

**The physician** Prescribing Information **also is available.**

© 2024 - Wayln Therapeutics LLC. All Rights Reserved. WT-COR-USA-0001



# EXHIBIT 1F

**Drugs.com**
Know more. Be sure.

Search Drugs.com

Sign In | Register

Browse all medications: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9

Advanced Search

**Drugs A-Z**  **Pill Identifier**  **Interaction Checker**  **Compare Drugs**  **News**  **Pro Edition**  **More...**    **Help & Support**

Home › Pill Identifier › Search › S 10 Logo

🖨 Print    💾 Save

# S 10 Logo Pill - yellow round, 9mm

Generic Name: empagliflozin

Pill with imprint **S 10 Logo** is Yellow, Round and has been identified as Jardiance 10 mg. It is supplied by Boehringer Ingelheim Pharmaceuticals, Inc.

Jardiance is used in the treatment of Chronic Kidney Disease; Heart Failure; Type 2 Diabetes; Cardiovascular Risk Reduction and belongs to the drug class SGLT-2 inhibitors. Risk cannot be ruled out during pregnancy. Jardiance 10 mg is not a controlled substance under the Controlled Substances Act (CSA).

## Images for S 10 Logo



### Jardiance

**Generic Name:** empagliflozin

**Imprint:** S 10 Logo

**Strength:** 10 mg

**Color:** Yellow

**Size:** 9.00 mm

**Shape:** Round

**Availability:** Prescription only

**Drug Class:** SGLT-2 inhibitors

**Pregnancy Category:** C - Risk cannot be ruled out

**CSA Schedule:** Not a controlled drug

**Labeler / Supplier:** Boehringer Ingelheim Pharmaceuticals, Inc.

**National Drug Code (NDC):** 00597-0152

[Drug Uses]  [Add to Drug List]  [Print]

Get help with Imprint Code FAQs.

### DRUG STATUS



**Availability**
Prescription only

**Pregnancy & Lactation**
Risk data available

**CSA Schedule***
Not a controlled drug

**Approval History**
Drug history at FDA



**User Reviews & Ratings**

5.3 / 10        322 Reviews

### We recommend

Medi-Dose/EPS Announces New Label Color for Medication Requiring Special Handling
US Pharmacist, 2019

Let's Get to the Point!
Matthew Grissinger, US Pharmacist, 2008

Generic Pharmaceuticals 2009: The Road Ahead
Greenstone LLC, US Pharmacist, 2008

Graphic Changes Aid Identification of Active OTC Ingredients
By  staff, US Pharmacist, 2016

New Pantoprazole Oral Liquid Option
US Pharmacist, 2023

Medi-Dose®, Inc. / EPS®, Inc. Announces LiquiDose® Direct Thermal Butterfly Labels in Five New Colors
US Pharmacist, 2020

Medi-Dose(R), Inc. / EPS(R), Inc. Announces LiquiDose(R) Direct Thermal Butterfly Labels in Five New Colors
US Pharmacist, 2020





**Drug Uses**   Add to Drug List   Print

Get help with Imprint Code FAQs.



Medi-Dose®, Inc. / EPS®, Inc. Announces LiquiDose® Direct Thermal Butterfly Labels
US Pharmacist, 2020

Medi-Dose(R), Inc. / EPS(R), Inc. Announces LiquiDose(R) Direct Thermal Butterfly Labels in Five New Colors ⬈
US Pharmacist, 2020

Changes in Generic Pill Appearance Affect Medication Adherence ⬈
By staff, US Pharmacist, 2020

Powered by TREND MD ⚙

**Related News**



Weight Loss Meds Help Stroke Survivors Prevent Stroke Recurrence, Death

### Related images for "S 10 Logo"



Synjardy



Synjardy XR



No image available

Gabapentin

3. Top-Rated Pain Pills for Fast Relief      ›      4. Best Sleeping Pills for Insomnia      ›

Was this page helpful?       

## More about Jardiance (empagliflozin)

- Check interactions

- Compare alternatives

- Pricing & coupons

- Reviews (322)

- Drug images

- Side effects

- Dosage information

- Patient tips

- During pregnancy

- Support group

- FDA approval history

- Drug class: SGLT-2 inhibitors

- Breastfeeding

- En español

### Patient resources

- Jardiance drug information

### Professional resources

- Jardiance prescribing information

- Empagliflozin (AHFS Monograph)

### Related treatment guides

- Chronic Kidney Disease

- Heart Failure

- Type 2 Diabetes

- Cardiovascular Risk Reduction

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer

Document title: S 10 Logo Pill Yellow Round 9mm - Pill Identifier
Capture URL: https://www.drugs.com/imprints/s-10-logo-22340.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:04:37 GMT

Add216

- Breastfeeding
- En español

## Patient resources

- Jardiance drug information

## Professional resources

- Jardiance prescribing information
- Empagliflozin (AHFS Monograph)

## Related treatment guides

- Chronic Kidney Disease
- Heart Failure
- Type 2 Diabetes
- Cardiovascular Risk Reduction

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



**Drugs.com Mobile App**

Access drug & treatment information, identify pills, check interactions and set up personal medication records.

**About**
About Drugs.com
Advertising policy
Attribution & citations

**Terms & privacy**
Terms of use
Editorial policy
Privacy policy

**Support**
Help center
Sitemap
Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.


**Discover a Treatment Option**
If you are affected by **Diabetes, Type 2**, help may be at hand.
Learn more

Document title: S 10 Logo Pill Yellow Round 9mm - Pill Identifier
Capture URL: https://www.drugs.com/imprints/s-10-logo-22340.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:04:37 GMT

# EXHIBIT 1G



# Drugs.com
### Know more. Be sure.

Browse all medications: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9

**Advanced Search**

Sign In

Drugs A-Z  Pill Identifier  Interaction Checker  Compare Drugs  News  Pro Edition  More...  Help & Support

Home › Pill Identifier › Search › HH 342

🖨 Print   🔖 Save

# HH 342 Pill - brown capsule/oblong, 11mm

Pill with imprint **HH 342** is Brown, Capsule/Oblong and has been identified as Valsartan 80 mg. It is supplied by Solco Healthcare U.S., LLC.

Valsartan is used in the treatment of High Blood Pressure; Left Ventricular Dysfunction; Heart Failure; Heart Attack and belongs to the drug class angiotensin receptor blockers. There is positive evidence of human fetal risk during pregnancy. Valsartan 80 mg is not a controlled substance under the Controlled Substances Act (CSA).

## Images for HH 342





**Valsartan**

**Imprint:** HH 342

**Strength:** 80 mg

**Color:** Brown

**Size:** 11.00 mm

**Shape:** Capsule/Oblong

**Availability:** Prescription only

**Drug Class:**
Angiotensin receptor blockers

**Pregnancy Category:**
D - Positive evidence of risk

**CSA Schedule:**
Not a controlled drug

**Labeler / Supplier:**
Solco Healthcare U.S., LLC

**Manufacturer:** Zhejiang Huahai Pharmaceutical Co., Ltd

**National Drug Code (NDC):**
43547-0368

**Inactive Ingredients:**
microcrystalline cellulose, crospovidone, silicon dioxide, magnesium stearate, titanium dioxide, polyethylene glycol 3350, magnesium silicate, polyvinyl alcohol, ferric oxide yellow, ferric oxide

### DRUG STATUS



**Availability**
Prescription only

**Pregnancy & Lactation**
Risk data available

**CSA Schedule***
Not a controlled drug

**Approval History**
Drug history at FDA



User Reviews & Ratings

 5.6 / 10    150 Reviews

**Related News**

One Type of Blood Pressure Med May Help Prevent Post-Stroke Epilepsy

Document title: HH 342 Pill Brown Capsule/Oblong - Pill Identifier
Capture URL: https://www.drugs.com/imprints/hh-342-23594.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:05:36 GMT

Add219



43547-0368

**Inactive Ingredients:**

microcrystalline cellulose, crospovidone, silicon dioxide, magnesium stearate, titanium dioxide, polyethylene glycol 3350, magnesium silicate, polyvinyl alcohol, ferric oxide yellow, ferric oxide red

Note: Inactive ingredients may vary.

| Drug Uses | Add to Drug List | Print |
|---|---|---|

Get help with Imprint Code FAQs.

Was this page helpful?   

## More about valsartan

- Check interactions
- Compare alternatives
- Pricing & coupons
- Reviews (150)
- Drug images
- Side effects
- Dosage information
- Patient tips
- During pregnancy
- Support group
- Drug class: angiotensin receptor blockers
- Breastfeeding
- En español

## Patient resources

- Valsartan drug information

Document title: HH 342 Pill Brown Capsule/Oblong - Pill Identifier
Capture URL: https://www.drugs.com/imprints/hh-342-23594.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:05:36 GMT

Add220

Patient resources

- Valsartan drug information
- Valsartan Tablets
- Valsartan Capsules

Other brands

Diovan, Prexxartan

## Professional resources

- Valsartan monograph
- Valsartan Oral Solution (FDA)

### Other brands

Diovan, Prexxartan

## Related treatment guides

- High Blood Pressure
- Left Ventricular Dysfunction
- Heart Failure
- Heart Attack

# Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



### Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.

About
About Drugs.com
Advertising policy
Attribution & citations

Terms & privacy
Terms of use
Editorial policy
Privacy policy

Support
Help center
Sitemap
Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12

- Valsartan Capsules

### Other brands

Diovan, Prexxartan

## Professional resources

- Valsartan monograph
- Valsartan Oral Solution (FDA)

### Other brands

Diovan, Prexxartan

## Related treatment guides

- High Blood Pressure
- Left Ventricular Dysfunction
- Heart Failure
- Heart Attack

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



# Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.



**About**
About Drugs.com
Advertising policy
Attribution & citations

**Terms & privacy**
Terms of use
Editorial policy
Privacy policy

**Support**
Help center
Sitemap
Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.



**Discover a Treatment Option**
If you are affected by **Diabetes, Type 2**, help may be at hand.

Learn more

Document title: HH 342 Pill Brown Capsule/Oblong - Pill Identifier
Capture URL: https://www.drugs.com/imprints/hh-342-23594.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:05:36 GMT

Add222

# EXHIBIT 1H

Sign In

**Drugs.com**
Know more. Be sure.

Browse all medications: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9

Advanced Search

Drugs A-Z    Pill Identifier    Interaction Checker    Compare Drugs    News    Pro Edition    More...    Help & Support

Home › Pill Identifier › Search › MSD 106 PRINIVIL

Print    Save

# MSD 106 PRINIVIL Pill - yellow u-shape, 10mm

**Generic Name:** lisinopril

Pill with imprint **MSD 106 PRINIVIL** is Yellow, U-shape and has been identified as Prinivil 10 mg. It is supplied by Merck & Company Inc.

Prinivil is used in the treatment of Heart Attack; High Blood Pressure; Heart Failure and belongs to the drug class Angiotensin Converting Enzyme Inhibitors. There is positive evidence of human fetal risk during pregnancy. Prinivil 10 mg is not a controlled substance under the Controlled Substances Act (CSA).

## Images for MSD 106 PRINIVIL



### Prinivil

**Generic Name:** lisinopril

**Imprint:** MSD 106 PRINIVIL

**Strength:** 10 mg

**Color:** Yellow

**Size:** 10.00 mm

**Shape:** U-shape

**Availability:** Prescription only

**Drug Class:**
Angiotensin Converting Enzyme Inhibitors

**Pregnancy Category:**
D - Positive evidence of risk

**CSA Schedule:**
Not a controlled drug

**Labeler / Supplier:**
Merck & Company Inc.

**National Drug Code (NDC):**
00006-0106 (Discontinued)

**Inactive Ingredients:**
calcium phosphate dihydrate diabasic, mannitol, magnesium stearate, corn starch, ferric oxide yellow

Note: Inactive ingredients may vary.

### DRUG STATUS



**Availability**
Prescription only

**Pregnancy & Lactation**
Risk data available

**CSA Schedule***
Not a controlled drug

**Approval History**
Drug history at FDA



User Reviews & Ratings

5.8 / 10          11 Reviews

Document title: MSD 106 PRINIVIL Pill Yellow U-shape - Pill Identifier
Capture URL: https://www.drugs.com/imprints/msd-106-prinivil-193.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:06:49 GMT

Add224



00000-0105 (Discontinued)

**Inactive Ingredients**
calcium phosphate dihydrate dibasic, mannitol, magnesium stearate, corn starch, ferric oxide yellow

Note: Inactive ingredients may vary.

[ Drug Uses ]  [ Add to Drug List ]  [ Print ]

Get help with Imprint Code FAQs.

Sponsored Listings for

1. Best Hypertension Medications ❯
2. 10 Best Blood Pressure Meds ❯
3. Best Arthritis Pain Medication ❯
4. Top 10 ADHD Medications ❯

Was this page helpful?  👍 👎

## More about Prinivil (lisinopril)

- Check interactions
- Compare alternatives
- Reviews (11)
- Drug images
- Side effects
- Dosage information
- Patient tips
- During pregnancy
- Drug class: Angiotensin Converting Enzyme Inhibitors
- Breastfeeding
- En español

### Patient resources

- Prinivil drug information

### Other brands

Zestril, Qbrelis

### Professional resources

- Prinivil prescribing information
- Lisinopril (AHFS Monograph)

Document title: MSD 106 PRINIVIL Pill Yellow U-shape - Pill Identifier
Capture URL: https://www.drugs.com/imprints/msd-106-prinivil-193.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:06:49 GMT

Add225

Patient resources

- Prinivil drug information

### Other brands

Zestril, Qbrelis

## Professional resources

- Prinivil prescribing information
- Lisinopril (AHFS Monograph)

### Other brands

Zestril, Qbrelis

## Related treatment guides

- Heart Attack
- Heart Failure
- High Blood Pressure

# Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



**Drugs.com Mobile App**

Access drug & treatment information, identify pills, check interactions and set up personal medication records.



**About**

About Drugs.com
Advertising policy
Attribution & citations

**Terms & privacy**

Terms of use
Editorial policy
Privacy policy

**Support**

Help center
Sitemap
Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.



**Discover a Treatment Option**

If you are affected by **Ulcerative Colitis**, help may be at hand.

Learn more

Document title: MSD 106 PRINIVIL Pill Yellow U-shape - Pill Identifier
Capture URL: https://www.drugs.com/imprints/msd-106-prinivil-193.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:06:49 GMT

Add226

# EXHIBIT 1I



**Drugs.com**
Know more. Be sure.

Browse all medications: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9

Advanced Search

Sign In

Drugs A-Z    Pill Identifier    Interaction Checker    Compare Drugs    News    Pro Edition    More...    Help & Support

Home › Pill Identifier › Search › E 46

🖨 Print    💾 Save

# E 46 Pill - green oval, 10mm

Pill with imprint **E 46** is Green, Oval and has been identified as Losartan Potassium 50 mg. It is supplied by Aurobindo Pharma.

Losartan is used in the treatment of High Blood Pressure; Diabetic Kidney Disease and belongs to the drug class angiotensin receptor blockers. There is positive evidence of human fetal risk during pregnancy. Losartan 50 mg is not a controlled substance under the Controlled Substances Act (CSA).

## Images for E 46



**DRUG STATUS**



Rx **Availability**
Prescription only

**Pregnancy & Lactation**
Risk data available

N/A **CSA Schedule***
Not a controlled drug

**Approval History**
Drug history at FDA



**User Reviews & Ratings**


4.5 / 10    570 Reviews

**Related News**

One Type of Blood Pressure Med May Help Prevent Post-Stroke Epilepsy

### Losartan Potassium

**Imprint:** E 46

**Strength:** 50 mg

**Color:** Green

**Size:** 10.00 mm

**Shape:** Oval

**Availability:** Prescription only

**Drug Class:**
Angiotensin receptor blockers

**Pregnancy Category:**
D - Positive evidence of risk

**CSA Schedule:**
Not a controlled drug

**Labeler / Supplier:**
Aurobindo Pharma

**National Drug Code (NDC):**
65862-0202

**Inactive Ingredients:**
microcrystalline cellulose, lactose monohydrate, corn starch, low substituted hydroxypropyl cellulose, magnesium stearate, hydroxypropyl cellulose, hypromellose 2910 (6 mPa.s), titanium dioxide, FD&C Blue No. 2, D&C Yellow No. 10, water

Note: Inactive ingredients may vary.



corn starch, low substituted hydroxypropyl cellulose, magnesium stearate, hydroxypropyl cellulose, hypromellose 2910 (6 mPa.s), titanium dioxide, FD&C Blue No. 2, D&C Yellow No. 10, water

Note: Inactive ingredients may vary.



**Drug Uses**    Add to Drug List    Print

Get help with Imprint Code FAQs.



## Related images for "E 46"



Cytotec



Lisdexamfetamine Dimesylate



Lisdexamfetamine Dimesylate

Was this page helpful?     

## More about losartan

- Check interactions
- Compare alternatives
- Pricing & coupons

Document title: E 46 Pill Green Oval 10mm - Pill Identifier
Capture URL: https://www.drugs.com/imprints/e-46-16422.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:07:49 GMT

Add229

- Compare...
- Pricing & coupons
- Reviews (570)
- Drug images
- Side effects
- Dosage information
- Patient tips
- During pregnancy
- Support group
- Drug class: angiotensin receptor blockers
- Breastfeeding
- En español

## Patient resources

- Losartan drug information

## Other brands

Cozaar

## Professional resources

- Losartan Potassium monograph
- Losartan (FDA)

## Other brands

Cozaar

## Related treatment guides

- High Blood Pressure
- Diabetic Kidney Disease
- Alport Syndrome

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



## Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.

Document title: E 46 Pill Green Oval 10mm - Pill Identifier
Capture URL: https://www.drugs.com/imprints/e-46-16422.html
Capture timestamp (UTC): Fri, 24 Jan 2025 22:07:49 GMT

Add230

- Losartan drug information

### Other brands

Cozaar

### Professional resources

- Losartan Potassium monograph
- Losartan (FDA)

### Other brands

Cozaar

### Related treatment guides

- High Blood Pressure
- Diabetic Kidney Disease
- Alport Syndrome

## Further information

Always consult your healthcare provider to ensure the information displayed on this page applies to your personal circumstances.

Medical Disclaimer



# Drugs.com Mobile App

Access drug & treatment information, identify pills, check interactions and set up personal medication records.

**About**

About Drugs.com

Advertising policy

Attribution & citations

**Terms & privacy**

Terms of use

Editorial policy

Privacy policy

**Support**

Help center

Sitemap

Contact us

Subscribe to our newsletter for the latest medication news, new drug approvals and FDA alerts.

Drugs.com provides accurate and independent information on more than 24,000 prescription drugs, over-the-counter medicines and natural products. This material is provided for educational purposes only and is not intended for medical advice, diagnosis or treatment. Data sources include Micromedex (updated 2 Dec 2024), Cerner Multum™ (updated 12 Jan 2025), ASHP (updated 12 Jan 2025) and others.



**Discover a Treatment Option**

If you are affected by **Ulcerative Colitis**, help may be at hand.

Learn more

# EXHIBIT 32



**Not an actual patient.**

# Starting with ENTRESTO®:
Scan the QR code to learn more about initiating ENTRESTO

## ENTRESTO IS AVAILABLE IN THREE DOSAGE STRENGTHS[1]







LOW
STARTING DOSE
**24/26 mg twice daily**

Pills shown not actual size.

RECOMMENDED
STARTING DOSE
**49/51 mg twice daily**

TARGET DOSE
**97/103 mg
twice daily**

Please <u>click here</u> for full Prescribing Information, including **Boxed WARNING**.

For complete dosing information, scan here:





Entresto®
(sacubitril/valsartan) tablets
24/26mg • 49/51mg • 97/103mg

Add233



Document title: Digital Dosing Card 09-22.pdf
Capture URL: https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/hcp-dosing-flashcard.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 19:44:54 GMT



# Entresto®
(sacubitril/valsartan) tablets
24/26mg • 49/51mg • 97/103mg

For complete dosing information, scan here or visit:
**www.EntrestoHCP.com**

Please **click here** for full Prescribing Information,
including **Boxed WARNING.**



**Reference: 1.** ENTRESTO [prescribing information]. East Hanover, NJ: Novartis Pharmaceuticals Corp.

ENTRESTO and the ENTRESTO logo are registered trademarks of Novartis AG.



**Novartis Pharmaceuticals Corporation**
East Hanover, New Jersey 07936-1080

© 2022 Novartis

9/22

229104

Document title: Digital Dosing Card 09-22.pdf
Capture URL: https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/hcp-dosing-flashcard.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 19:44:54 GMT

# EXHIBIT 42



# HEADING HOME
## WITH ENTRESTO®
### Follow the 4 steps below

## 1 Start
Start taking your ENTRESTO prescription as soon as advised by your doctor. See inside to learn how to save.

## 2 Follow up
Follow up within 7 to 14 days to lower the risk of hospitalization. Schedule an appointment and stay on top of it!

## 3 Prepare
Prepare for your doctor visit. Fill out the enclosed Doctor Discussion Guide and note any symptoms and questions you may have.

## 4 Prioritize
Prioritize Heart Failure. It's an ongoing condition that can get worse over time and needs your attention.

**What is ENTRESTO?**
ENTRESTO is a prescription medicine used to treat adults with long-lasting (chronic) heart failure to help reduce the risk of death and hospitalization. ENTRESTO works better when the heart cannot pump a normal amount of blood to the body.

**IMPORTANT SAFETY INFORMATION**
**What is the most important information I should know about ENTRESTO?**
ENTRESTO can harm or cause death to your unborn baby. Talk to your doctor about other ways to treat heart failure if you plan to become pregnant. Tell your doctor right away if you become pregnant during treatment with ENTRESTO.

**See additional Important Safety Information throughout and on page 5. Please click here for full Prescribing Information.**

Document Title: Heading Home with Entresto
Capture Url: https://www.entrestohcp.com/sites/entrestohcp_com/files/ documents/heading-home-digital-kit_1.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 17:47:24 GMT

# HOW TO TAKE ENTRESTO®

**ENTRESTO is a twice-daily medicine.** You should take your dose of ENTRESTO exactly as prescribed by your doctor. ENTRESTO is usually given with other Heart Failure medicines in place of an ACE inhibitor or other ARB. **Take ENTRESTO every day as prescribed. If you stop taking ENTRESTO, the medicine will stop working for you.**

### ENTRESTO is a tablet that comes in the following doses:


**24/26 mg**


**49/51 mg**


**97/103 mg**

**If you have been prescribed ENTRESTO and are currently taking an ACE inhibitor\*:**



STOP

**Stop taking your ACE inhibitor\***



WAIT

**Wait for 36 hours**



GO

**Start taking ENTRESTO, as prescribed**

\*Such as enalapril or lisinopril.

**IMPORTANT SAFETY INFORMATION (cont)**

**Tell your doctor about all the medicines you take**, including prescription and over-the-counter medicines, vitamins, and herbal supplements. Especially tell your doctor if you take potassium supplements or a salt substitute; nonsteroidal anti-inflammatory drugs (NSAIDs); lithium; or other medicines for high blood pressure or heart problems such as an ACE inhibitor, ARB, or aliskiren.

**Do not take ENTRESTO if you:**
- are allergic to any of the ingredients in ENTRESTO
- have had an allergic reaction including swelling of your face, lips, tongue, throat (angioedema), or trouble breathing while taking a type of medicine called an angiotensin-converting enzyme (ACE) inhibitor or angiotensin II receptor blocker (ARB)

**See additional Important Safety Information throughout and on page 5. Please <u>click here</u> for full Prescribing Information.**

**Entresto®**
(sacubitril/valsartan) tablets
24/26 mg • 49/51 mg • 97/103 mg

2

Document Title: Heading Home with Entresto
Capture Url: https://www.entrestohcp.com/sites/entrestohcp_com/
files/ documents/heading-home-digital-kit_1.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 17:47:24 GMT

# HELPFUL TOOLS FOR
# GETTING STARTED ON ENTRESTO®

 

## Sign up for free lifestyle and treatment support

The ENSPIRE Program from ENTRESTO® provides tips and tools to support you as you manage your Heart Failure, including resources that can help you keep track of your medications, stay active, and eat healthier.

## Ways to enroll in the ENSPIRE Program from ENTRESTO®

 Call **1-888-368-7378**
(Monday–Friday, excluding holidays,
8:00 AM to 8:00 PM ET)

 **Click here** to enroll.

### Additional Resources
The resources below will help you understand what to expect with ENTRESTO and prepare for your next appointment.

• Download the **Doctor Discussion Guide here**

• Download the brochure **"Getting Started on ENTRESTO" here**

---

**IMPORTANT SAFETY INFORMATION (cont)**

**Do not take ENTRESTO if you (cont):**

• take an ACE inhibitor medicine. Do not take ENTRESTO for at least 36 hours before or after you take an ACE inhibitor medicine. Talk with your doctor or pharmacist before taking ENTRESTO if you are not sure if you take an ACE inhibitor medicine

• have diabetes and take a medicine that contains aliskiren

**See additional Important Safety Information throughout and on page 5. Please click here for full Prescribing Information.**



Entresto®
(sacubitril/valsartan) tablets
24/26mg • 49/51mg • 97/103mg

Document Title: Heading Home with Entresto
Capture Url: https://www.entrestohcp.com/sites/entrestohcp_com/
files/ documents/heading-home-digital-kit_1.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 17:47:24 GMT

# 30-Day Free Trial Offer

For all patients (regardless of insurance) when initiating treatment.
This voucher is good for a 30-day (maximum 60 tablets, one-time use)
free trial of ENTRESTO® at no cost to you. One per patient. Limitations apply.



 **Just bring these pre-activated codes to your pharmacy with a valid prescription to redeem!**

## $10 Co-Pay Offer



- For eligible commercially/privately insured patients.
  Pay as little as $10 for up to a 90-day fill
- To sign up call **1-888-368-7378** or **click here**

Once you sign up, your co-pay registration will automatically be renewed at the beginning of each calendar year (annual limit of $4100).
Not valid under Medicare, Medicaid, or any other federal or state program.
Limitations apply. See Terms and Conditions here.

**See patient stories, recipes, and helpful tips for living with Heart Failure on our YouTube channel and Facebook page**

 **Facebook.com/entresto**     **@entresto_sacubitril_valsartan**     **YouTube.com/LivingWithHF**

**Visit our website** to learn more about these offers and to enroll.

The Novartis Patient Assistance Foundation, also known as NPAF, provides Novartis medicines at no cost to eligible US patients who have **limited or no prescription drug coverage** and cannot afford the cost of their medication. If eligible, Novartis medications may be available for free.

Call NPAF at **1-800-277-2254** or visit **www.PAP.Novartis.com** for more information or to download an application.

### IMPORTANT SAFETY INFORMATION (cont)

**Before taking ENTRESTO tell your doctor about all of your medical conditions, including if you:**
- have a history of hereditary angioedema
- have kidney or liver problems
- have diabetes
- are pregnant or plan to become pregnant; are breastfeeding or plan to breastfeed. You should not breastfeed during treatment with ENTRESTO

**See additional Important Safety Information throughout and on page 5. Please** click here **for full Prescribing Information.**


24/26mg • 49/51mg • 97/103mg

Document Title: Heading Home with Entresto
Capture Url: https://www.entrestohcp.com/sites/entrestohcp_com/
files/ documents/heading-home-digital-kit_1.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 17:47:24 GMT

4

## What is ENTRESTO®?

ENTRESTO is a prescription medicine used to treat adults with long-lasting (chronic) heart failure to help reduce the risk of death and hospitalization. ENTRESTO works better when the heart cannot pump a normal amount of blood to the body.

### IMPORTANT SAFETY INFORMATION

### What is the most important information I should know about ENTRESTO?

ENTRESTO can harm or cause death to your unborn baby. Talk to your doctor about other ways to treat heart failure if you plan to become pregnant. Tell your doctor right away if you become pregnant during treatment with ENTRESTO.

**Do not take ENTRESTO if you:**
- are allergic to any of the ingredients in ENTRESTO
- have had an allergic reaction including swelling of your face, lips, tongue, throat (angioedema), or trouble breathing while taking a type of medicine called an angiotensin-converting enzyme (ACE) inhibitor or angiotensin II receptor blocker (ARB)
- take an ACE inhibitor medicine. Do not take ENTRESTO for at least 36 hours before or after you take an ACE inhibitor medicine. Talk with your doctor or pharmacist before taking ENTRESTO if you are not sure if you take an ACE inhibitor medicine
- have diabetes and take a medicine that contains aliskiren

**Before taking ENTRESTO tell your doctor about all of your medical conditions, including if you:**
- have a history of hereditary angioedema
- have kidney or liver problems
- have diabetes
- are pregnant or plan to become pregnant; are breastfeeding or plan to breastfeed. You should not breastfeed during treatment with ENTRESTO

**Tell your doctor about all the medicines you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements. Especially tell your doctor if you take potassium supplements or a salt substitute; nonsteroidal anti-inflammatory drugs (NSAIDs); lithium; or other medicines for high blood pressure or heart problems such as an ACE inhibitor, ARB, or aliskiren.

**What are the possible side effects of ENTRESTO? ENTRESTO may cause serious side effects including:**
- **swelling of your face, lips, tongue, and throat (angioedema) that may cause trouble breathing and death.** Get emergency medical help right away if you have symptoms of angioedema or trouble breathing. Do not take ENTRESTO again if you have had angioedema while taking ENTRESTO
- people who are Black or who have had angioedema and take ENTRESTO may have a higher risk of having angioedema
- **low blood pressure (hypotension),** which is common, and your risk of low blood pressure is greater if you also take water pills (diuretics). Call your doctor if you become dizzy or lightheaded, or you develop extreme tiredness (fatigue)
- **kidney problems,** which are common, and can be serious and can lead to kidney failure
- **increased amount of potassium in your blood (hyperkalemia),** which is common

The most common side effects also include cough and dizziness.

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit www.fda.gov/medwatch, or call 1-800-FDA-1088.



**Please click here for full Prescribing Information, including Boxed WARNING.**



**Novartis Pharmaceuticals Corporation**
East Hanover, New Jersey 07936-1080

© 2024 Novartis

6/24

441424

Document Title: Heading Home with Entresto
Capture Url: https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/heading-home-digital-kit_1.pdf
Capture timestamp (UTC): Fri, 24 Jan 2025 17:47:24 GMT

Add240

# EXHIBIT 96



An official website of the United States government Here's how you know ⌄

On Oct. 1, 2024, the FDA began implementing a reorganization impacting many parts of the agency. We are in the process of updating FDA.gov content to reflect these changes.

**FDA** U.S. FOOD & DRUG
ADMINISTRATION

🔍 Search    ☰ Menu

← Home  /  Drugs  /  Resources | Drugs  /  Information for Consumers and Patients | Drugs  /  Frequently Asked Questions on Popular Topics  /  Generic Drugs: Questions & Answers

# Generic Drugs: Questions & Answers

f Share   ✗ Post   in Linkedin   ✉ Email   🖨 Print

Spanish Language version - Medicamentos Genéricos: Preguntas y Respuestas (PDF - 213 KB)



- What are generic drugs?
- How does FDA ensure generic medicines work the same as brand-name medicines?
- Why does a generic drug look different from the brand drug?
- Why do generic medicines often cost less than the brand?
- What standards must generic medicines meet to receive FDA approval?
- Is a generic of my brand-name medicine available?
- How does FDA monitor side effects or safety issues with generic medicines?
- Where can I find more information about generic medicines?

**Frequently Asked Questions on Popular Topics**

Approved Drugs: Questions and Answers

Prescription Drugs and Over-the-Counter (OTC) Drugs: Questions and Answers

Generic Drugs: Questions & Answers

Content current as of:
03/16/2021

## What are generic drugs?

A generic drug is a medication created to be the same as an already marketed brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use. These similarities help to demonstrate bioequivalence, which means that **a generic medicine works in the same way and provides the same clinical benefit as the brand-name medicine.** In other words, you can take a generic medicine as an equal substitute for its brand-name counterpart.

**Patient Education**

Find fact sheets, infographics, and more!

| Additional Resource |
| --- |
| - Generic Drug Facts <br> At-a-glance information on generic medicines, including why they may look different or cost less than brand-name medicines. |

## How does FDA ensure generic medicines work the same as brand-name medicines?

look different or cost less than brand-name medicines.

## How does FDA ensure generic medicines work the same as brand-name medicines?

Any generic medicine must perform the same in the body as the brand-name medicine. It must be the same as a brand-name medicine in dosage,  form and route of administration, safety, effectiveness, strength, and labeling (with certain limited exceptions).  It must also meet the same high standards of quality and manufacturing as the brand-name product, and it must be and quality, taken and used in the same way as well. This standard applies to all generic medicines.

Generic medicines use the same active ingredients as brand-name medicines and work the same way, so they have the same risks and benefits as the brand-name medicines. The FDA Generic Drugs Program conducts a rigorous review to ensure generic medicines meet these standards, in addition to conducting inspections of manufacturing plants and monitoring drug safety after the generic medicine has been approved and brought to market.

A generic drug may have certain minor differences from the brand-name product, such as different inactive ingredients.

It is important to note that there will always be a slight, but not medically significant, level of expected variability—just as there is for one batch of brand-name medicine compared with the next batch of brand-name product. This variability can and does occur during manufacturing, for both brand-name and generic medicines. When a medicine, generic or brand-name, is mass produced, very small variations in purity, size, strength, and other parameters are permitted. FDA limits how much variability is acceptable.

For example, a very large research study[1] comparing generics with brand-name medicines, found there were very small differences (approximately 3.5%) in absorption into the body between generic and brand-name medicines. Some generics were absorbed slightly more, some slightly less. This amount of difference is expected and clinically acceptable, whether for one batch of brand-name medicine tested against another batch of the same brand, or for a generic tested against a brand-name medicine.

| Additional Resource |
| --- |
| • [Research study: Clinical equivalence of generic and brand-name drugs used in cardiovascular disease](#)<br>A study of 38 published clinical trials showed no evidence that brand-name heart medicines worked any better than generic heart medicines. |

## Why does a generic drug look different from the brand drug?

Trademark laws in the United States do not allow a generic drug to look exactly like other drugs already on the market. Generic medicines and brand-name medicines share the same active ingredient, but other characteristics, such as colors and flavorings, that do not affect the performance, safety, or effectiveness of the generic medicine, may be different.



Add243

the brand drug?

Trademark laws in the United States do not allow a generic drug to look exactly like other drugs already on the market. Generic medicines and brand-name medicines share the same active ingredient, but other characteristics, such as colors and flavorings, that do not affect the performance, safety, or effectiveness of the generic medicine, may be different.

---

### Additional Resource

- **The importance of the physical characteristics of generic drugs**
  Read a discussion of FDA's guidance recommending that generic applicants design and develop generic drugs with a similar size and shape to the brand name product.

---

## Why do generic medicines often cost less than the brand-name medicines?

Generic drugs are approved only after a rigorous review by FDA and after a set period of time that the brand product has been on the market exclusively. This is because new drugs, like other new products, are usually protected by patents that prohibit others from making and selling copies of the same drug.

Generic drugs tend to cost less than their brand-name counterparts because generic drug applicants do not have to repeat animal and clinical (human) studies that were required of the brand-name medicines to demonstrate safety and effectiveness. This abbreviated pathway is why the application is called an "*abbreviated* new drug application."

The reduction in upfront research costs means that, although generic medicines have the same therapeutic effect as their branded counterparts, they are typically sold at substantial discounts, an estimated 80 to 85% less, compared with the price of the brand-name medicine. According to the IMS Health Institute, generic drugs saved the U.S. healthcare system nearly $2.2 trillion from 2009 to 2019[2].

When multiple generic companies are approved to market a single product, more competition exists in the marketplace, which typically results in lower prices for patients.

Bringing more drug competition to the market and addressing the high cost of medicines is one of FDA's top priorities. In 2017, FDA announced the Drug Competition Action Plan (DCAP) to further encourage robust and timely market competition for generic drugs and help bring greater efficiency and transparency to the generic drug review process, without sacrificing the scientific rigor underlying our generic drug program.

## What standards must generic medicines meet to receive FDA approval?

Drug companies must submit an abbreviated new drug application (ANDA) to FDA for approval to market a generic drug that is the same as (or bioequivalent to) the brand product. FDA reviews the application to ensure drug companies have demonstrated that the generic medicine can be substituted for the brand-name medicine that it copies.


Top

Add244

FDA for approval to market a generic drug that is the same as (or bioequivalent to) the brand product. FDA reviews the application to ensure drug companies have demonstrated that the generic medicine can be substituted for the brand-name medicine that it copies.

An ANDA must show the generic medicine is equivalent to the brand in the following ways:

- The active ingredient is the same as that of the brand-name drug/innovator drug.

  - An active ingredient in a medicine is the component that makes it pharmaceutically active — effective against the illness or condition it is treating.

  - Generic drug companies must provide scientific evidence that shows that their active ingredient is the same as that of the brand-name medicine they copy, and FDA must review that evidence.

- The generic medicine is the same strength.

- The medicine is the same type of product (such as a tablet or an injectable).

- The medicine has the same route of administration (such as oral or topical).

- It has the same use indications.

- The inactive ingredients of the medicine are acceptable.

  - Some differences, which must be shown to have no effect on how the medicine functions, are allowed between the generic and the brand-name product.

  - Generic drug companies must submit evidence that all the ingredients used in their products are acceptable, and FDA must review that evidence.

- It lasts for at least the same amount of time.

  - Most medicines break down, or deteriorate, over time.

  - Generic drug companies must do months-long "stability tests" to show that their products last for at least the same amount of time as the brand-name product.

- It is manufactured under the same strict standards as the brand-name medicine.

  - It meets the same batch requirements for identity, strength, purity, and quality.

  - The manufacturer is capable of making the medicine correctly and consistently.

    - Generic drug manufacturers must explain how they intend to manufacture the medicine and must provide evidence that each step of the manufacturing process will produce the same result each time. FDA scientists review those procedures, and FDA inspectors go to the generic drug manufacturer's facility to verify that the manufacturer is capable of making the medicine consistently and to check that the information the manufacturer


Top

Document title: Generic Drugs: Questions & Answers | FDA
Capture URL: https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers
Capture timestamp (UTC): Wed, 29 Jan 2025 14:42:45 GMT

Add245

manufacture the medicine and must provide evidence that each step of the manufacturing process will produce the same result each time. FDA scientists review those procedures, and FDA inspectors go to the generic drug manufacturer's facility to verify that the manufacturer is capable of making the medicine consistently and to check that the information the manufacturer has submitted to FDA is accurate.

- Often, different companies are involved (such as one company manufacturing the active ingredient and another company manufacturing the finished medicine). Generic drug manufacturers must produce batches of the medicines they want to market and provide information about the manufacturing of those batches for FDA to review.

- The container in which the medicine will be shipped and sold is appropriate.

- The label is the same as the brand-name medicine's label.

  ○ The drug information label for the generic medicine should be the same as the brand-name label. One exception is if the brand-name drug is approved for more than one use and that use is protected by patents or exclusivities. A generic medicine can omit the protected use from its labeling and only be approved for a use that is not protected by patents or exclusivities, so long as that removal does not take away information needed for safe use. Labels for generic medicines can also contain certain changes when the drug is manufactured by a different company, such as a different lot number or company name.

- Relevant patents or exclusivities are addressed.

  ○ As an incentive to develop new medicines, drug companies are awarded patents and exclusivities that may delay FDA approval of applications for generic medicines. FDA must comply with the delays in approval that the patents and exclusivities impose.

The ANDA process does not, however, require the drug applicant to repeat costly animal and clinical (human studies) on ingredients or dosage forms already approved for safety and effectiveness. This allows generic medicines to be brought to market more quickly and at lower cost, allowing for increased access to medications by the public.

### Additional Resources

- [What Is the Approval Process for Generic Drugs?](#)
  Detailed information on the critical factors the FDA reviews to make sure a generic medicine is as safe and effective as the brand-name drug.

- [The Generic Drug Approval Process, CDER Conversation](#)
  An interview on how FDA reviews generic medicines with Ted Sherwood, Director, Office of Regulatory Operations, Office of Generic Drugs, Center for Drug Evaluation and Research.

- What Makes a Generic the Same as a Brand-Name Drug?
  Download a [high-resolution, printable PDF](#) of this infographic (PDF - 431



Add246

An interview on how FDA reviews generic medicines with Ted Sherwood, Director, Office of Program and Operations, Office of Generic Drugs, Center for Drug Evaluation and Research.

- What Makes a Generic the Same as a Brand-Name Drug?
  Download a [high-resolution, printable PDF](#) of this infographic (PDF - 431 KB).



## Is a generic of my brand-name medicine available?

In addition to asking your local pharmacist for assistance, there are three ways to find out if there is a generic of your brand-name medicine available:

- Use [Drugs@FDA](#), a catalog of FDA-approved drug products, including their drug labeling.
  - First, search by brand name.
  - Second, select the brand name product and note which products are listed under the section labeled "Therapeutic Equivalents for …"
  - Products that include an ANDA (not NDA) number next to the name are generic products.
- Use the online version of the [Orange Book](#).
  - First, search by proprietary or brand name. Note the active ingredient name.
  - Second, search again by the active ingredient name.
  - Scroll right to find the dosage form (for example: tablet) and strength.
  - Next, scroll right to the TE Code column. If the TE column contains a code beginning with "A," FDA has approved generic equivalents.
  - Finally, look at the column "Appl No." If the letter "A" appears before the number, that product is an FDA-approved generic for the brand-name drug.
  - For very recent approvals, consult [First Generic Drug Approvals](#).

If you are unable to locate a generic of your brand-name medicine, it may be that the brand-name medicine is still within the period of time when it has exclusive rights to the marketplace, which allows drug companies to recoup their costs for the initial research and marketing of the brand-name or innovator drug. It is only after both patent and other periods of exclusivity are resolved that FDA can approve a generic of the brand-name medicine.

## How Does FDA monitor side effects or safety issues with generic medicines?

FDA takes several actions to ensure safety and quality before and after a new or generic medicine is approved. When a generic drug application is submitted,


Top

Add247

resolved that FDA can approve a generic of the brand-name medicine.

## How Does FDA monitor side effects or safety issues with generic medicines?

FDA takes several actions to ensure safety and quality before and after a new or generic medicine is approved. When a generic drug application is submitted, FDA conducts a thorough examination of the data submitted by the applicant and evaluates information obtained by FDA investigators while inspecting the related testing and manufacturing facilities to ensure that every generic drug is safe, effective, high quality, and substitutable to the brand name drug.

FDA staff continually monitors all approved drug products, including generics, to make certain the medicines at all levels of the supply chain, from active pharmaceutical ingredients (APIs) to products being sold to consumers, are safe, effective, and high quality.

FDA also monitors and investigates reports of negative patient side effects or other reactions. The investigations may lead to changes in how a product (brand-name and generic) is used or manufactured, and FDA will make recommendations to health care professionals and the public if the need arises.

[MedWatch](#) is the FDA's medical product safety reporting program. Health professionals, patients and consumers can use MedWatch to voluntarily report a serious adverse event, product quality problem, product use/medication error, or therapeutic inequivalence/failure that is suspected to be associated with the use of an FDA-regulated drug, biologic, medical device, dietary supplement or cosmetic.

**Additional Resource**

- Postmarketing Surveillance of Generic Drugs
  Download a [high-resolution, printable PDF](#) of this infographic (PDF - 282 KB)



## Where can I find more information about generic medicines?

Contact your doctor, pharmacist, or other health care provider for information on generic medicines. For more information, you can also:

- [Visit the FDA Generic Drugs Program](#)
- Call 1-888-INFO-FDA

[1]Davit et al. Comparing generic and innovator drugs: a review of 12 years of bioequivalence data from the United States Food and Drug Administration. *Ann Pharmacother*. 2009;43(10):1583-97.

[2][Association for Accessible Medicines. 2020 Generic Drug & Biosimilars Access & Savings in the U.S. Report](#) . Available from:

Top

Add248

a serious adverse event, product quality problem, product use/medication error or therapeutic failure that is associated with the use of an FDA-regulated drug, biologic, medical device, dietary supplement or cosmetic.

**Additional Resource**

- Postmarketing Surveillance of Generic Drugs
  Download a [high-resolution, printable PDF](#) of this infographic (PDF - 282 KB)



## Where can I find more information about generic medicines?

Contact your doctor, pharmacist, or other health care provider for information on generic medicines. For more information, you can also:

- [Visit the FDA Generic Drugs Program](#)
- Call 1-888-INFO-FDA

[1]Davit et al. Comparing generic and innovator drugs: a review of 12 years of bioequivalence data from the United States Food and Drug Administration. *Ann Pharmacother*. 2009;43(10):1583-97.

[2][Association for Accessible Medicines. 2020 Generic Drug & Biosimilars Access & Savings in the U.S. Report](#) 🔗. Available from: [http://www.imshealth.com/en/thought-leadership/quintilesims-institute/reports](#) 🔗

## Resources

- [Drugs@FDA](#)
- [Orange Book](#)
- [First Generic Drug Approvals](#)
- [Patient Education Information](#)



| | | |
|---|---|---|
| [FDA Archive](#) | [Visitor Information](#) | [FOIA](#) |
| [About FDA](#) | [Website Policies / Privacy](#) | [HHS.gov](#) |
| [Accessibility](#) | [No FEAR Act](#) | [USA.gov](#) |
| | [Vulnerability Disclosure Policy](#) | |

Contact FDA   📘 𝕏 📷 in ▶      **FDA**      📞 1-888-INFO-FDA (1-888-463-6332)

Add249

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG, NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>NOVADOZ PHARMACEUTICALS LLC, MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED,<br><br>Defendants. | No. 25-CV-00849-EP-JRA |

## DECLARATION OF RAVIKUMAR NITHIYANANDAM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

1.      I am Executive Vice President at Defendants MSN Pharmaceuticals Inc. ("MSN Pharmaceuticals") and MSN Laboratories Private Limited ("MSN Laboratories"; together with MSN Pharmaceuticals, "MSN").  I have held this position since 2016.

2.      As Executive Vice President of MSN, I am familiar with and responsible for MSN's research and development activities, including for its products that are released in the United States through our distribution partner Novadoz Pharmaceuticals LLC ("Novadoz") under the NOVADOZ trademark.  In particular, I was responsible for the product development of MSN's sacubitril-

1

valsartan (Entresto generic) product. I make this declaration based on my personal knowledge.

**Development of MSN's sacubitril-valsartan (Entresto generic) product**

3.     MSN began developing its generic equivalent to Novartis's Entresto medication in approximately 2017. MSN submitted its application for U.S. Food and Drug Administration ("FDA") approval of that drug on July 7, 2019, using the abbreviated new drug application ("ANDA") process for generic medications that are bioequivalent and functionally identical to their branded counterpart.

4.     To be eligible for FDA approval through an ANDA, a generic drug must contain the same active ingredient(s) as the branded drug and must be in the same dosage form (e.g., tablet, capsule, or liquid). It must also deliver the same dose of the active ingredient as the branded drug in the same amount of time, which is known as "bioequivalence."

5.     As a result of these requirements, MSN's product, like Entresto, comes in three different tablet forms, each containing a different dose (24/26 mg tablet; 49/51 mg tablet; and 97/103 mg tablet) of the active ingredients sacubitril and valsartan.

6.     Every ANDA application must also contain a description of the physical appearance of the finished dosage form so FDA, as part of the approval process, can assess its efficacy and the extent to which the applicant has complied with the

2

regulatory preference for generics that visually reference their branded equivalents. Thus, MSN's 2019 ANDA contained the following images and other information about the MSN's tablets' proposed appearance:



7. MSN has made no changes to the appearance of its generic Entresto pills since submitting its ANDA. I understand that, in 2021, MSN provided samples to Novartis for testing. Those samples would have had the same physical attributes as shown in the image above, and the same physical attributes as the pills MSN now intends to market.

8. In selecting the shapes and colors of the tablets, MSN followed FDA guidance that generic tablets and capsules should have similar physical

3

characteristics to their branded equivalent. Indeed, in our experience, if we submit an ANDA for tablets that are significantly different in appearance from the branded drugs, FDA will require us to submit a special justification for that change.

9.     There are several other reasons why MSN followed this FDA guidance in developing the tablets for its generic version of Entresto:

10.     First, the shape, sizes and colors of these pills communicate important functional information to patients. MSN followed the common practice of using different colored pills to denote different doses of its drug. And MSN chose colors that reference the colors used for Entresto pills so that patients taking MSN's generic equivalent will be able to rely on visual cues they are familiar with from past practice to identify what drug and which dose they are taking.

11.     Additionally, MSN used very common colors that are ubiquitous in the pharmaceutical industry and are therefore readily available to procure and source efficiently.

12.     Second, MSN's pills are ovaloid-shaped because that shape is very easy for patients to swallow. Ovaloid-shaped pills are also easier and more cost-effective for MSN to manufacture, including because they allow for a simpler mold design, more efficient use of the mold space, and more efficient coating and packaging processes. Indeed, hundreds if not thousands of other drug companies choose that ovaloid shape for their tablets for these functional reasons.

4

13.     Third, MSN's selection of pill sizes was driven entirely by functional and regulatory concerns.  MSN followed the common industry practice of using a larger pill size to indicate a higher dose, again providing the functional benefit of making it easier for patients to know what dose they are taking.  This also has a regulatory benefit, because the regulatory approval process is streamlined when pill size within a product family varies proportionally with the dose.  MSN thus developed a high-dose pill in an industry-standard size that was similar to the size of the high-dose Entresto pill, as FDA recommends, and then developed medium- and low-dose pills that were proportionally smaller according to the smaller doses.

14.     Finally, MSN took appropriate steps to ensure there were no intellectual property rights associated with the appearance of Entresto pills and confirmed that Novartis owned no federal or state trademark registrations relating to the appearance of Entresto pill shapes, sizes, or colors.  Based on my years of experience working in the pharmaceutical industry, I am aware that there is a small number of oral medications for which manufacturers actually engage in consumer advertising that calls out the shape and/or color of the medication as having brand significance.  One example is Nexium, which is marketed as the "purple pill."  I am not aware, however, of Novartis ever engaging in this type of consumer advertising for Entresto or otherwise claiming that it owned exclusive rights in the common shapes, sizes, and colors of Entresto pills before it filed this lawsuit.

5

15.    Although MSN followed the FDA guidance in relying on certain functional features of the Entresto pill configuration, MSN's pills also differ in appearance from Entresto in important respects that distinguish these as generic products not produced by Novartis.  For example:

    a.    The markings on the pills are completely different.  Entresto pills are all marked "NVR" on one side (presumably meaning "Novartis").  MSN's pills are marked "M" instead.  On the other side, Entresto low, medium, and high dose pills are marked "LZ," "L1," and "L11" respectively.  MSN's pills are marked "S1," "S2," and "S3" instead.

    b.    MSN's pills come in three different sizes, whereas the low and medium doses of Entresto come in pills that are the same size (and only the highest dose comes in a larger pill).

    c.    The colors used on MSN's pills are darker than those used for Entresto pills.  For example, whereas the Entresto low dose pill is "violet white," MSN's low dose pill is a noticeably darker purple.

16.    In addition, none of MSN's labels or packaging materials refer to the brand names Entresto or Novartis in any way but instead use the separate brand name NOVADOZ that is registered and has been used by Novadoz for more than six years.

6

These differences in appearance ensure that MSN's generic pills can easily be differentiated from branded Entresto pills in the market.

17.    At no point did MSN or any of its affiliated companies seek to create any confusion in the marketplace about the source or affiliation of its generic products with Novartis or Entresto.  The opposite is true.  MSN, like other generics, does not engage in traditional consumer-facing marketing activities—it provides a generic equivalent to the branded product in the distribution channel and relies on its independent reputation as a reliable provider of safe and affordable alternatives to branded drugs.

18.    Not surprisingly, the appearance of every other FDA-approved Entresto generic drug for which that information is publicly available has obviously been driven by these same functional and regulatory considerations.  A chart showing the visual parameters included in other generic manufacturers' ANDAs and comparing them to the parameters used by MSN and by Entresto is attached hereto as **Exhibit 1**.  As shown in the chart:

  a.    Every other generic manufacturer differentiates the three dosages by using different colored pills;

  b.    Every other generic manufacturer uses a "violet white" or "off white" color for its low dose pill;

7

 c. Every other generic manufacturer uses a "pale yellow" or "light yellow" color for its medium dose pill;

 d. Every other generic manufacturer uses a "light pink" color for its high dose pill;

 e. Every other generic manufacturer's high dose pill is 15 mm in size;

 f. Every other generic manufacturer's medium and low dose pills are smaller than the high dose pill;

 g. Three of the other generic manufacturers use an oval shape for some or all of their pills.

19. Under its existing FDA approval, MSN cannot modify the physical attributes of its generic Entresto pills without undertaking extensive further research. Any modification of the surface area would change the pills' dissolution profile, which would influence the rate and extent of absorption of the active ingredients. Therefore, any material change in the dissolution profile would require further studies to demonstrate that the modified pills are still bioequivalent to Entresto. This process would take years to complete and substantial additional financial resources.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 06-FEB-2025

N. hna

Ravikumar Nithiyanandam

9

# EXHIBIT 1

| Sacubitril and Valsartan Tablets – Innovator and Generics comparison | | | | | | |
|---|---|---|---|---|---|---|
| Parameters | ENTRESTO (NOVARTIS PHARMS CORP) | MSN Laboratories Private Limited (Novadoz Pharmaceuticals LLC) | Torrent Pharmaceuticals Limited | Laurus Labs Limited | Ascend Laboratories, LLC | Alembic Pharmaceuticals Inc. |
| NDA/ANDA # | NDA 207620 | ANDA 213748 | ANDA 213604 | ANDA 213676 | ANDA 213674 | ANDA 213682 |
| **Description** | | | | | | |
| 24 mg / 26 mg | Violet white unscored, ovaloid, biconvex, film-coated tablets debossed with "NVR" on one side and "LZ" on the other side. | Purple colored, oval shaped, biconvex, film coated tablets one side debossed with "M" and other side debossed with "S1" and free from physical defects. | Violet white colored, round shaped, biconvex, film coated tablet with beveled edges, unscored, debossed with "U4" on one side and plain on the other side. | Violet white color, ovalshaped, biconvex film-coated tablets debossed with "S5" on one side and plain on the other side | Off white to light pink unscored, ovaloid, biconvex, "SV5" on one side and plain on the other side | white to off white, modified capsule shaped, biconvex film-coated tablets debossed with "725" on one side and "L" on the other side. |
| 49 mg / 51 mg | Pale yellow unscored, ovaloid, biconvex, film-coated tablets debossed with "NVR" on one side and "L1" on the other side. | Light yellow to yellow colored, oval shaped, biconvex, film coated tablets one side debossed with "M" and other side debossed with "S2" and free from physical defects. | Pale yellow colored, oval shaped, biconvex, film coated tablet with beveled edges, unscored, debossed with "U5" on one side and plain on other side. | Pale yellow color, oval shaped, biconvex film-coated tablets debossed with "S1" on one side and plain on the other side. | Pale yellow to yellow unscored, ovaloid, biconvex, film-coated tablets, "SV1" on one side and plain on the other side | light yellow to yellow, modified capsule shaped, biconvex film-coated tablets debossed with "726" on one side and "L" on the other side. |
| 97 mg / 103 mg | Light pink unscored, ovaloid, biconvex, film-coated tablets debossed with "NVR" | Light pink to pink colored, oval shaped, biconvex, film coated tablets one side debossed with "M" and other side | Light pink colored, oval shaped, biconvex, film coated tablet with beveled edges, unscored, debossed with | Light pink color, oval shaped, biconvex film-coated tablets debossed with "S2" on one side and plain on the other side. | Light pink to pink unscored, ovaloid, biconvex, film-coated tablets, "SV2" on one side and plain on the other side | light pink to pink, modified capsule shaped, biconvex film-coated tablets debossed with "L727" on one side and plain on the other side. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | on one side and "L11" on the other side | debossed with "S3" and free from physical defects. | "U7" on one side and plain on other side. | | | |
| **Dimensions (Rounded)** | | | | | | |
| 24 mg / 26 mg | 13 mm | 10 mm | 6 mm | 9 mm | 10 mm | 9 mm |
| 49 mg / 51 mg | 13 mm | 13 mm | 11 mm | 12 mm | 13 mm | 12 mm |
| 97 mg / 103 mg | 15 mm | 15 mm | 15 mm | 15 mm | 15 mm | 15 mm |
| **Shape** | OVAL (ovaloid biconvex) | OVAL | 24 mg/26 mg – ROUND<br><br>49 mg / 51 mg and 97 mg/ 103 mg - OVAL (biconvex tablet with beveled edges) | OVAL (biconvex) | OVAL (Ovaloid biconvex) | CAPSULE (biconvex) |
| **DailyMed Link** | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=000dc81d-ab91-450c-8eae-8eb74e72296f | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=44db8114-622e-41f6-96a1-447d47b0267c | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=59b7a07a-96ee-44b1-8dae-2b42169aa2c5 | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=b47b5c7e-1c20-429c-9560-07f5f06cdce3 | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=98d838f6-03a9-43e9-b8dd-8882c6df1631 | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=5928f174-83e5-4c74-b15a-138338a70295 |
| **Exhibit with DailyMed Webpages and Drug Label Information** | Carrero Decl. Ex. 7 | Carrero Decl. Ex. 8 | Carrero Decl. Ex. 9 | Carrero Decl. Ex. 10 | Carrero Decl. Ex. 11 | Carrero Decl. Ex. 12 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVARTIS AG, NOVARTIS PHARMACEUTICALS CORPORATION, | No. 25-CV-00849-EP-JRA |
| Plaintiffs, | |
| v. | |
| NOVADOZ PHARMACEUTICALS LLC, MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, | |
| Defendants. | |

## DECLARATION OF MARTIN SHIMER IN OPPOSITION

## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

# TABLE OF CONTENTS

I.     PROFESSIONAL BACKGROUND .......................................................3

II.    THE FDCA DRUG APPROVAL PROCESS .........................................7

III.   GENERIC DRUG APPROVAL PROCESS............................................9

IV.    BENEFICIAL ASPECTS OF GENERIC DRUGS TO THE PUBLIC.......11

V.     FDA GUIDANCE DOCUMENTS.......................................................15

VI.    FDA GUIDANCE REGARDING THE APPEARANCE OF GENERIC DRUG TABLETS ............................................................................17

VII.   COLOR CODING OF TABLETS SERVES AN IMPORTANT FUNCTION ...................................................................................................20

VIII.  IRREPARABLE HARM TO MSN ....................................................30

# I.     PROFESSIONAL BACKGROUND

1.     I received a Bachelor of Science in Pharmacy from the University of Maryland at Baltimore in 1993.  I received a Certificate in Public Health from Georgetown University in 2009.  I received the Certificate in Public Health while I was employed by the United States Food & Drug Administration ("FDA").

2.     In July 2000, I was Commissioned as an Officer in the United States Public Health Service and accepted an assignment with FDA's Office of Generic Drugs ("OGD").[1]  While serving in OGD, I served in multiple positions until my retirement in July 2022.

3.     From July 2000 through August 2003, I worked as a Consumer Safety Officer in the Regulatory Support Branch of OGD.  During this period, I reviewed newly submitted Abbreviated New Drug Applications ("ANDAs") to determine whether the applications were satisfactory and satisfied the requirements for filing acceptance and technical discipline review.

4.     In August 2003, I was promoted to Branch Chief of the Regulatory Support Branch. I spent ten years in this role and supervised a team of roughly 8 to 16 individuals with responsibility for performing ANDA filing reviews. During this time, I developed expertise in the legal requirements for ANDA sponsors. In 2005, I

---

[1]  *Office of Generic Drugs*, U.S. Food & Drug Admin, https://www.fda.gov/about-fda/cder-offices-and-divisions/office-generic-drugs (last visited Feb. 4, 2025).

assumed responsibility for reviewing ANDAs to ensure that all legal requirements were satisfied prior to FDA taking an approval action.

5.     In April 2013, I was promoted to the Deputy Director of the Division of Labeling and Program Support. In that role, I assisted the Division Director with oversight of all project managers, labeling reviewers, the Regulatory Support Branch, and the Orange Book[2] staff.  I served in this role for roughly 18 months from April 2013 until October 2014. During this time, I had direct oversight of the legal review for ANDA submissions.

6.     During the 2013 to 2014 time period, OGD was reorganized. As part of this process, I was promoted to Deputy Director of the Division of Legal and Regulatory Support in October 2014, and I served in this role until my retirement on June 30, 2022.  In this role, I was tasked with building and training the Patent and Exclusivity Team.  As its name would suggest, this team was responsible for the same legal requirement review mentioned previously.  However, it was also responsible for administering the provisions including exclusivity for Competitive Generic Therapies; administering, and granting prioritization of original and

---

[2]  The "Orange Book" is a publication titled "Approved Drug Products with Therapeutic Equivalence Evaluations" that identifies FDA-approved drugs and related patent and exclusivity information.  *Approved Drug Products with Therapeutic Equivalence Evaluations*, U.S. Food & Drug. Admin., https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book (last visited Feb. 4, 2025).

4

supplemental ANDAs; and assisting with resolving drug shortages involving ANDAs.

7.  During my 22 years at FDA, I also developed expertise in many areas related to regulation of ANDAs, their review, and the resolution of issues that impact ANDAs.  More specifically, those areas included:

    a.  All aspects of the administration of the Orange Book;

    b.  Member of the Center for Drug Evaluation and Research ("CDER") Exclusivity Board from the board's inception until my retirement;

    c.  Coordinator of the President's Emergency Plan for AIDS Relief ("PEPFAR") for the OGD;

    d.  Contributor for Generic Drug User Fee Act ("GDUFA") I negotiations that ran from October 1, 2012 through September 30, 2017; and

    e.  Member of negotiating term for GDUFA II that ran from October 1, 2017, through September 30, 2022.

8.  While at FDA, I was exposed to and gained experience dealing with a broad range of issues related to FDA policy, FDA practice, and regulatory compliance. I was also exposed to and gained experience addressing issues related to drug misbranding.

9.  In July 2022, I joined Lachman Consultant Services, Inc. ("Lachman") as the Executive Director of Regulatory Services.  At Lachman, I oversee the

5

Add266

members of the regulatory team, serve as a consultant to industry, and assist clients with any number of issues that may arise with respect to their applications. In my current role at Lachman, I regularly advise clients on issues related to FDA practice and regulatory compliance.

10.     Based on my experience at the FDA and in the industry, I am intimately familiar with the regulatory steps, approvals and authorizations required before a company can commercially market a generic or authorized generic drug product, including the additional regulatory steps, approvals, and authorizations required *after* the FDA approves a company's ANDA.

11.     I provide this declaration in opposition to the motion for a preliminary injunction brought by Plaintiffs Novartis AG and Novartis Pharmaceutical Corporation (collectively, "Novartis") against Defendants Novadoz Pharmaceuticals LLC, MSN Pharmaceuticals Inc., and MSN Laboratories Private Limited (collectively, "MSN").

12.     Attached as **Exhibit A** is my curriculum vitae. It contains a description of my educational background, professional achievements, qualifications, publications.

13.     A list of the prior expert testimony I have offered in the last five years is attached as **Exhibit B**.

6

14.     My employer Lachman Consulting is being compensated at $750 per hour for my work on this case.  My compensation is not contingent on the outcome of this litigation or upon any opinions that I may express.

15.     I considered certain case-related documents in preparing this declaration.  The specific information I have considered is cited in the footnotes of the text.  Information not cited in the footnotes which I considered while developing this declaration are listed below:

16.      Complaint, filed in *Novartis v. Novadoz Pharmaceuticals, LLC*, No. 25-CV-00849 (D.N.J. Jan. 30, 2025), ECF 1.

17.     Memorandum of Law in Support of Novartis's Preliminary Injunction Motion filed in filed in *Novartis v. Novadoz Pharmaceuticals, LLC*, No. 25-CV-00849 (D.N.J. Jan. 31, 2025), ECF 4-1.

18.     Declaration of Dr. Arash Nayeri filed in Support of Novartis's Preliminary Injunction Motion filed in *Novartis v. Novadoz Pharmaceuticals, LLC*, No. 25-CV-00849 (D.N.J. Jan. 31, 2025), ECF 4-11.

19.     ANDA 213748 from MSN Laboratories Private Limited (Novadoz Pharmaceuticals LLC).

20.     *Novartis Pharms. Corp. v. Becerra*, No. 24-CV-02234 (DLF), 2024 WL 4492072, at *1 (D.D.C. Oct. 15, 2024).

## II.     THE FDCA DRUG APPROVAL PROCESS

7

21.     The Federal Food, Drug, and Cosmetic Act ("FDCA") requires that any drug product introduced into interstate commerce must be the subject of an approved application.[3]    For new or "brand" drugs, the sponsor submits a New Drug Application ("NDA") to FDA for review and approval.[4]   In this case, the "sponsor" is the pharmaceutical company seeking approval of the new drug.[5]  Before an NDA is submitted, a sponsor spends many years conducting research and testing the product.  This pre-submission process consists of discovery and preclinical testing and then phases I, II, and III of development.[6]  In total, this process, can, on average, take at least 10 years.[7]   Once completed, a sponsor is then able to submit the NDA to FDA for review.[8]  If FDA determines that the drug is both safe and effective for

---

[3]  21 U.S.C. § 355(b)(1), (j).

[4]  21 U.S.C. § 355(b)(1).

[5]  *New Drug Application (NDA)*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/types-applications/new-drug-application-nda#:~:text=The%20NDA%20application%20is%20the,become%20part%20of%20the%20NDA (last updated Jan. 21, 2022).

[6]  *The Drug Development Process*, U.S. Food & Drug Admin., https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process (last updated Jan. 4, 2018).

[7]  *See* Cong. Budget Off., Research and Development in the Pharmaceutical Industry 2 (April 2021), *available at* https://www.cbo.gov/publication/57126. Gaurav Agrawal, Felix Bader, Jan Gunther, and Stephan Wurzer, *Fast to first-in-human: Getting new medicines to patients more quickly*, McKinsey & Co. (Feb. 10, 2023), https://www.mckinsey.com/industries/life-sciences/our-insights/fast-to-first-in-human-getting-new-medicines-to-patients-more-quickly.

[8]  *The Drug Development Process*, *supra* note 6.

8

the intended use and patient population, the NDA will be approved, and the product can be legally marketed in the United States.[9] Brand drugs are often subject to periods of both regulatory exclusivity and, separately, patent protection.[10]

## III. GENERIC DRUG APPROVAL PROCESS

22. Generic drugs are approved via an abbreviated process. The application required to legally market a generic drug product is referred to as an ANDA.[11] ANDAs rely upon the FDA's previous finding of safety and efficacy for an NDA and therefore are not required to undertake the same clinical development and trial process.[12] ANDA sponsors are required to establish that their drug product is both a pharmaceutical equivalent of and bioequivalent to a Reference Listed Drug ("RLD").[13]

---

[9] *Step 4: FDA Drug Review*, U.S. Food & Drug Admin., https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review.

[10] *Frequently Asked Questions on Patents and Exclusivity*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/development-approval-process-drugs/frequently-asked-questions-patents-and-exclusivity.

[11] *See* 21 U.S.C. § 355(j); *Abbreviated New Drug Application (ANDA)*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda (last updated Dec. 16, 2022).

[12] 21 U.S.C. § 355(j)(2)(A)(i); 21 C.F.R. § 314.3(b) (defining "Reference listed drug"), § 314.94(a)(3).

[13] 21 U.S.C. § 355(j)(2)(A)(i)-(iv); 21 C.F.R. § 314.94(a)(4)-(7).

9

23.    Pharmaceutical equivalence means that a drug contains identical amounts of the identical active ingredient, has the same dosage form, strength, route of administration, and conditions of use as an existing NDA.[14]    Bioequivalence means that the ANDA product has established that its rate and extent of absorption of a drug is not significantly different to a Reference Listed Drugs when administered at the same dose.[15]

24.    In order to establish bioequivalence, an ANDA sponsor must first formulate and develop its drug product and then conduct testing in subjects referred to as in-vivo testing.[16]    The classic bioequivalence study is where a subject first receives a dose of the test product (the ANDA product for which approval is being sought).    Samples of the subject's blood are then taken at pre-defined time intervals, and those samples are then analyzed for the content of the drug. This same subject then receives a dose of the RLD with the same intervals of sampling.    These results are then compared statistically and if certain criteria are met the products are considered bioequivalent.

---

14  *Orange Book Preface*, U.S. Food & Drug Admin,
    https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface#:~:text=Pharmaceutical%20equivalents%20are%20drug%20products,require%20a%20reservoir%20or%20overage (last updated Sept. 11, 2024).

15  *Id.*

16  *Id.*

10

25.     Generally, bioequivalence testing is required for most solid oral dosage forms that act systemically in the human body.[17]  FDA's regulations require that the most accurate, sensitive, and reproducible method for establishing bioequivalence be utilized by applicants.

26.     To assist ANDA sponsors with developing ANDAs and provide FDA's current thinking on the most accurate, sensitive, and reproducible method for establishing bioequivalence, FDA generally publishes a specific type of guidance outlining the number and type of bioequivalence studies that ANDA sponsors should conduct to establish bioequivalence of their proposed product to a branded RLD. This guidance is referred to as Product Specific Guidance (PSG).  FDA published the original version of the PSG for ENTRESTO® in April 2016 and updated the PSG in October 2024.[18]

## IV.   BENEFICIAL ASPECTS OF GENERIC DRUGS TO THE PUBLIC

27.     In order to assure timely access to generic drugs, FDA published the Drug Competition Action Plan with the stated goal to "further encourage robust, timely market competition for generic drugs and help bring greater efficiency and transparency to the generic drug review process, without sacrificing the scientific

---

[17] *Id.*

[18] U.S. Food & Drug Admin., Draft Guidance on Sacubitril; Valsartan (2024).

11

rigor underlying our generic drug program."[19]  Moreover, FDA communicated that the overall goal of the Plan was to "spur competition that improves consumer's access to the medicines they need."[20]

28.    Even though FDA does not play a role in the setting of drug prices, FDA recognizes that robust competition in the pharmaceutical industry via availability of high-quality generic products enhances patient access to certain drug therapies due to the reduction in prices associated with multiple approved ANDAs that compete among themselves and with the branded RLD based on price.

29.    FDA published a report in December 2019 titled "Generic Competition and Drug Prices: New Evidence Linking Greater Competition and Lower Generic Drug Prices."[21] This report analyzed the impact of the number of generic market entrants, where those entrants must first achieve FDA approval, greatly influences the price of drug products.[22]  When a single generic competitor enters the market, a price reduction of approximately 39% than the branded price is realized but once six

---

19  *FDA Drug Competition Action Plan*, U.S. Food & Drug Admin. https://www.fda.gov/drugs/guidance-compliance-regulatory-information/fda-drug-competition-action-plan (last updated Jan. 15, 2025).

20  *Id.*

21  Ryan Conrad, Ph.D. & Randall Lutter, Ph.D., *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Genetic Drug Prices*, U.S. Food & Drug Admin. (Dec. 2019), https://www.fda.gov/media/133509/download.

22  *Id.* at 2.

12

or more generic competitors have entered the market price reduction of 95% in comparison to the branded price can be realized.[23] In part, FDA's analysis was based on data from the Center for Medicare and Medicaid Services (CMS), where the cost savings from generic competition are realized by the federal government in the form of reduced medication expenditures for beneficiaries.[24]

30.     Novartis received approval for all three strengths of ENTRESTO® Tablets on July 7, 2015 and while FDA has approved 11 ANDAs for generic versions of ENTRESTO® between May 28, 2024 and present, none of these ANDAs have commenced marketing. Thus, Novartis has benefitted from almost 10 years of monopoly pricing for ENTRESTO® Tablets. It cannot be disputed that ENTRESTO® is both an effective therapy for patients and is expensive. ENTRESTO® was one of the first ten branded RLD products the Federal Government selected for mandatory price negotiations under the Inflation Reduction Act (IRA). Drugs may be subject to the IRA if they have been approved for at least 7 years and do not face any generic competition, both of these criteria apply to ENTRESTO®. Based on a November 1, 2023 Fact Sheet published by the Assistant Secretary for Planning and Evaluation (ASPE), approximately 521,000 enrollees in

---

23 *Id.* at 2–3.
24 *Id.* at 5.

Medicare Part D received ENTRESTO® therapy at a cost of approximately $2.5 billion.

31.     To protect the "golden goose" that is ENTRESTO®, Novartis has engaged in multiple tactics to first convince FDA not to approve generics of ENTRESTO® unless ANDAs met certain conditions deemed critical by Novartis. Novartis submitted two Citizens Petitions to FDA, the first in 2019 broadly claiming that ANDAs needed to meet certain requirements for establishing sameness of the active ingredients sacubitril and valsartan, and then in 2022 Novartis submitted their second petition challenging the ability of ANDA applicants to remove language from their proposed labels, as permitted by section 505(j)(2)(A)(viii) of the Federal Food Drug & Cosmetic Act.

32.     Novartis's allegations in the 2022 Citizen's Petition was that FDA could not permit removal of protected dosing information as doing so would result in a generic product with labeling that was "less safe" than ENTRESTO®.  FDA summarily denied both of Novartis's petitions with fulsome responses on May 28, 2024 for the 2019 Citizen's Petition[25] and July 24, 2024 for the 2022 petition.[26]

---

[25] U.S. Food & Drug Admin., FDA-2019-P-1893-0010, Final Response Letter from FDA CDER to Novartis Pharmaceuticals Corporation (May 28, 2024), https://www.regulations.gov/document/FDA-2019-P-1893-0010.

[26] U.S. Food & Drug Admin, FDA-2022-P-2228-0015, Final Response Letter from FDA CDER to Novartis Pharmaceuticals Corporation (Jul. 24, 2024), https://www.regulations.gov/document/FDA-2022-P-2228-0015.

14

33.     After Novartis's failure to convince FDA to delay generic approvals failed via the submission of Citizen's Petitions, Novartis sued FDA on July 30, 2024 in the United States District Court for the District of Columbia claiming that FDA's approval of MSN's ANDA violated the Administrative Procedures Act (APA).  In a Memorandum Opinion dated October 13, 2024, the United States District Court for the District of Columbia granted Summary Judgment in favor of FDA's finding that FDA did not violate the APA, the Federal Food Drug & Cosmetic Act, or FDA's implementing regulations.  That case is now on appeal at the DC Circuit Court of Appeals, which recently denied Novartis's motion for an injunction pending appeal. Still undeterred, Novartis brought yet another suite in the USDC for the District of Columbia on January 13, 2025, CA No. 25-90.  In this most recent suit, that to the best of my knowledge remains pending with the Court as of the date of this report, though the Court denied Novartis's request for emergency injunctive relief.  Novartis again asks the Court to compel FDA to convert final approval of MSN's ANDA to tentative approval citing a pediatric exclusivity period that went into effect on January 15, 2025 upon expiration of US Patent No. 8,101,659. Novartis is leaving no stone unturned with respect to attempting to keep MSN's product from entering the market.

## V.     FDA GUIDANCE DOCUMENTS

15

34.  FDA develops guidance documents to explain the agency's current position, interpretation, or policy in relation to a regulatory issue.[27] These guidance documents can address any number of practices, policies, expectations, procedures, or scientific matters related to the development, submission, review, approval and lifecycle maintenance of drug products.[28]  All FDA guidance documents include a disclaimer that the recommendations contained within a guidance are not legally binding (with some limited exceptions).[29]

35.  FDA publishes guidances to assist regulated industry with understanding FDA's views on how industry can most effectively reach their regulatory goals.[30]  Generally speaking, sponsors that follow FDA's guidances when submitting their applications will experience a smoother review because the application sponsor is attempting to conform with FDA's most current position and interpretation of regulatory requirements.

36.  Guidance documents are initially published as draft guidances with an associated comment period to permit industry to comment on the content of the

---

[27] *Background: FDA Good Guidance Practices*, U.S. Food & Drug Admin., https://www.fda.gov/regulatory-information/guidances/background-fda-good-guidance-practices (last updated Dec. 17, 2024).

[28] *Id.*

[29] *Id.*

[30] *Id.*

16

guidance or to ask additional clarifying questions for FDA to consider prior to issuance of a final guidance.[31]  In some instances, FDA will follow an initial draft guidance with a draft Questions and Answers guidance to address questions received on the initial draft guidance.[32]  This tactic is most frequently employed when FDA receives numerous comments on an initial draft guidance which may happen when FDA is changing its regulatory expectations for applicants.  All FDA guidance are issued in accordance with FDA's Good Guidance Practice regulations at 21 CFR 10.115.[33]

## VI.  FDA GUIDANCE REGARDING THE APPEARANCE OF GENERIC DRUG TABLETS

37.    To communicate expectations to the generic industry with respect to the physical characteristics of generic drug products, which would be substituted for their branded counterpart, FDA published Guidance for Industry titled "Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules" in June 2015 (Physical Attribute Guidance).[34]

---

[31] U.S. Food & Drug Admin, Draft Report and Plan on Best Practices for Guidance 5–6 (last visited Feb. 5, 2025), https://www.fda.gov/media/175121/download?attachment.

[32] *See id.* at 21.

[33] *See id.* at 5.

[34] U.S. Food & Drug Admin., Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules: Guidance for Industry (June 2015), https://www.fda.gov/media/87344/download.

38.    FDA stated that the purpose for issuance of this guidance was that the FDA was "concerned that differences in physical characteristics (e.g. size and shape of the tablet or capsule) may affect patient compliance and acceptability of medication regimens or could lead to medication errors. We believe these patient safety concerns are important, and we are recommending that generic drug manufacturers consider physical attributes when they develop quality target product profiles (QTPPs) for their generic product candidates."[35]

39.    Thus, in order for a generic drug product to have a similar safety profile when compared to a branded Reference Listed Drug (RLD) the ANDA sponsor developing the generic must consider certain physical attributes including the size and shape of the generic product.  FDA considers information from sponsors when the sponsor submits their ANDA to FDA for approval. FDA's Physical Attribute Guidance directs ANDA sponsors to submit information on the size of a tablet or capsule product in a specific section of an ANDA titled Description and Composition of the Drug Product of the ANDA, section 3.2.P.1 and states that FDA may request samples for evaluation of the physical attributes of the tablet or capsule.[36]

40.    FDA's Physical Attribute Guidance includes a discussion of certain safety concerns related to swallowing oral tablets and capsules.  Both the size and

---

[35] *See id.* at 1.
[36] *Id.* at 6.

18

shape of oral tablets and capsules impact a patient's ability to readily swallow these dosage forms while reducing difficulty or adverse events.[37] The Physical Attribute Guidance includes the following recommendation "For comparable ease of swallowing as well as patient acceptance and compliance with treatment regimens, the Agency recommends that generic oral tablets and capsules intended to be swallowed intact should be of similar size to the corresponding RLD."[38] FDA's Physical Attribute Guidance provides recommendations for differences in the largest dimension and the overall volume of the tablet or capsule.[39]

41.     FDA's Physical Attribute Guidance also recognizes that the shape of a tablet or capsule is an important characteristic, noting that studies have shown that oval tablets may be easier to swallow and have faster esophageal transit times than round tablets of the same weight.[40] Patient compliance or adherence to their medication regimen may also be influenced by the size and shape of a tablet or capsule.[41]

42.     Safety concerns related to the physical attributes of generic products have been studied by academics, where those findings generally suggest that patients

---

37 *Id.* at 2–6.
38 *Id.* at 4.
39 *Id.* at 5.
40 *Id.* at 5–6.
41 *Id.* at 3.

will have greater confidence in taking a generic product when it is similar in appearance to the branded RLD.[42]

43.    ANDA sponsors that either ignore or choose not to follow FDA Guidance with respect to the Physical Attribute Guidance run the risk of receiving deficiencies from FDA ranging from comments issued in the context of an Information Request to a Complete Response Letter (CRL) refusing to approve the ANDA.[43]    Because FDA considers Physical Attributes to correlate to the safety profile of a product, issuance of a CRL will often require the ANDA sponsor to reformulate their product to ensure that the safety profile of the generic product matches that of the branded RLD.

## VII.    COLOR CODING OF TABLETS SERVES AN IMPORTANT FUNCTION

44.    In my experience, prudent developers of generic drugs know that compliance with FDA Guidance documents will often result in a smoother review of their ANDA with fewer questions from FDA.  Alternatively, developers of generic drugs that do not comply with FDA Guidance will often experience protracted

---

[42] *See* Kesselheim, Aaraon S. et al., Variations in Pill Appearance of Antiepileptic Drugs and the Risk of Nonadherence, 173 JAMA Internal Medicine (2013).

[43] U.S. Food & Drug Admin., Information Requests and Discipline Review Letters Under GDUFA: Guidance for Industry (Oct. 2022), https://www.fda.gov/media/109915/download; 21 C.F.R. 314.3 https://www.ecfr.gov/current/title-21/part-314/section-314.3#p-314.3(Complete%20response%20letter).

reviews with many questions and deficiencies that could have been easily avoided.[44]
Because FDA has indicated that attributes such as size and shape should be
considered as part of a QTPP analysis, generic developers will consider these
attributes and endeavor to develop products that comply with FDA guidance
including similarities with respect to size and shape.

45.    Based upon my 22-year career in the Office of Generic Drugs, ANDA
sponsors routinely consider using color schemes for their generic products that are
similar to the branded RLD.   Similarities in color scheme help ensure that patients
are more readily able to further distinguish differences in products that have similar
size and shape characteristics.[45]

46.    This practice is evident with the ENTRESTO® products where the 24
mg/26 mg tablet and the 49 mg/51 mg tablet are both oval tablets with dimensions
of 13.1 mm x 5.2 mm.  With identical physical dimensions, a difference in color or

---

[44] *See* U.S. Food & Drug Admin., Good ANDA Submission Practices: Guidance
for Industry at 29 (Jan. 2022), https://www.fda.gov/media/110689/download
(describing various submissions that are required when the ANDA differs from
product-specific guidelines).; Kurt R. Karst, "Size Matters," Says FDA, When it
Comes to Generic Drug-RLD Sameness, FDA Law Blog (Jan. 4, 2012),
https://www.thefdalawblog.com/2012/01/size-matters-says-fda-when-it-comes-
to-generic-drug-rld-sameness/ (describing letters issued by OGDs to companies
with pending ANDAs regarding tablet size differences).

[45] *See* Kesselheim, supra note 42.

some other attribute (e.g. scoring or beveling) helps to ensure that patients are able to distinguish between different doses.

47.    While ANDA sponsors are not required to employ the same color scheme as the RLD, there is a sound reason for ANDA sponsors to follow this practice as they are helping to ensure that patients are able to distinguish doses for similar products using the same functional cues as the color scheme of the branded RLD that a patient had been accustomed to receiving.

48.    It doesn't take much imagination to realize the uncertainty that would arise if manufacturers of generic drugs simply chose to use a handful of tablet sizes and a single shape and color for all of their generic products.  This would result in a world of patients taking either round or oval tablets, in two or three sizes from around 9 mm to 17 mm, which were all a single color where that color would likely be white. How could a patient being treated for heart failure, the primary indication of ENTRESTO®, with a generic of ENTRESTO® be able to distinguish their heart failure medication, from the medication they use to treat their kidney failure, their diabetes, their acid reflux, their seizures, and chronic arthritis.  It is certainly not an uncommon occurrence for many patients to be treated with half a dozen or more oral medications to treat multiple disease states.  Patients rely upon visual cues and other distinguishing factors such as color and shape to both identify the kind of medication they are taking and how many times a day they take that medication. These factors

22

are critical to ensure that patients are taking the right drug at the right time for the right condition.[46]

49.    There are numerous examples of drug products where to visually distinguish different strengths of drug products for patients both the branded RLD and generic manufacturers utilize the same color scheme across the spectrum of strengths to enhance patient safety.   Certain drug products with many strengths provide particularly useful examples.

50.    One such product that remains in the marketplace is Synthroid® (levothyroxine) tablets, produced by AbbVie, Inc., which are available in 0.025 mg, 0.05 mg, 0.075 mg, 0.88 mg, 0.1 mg, 0.112 mg, 0.125 mg, 0.137 mg, 0.15 mg, 0.175 mg, 0.2 mg and 0.3 mg. Synthroid's tablets are all round tablets with the following colors: 0.025 mg is orange, 0.050 mg is white, 0.075 mg is purple, 0.88 mg is green, 0.1 mg is yellow, 0.112 mg is red, 0.125 mg is brown, 0.137 mg is blue(turquoise), 0.15 mg is blue, 0.175 mg is purple(lilac),  0.2 mg is pink, and 0.3 mg is green.[47]

---

[46] Greene JA, Kesselheim AS. Why do the same drugs look different? Pills, trade dress, and public health. N Engl J Med. 2011 Jul 7;365(1):83-9. doi: 10.1056/NEJMhle1101722. PMID: 21732842.

[47] Label for Synthroid, AbbVie, Inc. *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1e11ad30-1041-4520-10b0-8f9d30d30fcc (last visited Feb. 5, 2025). Images for all charts are from Drugs.com. *See* Declaration of Jacquellena T. Carrero ("Carrero Decl."), Ex. 3.

| Synthroid® (levothyroxine) | | | | | |
| AbbVie \| NDA 21402 | | | | | |
| 0.025 mg | 0.05 mg | 0.075 mg | 0.088 mg | 0.1 mg | 0.112mg |
| 0.125 mg | 0.137 mg | 0.15 mg | 0.175 mg | 0.2 mg | 0.3 mg |

51.    Consistent with the practice and guidance discussed above, several

entities who have filed ANDA's for this product follow the same color-coding

scheme:

a.    ANDA 212399 from Accord Healthcare, Inc. is available as a 7 mm

round tablet employing the same color scheme,[48]



| Levothyroxine | | | | | |
| Accord Healthcare Inc. \| ANDA 212399 | | | | | |
| 0.025 mg | 0.05 mg | 0.075 mg | 0.088 mg | 0.1 mg | 0.112 mg |
| 0.125 mg | 0.137 mg | 0.15 mg | 0.175 mg | 0.2 mg | 0.3 mg |

---

48 Label for Levothyroxine Sodium, Accord Healthcare, Inc.. *available at*
DailyMed, Nat. Inst. of Health,
https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=a6233381-3043-
4e9a-aaa6-a6b105e5142b (last visited Feb. 5, 2025).

b. ANDA 210831 from Amneal Pharmaceuticals LLC is available as a 9 mm round tablets employing the same color scheme with exception of its 0.112 mg which is described as dark pink,[49]



c. ANDA 209713 from Lupin Pharmaceuticals, Inc. is available as a 6 mm round tablet employing the same color scheme with exception of its 0.112 mg which is described as pink.[50]

---

[49] Label for Levothyroxine Sodium, Amneal Pharmaceuticals NY LLC. *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=b0efcd19-42a3-4ddb-af5a-16cd073a492a (last visited Feb. 5, 2025).

[50] Label for Levothyroxine Sodium, Lupin Pharmaceuticals, Inc.. *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=18717e58-89fb-4e2f-93b6-d6ac3e988d37 (last visited Feb. 5, 2025).



52. Novartis's own products also aren't immune from having ANDA sponsors employ the same physical attributes as Novartis's branded RLD. One such Novartis example is their product marketed under the proprietary name Myfortic® (mycophenolic sodium) Delayed-release Tablets NDA 50791. Novartis' most recently updated labeling and drug listing information available on DailyMed describes Myfortic® Delayed-release Tablets, 180 mg as 10 mm, round, green, tablets and 360 mg as 18 mm, oval (ovaloid), orange, tablets.[51]



---

[51] Label for Myfortic, Novartis Pharms. Corp., *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=eed26501-890d-4ff6-88e7-6dbea4726e53 (last visited Feb. 5, 2025).

53.  Like the other examples noted above, filers of ANDA reference these color combinations in keeping with the FDA guidance:

a.  ANDA 216637 from Novugen Pharma (USA) LLC is available in 180 mg as 10 mm, round, green tablets and 360 mg as 18 mm, oval (ovaloid), orange, tablets.[52]

b.  ANDA 214376 from Slate Run Pharmaceuticals LLC is available as 10 mm, round, green, tablets, and 360 mg as 17 mm, oval, orange, tablets.[53]

c.  ANDA 202555 from Accord Healthcare Inc. is available in 180 mg as 10 mm round, green tablets and 360 mg as 17 mm, oval(oblong), orange tablets.[54]

---

[52]  Label for Mycophenolic Acid Tablet, Delayed Release, Novugen Pharma (USA) LLC, *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=cbc3e916-09e2-4e6e-9e5e-98375f5e6d41 (last visited Feb. 5, 2025).

[53]  Label for Mycophenolic Acid Tablet, Delayed Release, Slate Run Pharmaceuticals LLC, *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=c1ce92ef-4102-1487-e053-2995a90ac521 (last visited Feb. 5, 2025).

[54]  Label for Mycophenolic Acid Tablet, Delayed Release, Accord Healthcare Inc., *available at* DailyMed, Nat. Inst. of Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=dc24aa15-330c-4698-872f-159d7e582b4b (last visited Feb. 5, 2025).

| Mycophenolic sodium |
| Accord Healthcare Inc. \| ANDA 202555 |

54. Other ANDAs for Entresto also follow the size and color dosing regimes.

55. I understand that at least 17 other companies have also filed ANDAs to release a generic version of Entresto and as of February 5, 2025, FDA had approved 11 ANDAs from different ANDA sponsors.[55]

56. Consistent the practices noted above, the publicly available information regarding these ANDAs show that they also follow the color schemes and sizes of Novartis' Entresto product:[56]

| | | | | | | |
|---|---|---|---|---|---|---|
| **Sacubitril and Valsartan Tablets – Innovator and Generics comparison** | | | | | | |
| Parameters | ENTRESTO (NOVARTIS PHARMS CORP) | MSN Laboratories Private Limited (Novadoz Pharmaceuticals LLC) | Torrent Pharmaceuticals Limited | Laurus Labs Limited | Ascend Laboratories, LLC | Alembic Pharmaceuticals Inc. |

---

[55] *See* U.S. Food & Drug Admin., Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm (last visited Feb. 5, 2025) (database listing approved ANDAs for sacubitril and valsartan tablets).

[56] For sources of information contained in this chart, see Carrero Decl. Exs. 7–12.

| NDA/ANDA # | NDA 207620 | ANDA 213748 | ANDA 213604 | ANDA 213676 | ANDA 213674 | ANDA 213682 |
|---|---|---|---|---|---|---|
| **Description** | | | | | | |
| 24 mg/ 26 mg | Violet white unscored, ovaloid, biconvex, film-coated tablets debossed with "NVR" on one side and "LZ" on the other side. | Purple colored, oval shaped, biconvex, film coated tablets one side debossed with "M" and other side debossed with "S1" | Violet white colored, round shaped, biconvex, film coated tablet with beveled edges, unscored, debossed with "U4" on one side and plain on the other side. | Violet white color, oval shaped, biconvex film-coated tablets debossed with "S5" on one side and plain on the other side | Off white to light pink unscored, ovaloid, biconvex, film-coated tablets, "SV5" on one side and plain on the other side | white to off white, modified capsule shaped, biconvex film-coated tablets debossed with "725" on one side and "L" on the other side. |
| 49 mg / 51 mg | Pale yellow unscored, ovaloid, biconvex, film-coated tablets debossed with "NVR" on one side and "L1" on the other side. | Light yellow to yellow colored, oval shaped, biconvex, film coated tablets one side debossed with "M" and other side debossed with "S2" | Pale yellow colored, oval shaped, biconvex, film coated tablet with beveled edges, unscored, debossed with "U5" on one side and plain on other side. | Pale yellow color, oval shaped, biconvex film-coated tablets debossed with "S1" on one side and plain on the other side. | Pale yellow to yellow unscored, ovaloid, biconvex, film-coated tablets, "SV1" on one side and plain on the other side | light yellow to yellow, modified capsule shaped, biconvex film-coated tablets debossed with "726" on one side and "L" on the other side. |
| 97 mg/ 103 mg | Light pink unscored, ovaloid, biconvex, film-coated tablets debossed with "NVR" on one side and "L11" on the other side | Light pink to pink colored, oval shaped, biconvex, film coated tablets one side debossed with "M" and other side debossed with "S3" | Light pink colored, oval shaped, biconvex, film coated tablet with beveled edges, unscored, debossed with "U7" on one side and plain on other side. | Light pink color, oval shaped, biconvex film-coated tablets debossed with "S2" on one side and plain on the other side. | Light pink to pink unscored, ovaloid, biconvex, film-coated tablets, "SV2" on one side and plain on the other side | light pink to pink, modified capsule shaped, biconvex film-coated tablets debossed with "L727" on one side and plain on the other side. |
| **Dimensions (Rounded)** | | | | | | |
| 24 mg/ 26 mg | 13 mm | 10 mm | 6 mm | 9 mm | 10 mm | 9 mm |

| | | | | | | |
|---|---|---|---|---|---|---|
| 49 mg / 51 mg | 13 mm | 13 mm | 11 mm | 12 mm | 13 mm | 12 mm |
| 97 mg/ 103 mg | 15 mm | 15 mm | 15 mm | 15 mm | 15 mm | 15 mm |
| **Shape** | OVAL (ovaloid biconvex) | OVAL | 24 mg/26 mg – ROUND<br><br>49 mg / 51 mg and 97 mg / 103 mg - OVAL (biconvex tablet with beveled edges) | OVAL (biconvex) | OVAL (Ovaloid biconvex) | CAPSULE (biconvex) |
| **DailyMed Link** | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=000dc81d-ab91-450c-8eae-8eb74e72296f | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=44db8114-622e-41f6-96a1-447d47b0267c | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=59b7a07a-96ee-44b1-8dae-2b42169aa2c5 | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=b47b5c7e-1c20-429c-9560-07f5f06cdce3 | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=98d838f6-03a9-43e9-b8dd-8882c6df1631 | https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=5928f174-83e5-4c74-b15a-138338a70295 |
| **Exhibit with DailyMed Webpages and Drug Label Information** | Carrero Decl. Ex. 7 | Carrero Decl. Ex. 8 | Carrero Decl. Ex. 9 | Carrero Decl. Ex. 10 | Carrero Decl. Ex. 11 | Carrero Decl. Ex. 12 |

57.    It is readily apparent from these examples that ANDA which follow the physical attributes, including color, of a branded RLD are routinely reviewed and approved by FDA and are available in the marketplace.

## VIII.  IRREPARABLE HARM TO MSN

58.    I understand that Novartis has asked the Court for a preliminary injunction enjoining and restraining Defendants from distributing a generic sacubitril/valsartan drug.

59.     The effect of such an order would mean that MSN could not launch its product and all its investment in research and development over years would be placed at risk.

60.     First, there is no way to simply change the size, shape, and color of the tablet without essentially starting over with the entire process at the FDA for regulatory approval.  Reformulation of a developed product to change the physical attributes of the product amounts to an ANDA sponsor needing to completely restart development of a specific product.[57]  FDA Guidance on this matter clearly states that changes in color, size, or shape would need to be submitted as a Prior Approval Supplement  (PAS) to an approved ANDA.[58]  Such a PAS would need to include new exhibit batches, and a minimum of 6 months of stability under accelerated conditions (40 degrees Centigrade/ 75% relative humidity) and ambient conditions(25 C/60% RH).  Notably, prior to manufacturing exhibit batches, MSN would need to develop the new product to determine what size and shape is feasible and whether transition to a new size and shape required any alterations to the formulation of the product, this development work would precede exhibit batch manufacturing. It is also highly likely that the Office of Generic Drugs would require

---

[57] *SUPAC-IR Questions and Answers about SUPAC-IR Guidance*, U.S. Food & Drug Admin. (Feb. 18, 1997), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/supac-ir-questions-and-answers-about-supac-ir-guidance.

[58] *Id.*

31

the ANDA sponsor to complete a new fasting bioequivalence study comparing the new proposed product to the branded RLD.  FDA's review of the PAS would be governed by the Generic Drug User Fee Act III Commitment Letter.  Because there are already 11 ANDAs that have been approved by FDA for generic versions of ENTRESTO®, a hypothetical PAS submitted by MSN would not be eligible for priority review, with the resulting review from FDA being completed in either 6 months or 10 months.  The 6-month timeframe would apply if there was no facility referenced in the PAS that required FDA inspection and the 10-month review would apply if any inspection was needed.

61.    Second, in my experience, any delay in bringing a generic to market would have devasting consequences as it would place the generic sponsor at a competitive disadvantage with other generics able to launch.  Generally speaking, the first ANDA applicant that is able to enter into the highly competitive generic marketplace is at a distinct advantage over other ANDA applicants that enter the market at a later date.  This concept is generally referred to as the first-mover advantage. The first sponsor to enter the market is generally able to enter into purchasing contracts in advance of competitors and as previously stated in paragraph 19, the first sponsor to enter the generic marketplace is usually able to sell their product at a higher price for a period of time until other competitors are able to enter the market.

62.     In essence, Novartis asks this Court to effectively overturn an approval decision for a drug product that FDA has reviewed and approved thus determining that MSN's product is an equivalent of and provides a similar safety profile to ENTRESTO®.

63.     Novartis thus asks this Court to return MSN to development of their product with the goal of developing a product that is less similar to ENTRESTO® and may in FDA's view, per concepts communicated by FDA in the Physical Attribute Guidance, result in a product that is less safe or more confusing for patients.

33

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 6, 2025

Martin Shimer

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

NOVARTIS AG,
NOVARTIS PHARMACEUTICALS
CORPORATION,

                        Plaintiffs,

        v.

NOVADOZ PHARMACEUTICALS LLC,
MSN PHARMACEUTICALS INC., and
MSN LABORATORIES PRIVATE
LIMITED,

                        Defendants.

Civil Action No. 25-849

**Rebuttal Expert Declaration of Dr. Arash Nayeri, MD**
**In Further Support of Plaintiffs' Motion for a Preliminary Injunction**

February 10, 2025

I.     INTRODUCTION .................................................................................................... 2

II.     ASSIGNMENT .......................................................................................................... 6

III.     SUMMARY OF CONCLUSIONS ......................................................................... 6

     A.   Patients Should Have The Opportunity To Make Informed Decisions Regarding The Pros and Cons of Generic Drugs. ........................................................................................................................ 8

     B.   Mr. Clark's Assessment of Clinical Reasons For Similarities In Physical Attributes of Generics and Brand Drugs Are Either Overstated or Divorced From The Relevant Context: Treatment of Heart Failure With A Sacubitril / Valsartan Drug. ................................................................................................ 11

     C.   The Manner In Which Entresto Is Prescribed Means That It Is Unnecessary For Patients To Rely On Color-Coding to Determine Which Dose They Must Take. .......................................................... 14

     D.   Online Resources Incorporating Both Images of The Drugs and Prescribing Information For The Drugs Could Lead To Consumer Confusion and A Resulting Mis-Dosing of Entresto. ............................. 14

     E.   Consumer Confusion Could Lead To Patient Harm. ................................................................... 15

     F.   Entresto Prescribers Are Not Limited To Cardiologists. ............................................................ 16

     G.   HCPs May Have Increased Confidence In An Authorized Generic Released From The Manufacturer of The Brand Drug. .................................................................................................................................. 17

1

## I. Introduction

1.      I submit this rebuttal expert declaration on behalf of Novartis AG and Novartis
Pharmaceuticals Corp. (together "Novartis"). I have been asked by counsel for Plaintiffs to offer
opinions relevant to this matter based on my expertise as a cardiologist, clinical researcher, and
regular prescriber of Entresto, to rebut the opinions offered by Todd Clark and Dr. Hossein
Ardehali, as well as the arguments made by Defendants Novadoz Pharmaceuticals, LLC
("Novadoz Pharma"), MSN Pharmaceuticals Inc. ("MSN Pharma"), and MSN Laboratories
Private Limited ("MSN Labs," and together with Novadoz Pharma and MSN Pharma, "MSN")
in their Opposition to Novartis's Order to Show Cause for Preliminary Injunctive Relief.
*Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Feb. 6, 2025), ECF
No. 13.

2.      On January 30, 2025, I submitted an expert declaration ("Opening Declaration"[1]) in
support of the application for a temporary restraining order and motion for preliminary
injunction that Novartis filed that same day. My qualifications, experience, and compensation,
including a copy of my curriculum vitae and a summary of the background of this case, is
included in my Opening Declaration.

3.      On February 6, 2025, Todd Clark and Dr. Hossein Ardehali submitted expert declarations
(respectively, the "Clark Declaration,"[2] and "Ardehali Declaration"[3]), on behalf of Defendants.

4.      Based on my review of the Clark Declaration:

      a)      Mr. Clark opines that "[s]imilarities in physical attributes between generic
      pharmaceuticals and RLDs serve clinical purposes, the most important of which are

---

[1]      Expert Declaration of Dr. Arash Nayeri, MD In Support of Plaintiffs' Order to Show Cause for a Temporary Restraining
Order and Motion for Preliminary Injunction. *Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J.
Jan. 30, 2025), ECF No. 4-11.

[2]      Declaration of Todd Clark, MBA, MS In Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief. *Novartis AG v.
Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Feb. 6, 2025), ECF No. 13-40.

[3]      Declaration of Hossein Ardehali, M.D., PH.D. In Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief.
*Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Feb. 6, 2025), ECF No. 13-49.

reductions in <u>medication errors</u>, <u>increased therapeutic adherence</u>, and <u>maintenance of the placebo effect</u>."[4]

        i)      With respect to <u>medication errors</u>, Mr. Clark asserts that color-coding has been adopted to improve patient safety in the context of asthma inhalers and anesthetic drugs (which are used in the high-pressure, fast-moving environments of intensive care and surgical wards), as well as for ocular medications (which patients had difficulty distinguishing).[5] He also notes that some countries have adopted color coding for short, intermediate, and long-acting insulin, confusion of which can lead to serious adverse events.[6]

        ii)     With respect to <u>adherence</u>, Mr. Clark opines that "clinically important adherence behaviors are boosted when generic pharmaceuticals and RLDs have similar physical attributes."[7] He specifically points to studies showing a 53% increase in adherence failure in seizure patients following a change in color, and a 58% increase in discontinuation of the prescribed therapy for heart attack patients following a change in shape or color.[8]

        iii)    With respect to the <u>placebo effect</u>, Mr. Clark opines that the physical attributes of a drug "play a role in the psychologically mediated but physiologically measurable placebo effect," and that "[r]esearch suggests that the placebo effect is related to a conditioned response and, therefore, it may be more vulnerable to disruption where patients have become accustomed to a drug's physical appearance over time."[9] Mr. Clark points to examples of colors that he asserts have specific placebo effects, including "red or pink in liquid medicines," which 'ha[ve] been shown to enhance the placebo-driven suppression of gastric acid," blues which "tend to have a

---

[4]    Clark Declaration ¶ 50.

[5]    Clark Declaration ¶¶ 51–52.

[6]    Clark Declaration ¶ 53.

[7]    Clark Declaration ¶ 55.

[8]    Clark Declaration ¶ 55.

[9]    Clark Declaration ¶ 17.

3

sedative effect," yellows which "are associated with relief of depression," and greens which are associated "with relief of anxiety."[10]

b)    Mr. Clark opines that problems with dosing Entresto are "very unlikely to occur."[11] He asserts that, "[i]f MSN's generic can be safely prescribed without reference to the titration labeling, it necessarily follows that its branded therapeutic equivalent Entresto can as well."[12]

c)    In addition, Mr. Clark opines that "any alleged 'loss of patient autonomy' prioritizes the needs of the less than 5% of patients who choose to remain on brand drugs over the 95% who switch to generics. Thus, the benefits offered by continuity of appearance between Entresto and the MSN generic far outweigh any hypothetical downsides. And . . . switching to a therapeutically equivalent generic has no medical significance."[13]

5.    Based on my review of the Ardehali Declaration:

a)    Dr. Ardehali opines that "it is not realistic to believe that any healthcare professionals (HCPs) could inadvertently confuse drugs and prescribe the wrong medication based on the drugs' 'appearance or confusingly similar manufacturer names.'"[14] In making prescribing decisions, "HCPs may consult online resources such as Medscape," but "those searches are mostly designed to learn about the drug, the dosage of the drug and its potential side effects."[15] Dr. Ardehali also asserts that "HCPs rarely use [] search engines to look for the appearance of drugs because it does not influence

---

[10]   Clark Declaration ¶ 57.

[11]   Clark Declaration ¶ 19; *see also id.* at ¶¶ 67–71.

[12]   Clark Declaration ¶ 71.

[13]   Clark Declaration ¶ 19; *see also id.* at ¶¶ 80–81.

[14]   Ardehali Declaration ¶ 26(a); *see also id.* at ¶¶ 27–30.

[15]   Ardehali Declaration ¶ 29.

4

their prescribing decisions."[16] Many HCPs will use the "chemical drug name," rather than the "brand names" to search for and prescribe medications.[17]

   b)   Dr. Ardehali opines that "[t]here is no legitimate public safety risk that patients could be harmed because a confused HCP could prescribe an incorrect dosing regimen based on Entresto's label rather than MSN's."[18] This is because "[p]hysicians who prescribe Entresto are mainly cardiologists and they are fully aware of the limitations in pharmacological treatment of heart failure patients."[19] "In patients with low blood pressure or who have not tolerated ACEis or ARBs, if [physicians] are considering a medication that reduces blood pressure, [they] either exclude them or start at a low dose and adjust as needed."[20]

   c)   In addition, Dr. Ardehali opines that "[m]any HCPs are not aware of the manufacturer of most of the drugs they prescribe. And even if they were, it would make no difference to the clinical judgment of HCPs . . . HCPs do not concern themselves with the identity of the drug products they describe. HCPs focus on the patients' diagnosis and the drugs that can be used to treat patients' conditions, and their familiarity is with the chemical drug name (e.g., sacubitril/valsartan) like those mentioned above, not the party who made the drug."[21]

   d)   He also asserts that "[t]he introduction of the generic version [of Entresto] will increase competition, resulting in lower prices and better treatment options for patients."[22]

---

[16]   Ardehali Declaration ¶ 29.

[17]   Ardehali Declaration ¶ 28.

[18]   Ardehali Declaration ¶ 26(b).

[19]   Ardehali Declaration ¶ 33.

[20]   Ardehali Declaration ¶ 34.

[21]   Ardehali Declaration ¶ 31.

[22]   Ardehali Declaration ¶ 38.

## II.     Assignment

6.     I have been asked by counsel to respond to the opinions of Mr. Clark and Dr. Ardehali summarized in Section I above, and specifically to:

          a)     Correct key misrepresentations of my opinions from the Opening Declaration;

          b)     Address Dr. Ardehali's opinions on the advantages of a new generic version of Entresto;

          c)     Respond to Mr. Clark's opinions concerning the clinical significance of similarities in appearance between a generic and brand drug, and evaluate whether Entresto and any generic version of Entresto must be nearly identical;

          d)     Respond to Dr. Ardehali's opinions concerning HCPs prescribing decisions and to both Dr. Ardehali's and Mr. Clark's opinions concerning potential patient harm; and

          e)     Assess the degree to which a manufacturer name might influence prescribing decisions for generic drugs.

7.     In reaching my opinions I have relied on my review of publicly available sources as well as case documents, and have relied on my training, experience, and education. I reserve the right to address additional issues as requested by counsel in future declarations or reports.

## III.     Summary of Conclusions

8.     Based on my expertise as a cardiologist, clinical researcher, and regular prescriber of Entresto, I have reached the following rebuttal opinions:

          a)     There are both pros and cons to generic drugs. Although generic medicines can be a more cost-effective treatment and contain the same active ingredients as their branded counterparts, they can also present higher risks of contamination, may not always result in the same clinical outcomes, and—due to the presence of different inactive ingredients—may trigger sensitivities or intolerances in some patients. Although

6

the benefits of a generic can be great, the mere existence of these potential disadvantages means that it is paramount that patients are able to distinguish between a generic and its branded counterpart and, accordingly, make an informed decision as to whether they are comfortable preceding with a generic option. In short, it is vital that patients are free of confusion so that they can exercise autonomy over their treatment in this regard.

b)   Dr. Ardehali misstates my opinion as to how HCPs might confuse Entresto and MSN's generic, when using online resources incorporating images of both drugs:

i)   I have not opined that HCPs are likely to prescribe an incorrect dosing regimen based on Entresto's label. Instead, I have opined that an HCP may inadvertently ***rely upon MSN's label*** (or the information on that label made available through an online resource like Drugs.com) ***in making prescribing decisions regarding Entresto***.

ii)   In addition, I have not opined that HCPs will make prescribing decisions based on images. Instead, my Opening Declaration explains that images that appear as search results collected from a search for the name of a drug (either the chemical name or the brand name), may confuse HCPs and lead them to linked informational pages for the wrong drug.

c)   Any suggestion that HCPs do not rely on FDA-approved prescribing information in making prescribing decisions is inaccurate. Even experienced HCPs consult labels and may—where they mistakenly refer to the MSN generic's prescribing information—fail to prescribe Entresto pursuant to the directed dosing regimen for patients naïve to or on low doses of ACEis and ARBs. Even though the FDA has approved MSN's generic, confusion between the drugs based on their nearly identical appearance, use of the Novadoz name, and reliance on the wrong label could result in incremental patient harm in the form of negative side effects that would not have occurred but for the confusion.

d)   Prescribers of Entresto (which is prescribed not only in urban, research-based hospitals but also in smaller community hospitals and clinics) are not immune to

7

confusion or error. The HCPs who make prescribing decisions are not limited to cardiologists; this group also includes physicians focused on internal medicine or family medicine, physician assistants, and nurse practitioners who may not be as familiar with the dosing regimen directed by Entresto's FDA-approved label and prescribing information and may be more prone to confusion.

e)     While HCPs prioritize factors including clinical guidelines, research on clinical efficacy, and individual patient need in making prescribing decisions, HCPs are aware of drug manufacturer names and may have increased confidence in an authorized generic released from the manufacturer of the brand drug.

f)     Patients taking Entresto are prescribed one dose at a time, as tolerated, and that dose changes only when they are prescribed a different dose in consultation with an HCP.  Patients do not take multiple doses at the same time, such that they would need to rely upon color-coding to determine which dose to take.

**A.  Patients Should Have The Opportunity To Make Informed Decisions Regarding The Pros and Cons of Generic Drugs.**

9.     It is undeniable that generic drugs can yield good results for many patients. Generic drugs are often a less expensive, yet "bioequivalent" option—which means they contain the same active ingredients and many times the generic medication "works in the same way and provides the same clinical benefit as the brand-name medicine."[23]

10.     However, generic drugs also present disadvantages. For example, generic drugs are often produced in factories in countries with cheaper labor, such as India or China. Poor conditions at factories have sometimes led to contamination of drugs, leading to recalls in the United States.[24] Although U.S.-based brand name drug manufacturers are not immune to these issues, their rates

---

[23]   Generic Drugs: Questions & Answers, FDA, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers (accessed Feb. 8, 2025).

[24]   White CM. Generic Drugs Not as Safe as FDA Wants You to Believe. Ann Pharmacother. 2020 Mar;54(3):283-286; *see also* Safeguarding Pharmaceutical Supply Chains in a Global Economy, FDA, https://www.fda.gov/news-events/congressional-testimony/safeguarding-pharmaceutical-supply-chains-global-economy-10302019 (accessed Feb. 9, 2025).

of recall are lower.[25] A fairly recent and prominent example includes the FDA recall of generic valsartan (commonly used for both heart failure and hypertension) due to the presence of N-Nitrosodiethylamine (NDEA), an impurity known to be associated with higher rates of cancer.[26] This recall demonstrates the dangers of contamination; researchers have determined the NDEA impurity was created by a change in manufacturing method in 2012 by an overseas generic manufacturer, but the impurity was not detected until 2018, when the recall was issued.[27] In addition to exposing many patients to a possible carcinogen, the recall process thereafter led to interruption of therapy for these same patients.[28]

11.     In addition, although generics are bioequivalent to their branded counterparts, they are not identical in chemical composition. Generic drugs contain different inactive ingredients to which some patients may have sensitivities or intolerances.[29]

12.     Despite Mr. Clark's assertion that less than 5% of patients choose to remain on brand drugs as opposed to generic options,[30] it is my opinion that this percentage is higher for a more important drug with life-saving potential. For reasons including possible adverse reactions to "inactive" ingredients in the generic, many patients do prefer taking brand drugs. As an example, with the introduction of generic dapagliflozin, the majority of my patients have chosen to remain on brand Farxiga, even when aware of the generic option. I personally have honored, and will continue to honor, patient requests for the brand drug.

---

[25]   Jimenez D. Generic Drug Safety:  US Regulators Struggle to Keep up with a Global Market, Pharmaceutical Technology, https://www.pharmaceutical-technology.com/features/generic-drug-safety-us-regulators-struggle-global-market/?cf-view (accessed Feb. 10, 2025).

[26]   11/21/2018: UPDATE – FDA alerts patients and health care professionals to Mylan's recall of valsartan products due to NDEA, FDA, https://www.fda.gov/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan#:~:text=Update%20%5B11/21/2018,that%20treats%20the%20same%20condition (accessed Feb. 9. 2025).

[27]   Farrukh MJ, Tariq MH, Malik O, Khan TM. Valsartan recall: global regulatory overview and future challenges. Therapeutic advances in drug safety. 2019 Jan;10:2042098618823458.

[28]   Devine JW, Tadrous M, Hernandez I, Mukhopadhyay N, Rothenberger SD, Callaway Kim K, Gellad WF, Suda KJ. Effects of the valsartan recall on heart failure patients: A nationwide analysis. Pharmacoepidemiology and Drug Safety. 2024 Apr;33(4):e5777.

[29]   Reker D, Blum SM, Steiger C, Anger KE, Sommer JM, Fanikos J, Traverso G. "Inactive" ingredients in oral medications. Sci Transl Med. 2019 Mar 13;11(483):eaau6753; Kelso JM. Potential food allergens in medications. J Allergy Clin Immunol. 2014 Jun;133(6):1509-18.; Swerlick RA, Campbell CF. Medication dyes as a source of drug allergy. J Drugs Dermatol. 2013 Jan;12(1):99-102.

[30]   Clark Declaration ¶ 19.

9

13.     In addition, I personally have purchased brand drugs (including over-the-counter drugs for pain and allergy relief) and know that many of my colleagues with similar medical training also make similar decisions, on a case-by-case basis. From an ethical perspective with regard to patient autonomy, I find it indefensible that I should maintain my right to make that decision for my own healthcare but that patients' rights should be neglected under the guise of enhancing overall patient compliance with generics so similar in appearance that they are passed off as their branded counterparts.

14.     Despite this concern, any attempts by MSN's experts to frame my opinions as an attack on generics generally is a distortion of my opinions. The key point is that generics can be good options when they are provided responsibly, in a manner that is not likely to confuse consumers and deprive them of vital autonomy over their own medical treatment.

15.     I have no objections to expanding access to sacubitril / valsartan to all patients who need it. However, I do object to a generic option that misleadingly copies the appearance of Entresto and uses the Novadoz name in a confusing manner. Access can be expanded without this misleading behavior, which infringes upon patient autonomy.

16.     In my experience and in the experience of my colleagues, Entresto has had a very competitive insurance update, and many patients are receiving it with adequate insurance coverage.

17.     I disagree with the suggestion in MSN's Opposition brief that a change in patient co-pays would necessarily cause a patient to understand that their Entresto medication had been substituted for a generic.[31] If a consumer believed they were receiving Entresto, due to the nearly identical appearance and branding of MSN's generic, they could just as easily assume other causes for any pricing change, including a change in Medicare coverage phases, the effect of price negotiations under the Inflation Reduction Act, a discount or coupon applied by their pharmacy, an update to their insurance coverage, or any number of other rationales for change in drug pricing.

---

[31]   Defs.' Mem. at 35.

**B. Mr. Clark's Assessment of Clinical Reasons For Similarities In Physical Attributes of Generics and Brand Drugs Are Either Overstated or Divorced From The Relevant Context: Treatment of Heart Failure With A Sacubitril / Valsartan Drug.**

18.     Mr. Clark identifies three primary "clinical reasons" for similarities in appearance between generic and brand drugs: (1) the <u>reduction of medical errors</u> through standardized color coding, (2) the promotion of <u>patient adherence</u> to their treatment regimens, and (3) reliance on the <u>placebo effect</u> of certain physical features. None of these rationales justifies a generic drug nearly identical in appearance to Entresto.

19.     As to the <u>reduction of medical errors</u>, Mr. Clark's examples provide contexts in which color coding has been applied—ranging from medications used in a fast-paced, emergency settings (i.e., inhalers and anesthetic drugs) to ocular medications that patients had a difficult time visually distinguishing.

20.     These examples are factually distinguishable from the context in which a patient would use a sacubitril / valsartan drug (like Entresto).

21.     Unlike the inhalers and anesthetic drugs Mr. Clark references, Entresto is a drug that I most often prescribe to patients for use outside of emergent, hospital settings.[32] Patients usually take the Entresto tablets twice a day, indefinitely under non-emergent conditions. Similarly, to the extent a patient takes Entresto while in the hospital, it is under non-emergent conditions; an HCP would generally only administer Entresto to a patient who is hemodynamically stable and with stable renal function. As a result, errors that accompany the administration of medicines in fast-paced, urgent environments are less likely in connection with the administration of Entresto and color coding is not comparably necessary here.

22.     In addition, I am not aware of any FDA-mandated requirements for color coding systems in the context of heart failure treatments, like those Mr. Clark describes for ophthalmics.

---

[32]   <u>Entresto</u>, Entresto, https://www.entresto.com/ (accessed Feb. 8, 2025) (showing patient testimonials, depicting patients who take Entresto but are carrying on with their lives).

11

23.     As to <u>patient adherence</u>, Mr. Clark fails to cite a single study that supports the proposition that a generic drug ***must be nearly identical*** in appearance to the brand drug to encourage patient adherence. While patient adherence is important, as I note in my Opening Declaration, it can be preserved in other ways—including by informing patients as to potential changes and providing clear information on the clinical efficacy of any new generic that they may receive.[33]

24.     The 2003 and 2013 studies that Mr. Clark cites on adherence[34] are not the only available literature on the issue of adherence—which is subject to debate. A 2020 study of 1000 patients on preferences for and experiences with pill appearance changes found that only 12% of patients believed a change in their pill appearance negatively impacted their compliance to some degree.[35] Of the patients studied, 82% answered that they would prefer to be notified about changes in their pill appearance, but less than half of all patients were ever notified of such changes.[36]

25.     Overall, this highlights two important ideas regarding the impact of changes in pill appearances. First, the possible impact on compliance involves a much smaller percentage of patients than identified by the citations to which Dr. Clark points. Second, patients explicitly voice their preference for transparency and disclosure—expressing a preference for notifications regarding changes in their pharmaceuticals. Unfortunately, the data illustrates that this preference is often not honored.[37] As a result, clear differences in pill appearances are vital to ensure that patients can detect a change and in turn make an informed decision as to treatment.

26.     Finally, as to the <u>placebo effect</u>, Mr. Clark's suggestion that physical features like color may have a placebo effect lacks any persuasive support in the context of heart failure treatment. In the context of heart failure treatment—as opposed to something like pain control—the notion that the color of a pill could have a placebo effect is farfetched. Heart failure is a chronic

---

[33]   Opening Declaration ¶¶ 29(e), 52–53.

[34]   Clark Declaration ¶ 55.

[35]   Barenie RE, Kesselheim AS, Gagne JJ, Lu Z, Campbell EG, Dutcher SK, Jiang W, Sarpatwari A. <u>Preferences for and experiences with pill appearance changes: national surveys of patients and pharmacists</u>. Am J Manag Care. 2020 Aug;26(8):340-347.

[36]   *Id.*

[37]   *Id.*

condition requiring treatment of the problem—not merely the symptoms. For example, in PARADIGM-HF,[38] the primary outcome of the study was a composite of death from cardiovascular causes or hospitalization for heart failure. These are clinical outcomes for which the trial design did not even entertain the need to include a placebo control group given no good medical rational to expect a placebo benefit in heart failure patients. A "placebo" effect is more likely to occur in the context of treatment of symptoms like a headache or stomachache. In my experience as a clinician, I have never heard concern from a colleague regarding the need to maintain a possible placebo effect in the treatment of heart failure.

27.     Moreover, if the intent is to maintain a "placebo" effect by deceiving a consumer into believing they are still taking a brand name drug, when in fact they are taking a nearly identically appearing generic drug, this is a violation of patient autonomy.

28.     Given that the three clinical reasons for continuity in physical appearance that Mr. Clark offers do not hold up in the context of heart failure treatment, generic sacubitril / valsartan pills do not need to be nearly identical in appearance to Entresto to be effective. As a result, Mr. Clark's assertion that a failure to maintain continuity of appearance for the sake of ensuring patient awareness of a switch between the branded drug and generic (and relatedly ensuring patient autonomy over medical treatment), is somehow prioritizing the 5% of patients who would choose to remain on a brand if given the option, does not hold up. This "either / or" approach—the suggestion that either we can prioritize patients who choose generics by offering generic drugs that look the same as branded drugs, or we can prioritize patients who choose to remain on brand drugs by offering generic products with visual differences that preserve patient autonomy—is a logical fallacy. [39] It is entirely possible to offer effective generic drugs that do not appear nearly identical to their branded counterparts.

---

[38]    *See* Opening Declaration ¶ 14 (explaining that PARADIGM-HF was a landmark trial published in the New England Journal of Medicine in 2014, involving Entresto); *see also* McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR. PARADIGM-HF Investigators and Commitees. Angiotensin-neprilsyin inhibitors versus enalapril in heart failure. N Engl J Med. 2014 Sep. 11;371(11):993-1004.

[39]    Clark Declaration ¶ 19.

13

### C.  The Manner In Which Entresto Is Prescribed Means That It Is Unnecessary For Patients To Rely On Color-Coding to Determine Which Dose They Must Take.

29.  As explained in my Opening Declaration, Entresto comes in three doses—(1) a 24/26 mg "Low Starting Dose," (2) a 49/51 mg "Recommended Starting Dose," and (3) a 97/103 mg "Target Dose".[40] The doses come in different colors and sizes.[41]

30.  Based on my experience prescribing Entresto, consultation of Entresto's FDA-approved prescribing information, and assessment of patient needs, I usually initially prescribe one of the two starting doses of Entresto (either the Low Starting Dose or Recommended Starting Dose) twice daily, as tolerated by each patient.[42] After two to four weeks, I generally check in with the patient to determine if they are tolerating their starting dose. If they are, I prescribe them a higher dose. Ultimately, some patients progress to taking the Target Dose twice a day indefinitely, while other patients remain on one of the lower doses.

31.  A patient is prescribed only one dose of Entresto at a time. If a patient is switched to a new dose, they remove any prior doses from their medication cycle.

32.  Because I only prescribe one dose of Entresto at a time, and patients only take one dose of Entresto (twice daily) at a time, patients do not need to distinguish between doses daily.

### D.  Online Resources Incorporating Both Images of The Drugs and Prescribing Information For The Drugs Could Lead To Consumer Confusion and A Resulting Mis-Dosing of Entresto.

33.  Dr. Ardehali's Declaration mischaracterizes my opinions as to how HCPs may use online resources. I have not offered the opinion that HCPs search by, or rely upon, pictures to prescribe medications to patients. Instead, it is my opinion that HCPs—particularly the younger generation of physicians that I have helped to train—search online for either the chemical or brand name of

---

[40]  Opening Declaration, ¶ 16.

[41]  Entresto Prescribing Information, Entresto, https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/entresto.pdf#page= ((accessed Feb. 10, 2024).

[42]  Safety & Dosing, Entresto, https://www.entrestohcp.com/safety-and-dosing/dosing (accessed Feb. 10, 2024).

a drug and obtain results that are a mix of both information and photographs (often with links leading to information).[43]

34.    Where images of Entresto and MSN's generic are nearly identical, an HCP could easily click on a linked photograph of MSN's generic, believing it to be Entresto ***and believing it will lead to information about Entresto***. That HCP then could consult the information on the linked page—including relevant information on dosing (which Dr. Ardehali agrees physicians look to the internet for[44])—and prescribe Entresto without the benefit of the modified dosing regimen for patients naïve to or on low doses of ACEis and ARBs that is included on Entresto's label.

35.    As explained in my Opening Declaration, when you search for the compound name of a drug on Drugs.com, its leads to search results including images from a Pill Identifier, which are comprised of a mix of images of both the generic and branded medications side-by-side.[45] Once MSN's generic is launched and informational pages on the generic are available on resources like Drugs.com alongside informational pages on Entresto, an HCP looking for prescribing information specific to Entresto could mistakenly click on the image of MSN's generic, and make prescribing decisions for Entresto based on the information on the linked pages associated with the generic drug.

### E.  Consumer Confusion Could Lead To Patient Harm.

36.    As I explained in my Opening Declaration, Entresto has been a powerful addition to the medical treatment of heart failure, with the promise of improved patient survival. This impactful drug—in spite of its clear benefits—presents risks for possible adverse events. In PARADIGM-HF,[46] the rates of symptomatic hypotension (a/k/a low blood pressure) were higher with Entresto than with Enalrapril (a standard ACEi). In my opinion, this highlights a higher risk of adverse events if there is confusion regarding the dosing of this drug compared to some of the other drugs used in the treatment of heart failure.

---

[43]    *See* Opening Declaration ¶¶ 30–35.

[44]    Ardehali Declaration ¶ 29.

[45]    Opening Declaration ¶ 35.

[46]    *See* Opening Declaration ¶ 14 (explaining that PARADIGM-HF was a landmark trial published in the New England Journal of Medicine in 2014, involving Entresto).

15

37.     This means that the possibility of negative side effects stemming from a failure to abide by Entresto's directed modified dosing regimen for patients naïve to or on low doses of ACEis and ARBs is even more pronounced. As I noted in my Opening Declaration, those potential side effects include hypotension, electrolyte imbalance, and renal injury or failure.[47]

38.     The FDA's approval of the MSN Drug does not mean these side effects are not a concern. Where a confused HCP mistakenly relies upon the MSN generic drug's label, they may prescribe Entresto at the Recommended Starting Dose, rather than the Low Starting Dose. In other words, confusion as to source caused by the appearance of the drugs (and uses of Novadoz, where the manufacturer name is present), could lead the HCP to make a prescribing choice they may not have otherwise made and to expose their patient to increased risks of side effects they may not otherwise have incurred if not for the HCP confusion.

39.     I am not challenging the FDA's approval of the MSN generic drug or otherwise suggesting it is unsafe for use. However, it is my opinion that inadvertent use of the MSN prescribing information for prescriptions of Entresto could heighten the potential for harm to patients taking Entresto. Even if MSN's generic is an FDA approved option, HCPs should be free from confusion in making prescribing decisions concerning Entresto to safely care for their patients.

### F.  Entresto Prescribers Are Not Limited To Cardiologists.

40.     Mr. Clark's assertions that Entresto prescribers are "sophisticated health professionals who have presumably experienced generic entry for previously brand-only therapies many times,"[48] and Dr. Ardehali's general finding that HCPs are too familiar with Entresto to make errors,[49] disregard the reality of who is actually prescribing Entresto.

41.     In my experience at two large tertiary care hospitals, care for heart failure patients is not restricted to cardiologists or heart failure specialists. Instead, in both an inpatient and outpatient setting, midlevel providers such as physicians' assistants and nurse practitioners, play a role in

---

[47]   Opening Declaration ¶ 17.

[48]   Clark Declaration ¶ 70.

[49]   Ardehali Declaration ¶¶ 33–34.

the care of heart failure patients and often make prescribing decisions for these patients.[50] There are also HCPs who have recently finished their medical training and may be new to this class of drug. These providers may be particularly prone to confusion and be less familiar with the intricacies of Entresto dosing.

42. I am also aware of other smaller hospitals and clinic systems without cardiology presence where the care of patients with heart failure is carried out by internal medicine or family medicine physicians who also use Entresto but may not be as familiar with the drug. Therefore, I do not believe that it is valid to state that because many cardiologists should already be familiar with this drug, the risk of confusion and improper dosing (particularly in patients naïve to ACEis and ARBs) is negligible. Mr. Clark's and Dr. Ardehali's opinions do not extend to all prescribers, especially those with less heart failure training.

43. The risks here must be taken seriously; the reality is that there are less experienced providers prescribing Entresto to an ever-growing population of patients for whom the modified dosing regimen is relevant. The expanded coverage and use of Entresto (even prior to the introduction of generics) has been shown to lead to more first-time users of Entresto without prior use of ACEis or ARBs.[51] This means the population of patients for whom the modified dosing regimen is relevant is growing. Moreover, the hypotensive effect of Entresto—which is exacerbated by starting a patient on a dose that is too high—appears to be more marked than it is in other heart failure drugs.[52] As a result, the risk of adverse events with dosing that does not adhere to the Entresto prescribing information is high.

### G. HCPs May Have Increased Confidence In An Authorized Generic Released From The Manufacturer of The Brand Drug.

44. Dr. Ardehali's opinion that an HCP's prescribing decisions would never be influenced by the impression that the brand drug manufacturer is releasing an "authorized generic" disregards

---

[50] King-Dailey K, Frazier S, Bressler S, King-Wilson J. The Role of Nurse Practitioners in the Management of Heart Failure Patients and Programs. Curr Cardiol Rep. 2022 Dec;24(12):1945-1956..

[51] Srivastava PK, Klomhaus AM, Greene SJ, et al. Angiotensin Receptor-Neprilysin Inhibitor Prescribing Patterns in Patients Hospitalized for Heart Failure. JAMA Cardiol. 2024 Dec 11. doi:10.1001/jamacardio.2024.3815.

[52] McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR; PARADIGM-HF Investigators and Committees. Angiotensin-neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

that there are actual chemical differences between a generic drug and an ***authorized*** generic drug that might make HCPs more willing to use the authorized generic (as opposed to a generic) and refrain from prescribing the brand drug only.

45.     As discussed in Section III(A) above, a normal generic drug is "bioequivalent" to the brand drug—meaning it possesses the same active ingredients but may differ as to inactive ingredients. By contrast, an authorized generic "is the exact same drug as the branded product."[53] In other words, an authorized generic is identical with respect to both active and inactive ingredients, alleviating concerns that some patients may have sensitivities to or intolerances of distinct inactive ingredients.

46.     Moreover, HCPs may be more likely to trust brands of which they are aware and that they know have experience successfully producing the brand drugs they usually prescribe. This is particularly relevant for a drug with a strong marketing force like Entresto. Many cardiologists like myself and other HCPs have received brochures and prescribing information concerning Entresto, bearing both the Entresto and Novartis trademarks.

47.     I personally have seen advertisements in different contexts—including television, online, and print advertisements—highlighting that Novartis manufactures Entresto. I am confident that many of my colleagues recognize that Novartis manufactures Entresto and that many of my colleagues are aware of the historical ties between Novartis and Sandoz.

48.     As a result, I do believe that consumer confusion stemming from uses of Novadoz—and the potential suggestion that Novartis, by nature of its historical ties with Sandoz, is releasing an authorized generic drug—is likely to impact prescribing decisions. While prescribing decisions are first and foremost driven by factors including clinical efficacy and patient need, the misimpression that Novartis is releasing an authorized generic is likely to play a role in prescribing decisions by making HCPs more comfortable with the generic option. It is also my concern that this seemingly purposeful effort to confuse HCPs jeopardizes the opportunity for an

---

[53]     FDA List of Authorized Generic Drugs, FDA, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs (accessed Feb. 9, 2025).

informed prescriber/patient discussion regarding treatment options without any clear benefit to the HCP or the patient.

I declare under penalty of perjury that the foregoing is comprised of true and correct statements of my expert opinions.

Signed this 10th day of February, 2025, in _Los Angeles, CA_:

_____

Arash Nayeri, MD

19

## Appendix A – Materials Considered

In addition to the materials listed in Appendix B of my Opening Declaration, I have considered the following materials in support of my rebuttal opinions:

### Legal Documents

Declaration of Hossein Ardehali, M.D., PH.D. In Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, *Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Feb, 6, 2025), ECF No. 13-49.

Declaration of Todd Clark, MBA, MS In Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, *Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Feb, 6, 2025), ECF No. 13-40.

Expert Declaration of Dr. Arash Nayeri, MD In Support of Plaintiffs' Order to Show Cause for a Temporary Restraining Order and Motion for Preliminary Injunction, *Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Jan. 30, 2025), ECF No. 4-11.

Opposition to Novartis's Order to Show Cause for Preliminary Injunctive Relief, *Novartis AG v. Novadoz Pharms. LLC, et al.*, Case No. 25 CV 0849 (D.N.J. Feb. 6, 2025), ECF No. 13.

### Academic Papers

Ball GP, Shah R, Wowak KD. Product competition, managerial discretion, and manufacturing recalls in the U.S. pharmaceutical industry. Journal of Operations Management. 2018 Mar 1;58:59-72.

Barenie RE, Kesselheim AS, Gagne JJ, Lu Z, Campbell EG, Dutcher SK, Jiang W, Sarpatwari A. Preferences for and experiences with pill appearance changes; national surveys patients and pharmacists. Am J Manag Care. 2020 Aug;26(8):340-347.

Devine JW, Tadrous M, Hernandez I, Mukhopadhyay N, Rothberger SD, Callaway Kim K, Gellad WF, Suda KJ. Effects of the valsartan recall on heart failure patients: A nationwide analysis. Pharmacoepidemiology and Drug Safety. 2024 Apr;33(4):e5777.

Farrukh MJ, Tariq MH, Malik O, Khan TM. Valsartan recall: global regulatory overview and future challenges. Therapeutic advances in drug safety. 2019 Jan;10:2042098618823458.

20

Kelso JM. Potential food allergens in medications. J Allergy Clin Immunol. 2014 Jun;133(6):1509-18.

King-Dailey K, Frazier S, Bressler S, King-Wilson J. The Role of Nurse Practitioners in the Management of Heart Failure Patients and Programs. Curr Cardiol Rep. 2022 Dec;24(12):1945-1956.

McMurray JJ, Packer M, Desai AS, Gong J, Lefkowitz MP, Rizkala AR, Rouleau JL, Shi VC, Solomon SD, Swedberg K, Zile MR; PARADIGM-HF Investigators and Committees. Angiotensin-neprilysin inhibition versus enalapril in heart failure. N Engl J Med. 2014 Sep 11;371(11):993-1004.

Reker D, Blum SM, Steiger C, Anger KE, Sommer JM, Fanikos J, Traverso G. "Inactive" ingredients in oral medications. Sci Transl Med. 2019 Mar 13;11(483):eaau6753.

Srivastava PK, Klomhaus AM, Greene SJ, et al. Angiotensin Receptor-Neprilysin Inhibitor Prescribing Patterns in Patients Hospitalized for Heart Failure. JAMA Cardiol. 2024 Dec 11. doi:10.1001/jamacardio.2024.3815.

Swerlick RA, Campbell CF. Medication dyes as a source of drug allergy. J Drugs Dermatol. 2013 Jan;12(1):99-102.

White CM. Generic Drugs Not as Safe as FDA Wants You to Believe. Ann Pharmacother. 2020 Mar;54(3):283-286/.

**Public Documents**

Entresto, Entresto, https://www.entresto.com/.

Entresto Prescribing Information, Entresto, https://www.entrestohcp.com/sites/entrestohcp_com/files/documents/entresto.pdf#page=.

FDA List of Authorized Generic Drugs, FDA, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs.

Generic Drugs: Questions & Answers, FDA, https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers.

Jimenez D. Generic Drug Safety:  US Regulators Struggle to Keep up with a Global Market, Pharmaceutical Technology, https://www.pharmaceutical-technology.com/features/generic-drug-safety-us-regulators-struggle-global-market/?cf-view.

Safeguarding Pharmaceutical Supply Chains in a Global Economy, FDA,
https://www.fda.gov/news-events/congressional-testimony/safeguarding-pharmaceutical-
supply-chains-global-economy-10302019.

Safety & Dosing, Entresto, https://www.entrestohcp.com/safety-and-dosing/dosing.

11/21/2018: UPDATE – FDA alerts patients and health care professionals to Mylan's recall of
valsartan products due to NDEA, FDA, https://www.fda.gov/drugs/drug-safety-and-
availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-
recalls-valsartan-
losartan#:~:text=Update%20%5B11/21/2018,that%20treats%20the%20same%20conditio
n.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Novartis AG, Novartis Pharmaceuticals Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Novadoz Pharmaceuticals LLC, MSN Pharmaceuticals Inc., MSN Laboratories Private Limited,<br><br>Defendants, | Civil Action No. 2:25-cv-00849 |

# EXPERT REBUTTAL DECLARATION OF MARK ROBBINS, PH.D., J.D.

## February 10, 2025

Case 2:24-cv-02956-CP-JRA Document 17-2 Filed 02/25 Page: 356 Date Filed: 05/28/2025 PageID: 6693

## TABLE OF CONTENTS

I.      **ASSIGNMENT** ................................................................................................ 1

II.     **REPLY OPINIONS** ....................................................................................... 1

    A.   Defendants' Experts Do Not Address My Opinions Regarding the Potential for Patients to Believe that the Novadoz Generic is Entresto or is Associated with Entresto ................................................................................................................ 1

    B.   Defendants Misconstrue My Opinions When Stating that Entresto's Appearance is Functional ......................................................................................................... 2

    C.   Defendants' Experts Fail to Focus on the Relevant Context of Patients Taking Entresto for Chronic Heart Failure ...................................................................... 3

    D.   Defendants' Experts Fail to Recognize that the FDA Does Not Encourage Generics to Copy Brand Drugs in All Aspects of Pill Appearance, and Further, They Ignore that the FDA Has Emphasized the Importance of Trade Dress Protectability for Pill Appearance ...................................................................... 4

    E.   Mr. Clark Inappropriately Dismisses the Substantial Number of Patients Whose Choice Could be Undermined by the Alleged Visual Similarities between Entresto and the Novadoz Generic ....................................................................... 7

    F.   Mr. Clark's Empirical Analysis of Generic-Brand Drug Appearance Is Flawed ............ 9

    G.   Mr. Shimer's Argument for Maintaining Color Consistency Across Strengths Is Flawed ................................................................................................................ 12

    H.   Defendants Misrepresent and Misconstrue My Opinions ............................... 16

## I.   ASSIGNMENT

1.   I have been retained by counsel for Novartis AG and Novartis Pharmaceuticals Corporation (together, "Novartis" or "Plaintiffs") in the above-captioned matter.  On January 30, 2025, I submitted an expert declaration ("Robbins Declaration").[1]   On February 6, 2025, Novadoz Pharmaceuticals LLC, MSN Pharmaceuticals Inc., and MSN Laboratories Private Limited (collectively, "Novadoz" or "Defendants") filed a Memorandum of Law in Opposition to Plaintiffs' Order to Show Cause for Preliminary Injunctive Relief, and Defendants' experts, Hossein Ardehali, M.D., Ph.D.; Todd Clark, MBA, MS; and Martin Shimer, filed declarations in opposition to Plaintiffs' Motion for Preliminary Injunctive Relief.[2]

2.   I have now been asked to review Defendants' Opposition Memorandum, the Ardehali Declaration, the Clark Declaration, and the Shimer Declaration, to rebut the opinions offered by Mr. Clark, Dr. Ardehali, and Mr. Shimer, and to rebut the arguments made by Defendants.

## II.   REPLY OPINIONS

### A.   Defendants' Experts Do Not Address My Opinions Regarding the Potential for Patients to Believe that the Novadoz Generic is Entresto or is Associated with Entresto

3.   The Robbins Declaration explained my opinion that "to the degree that the [Novadoz] generic is similar in appearance to Entresto®, and patients perceive it as such, this creates the potential for Defendants to unfairly benefit from patients' inability to distinguish the two drugs."[3]   I further explained that "a patient that has been using Entresto® may not

---

[1]   Expert Declaration of Mark Robbins, Ph.D., J.D., January 30, 2025.  I incorporate by reference my qualifications, my statement of independence, and my compensation from the Robbins Declaration.

[2]   Memorandum of Law in Opposition to Plaintiffs' Order to Show Cause for Preliminary Injunctive Relief, February 6, 2025 ("Defendants' Opposition Memorandum"); Declaration of Hossein Ardehali, M.D., Ph.D. in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, February 6, 2025 ("Ardehali Declaration"); Declaration of Todd Clark, MBA, MS in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, February 6, 2025 ("Clark Declaration"); Declaration of Martin Shimer in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, February 6, 2025 ("Shimer Declaration").

[3]   Robbins Declaration, ¶ 25.

1

realize that they have been switched to a generic product if that generic has a similar appearance, and if the manufacturer name on the bottle ('Novadoz') is perceived as similar to 'Novartis' (or if they do not pay attention to the manufacturer name on the bottle)."[4]

4.  Defendants' experts do not address these opinions. Mr. Clark instead offers the opinion that such confusion would not be harmful to patients because it has "no medical significance."[5] Dr. Ardehali focuses on the behavior of healthcare professionals and the benefits of generic availability.[6] Mr. Shimer also focuses on "beneficial aspects of generic drugs to the public," among other topics.[7] None of these experts address potential harm to Novartis based on the possibility of patient confusion between Entresto and the Novadoz Generic.

### B. Defendants Misconstrue My Opinions When Stating that Entresto's Appearance is Functional

5.  In support of their claim that "the colors and sizes of Entresto pills communicate crucial functional information to patients,"[8] Defendants write that "[e]ven Novartis's own experts acknowledge that patients – particularly those with chronic conditions like those treated with Entresto – 'rely on pill appearance to help identify which medication to take.'"[9] This completely misconstrues my opinions. To be clear, my use of the language "help identify which medication to take" refers to patients relying on pill appearance to know that they are taking Entresto (i.e., the medication that they have been prescribed and have been taking for chronic heart failure).[10] In other words, this relates to patients identifying that their medication continues to be from the same source that it has been from in the past, i.e., the maker of Entresto (whether patients recognize that maker as Novartis or not).

---

[4]  Robbins Declaration, ¶ 25.
[5]  Clark Declaration, Section IV.C and ¶ 19.
[6]  Ardehali Declaration, ¶ 26.
[7]  Shimer Declaration, Section IV.
[8]  Defendants' Opposition Memorandum, p. 13.
[9]  Defendants' Opposition Memorandum, p. 14, citing Robbins Declaration, ¶¶ 13-15.
[10]  Robbins Declaration, ¶¶ 13-15.

2

### C.    Defendants' Experts Fail to Focus on the Relevant Context of Patients Taking Entresto for Chronic Heart Failure

6.    As I explain in this section, Defendants' experts attempt to apply findings from the pharmaceutical industry broadly that are unlikely to be relevant to the specific context of Entresto, which is a medication for a chronic condition, taken indefinitely.[11]

7.    Mr. Clark points to other categories of medications where the FDA or another regulatory body has established color standards.[12]  For example, for ophthalmic, or drugs delivered directly to the eye, Mr. Clark writes that "the FDA has taken steps to ensure that generic pharmaceuticals comply with the color-coding system,"[13] and "caps for eye drops have also been governed by a class-based color-coding system."[14]  In the present matter the relevant context is the one Entresto faces as an oral tablet taken for a chronic condition.[15]  It is my understanding that the FDA has not implemented a color coding scheme for Entresto, and as I discuss below in **Section II.D**, the FDA does not generally require a color scheme.

8.    Mr. Clark claims to analyze whether "the color and shape of the Entresto tablet are common among U.S. pharmaceuticals," by searching on Drugs.com's Pill Identifier feature for drugs that had either the shape or color used by any strength of the Entresto pills and finding "approximately 100 prescription drugs that share one or more of Entresto's color or shape."[16]  This search is flawed first in that it ignores that the relevant perspective, in terms of whether patients use color and shape to know that they are taking Entresto, is the perspective of the patient.  The relevance to patients of a general search on Drugs.com is unclear.  Second, Mr. Clark searches *all* medications on Drugs.com, which according to promotions for the Drugs.com Pill Identifier App, include "more than 24,000 Rx/OTC medications."[17]  While Defendants and their expert Mr. Clark opine that Entresto patients take multiple pills and therefore might be exposed to similar-looking pills from other

---

[11]    Robbins Declaration, ¶¶ 13-15.
[12]    Clark Declaration, ¶¶ 16, 51.  Mr. Clark cites examples from anesthesia, ophthalmic drugs, asthma inhalers, and insulin products.
[13]    Clark Declaration, ¶ 16.
[14]    Clark Declaration, ¶ 52.
[15]    Robbins Declaration, ¶ 14.
[16]    Clark Declaration, ¶¶ 83-84.
[17]    "Pill Identifier," Drugs.com, available at: https://www.drugs.com/pill_identification.html.

categories, they have cited no evidence and provide no examples to support the understanding that this can occur to any appreciable degree.[18]

**D.      Defendants' Experts Fail to Recognize that the FDA Does Not Encourage Generics to Copy Brand Drugs in All Aspects of Pill Appearance, and Further, They Ignore that the FDA Has Emphasized the Importance of Trade Dress Protectability for Pill Appearance**

9.     Mr. Clark relies in part on the FDA guidance for the understanding that patient adherence to a medication regimen improves when there are "[s]imilarities in physical attributes between generic pharmaceuticals and [reference-listed drugs ('RLDs')]."[19] Mr. Shimer also claims that the FDA guidance acknowledges the role of a tablet or capsule's size and shape in patient adherence, stating that "[p]atient compliance or adherence to their medication regimen may also be influenced by the size and shape of a tablet or capsule."[20] The Defendants' experts' opinions, however, are overly simplified and do not take into consideration the limitations expressed in the FDA guidance, as I explain in this section.

10.    The FDA does not mandate that generics must look identical (or even nearly identical) to their brand-name counterparts.  In fact, the FDA publications, including the very guidance cited by Defendants' experts, echo this understanding.  The FDA Guidance titled "*Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules,*" which Defendants' experts rely on, does not recommend requiring a generic pill to match the brand drug in both size and shape.  Rather, it recommends that certain physical attributes, such as size and shape, are "similar," while noting other physical attributes "should be considered."[21]  Moreover, as Mr. Shimer recognized,[22] this recommendation stems from

---

[18]    Defendants' Opposition Memorandum, p. 15; Clark Declaration, Sections V.A-V.B.

[19]    Clark Declaration, p. 24.  Mr. Clark also cites the 2022 Final FDA Guidance titled *"Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules,"* which expresses concern that differences in physical characteristics, such as the size and shape of tablets or capsules, could impact patient compliance, medication acceptability, or potentially lead to medication errors. *See* Clark Declaration, p. 31.

[20]    Shimer Declaration, pp. 18-19.

[21]    *See*, e.g., "[T]he Agency recommends that generic oral tablets and capsules intended to be swallowed intact should be of a similar size to the corresponding RLD."  "Guidance for Industry: Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules (October 2022 version)," FDA, p. 4, available at https://www.fda.gov/media/161902/download. *See also*, "Guidance for Industry: Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules (June 2015 version)," FDA, p. 4, available at https://www.fda.gov/media/87344/download.  I understand that Mr. Clark and Mr. Shimer cite the October 2022 version and the June 2015 version of the guidance in their declarations, respectively.

[22]    Shimer Declaration, pp. 18-19.

4

the FDA's concern that significant changes in a generic drug's physical attributes may affect a patient's ability to swallow the medication.[23]  The guidance does not suggest that generic and brand drugs must look alike to be safe and effective.

11.   The FDA guidance also makes no recommendations regarding color.  Mr. Shimer acknowledged this in his declaration, stating that "ANDA sponsors are not required to employ the same color scheme as the RLD."[24]  An FDA report titled "Generic Drug Facts" confirms that "[generics] can look different,"[25] that "[a]llowable differences in size, shape, and color do not impact how medications work," and that "[g]eneric medicines may look different than the brand-name drugs they duplicate."[26]  Mr. Clark's own analysis is also consistent with this publication in that, notwithstanding the flaws I describe in **Section II.F** below, he finds that the majority of brand-generic drug pairs differ in at least one of the four physical attributes he examined.[27]  This further demonstrates that Novadoz could be consistent with the FDA guidance, make reasonable adjustments to the physical attributes of its generic drug, and still avoid trade dress infringement, rather than mimicking Entresto's appearance.

12.   Mr. Clark's opinions are further flawed in that they present an overly simplified understanding of the multiple considerations relevant to pill appearance regulatory decisions.  While adherence is one consideration (as noted in the Robbins Declaration), patient choice and brand drug manufacturers' intellectual property rights are also relevant considerations for regulatory bodies.[28]  For example, an FDA article titled "Generic Drugs: Questions & Answers" states that "[t]rademark laws in the United States do not allow a

---

[23]   "For comparable ease of swallowing as well as patient acceptance and compliance with treatment regimens, the Agency recommends that generic oral tablets and capsules intended to be swallowed intact should be of a similar size to the corresponding RLD" and "we recommend manufacturing tablets and capsules that have a similar shape or have a shape that has been found to be easier to swallow compared with the shape of the RLD."  "Guidance for Industry: Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules (October 2022 version)," FDA, pp. 4-5, available at https://www.fda.gov/media/161902/download.  *See also*, "Guidance for Industry: Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules (June 2015 version)," FDA, pp. 4-5, available at https://www.fda.gov/media/87344/download.

[24]   Shimer Declaration, p. 22.

[25]   "Generic Drug Facts," FDA, available at https://www.fda.gov/media/107601/download.

[26]   "Generic Drug Facts," FDA, available at https://www.fda.gov/media/107601/download.

[27]   Clark Declaration, pp. 50-51 and Exhibit 3.  Calculator: 55.9% = 100% - 44.1%.

[28]   Robbins Declaration, p. 9.  *See*, e.g., "Generic Drugs - Specific Labeling Resources," FDA, available at https://www.fda.gov/drugs/fdas-labeling-resources-human-prescription-drugs/generic-drugs-specific-labeling-resources.

5

generic drug to look exactly like other drugs already on the market."[29]  Additionally, a Comment and Response published in the *Annals of Internal Medicine*, cited in the Robbins Declaration, discusses the legal protections associated with the appearance of the brand-name drugs.[30]  In the Comment, FDA staff at the Office of Generic Drugs responded to a proposal that brand and generic drugs should look similar, by noting that "[t]he legal protections for characteristics of drug products known as 'trade dress' are extensive.  Even color can constitute a defensible trademark."[31]  They further elaborated that a regulatory requirement mandating generic drugs to match the brand-name drug's size, shape, and color could "effectively eliminate the ability to market a generic product in many cases, thus restricting or limiting patient access to more affordable medicines."[32]  These statements undermine the assertions made by Defendants' experts that the FDA supports generic drugs adopting the physical appearance of brand drugs.

13.    Further, as noted in the Robbins Declaration, and in scholarly literature, adherence is affected by a number of factors including "patient factors, providers, and routine aspects of health care delivery, such as medication burden."[33]  Mr. Clark largely ignores these other factors for adherence.

14.    In any event, it is worth noting that the FDA guidance represents, in the FDA's own words, "the Agency's current thinking on a topic," rather than a legal requirement that companies must adhere to.[34]  As also stated in the FDA's Good Guidance Practices regulation, "[g]uidance documents do not establish legally enforceable rights or responsibilities.  They do not legally bind the public or FDA."[35]  Therefore, even if the FDA guidance did

---

[29]    "Generic Drugs: Questions & Answers," FDA, available at https://www.fda.gov/drugs/frequently-asked-questions-popular-topics/generic-drugs-questions-answers.

[30]    Robbins Declaration, FN 13.

[31]    "Burden of Change in Generic Pill Appearance," *Annals of Internal Medicine, Comments and Responses,* December 2014, Vol. 161, No. 11, p. 839.

[32]    "Burden of Change in Generic Pill Appearance," *Annals of Internal Medicine, Comments and Responses,* December 2014, Vol. 161, No. 11, p. 839.

[33]    Robbins Declaration, FN 13.

[34]    According to the guidance Mr. Clark cites on size, shape, and physical attributes of generic tablets and capsules, "[t]his guidance…does not establish any rights for any person and is not binding on FDA or the public."  Rather, a company "can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations" and the "FDA's guidance documents do not establish legally enforceable responsibilities."  *See* "Guidance for Industry: Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules (October 2022 version)," FDA, p. 2, available at https://www.fda.gov/media/161902/download.

[35]    "Good Guidance Practices Regulation," FDA, pp. 2-3, available at https://www.ecfr.gov/current/title-21/chapter-I/subchapter-A/part-10/subpart-B/section-10.115.

6

recommend that generic drugs identically or nearly identically copy brand drugs in all aspects of pill appearance (which is not the case), it is unclear how such guidance could be used as justification for an allegedly illegal act (in this case, alleged trade dress infringement).  The FDA's responsibility focuses on safety and efficacy of pharmaceutical products,[36] and, as Mr. Clark recognizes in his declaration, "[t]he FDA is not specifically charged with regulating the color or shape of medicinal products."[37]

### E.    Mr. Clark Inappropriately Dismisses the Substantial Number of Patients Whose Choice Could be Undermined by the Alleged Visual Similarities between Entresto and the Novadoz Generic

15.    Mr. Clark claims that "5% of patients [] choose to remain on brand drugs [as opposed to] 95% who switch to generics,"[38] and that "more than 90%" of Entresto patients are likely to be switched to a generic.[39]  Mr. Clark's reliance on these statistics to support understanding around what portion of patients would choose to stay on Entresto (assuming they have agency to make the decision) is flawed.  The cited 5 percent statistic is drawn from a study that estimated what portion of prescriptions submitted to CVS Caremark Insurance were marked "dispense as written" for a portion of 2009.[40]  Mr. Clark fails to mention that the study reporting this statistic noted that "[s]ubstantial variation in dispense as written requests were seen by medication class," and that "[t]he odds of requesting dispense as written was 78.5% greater for specialists than generalists."[41]

16.    Further, the study Mr. Clark cites for the 5 percent aggregate percentage encompasses a broad range of medication classes, including those in which multiple generics have been available in the market for years, factors that likely contribute to higher generic adoption

---

[36]    "What We Do," FDA, available at https://www.fda.gov/about-fda/what-we-do.

[37]    Clark Declaration, p. 31.

[38]    Clark Declaration, pp. 9, 13-14 citing Shrank, W., et al., "The Consequences of Requesting 'Dispense as Written,'" *The American Journal of Medicine*, 2011, Vol. 124, No. 4, p. 310.

[39]    Clark Declaration, pp. 9, 14 citing "Generic and Biosimilar Drugs Generate $408 Billion in Savings For America's Patients and Health-Care System in 2022," Associate for Accessible Medicines, available at https://accessiblemeds.org/resources/press-releases/generic-biosimilar-drugs-generate-408-billion-savings-2022/.

[40]    Shrank, W., et al., "The Consequences of Requesting 'Dispense as Written,'" *The American Journal of Medicine*, 2011, Vol. 124, No. 4.

[41]    Shrank, W., et al., "The Consequences of Requesting 'Dispense as Written,'" *The American Journal of Medicine*, 2011, Vol. 124, No. 4.

7

and acceptance. For example, lisinopril, an antihypertensive medication[42] that represents one of the most commonly prescribed drug classes in the study sample, was approved by the FDA under the brand name Zestril on May 19, 1988.[43] The FDA later approved generic versions of lisinopril for several manufacturers as early as July 1, 2002, including Teva Pharmaceuticals, Watson Laboratories, and others.[44] Mr. Clark provides no basis to assume that the cited 5 percent aggregate percentage is predictive of the portion of Entresto patients who would elect to stay with Entresto if the Novadoz generic were to enter the marketplace as the first generic option. A study by Kesselheim et al. found that "[w]hereas evidence does not support the notion that brand-name drugs used in cardiovascular disease are superior to generic drugs, a substantial number of editorials counsel against the interchangeability of generic drugs."[45] In fact, a study examining the use of generic cardiovascular medications among elderly Medicare beneficiaries finds that the generic substitution rates for beta-blockers, thiazide diuretics, and ACE inhibitors—each of which is used to treat CHF—are 86.6 percent, 92.0 percent, and 59.0 percent, respectively. These rates are lower than the 95 percent substitution rate suggested by Mr. Clark.[46]

17.  Even if one were to accept the assumption that only 5 percent of Entresto patients would want to stay with Entresto upon the entry of the Novadoz generic, it is instructive to consider what this figure represents in terms of the number of patients. Novartis' annual report for 2023 noted that Entresto had at that point "reached more than 2 million patients in the US."[47] Five percent of that figure is over 100,000 patients, and the passage of time since 2023 points to an even larger number of patients that have benefited from Entresto.

---

[42]  "Once-Daily Zestril (Lisinopril)," Zestril.com, available at https://www.zestril.com/.

[43]  Shrank, W., et al., "The Consequences of Requesting 'Dispense as Written,'" *The American Journal of Medicine*, 2011, Vol. 124, No. 4, p. 313. *See also*, "Generic Zestril Availability," Drugs.com, available at https://www.drugs.com/availability/generic-zestril.html.

[44]  "Generic Zestril Availability," Drugs.com, available at https://www.drugs.com/availability/generic-zestril.html. *See also*, "Teva Announces Approval of Lisinopril Tablets and Lisinopril HCTZ Tablets," Tevapharm.com, available at https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2002/Teva-Announces-Approval-of-Lisinopril-Tablets-and-Lisinopril-HCTZ-Tablets/default.aspx.

[45]  Kesselheim, Aaron S., et al., "Clinical Equivalence of Generic and Brand-Name Drugs Used in Cardiovascular Disease: A Systematic Review and Meta-analysis," *JAMA*, 2008, Vol. 300, p. 2.

[46]  Federman, Alex D., et al., "Use of Generic Cardiovascular Medications by Elderly Medicare Beneficiaries Receiving Generalist or Cardiologist Care," *Medical Care*, 2007, Vol. 45, pp. 109, 111, and 114.

[47]  "Novartis Annual Report 2023," Novartis, available at https://www.novartis.com/sites/novartis_com/files/novartisannual-report-2023.pdf, p. II ("Other standout performers include Entresto, our treatment for heart failure and hypertension that has now reached more than 2 million patients in the US.").

8

Mr. Clark's view that "the benefits offered by continuity of appearance between Entresto and the MSN generic far outweigh any hypothetical downsides"[48] fails to appreciate the importance of patient awareness about changes to their medication and patient agency to determine what medication to take, which is an important benefit that I discussed in the Robbins Declaration.[49]

18. Finally, Mr. Clark's view that "any alleged 'loss of patient autonomy' prioritizes the needs of the less than 5% of patients who choose to remain on brand drugs over the 95% who switch to generics"[50] is flawed. The ideal approach is one that gives all patients the opportunity to exercise their agency, which may involve accepting the generic or, alternatively, may involve staying with the brand drug. Facilitating agency for all patients taking Entresto, including those who would ultimately choose to accept generic substitution and those who would ultimately reject generic substitution, does not require prioritizing the needs of some patients over others.

**F.      Mr. Clark's Empirical Analysis of Generic-Brand Drug Appearance Is Flawed**

19. Mr. Clark claims that "[a]n extensive study of real-world product design practices shows that generic pharmaceuticals share most of the physical attributes of their RLDs," and that "44% [of generics] were the same as the corresponding brand drug[.]"[51] To support these claims, Mr. Clark cites to a survey he conducted in 2018 that analyzed the visual appearance of 370 generic drugs and their corresponding RLDs ("generic-RLD pairs").[52] As I explain below, this analysis is flawed for several reasons.

20. First, Mr. Clark categorizes generic-RLD pairs as being the same color when the colors are different.[53] For example, Mr. Clark treats orange and peach as the same color for brand

---

[48]   Clark Declaration, p. 9.
[49]   Robbins Declaration, FN 13.
[50]   Clark Declaration, p. 9.
[51]   Clark Declaration, pp. 9-10.
[52]   Mr. Clark states in his declaration that this analysis includes 375 pairs, however, his Exhibit 3 relies on a reduced sample with 370 pairs. *See* Clark Declaration, pp. 44-45; Clark Exhibit 3 (0013-43), p. 19.
[53]   The product characteristics included in Exhibit 3.E are color, shape, score, size, and imprint code. *See* Clark Declaration, Exhibit 3.E. Note: my opinions provided in this section and throughout this declaration do not seek to identify certain characteristics as "different" or "similar" to the fact finder. I am merely responding to Defendants' experts' opinions.

9

Levaquin and Dr. Reddy's generic levofloxacin product (**Figure 1**),[54] and for brand Flomax and Zydus's generic tamsulosin hydrochloride product (**Figure 2**).[55]

**Figure 1**
**Brand Levaquin and Dr. Reddy's Generic Levofloxacin (500mg)[56]**



Levaquin (500mg)　　　　　　　Levofloxacin (500mg)

**Figure 2**
**Brand Flomax and Zydus's Generic Tamsulosin Hydrochloride (0.4mg)[57]**

 

Flomax (0.4mg)　　　　　Tamsulosin Hydrochloride (0.4mg)

21.     Second, Mr. Clark categorizes generic-RLD pairs as having the same shape when the shapes are different.  For example, Mr. Clark treats a biconvex capsule as the same shape as an oval capsule for brand Zestril and Eon's generic lisinopril (**Figure 3**),[58] and he

---

[54]　Clark Exhibit 3 (0013-43), p. 114.

[55]　Clark Exhibit 3 (0013-43), p. 137.

[56]　The RLD Levaquin color is listed as "ORANGE(PEACH)," and the Dr. Reddy's generic levofloxacin color is listed as "ORANGE."  *See* Clark Exhibit 3 (0013-43), p. 114.

[57]　The RLD Flomax color is listed as "GREEN, ORANGE," and the Zydus generic tamsulosin hydrochloride color is listed as "GREEN (GREEN), ORANGE (PEACH)."  *See* Clark Exhibit 3 (0013-43), p. 137.

[58]　Clark Exhibit 3 (0013-43), p. 189.

categorizes brand Valium and Teva's generic diazepam product as the same shape, even though Valium has a "V-shaped" carveout in the interior (**Figure 4**).[59]

**Figure 3**
**Brand Zestril and Eon's Generic Lisinopril (5mg)[60]**

 

Zestril (5mg)                     Lisinopril (5mg)

**Figure 4**
**Brand Valium and Teva's Generic Diazepam (10mg)[61]**

 

Valium (10mg)                     Diazepam (10mg)

---

[59]   "VALIUM-diazepam tablet," *DailyMed*, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=554baee5-b171-4452-a50a-41a0946f956c; "DIAZEPAM tablet," *DailyMed*, available at https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=48aa32cb-047a-414a-822e-82a5f26d8817.

[60]   The RLD Zestril shape is listed as "CAPSULE (biconvex)," and the Eon generic lisinopril shape is listed as "OVAL." Biconvex refers to a shape that is convex on both sides. Clark Exhibit 3 (0013-43), p. 189. *See* "Biconvex," Merriam-Webster.com, available at https://www.merriam-webster.com/dictionary/biconvex.

[61]   The RLD Valium shape is listed as "ROUND," and the Teva generic diazepam shape is listed as "ROUND." *See* Clark Exhibit 3 (0013-43), p. 231.

11

22.     Third, in addition to the flaws identified above, Mr. Clark assumes that there is a "size match" for pills that differ in size by 20% or less.[62]  Mr. Clark bases his assessment of size differences on the FDA recommendation that there be a maximum size difference of 20% between branded and generic drugs.[63]  However, Mr. Clark provides no support for the understanding that patients consider brand and generic pills that differ by less than 20% in size to be a "match."

23.     An additional error in Mr. Clark's sample for his analysis is the inclusion of capsule drugs, further increasing the likelihood of Mr. Clark overestimating the relevant share of similar generic-RLD pairs.  Generic-RLD pairs of tablets, such as Entresto®, are likely to be less similar in shape than capsules because tablets can be manufactured in a greater variety of shapes than capsules.

24.     As a result of the errors discussed above, Mr. Clark overestimates the share of generic drugs that share similar features with corresponding branded drugs.  For Mr. Clark's analysis to be informative about the prevalence of similarities between generic and brand drugs, he would, at least, need to properly identify common attributes.  Moreover, it is unclear what conclusions can be reached from the statistics in Mr. Clark's study because, for reasons discussed above, his sample is not representative.

### G.     Mr. Shimer's Argument for Maintaining Color Consistency Across Strengths Is Flawed

25.     Mr. Shimer claims that "[t]here are numerous examples of drug products where to visually distinguish different strengths of drug products for patients both the branded RLD and generic manufacturers utilize the same color scheme across the spectrum of strengths to enhance patient safety."[64]  While in general, I agree with Mr. Shimer's observation that

---

[62]   Clark Exhibit 3 (0013-43), p. 21; Clark Declaration, ¶ 96 ("For size, any difference of less than 20% is considered a match[.]").

[63]   Clark Declaration, ¶ 96. The FDA article that Mr. Clark cites recommends that the (1) "[i]f the RLD is less than 17 mm," then the generic should be "[n]o more than 20 percent larger than the RLD in any single dimension [and] [n]o more than 40 percent larger than the volume of the RLD," and (2) "[i]f the RLD is equal to or greater than 17 mm," then the generic should be "[n]o larger than the RLD in any single dimension [and] [n]o larger than the volume of the RLD." See Guidance for Industry: Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules. FDA June 2015, pp. 4-5. I also note that pill size can be at least partially driven by the strength of the dosage form.

[64]   Shimer Declaration, p. 23.

some manufacturers use different colors across different strengths of the same drug, this statement does not support a broader claim that generics should copy *all* physical appearance elements of their brand counterparts. Copying across all elements is neither necessary to preserve safety nor necessary to be a viable option in the marketplace, as shown by the examples I provided in the Robbins Declaration,[65] and also by the additional examples I provide below, which are specific to drugs with multiple strengths.

26.    It is instructive to consider the examples in Exhibit 2 to the Declaration of Jacquellena T. Carrero.[66] According to the Carrero Declaration, Exhibit 2 attached to that declaration lists "pills that, like Entresto, use colors functionally to indicate dosage information."[67] However, while the exhibit includes multiple examples of drugs that use different colors for different dosages, it fails to address whether these color arrays are consistent across brand and generic versions of the same drug.

27.    My review of the first three drugs listed in the Carrero Declaration's Exhibit 2 demonstrates that differences exist across brand and generic pairs.[68] For example, for the first drug in the Carrero Declaration's Exhibit 2, valsartan, brand Diovan has a distinct color from Solco Healthcare's generic valsartan product for each of the three doses (See **Figure 5**). **Exhibit 1** to the present declaration demonstrates that this is the case for each of the first three drugs in the Carrero Declaration's Exhibit 2.

---

[65]    Robbins Declaration, ¶¶ 23-24.
[66]    Declaration of Jacquellena T. Carrero in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, February 6, 2025 ("Carrero Declaration"), Exhibit 2.
[67]    Carrero Declaration, ¶ 5.
[68]    I did not conduct an exhaustive analysis of Carrero Declaration's Exhibit 2, as the first three rows were more than sufficient to establish the point that generics need not copy the color arrays of their branded counterpart drug for multiple dosage strengths.

**Figure 5**
**Brand Diovan and Solco Healthcare's Generic Valsartan (different doses)[69]**

| Dose | Diovan<br>Novartis | Valsartan<br>Solco Healthcare |
|---|---|---|
| 80mg |  |  |
| 160mg |  |  |
| 320mg |  |  |

28. Unlike the Carrero Declaration's Exhibit 2, Mr. Shimer's report does provide a comparison between a branded drug with multiple dosage strengths, Synthroid, and some generic levothyroxine products.[70] However, Mr. Shimer's comparison fails to address the fact that, as I explained in the Robbins Declaration,[71] other levothyroxine products do *not* copy the appearance of Synthroid across its dosage strengths.

29. **Figure 6** below illustrates this point by comparing three different Synthroid doses with generic levothyroxine products from Mylan and Provell. Mylan's generic levothyrozine product retains Synthroid's color scheme but changes the pill's shape (as I explained in the

---

[69]   *See* Carrero Declaration Exhibit 2; "NVR DV Pill- red egg-shape,10 mm," Drugs.com, available at https://www.drugs.com/imprints/nvr-dv-8166.html; "NVR DX Pill – orange egg-shape,13 mm," Drugs.com, available at https://www.drugs.com/imprints/nvr-dx-8167.html; "NVR DXL Pill – purple egg-shape, 16mm," Drugs.com, available at https://www.drugs.com/imprints/nvr-dxl-1199.html. The 80mg Diovan color is listed on Drugs.com – the source used in the Carrero Declaration – as "Red," while the 80mg Solco Healthcare valsartan product is listed as "Brown;" the 160mg Diovan color is listed on Drugs.com as "Orange," while the 160mg Solco Healthcare valsartan product is listed as "Yellow;" and the 320mg Diovan color is listed on Drugs.com as "Purple," while the 320mg Solco Healthcare valsartan product is listed as "Brown."

[70]   Shimer Declaration, ¶¶ 50-51. Synthroid is a narrow therapeutic index ("NTI") drug. *See* "Important Update toe the Prescribing Information for SYNTHROID® (levothyrozine sodium) tablets, for oral use," Synthroid, available at: https://www.synthroid.com/content/dam/synthroid/pdf-documents/consumer_lch_source_document.pdf.

[71]   Robbins Declaration, ¶ 23, and Figure 9.

14

Robbins Declaration),[72] whereas Provell's generic maintains the same shape as Synthroid, but all doses are white in color. **Exhibit 2** to the present declaration expands this example to all doses of Synthroid, demonstrating (i) that generics do not need to copy the brand drug's appearance across dosage strengths to have a viable presence in the marketplace, and (ii) that varying colors between doses from the same manufacturer is not a requirement either.

**Figure 6**
**Brand Synthroid and Generic Levothyroxine from Mylan and Provell (different doses)[73]**

| Dose | Synthroid Abbot Laboratories | Levothryoxine Mylan | Levothryoxine Provell |
|---|---|---|---|
| 0.025mg |  |  |  |
| 0.05mg |  |  |  |
| 0.075mg |  |  |  |

30.    Mr. Shimer notes study findings that "generally suggest that patients will have greater confidence in taking a generic product when it is similar in appearance to the branded RLD."[74]  By this statement, Mr. Shimer fails to consider that such "greater confidence" may well be driven by patient belief that the similar-looking generic is in fact the brand

---

[72]    Robbins Declaration, ¶ 23, and Figure 9.
[73]    *See* Carrero Declaration Exhibit 3. "M L 4 Pill – orange capsule/oblong, 9mm," Drugs.com, available at https://www.drugs.com/imprints/m-l-4-7221.html; "M L 5 Pill – white capsule/oblong, 9mm," Drugs.com, available at https://www.drugs.com/imprints/m-l-5-7222.html; "M L 6 Pill – purple capsule/oblong, 9 mm," Drugs.com, available at https://www.drugs.com/imprints/m-l-6-7223.html; "EM 25 Pill – white round, 7mm," Drugs.com, available at https://www.drugs.com/imprints/em-25-29644.html; "EM 50 Pill – white round, 7mm," Drugs.com, available at https://www.drugs.com/imprints/em-50-29645.html; m 75 Pill – white round, 7mm," Drugs.com, available at https://www.drugs.com/imprints/em-75-29646.html.
[74]    Shimer Declaration, ¶ 42.

drug, or is associated with the brand drug, as explained in the Robbins Declaration.[75]  Both similar-looking and unsimilar-looking generics are FDA-approved, so objective safety and efficacy considerations cannot explain Mr. Shimer's "greater confidence" interpretation.[76]

31.     Mr. Shimer also states that "[w]ith identical physical dimensions, a difference in color or some other attribute … helps to ensure that patients are able to distinguish between different doses" of Entresto.[77]  By the very same logic, visual differences can help patients distinguish between brand and generic drugs when substitution has occurred, and conversely, the absence of visual differences may result in patients failing to distinguish between the brand and generic when substitution has occurred, as I explained in the Robbins Declaration.[78]

### H.      Defendants Misrepresent and Misconstrue My Opinions

32.     Defendants' Opposition Memorandum misinterprets and misrepresents multiple of my opinions in the Robbins Declaration. For example:

- Defendants state that "[t]he ovaloid shapes that Novartis and MSN (and other generic manufacturers) chose for their tablets are functional because they make pills easier to (1) manufacture and (2) swallow… The availability of thousands of ovaloid pills on the market confirms the usefulness of that shape… Novartis's own expert acknowledges that ovals and capsules are common, functional pill shapes rather than purely ornamental source signifiers," citing the Robbins Declaration.[79]  Again, Defendants' Opposition Memorandum misconstrues my opinions. Nowhere in the cited paragraph of the Robbins Declaration do I claim that an oval pill shape, or any pill shape, is functional (which I understand is a legal determination to be made by the fact-finder).[80]  The Robbins Declaration cited 12

---

[75]   Robbins Declaration, Section III.
[76]   Mr. Shimer discusses ease of pill swallowing in paragraphs 40 and 41 of his declaration, but couches his "greater confidence" interpretation in the broad language "similar in appearance" with no explicit mention of ease of swallowing.  In any event, ensuring ease of swallowing does not require similarity in all pill appearance attributes.
[77]   Shimer Declaration, ¶ 46.
[78]   Robbins Declaration, Section III.
[79]   Defendants' Opposition Memorandum, pp. 15-16, citing Robbins Declaration, ¶ 12. Defendants also state that "Novartis' own expert cites Entresto's basic ovaloid shape as one of twelve 'common tablet shapes,'" citing the Robbins Declaration. *See* Defendants' Opposition Memorandum, p. 17, citing Robbins Declaration, ¶ 12.
[80]   Robbins Declaration, ¶ 12.

16

"common" tablet shapes,[81] and provided numerous examples of pills with various shapes including diamond, oval, round with a "V" interior space, round, and rectangular in Figures 4-9.[82]  Further, Defendants' reference to "ovals" disregards that there are many variations on what it means to be "oval."  The Carrero Declaration Exhibit 1 lists a number of pills that are "oval/oblong," but which vary in shape, demonstrating variation within the broader "oval" category and opportunity for one "oval" pill to be distinct from another.[83]  Pills Ms. Carrero has identified as "oval/oblong" are shown below in **Figure 7**:

**Figure 7**
**"Oval/Oblong" Pills in Carrero Declaration, Exhibit 1[84]**

  

Entresto                Valsartan                Estradiol

- Defendants claim that "[e]ven Novartis's paid expert does not purport to opine that relevant patients actually have come to associate the alleged trade dress exclusively with Novartis and instead merely speculates about how pill shapes in advertising could be perceived as a visual cue for Entresto," citing the Robbins Declaration.[85] To be clear, my assignment for the Robbins Declaration did not include an analysis of the alleged trade dress or an empirical analysis of what patients think of it.[86] As I wrote in the Robbins Declaration, "[i]mages of pill design can reinforce that visual cues like shape and color are intended by the manufacturer to serve as a reference point for patients to identify the particular medication they are prescribed, e.g.,

---

81    Robbins Declaration, ¶ 12, Figure 1.
82    Robbins Declaration, Figures 4-9.
83    Carrero Declaration, Exhibit 1.
84    Carrero Declaration, Exhibit 1.
85    Defendants' Opposition Memorandum, p. 20, citing Robbins Declaration, ¶ 17.
86    Similarly, Defendants' other experts do not opine on or empirically analyze what patients think of the alleged trade dress.

17

Entresto"[87] and "[d]rug appearance may be especially important for patients with chronic conditions, such as patients with chronic heart failure that may be prescribed Entresto®, because (i) intuitively, a patient taking the same prescribed medication (e.g., Entresto®) repeatedly over a longer period will have a greater familiarity with the appearance of that medication than with a pill they take for a short period, all else equal; and (ii) patients with chronic conditions are more likely to take multiple medications relative to other patients."[88]  Thus, while Defendants focus on familiarity with pill appearance from advertising, they neglect that the Robbins Declaration also discussed familiarity arising from the patient's experience of taking Entresto repeatedly for a chronic condition and "rely[ing], at least in part, on pill appearance to ensure that they are taking the particular medication they have been prescribed (e.g., Entresto®)."[89]

[SIGNATURE ON NEXT PAGE]

---

[87]  Robbins Declaration, ¶ 17.
[88]  Robbins Declaration, ¶ 14.
[89]  Robbins Declaration, ¶ 14.

18

33.　I declare under penalty of perjury that the foregoing is comprised of true and correct statements of my expert opinions.

34.　Signed this 10th day of February, 2025.

Mark Robbins, Ph.D., J.D.

**Exhibit 1**

| Name | Labeler/Supplier | Dose | Image | Brand Name | Labeler/Supplier | Dose | Image | Source | Description |
|------|------------------|------|-------|------------|------------------|------|-------|--------|-------------|
| **Valsartan** | Solco Healthcare US, LLC | 80 mg | | **Diovan** | Novartis Pharmaceuticals | 80 mg | | https://www.drugs.com/imprints/nvr-dv-8166.html | Different color scheme across dosages and different shape. |
| | | 160 mg | | | | 160 mg | | https://www.drugs.com/imprints/nvr-dx-8167.html | |
| | | 320 mg | | | | 320 mg | | https://www.drugs.com/imprints/nvr-dxl-1199.html | |
| **Sertraline** | Cipla USA, Inc. | 25 mg | | **Zoloft** | Pfizer Inc. | 25 mg | | https://www.drugs.com/imprints/zoloft-25-mg-450.html | Similar color scheme across dosages, different shape. |
| | | 50 mg | | | | 50 mg | | https://www.drugs.com/imprints/zoloft-50-mg-448.html | |
| | | 100 mg | | | | 100 mg | | https://www.drugs.com/imprints/zoloft-100-mg-449.html | |
| **Clonazepam** | Qualitest Pharmaceuticals, Inc. | 0.5 mg | | **Klonopin** | Roche Laboratories | 0.5 mg | | https://www.drugs.com/imprints/k-roche-1-2-k-klonopin-290.html | Different color scheme for some dosages, similar shape but with distinctive "K" cutout. |
| | | 1 mg | | | | 1 mg | | https://www.drugs.com/imprints/k-roche-1-k-klonopin-289.html | |
| | | 2 mg | | | | 2 mg | | https://www.drugs.com/imprints/k-roche-2-k-klonopin-7041.html | |

**Notes and Sources:**

[A] Images for generic drugs are sourced directly from Exhibit 2 of the Carrero Declaration. I do not intend for this analysis to be exhaustive and study the first three entries in the Exhibit.

[B] I find the brand drug for each generic drug listed in Exhibit 2 of the Carrero Declaration via Drugs@FDA.

[C] I source all images for brand drugs via drugs.com, at the links in the 'Source' column.

**Exhibit 2**

| Brand Name | Labeler/Supplier | Dose | Image | Source | Generic Name | Labeler/Supplier | Dose | Image | Source | Generic Name | Labeler/Supplier | Dose | Image | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0.025 mg |  | https://www.drugs.com/imprints/synthroid-25-7430.html | | | 0.025 mg |  | https://www.drugs.com/imprints/m-l-4-7221.html | | | 0.025 mg |  | https://www.drugs.com/imprints/em-25-29644.html |
| | | 0.05 mg | | https://www.drugs.com/imprints/synthroid-50-7431.html | | | 0.05 mg | | https://www.drugs.com/imprints/m-l-5-7222.html | | | 0.05 mg | | https://www.drugs.com/imprints/em-50-29645.html |
| | | 0.075 mg | | https://www.drugs.com/imprints/synthroid-75-7432.html | | | 0.075 mg | | https://www.drugs.com/imprints/m-l-6-7223.html | | | 0.075 mg | | https://www.drugs.com/imprints/em-75-29646.html |
| | | 0.088 mg | | https://www.drugs.com/imprints/synthroid-88-7433.html | | | 0.088 mg | | https://www.drugs.com/imprints/m-l-7-7224.html | | | 0.088 mg | | https://www.drugs.com/imprints/em-88-29647.html |
| | | 0.1 mg | | https://www.drugs.com/imprints/synthroid-100-7434.html | | | 0.1 mg | | https://www.drugs.com/imprints/m-l-8-7225.html | | | 0.1 mg | | https://www.drugs.com/imprints/em-100-29648.html |
| | | 0.112 mg | | https://www.drugs.com/imprints/synthroid-112-7440.html | | | 0.112 mg | | https://www.drugs.com/imprints/m-l-9-7226.html | | | 0.112 mg | | https://www.drugs.com/imprints/em-112-29649.html |
| Synthroid | Abbott Laboratories | 0.125 mg | | https://www.drugs.com/imprints/synthroid-125-7435.html | Levothyroxine Sodium | Mylan Pharmaceuticals | 0.125 mg | | https://www.drugs.com/imprints/m-l-10-7227.html | Levothyroxine Sodium | Provell Pharmaceuticals, LLC | 0.125 mg | | https://www.drugs.com/imprints/em-125-29650.html |
| | | 0.137 mg | | https://www.drugs.com/imprints/synthroid-137-7429.html | | | 0.137 mg | | https://www.drugs.com/imprints/m-l-15-16350.html | | | 0.137 mg | | https://www.drugs.com/imprints/em-137-29651.html |
| | | 0.15 mg | | https://www.drugs.com/imprints/synthroid-150-7436.html | | | 0.15 mg | | https://www.drugs.com/imprints/m-l-11-7228.html | | | 0.15 mg | | https://www.drugs.com/imprints/em-150-29652.html |
| | | 0.175 mg | | https://www.drugs.com/imprints/synthroid-175-7437.html | | | 0.175 mg | | https://www.drugs.com/imprints/m-l-12-7229.html | | | 0.175 mg | | https://www.drugs.com/imprints/em-175-29653.html |
| | | 0.2 mg | | https://www.drugs.com/imprints/synthroid-200-7438.html | | | 0.2 mg | | https://www.drugs.com/imprints/m-l-13-7230.html | | | 0.2 mg | | https://www.drugs.com/imprints/em-200-29654.html |
| | | 0.3 mg | | https://www.drugs.com/imprints/synthroid-300-7439.html | | | 0.3 mg | | https://www.drugs.com/imprints/m-l-14-7231.html | | | | | |

**Notes and Sources:**
[A] I find two generic drugs for Synthroid. I do not intend for this analysis to be exhaustive as there are several generic drugs available for Synthroid.
[B] I source all images for brand drugs via drugs.com, at the links in the 'Source' column.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Entresto (Sacubitril/Valsartan) Patent Litigation | C.A. No. 20-2930-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MSN PHARMACEUTICALS INC., MSN LABORATORIES PRIVATE LIMITED, MSN LIFE SCIENCES PRIVATE LIMITED, <br><br> Defendants. | C.A. No. 19-2053-RGA |

## FINAL JUDGMENT

**WHEREAS** Plaintiff Novartis Pharmaceuticals Corporation ("Novartis") in the above-captioned suit has asserted that Defendants MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences Private Limited (collectively "MSN") infringed claims 1-4 of Novartis's U.S. Patent No. 8,101,659 ("'659 Patent") ("Asserted Claims of the '659 Patent") by filing Abbreviated New Drug Application ("ANDA") No. 213748;

**WHEREAS** Novartis has asserted that MSN's generic sacubitril/valsartan products as described in MSN's ANDA No. 213748 ("MSN's ANDA Products") infringe the Asserted Claims of the '659 Patent;

**WHEREAS** the Court on July 21, 2023 entered final judgment that the Asserted Claims of the '659 Patent were infringed and were not invalid for non-enablement or obviousness, but were invalid for lack of written description (20-md-2930, D.I. 1120);

1

WHEREAS Novartis appealed the Court's July 21, 2023 final judgment to the Federal

Circuit in Appeal Nos. 23-2218 and 23-2221 (consolidated under Appeal No. 23-2218);

WHEREAS the Federal Circuit on January 10, 2025 issued an opinion and judgment in

Novartis's favor (Appeal No. 23-2218, D.I. 106, 107) affirming the Court's holdings that the

Asserted Claims of the '659 Patent were not invalid for non-enablement or obviousness, and

reversing the Court's finding that the Asserted Claims were invalid for lack of written

description, and the Federal Circuit has now issued the mandate in Appeal No. 23-2218;

WHEREAS the '659 Patent expired on January 15, 2025, but Novartis has been awarded

under 21 U.S.C. § 355a(c) an additional marketing exclusivity period of six months after the date

the patent expires and MSN's ANDA is subject to that pediatric exclusivity;

**IT IS HEREBY ORDERED, DECREED, AND ADJUDGED:**

1.   Judgment is entered in Novartis's favor that MSN's filing of ANDA No. 213748,

     including any amendments or supplements thereto, infringed the Asserted Claims

     of the '659 Patent under 35 U.S.C. § 271(e)(2).

2.   Judgment is entered in Novartis's favor that any use, sale, offer for sale,

     manufacture, and/or importation into the United States of MSN's ANDA Products

     during the '659 Patent's term would infringe the Asserted Claims of the '659

     Patent.

3.   Judgment is entered in Novartis's favor and against Defendants MSN

     Pharmaceuticals Inc., MSN Laboratories Private Limited, and MSN Life Sciences

     Private Limited that claims 1-4 of the '659 Patent were not proven to be invalid.

4.   Defendants MSN Pharmaceuticals Inc., MSN Laboratories Private Limited, and

     MSN Life Sciences Private Limited, and their affiliates, subsidiaries, and each of

2

their officers, agents, servants and employees and those acting in privity or in concert with one or more of the MSN Defendants, are enjoined from commercial marketing and sale of MSN's ANDA Products until FDA resets the effective approval date of MSN's ANDA No. 213748 to no earlier than July 16, 2025, the date after the expiration of pediatric exclusivity awarded to Novartis pursuant to 21 U.S.C. § 355a.  This injunction shall be effective immediately.

5.      In accordance with 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of MSN's ANDA No. 213748 shall be no earlier than July 16, 2025, the date after the expiration of pediatric exclusivity awarded to Novartis pursuant to 21 U.S.C. § 355a.

6.      This Court shall retain jurisdiction to resolve any remaining disputes arising from this case or out of this final judgment.

7.      Each party shall bear its own costs and attorney fees.


/s/ Richard G. Andrews
UNITED STATES DISTRICT JUDGE

3

Add344

**CERTIFICATE OF COMPLIANCE AND BAR MEMBERSHIP**

The foregoing filing complies with the relevant type-volume, typeface, and type style requirements of the Federal Rules of Appellate Procedure because it has been prepared using a proportionally spaced typeface, including serifs, in 14-point Times New Roman font using Microsoft Word and includes 5,197 words, excluding the parts exempted by the Rules.

Pursuant to Local Appellate Rules 28.3(d) and 46.1(e), I hereby certify that I am an active member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated:  May 28, 2025                           /s/ Deanne E. Maynard
                                                              Deanne E. Maynard

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system on May 28, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  May 28, 2025

_____/s/ Deanne E. Maynard_____
Deanne E. Maynard

sf-6683075